**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE INTERCEPT MEDIA, INC., *and* <br><br> FREEDOM OF THE PRESS FOUNDATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States*, <br><br> NATALIE J. HARP, *in her official capacity as Executive Assistant to the President of the United States*, <br><br> DANIEL SCAVINO, *in his official capacity as White House Deputy Chief of Staff and Director of the White House Personnel Office*, <br><br> EXECUTIVE OFFICE OF THE PRESIDENT, *and* <br><br> WHITE HOUSE OFFICE, <br><br> *Defendants*. | Civil Action No. 1:26-cv-6867 |

**<u>COMPLAINT</u>**

1. President Donald Trump is charging $100,000 per month for advance access to his official government announcements on Truth Social, the social media platform he owns. This scheme is extraordinary, corrupt, and unconstitutional, and Plaintiffs bring this case to stop it.

2. President Trump created Truth Social in 2021 and remains its parent company's largest shareholder. With the help of the other defendants in this case, President Trump frequently—and exclusively—posts official government announcements on Truth Social,

declaring military attacks and subsequent ceasefires, hiring (and firing) agency heads, and announcing major domestic policies.

3.      Last month, Truth Social's parent company announced an astounding scheme. Starting August 1, 2026, Truth Social would charge up to $100,000 per month for users to get early access to "market-moving" messages from the President and other officials on the platform. At the same time, its CEO announced that the company would take steps to prevent users from systematically gathering (or "scraping") posts from the platform. The scheme is now live, and paying customers are already gaining advance access to official government announcements.

4.      This scheme is profoundly corrupt. The President stands to gain financially by giving "market-moving" government information to those who are willing and able to pay his personal company.

5.      This scheme is also unconstitutional. The First Amendment guarantees equal access to the President's public announcements, and even content-neutral burdens on that access must be narrowly tailored to serve a significant government interest. There is no legitimate interest, let alone a significant one, in permitting President Trump to profit from selling government information. Similarly, the Fifth Amendment prohibits charging unreasonable sums that cannot be justified to offset the cost of the government benefit, and granting preferential access to crucial government information for arbitrary and irrational reasons, as is the case here.

6.      Plaintiffs are harmed by the President's illegal scheme. The Intercept Media, Inc. is an award-winning nonprofit investigative news organization that frequently covers the President's posts. Freedom of the Press Foundation is a nonprofit organization that supports public interest journalism and operates the "Trump Anti-Press Social Media Tracker" database, which aggregates and categorizes the President's Truth Social posts attacking the media. Both face

indefinitely delayed access to the President's latest posts, and face permanent bars to the President's archived posts, making it harder for both organizations to do their jobs.

7.    The Constitution guarantees that public officials "can themselves have no pecuniary interest or proprietorship, as against the public at large, in the fruits of their [official] labors." *Banks v. Manchester*, 128 U.S. 244, 253 (1888). The President is profiting by selling government information. That is illegal. Plaintiffs bring this case to stop it.

## PARTIES

8.    **Plaintiff The Intercept Media, Inc. ("The Intercept")** is a news organization dedicated to holding the powerful accountable through fearless, adversarial journalism. The Intercept has won awards for its reporting on U.S. drone programs, criminal behavior in a major metropolitan police department, and toxic Teflon chemicals, among other work. In its journalism, The Intercept frequently reports on statements made by President Trump on Truth Social. The Intercept is a Delaware corporation headquartered in New York, New York.

9.    **Plaintiff Freedom of the Press Foundation ("FPF")** is a non-profit dedicated to defending a free press by building communications tools for news organizations, training journalists on personal safety, and monitoring press freedom violations in the United States. FPF maintains a public database of social media posts by Donald Trump attacking the press. In recent years, these posts have overwhelmingly come from Truth Social. FPF is a California corporation headquartered in New York, New York.

10.    **Defendant Donald J. Trump** is the current President of the United States and is sued in his official capacity. In 2021, President Trump created Trump Media & Technology Group ("Trump Media" or "TMTG"), which owns and operates Truth Social. President Trump owns the largest stake in Trump Media through The Donald J. Trump Revocable Trust, of which President Trump is the sole beneficiary and which holds approximately 41.43% of Trump Media's shares,

3

which collectively are worth more than $1 billion. President Trump operates a social media account on Truth Social (@realDonaldTrump), which currently has approximately 13 million followers. Since returning to office, President Trump has used his Truth Social account daily, announcing public policy, foreign policy, and issuing military directives.

11. **Defendant Natalie J. Harp** is an Executive Assistant to President Trump and is sued in her official capacity. Along with Defendant Scavino, Harp is one of two aides to the President who have access to his Truth Social account, and she regularly publishes President Trump's Truth Social posts on his behalf. Reports indicate that Harp is the primary White House staffer helping President Trump post on his Truth Social account. President Trump reportedly approves the content of his posts via physically printed-out drafts, at which point Harp goes onto the President's Truth Social account and posts for the President.

12. **Defendant Daniel Scavino** is the Deputy Chief of Staff to President Trump and Director of the White House Personnel Office and is sued in his official capacity. Along with Defendant Harp, Scavino is one of two aides to the President who have access to his Truth Social account, and he regularly publishes President Trump's Truth Social posts on his behalf. Scavino's 2025 public financial disclosure report shows he worked as a "Social Media Consultant" for Trump Media between 2021 and 2025, and that he received between $1 and $5 million in income and assets from Trump Media. Scavino subsequently reported selling an interest in Trump Media valued between $1 and $5 million in April 2025.

13. **Defendant Executive Office of the President ("EOP")** is a federal entity headquartered in Washington, D.C. Defendants Harp and Scavino are employed within the EOP.

14. **Defendant White House Office** is a component of the EOP headquartered in Washington, D.C. Defendants Harp and Scavino are employed within the White House Office.

**JURISDICTION AND VENUE**

15.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the United States Constitution.

16.    This Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02.

17.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1), because this action seeks relief against officers and agencies of the United States, Plaintiff The Intercept resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred here.

**FACTUAL ALLEGATIONS**

**A.    President Trump Launches Truth Social**

18.    President Trump created Truth Social to be a social media platform over which he could exercise complete control.

19.    On February 8, 2021, President Trump partnered with two former contestants on *The Apprentice* to launch Trump Media & Technology Group. President Trump acquired a 90% stake in the company.

20.    On October 20, 2021, a special-purpose acquisition company, Digital World Acquisition Corp., announced a merger with Trump Media. President Trump was named Chairman of the Board of Trump Media and received 78.8 million shares in the reconstituted company (roughly 57.6% of the company's total outstanding stock). Pursuant to the merger agreement, President Trump received an additional 36 million earnout shares a month later, bringing his total shares to nearly 115 million.

21.    On February 20, 2022, Trump Media launched Truth Social for users to join and made the Truth Social mobile application available for public download. President Trump began

using Truth Social as his primary social media account on April 28, 2022, using the account @realDonaldTrump.

22.    At launch and now, Truth Social closely resembles the social media platform Twitter (now X), which was once President Trump's preferred social media platform. Users sign up for a Truth Social account by confirming that they are over the age of 18, providing a phone number, and agreeing to Truth Social's terms of service and privacy policy. Users may then create a "handle"—a user account—and publish posts with images, videos, and up to 3,000 characters of text. Users may follow other users, as well as respond to, like, reshare, and bookmark others' posts. Truth Social's homepage features a feed of content posted by those accounts a user follows.

23.    Truth Social earns money by selling ads on its platform, and the more users it has, the more advertisers—and money—it gains. As the original prospectus for Trump Media's initial public offering explained, the number of users on Truth Social motivates advertisers to spend money there, while "a decline in the number of users" on the platform would lead advertisers to "reduce their spending with TMTG—which would harm TMTG's business and operating results."

24.    Truth Social also depends heavily on its association with President Trump and his use of the platform. Securities filings by Trump Media in 2025 made this clear. In a section called "Risks Related to President Donald J. Trump," the company noted that its success depends "on the popularity of President Donald J. Trump," and that it "would negatively impact TMTG's business" if President Trump's popularity were to decrease or he were to limit his use of Truth Social. The same filing noted that, if President Trump were to stop posting "politically-related" content on Truth Social, it "could have a material adverse effect" on Truth Social's business and operations.

**B.      President Trump Uses Truth Social As His Primary Means of Communicating with the Public**

25.      Since returning to office on January 20, 2025, President Trump has used his Truth Social account as his primary online means of communicating with the public and making official announcements. For instance, at 8:17 a.m. EST on inauguration day, President Trump posted a video celebrating his forthcoming inauguration.[1] The next day, President Trump used his Truth Social account to fire four government officials and announce that he would soon be firing over a thousand more employees.[2]

26.      From just January 20 to January 31, 2025, President Trump published more than 150 posts on Truth Social, using his account to announce senior government appointments;[3] impose tariffs on Colombia;[4] demand President Putin cease hostilities in Ukraine;[5] disclose the release of hostages from Venezuela;[6] and ask Elon Musk to return stranded astronauts to Earth.[7]

27.      President Trump has continued to use Truth Social to conduct the business of the presidency throughout his second term:

---

[1]      https://truthsocial.com/@realDonaldTrump/posts/113860871478605894.

[2]      https://truthsocial.com/@realDonaldTrump/posts/113864692804149616.

[3]      https://truthsocial.com/@realDonaldTrump/posts/113874738288379518;
https://truthsocial.com/@realDonaldTrump/posts/113885433070959220.

[4]      https://truthsocial.com/@realDonaldTrump/posts/113896070273857964.

[5]      https://truthsocial.com/@realDonaldTrump/posts/113872782548137314.

[6]      https://truthsocial.com/@realDonaldTrump/posts/113925800748181952.

[7]      https://truthsocial.com/@realDonaldTrump/posts/113909188940119917.

28.    **Military actions.** President Trump has announced military operations and declared ceasefires on Truth Social, including the bombing of alleged drug boats;[8] the bombing of Iran's nuclear facilities and the ceasefire two days later;[9] the raid and capture of Venezuelan President Maduro;[10] and the repeated start and stop of military operations in Iran in 2026.[11]



29.    **Foreign affairs.** President Trump has set foreign affairs policy through posts to his Truth Social account, including, for example, terminating an oil transaction agreement with

---

[8]     https://truthsocial.com/@realDonaldTrump/posts/115209549037822166; https://truthsocial.com/@realDonaldTrump/posts/116591892659828831.

[9]     https://truthsocial.com/@realDonaldTrump/posts/114724035571020048; https://truthsocial.com/@realDonaldTrump/posts/114734934153569653.

[10]    https://truthsocial.com/@realDonaldTrump/posts/115830428767897167.

[11]    *E.g.*, https://truthsocial.com/@realDonaldTrump/posts/116147082884192486; https://truthsocial.com/@realDonaldTrump/posts/116750587569914985; https://truthsocial.com/@realDonaldTrump/posts/117023461141824050.

Venezuela,[12] inviting South African farmers to participate in a rapid pathway to American citizenship,[13] and withholding aid payments to Colombia.[14]

30.    **Trade.** On Truth Social, President Trump has regularly purported to impose, revise, and lift tariffs on China, India, and other countries.[15]

31.    **Domestic Policy.** President Trump has set domestic policy through posts to his Truth Social account, by, for example, resuming Immigration and Customs Enforcement's traffic stops;[16] directing universities to alter their admission policies in order to avoid federal investigation;[17] announcing a "most favored nation" policy to reduce prescription drug prices;[18] and directing the Treasury Department to stop producing the penny.[19]

---

[12]    https://truthsocial.com/@realDonaldTrump/posts/114071774104516883.

[13]    https://truthsocial.com/@realDonaldTrump/posts/114121529754059509.

[14]    https://truthsocial.com/@realDonaldTrump/posts/115401182824973489.

[15]    https://truthsocial.com/@realDonaldTrump/posts/114309144289505174 (China); https://truthsocial.com/@realDonaldTrump/posts/114942106248731470 (India); https://truthsocial.com/@realDonaldTrump/posts/114144217763824399 (Canada); https://truthsocial.com/@realDonaldTrump/posts/116109447886304328 ("Worldwide Tariff").

[16]    https://truthsocial.com/@realDonaldTrump/posts/116923585931908111.

[17]    https://truthsocial.com/@realDonaldTrump/posts/115362973187528235.

[18]    https://truthsocial.com/@realDonaldTrump/posts/114491534347862682.

[19]    https://truthsocial.com/@realDonaldTrump/posts/113977224933701762.



32.    **Agency appointments and firings.** President Trump has nominated, appointed, and removed heads of federal agencies and other federal employees through posts to his Truth Social account. For example, on Truth Social, President Trump fired Attorney General Pam Bondi,[20] fired Secretary for the Department of Homeland Security Kristi Noem,[21] fired Lisa Cook from the Board of Governors for the Federal Reserve,[22] appointed Todd Blanche to serve as acting Attorney General,[23] and nominated Markwayne Mullin to serve as Secretary for the Department of Homeland Security.[24]

---

[20]    https://truthsocial.com/@realDonaldTrump/posts/116336247856387679.

[21]    https://truthsocial.com/@realDonaldTrump/posts/116178030946996760.

[22]    https://truthsocial.com/@realDonaldTrump/posts/115092130707196133.

[23]    https://truthsocial.com/@realDonaldTrump/posts/116336247856387679.

[24]    https://truthsocial.com/@realDonaldTrump/posts/116178030946996760.



33.     In total, since resuming office, President Trump has published between 9,000 and 11,000 posts or reposts on Truth Social. Often his posts have no immediate corresponding announcement from the White House. In other words, President Trump's posts are the only way to get official government news.

34.     Lest there be any doubt about the status of President Trump's Truth Social account, on February 18, 2026, when asked whether one of President Trump's posts represented the official policy of the United States, Press Secretary Karoline Leavitt responded:

> The post should be taken as the policy of the Trump Administration. It's coming straight from the horse's mouth. When you see it on Truth Social, you know it's directly from President Trump. That's the beauty of this President and his transparency in relaying this Administration's policies to all of you and to the rest of the world.

35.     Insofar as President Trump's Truth Social posts concern government business, they are Presidential records under the Presidential Records Act, and are the property of the United States, not of President Trump or Trump Media. *See* 44 U.S.C. §§ 2201, 2202.

C.     **President Trump and Truth Social Benefit Each Other**

*President Trump Has a Direct Financial Interest in Truth Social*

36.     President Trump posts constantly on Truth Social; he also benefits financially by doing so.

11

37. Following his reelection on November 5, 2024, President Trump transferred his nearly 115 million shares in Trump Media to The Donald J. Trump Revocable Trust. President Trump is the settlor and sole beneficiary of the Trust, and his son, Donald Trump, Jr., is the sole trustee.

38. At the time of the transfer, President Trump's shares in Trump Media were worth approximately $4 billion and represented an approximately 52.1% ownership stake in the company.

39. Today, those shares are worth a little more than $1 billion, and after Trump Media issued additional shares in May 2025 to buy cryptocurrency, President Trump's nearly 115 million shares now represent an approximately 41.4% ownership stake in the company. President Trump remains the largest shareholder of Trump Media.

### 2. *President Trump Is Contractually Obligated to Publish Social Media Posts Exclusively on Truth Social*

40. Just as Truth Social benefits President Trump, President Trump benefits Truth Social. Securities filings show that the President is contractually obligated to exclusively publish certain social media posts on Truth Social and may only republish those posts elsewhere at least six hours later.

41. In September 2021, President Trump entered an agreement with Trump Media that included a term called "DJT/TMTG Social Media 6-Hour Exclusive." Under that agreement, President Trump was "generally obligated to make any social media post on Truth Social and may not make the same post on another social media site for 6 hours." The agreement included certain carve-outs for "political messaging, political fundraising, or get-out-the-vote efforts," though made no exception for official government posts.

42. According to a 2023 SEC filing, the exclusivity arrangement would continue "in perpetuity until terminated by TMTG" if Trump Media became a public company prior to September 23, 2024. Trump Media became a public company in March 2024 and did not terminate this exclusivity agreement.

43. A separate securities filing shows that President Trump updated his agreement with Trump Media in February 2024, in a document titled "Second Amended & Restated License, Likeness, Exclusivity and Restrictive Covenant Agreement."

44. The 2024 agreement included an updated "Social Media 6-Hour Exclusive," directing President Trump to "*FIRST* channel any and all social media communications and posts coming from a DJT Personal Profile to Truth Social" (emphasis in original) and not to re-post them elsewhere for six hours.

45. This exclusivity term gave President Trump the option to circumvent the six-hour waiting period for posts about "government, politics, political messaging, political fundraising, get-out-the-vote efforts," or other related topics, but President Trump has not regularly exercised that option since resuming office. For example, from January 1 to August 8, 2026, President Trump published more than 4,000 posts on Truth Social @realDonaldTrump. In the same period, he published only 160 posts on his @realDonaldTrump account on Meta and only 18 posts or reposts on his @realDonaldTrump account on X.

46. The "6-Hour Exclusive" term in the 2024 agreement automatically extends every 12 months, in perpetuity, until terminated in writing by President Trump or Trump Media. No securities filing has indicated that either party has terminated the agreement.

**D.     President Trump, Trump Media, and Truth Social Are Enmeshed in Other Ways**

47.     Trump Media and President Trump are enmeshed in other ways, to such an extent that Trump Media's prospectus for shareholders and its SEC filings make clear that the company's "success depends in part on the popularity of its brand and the reputation and popularity of President Donald J. Trump."

48.     The 2024 agreement mentioned above bound President Trump and Truth Social together in various ways. For instance, as a demonstration of his "desire[] to continue supporting the commercialization of TMTG," President Trump granted his company an "exclusive, worldwide" license to use the President's likeness to promote Truth Social. President Trump also agreed not to compete with Truth Social by "founding or developing, or acquiring a controlling interest in" another social media platform such as X, Facebook, YouTube, or Instagram.

49.     Conversely, underlining the clear and specific political viewpoint of Truth Social (a wing of Trump Media), Trump Media agreed to submit any uses of President Trump's likeness to him for advance approval, and further not to "use any of the DJT Likeness in any manner that denigrates or causes the ridicule of the name, image, or reputation of Donald J. Trump, any member of his family, or any of his or their businesses, properties, or endeavors." Interestingly, the 2024 agreement expressly provided that Trump Media could not disassociate from President Trump, even if he or his family members engaged in conduct that would "negatively reflect on TMTG's reputation or brand or be considered offensive, dishonest, illegal, immoral, or unethical, or otherwise harmful to TMTG's brand or reputation."

50.     Truth Social is so reliant on President Trump's participation on the platform, in fact, that Trump Media's 2024 prospectus for Truth Social stated that "if President Donald J.

14

Trump were to cease to be able to devote substantial time to Truth Social, TMTG's business would be adversely affected."

51.    Confirming the joint and symbiotic relationship between President Trump and TMTG, President Trump has regularly marketed Truth Social since returning to office:[25]



**E.    Truth Social Announces A $100,000-Per-Month Subscription for Early Access to President Trump and Other Government Officials' Posts**

52.    On July 16, 2026, Trump Media announced "Truth API," which it described as a "new business-to-business data feed that provides licensed, real-time access to posts from the highest-ranking Truth Social accounts."

---

[25]    https://truthsocial.com/@realDonaldTrump/posts/114212465033291057;
https://truthsocial.com/@realDonaldTrump/posts/114859554812594090;
https://truthsocial.com/@realDonaldTrump/posts/115649576495618820;
https://truthsocial.com/@realDonaldTrump/posts/116456358242090182.

53. Truth API (short for "Application Programming Interface") is a paywalled feed that delivers posts from certain high-ranking accounts to paying users faster than those same posts are delivered to the general public.

54. The Truth API provides this faster access to the posts of the ten most popular accounts on Truth Social. Currently these include President Donald Trump (@realDonaldTrump), Defendant—and White House Deputy Chief of Staff—Dan Scavino (@DanScavino), the White House itself (@WhiteHouse), Vice President JD Vance (@JDVance1), FBI Director Kash Patel (@Kash), White House Press Secretary Karoline Leavitt (@PressSec), Secretary of Transportation Sean Duffy (@SecDuffy), and Health and Human Services Secretary Robert F. Kennedy Jr. (@SecKennedy).

55. The purpose of this service is plain. Trump Media CEO Kevin McGurn said in a press release announcing the service that "markets already move on Truth Social posts," and that the intention is to provide early access to the "most market-moving" posts on the platform. Truth API was thus designed to target "organizations that place a premium on immediate, verified access" to that important information.

56. Access to Truth API costs $100,000 per month, or $60,000 per month if users commit to subscribing for three years. CEO Kevin McGurn described the scheme as a "high-margin" product intended to provide a "meaningful, ongoing source of revenue" for Trump Media. Even before the launch of the service, Trump Media said that it had already signed up customers. These reportedly included financial news organizations and high-frequency trading firms.

57. Trump Media CEO Kevin McGurn has said that the API will be significantly faster than web-scraping tools, which gather posts when they are made available to the general public.

16

In other words, those who subscribe to Truth API will get the President's posts faster—potentially significantly faster—than those who do not.

58.    Trump Media also promised that the Truth API release would provide "a historical archive of posts dating back to 2022." Trump Media CEO McGurn further said that the company would take steps to disrupt such web-scraping tools that offer instant and archived access to Truth Social posts, saying that "We're going to create a lot of friction for those folks that aren't coming to us directly." Instead, users hoping to access deleted or modified posts that are no longer available to the public must subscribe to Truth API. McGurn added that the API might someday be expanded to more accounts for customers willing to pay more than the current $100,000 per month.

59.    On a subsequent earnings call on August 10, 2026, McGurn added that Trump Media had already signed up over ten subscribers to Truth API, generally for between $60,000 and $100,000 per month. McGurn added that the company was exploring licensing its data for prediction markets (apparently to facilitate betting on the President's announcements) and was moving to prevent third-party web scrapers from accessing their site.

**F.    Truth API Burdens The Intercept's and Freedom of the Press Foundation's Ability to Cover the President**

60.    Plaintiffs are harmed by this corrupt and unconstitutional scheme.

61.    The Intercept is a nonprofit investigative news organization focused on exposing corruption and perceived injustices. The Intercept and its reporters have received many awards for their reporting, including the George Polk award for its reporting on the disclosures of Edward Snowden, and the Edward R. Murrow Award for reporting on Arizona's illegal dumping of shipping containers as an ad hoc border barrier on protected public lands, among other accolades. The Intercept is supported through a combination of donations from readers and other donors.

17

62.     The Intercept primarily focuses on national news, critically covering the President and other government officials. As a result, the organization frequently reports on statements from President Trump made exclusively on Truth Social. As of August 9, 2026, The Intercept referenced Truth Social in over 800 articles.

63.     The Intercept's business depends on timely reporting of these statements, including statements that are later deleted from Truth Social. When The Intercept has previously been scooped by other organizations who reported the same news faster, the Intercept saw a decline in reader traffic and, as a result, a decline in subscriptions and donations.

64.     The Intercept and its reporters also use social media for shorter form commentary and reporting, which drives traffic and subscribers to The Intercept's website.

65.     At least one of The Intercept's reporters regularly reports on President Trump's social media posts on Truth Social. This reporter maintains a Truth Social account, follows the President's @realDonaldTrump account, and regularly and actively monitors Truth Social for social media posts to that account. When the President publishes a post to his @realDonaldTrump account on Truth Social, the reporter receives an alert on the Truth Social platform, notifying him that President Trump has posted; and the reporter's homepage "Following" feed automatically updates to display President Trump's post in his feed.

66.     By selling preferred access to the President's and others' posts, Truth Social allows other organizations to get a competitive advantage over The Intercept and its reporters. The Intercept is both unable and unwilling to subscribe to Truth Social's API: unable because it is unaffordable, unwilling because a subscription would endorse the President's private business and subsidize the speech of Truth Social and Trump Media, which has a specific and clear viewpoint.

Such a subscription would hurt the Intercept's objectivity and standing with its readership, and potentially create liability for The Intercept by participating in an apparently illegal scheme.

67.     The President's use of Truth Social's API scheme forces The Intercept to make an unconstitutional choice: either subsidize and associate with the President's private company, harming The Intercept's finances, reputation, and legal security, or risk losing out on timely news to competing organizations, similarly harming its reputation and revenue.

68.     FPF faces a similar dilemma. Like The Intercept, FPF opposes Trump's anti-press policies and furthermore wishes to retain editorial independence. It does not want to support Trump's personal business. FPF created, hosts, and maintains the "Trump Anti-Press Social Media Tracker," a database of President Trump's social media posts attacking journalists, news organizations, and other members of the press.[26]

69.     The purpose of the Trump Anti-Press Social Media Tracker is to enable journalists and researchers to "better understand the scope and impact of [President] Trump's anti-press rhetoric." It also allows journalists and researchers to access, in their original forms, Trump's statements that were subsequently deleted or modified.

70.     FPF's Tracker pulls the text of each of President Trump's posts attacking the press and catalogues the date of the post, the target of President Trump's attack, tags reflecting the overarching theme or themes of President Trump's attack (e.g., "#Fake news," "#Opposition") and the specific type(s) of attack (e.g., "Media bias," "Denigrate the media," "Accusation of false reporting").

---

[26]     https://taps.pressfreedomtracker.us/.



*Example record in the Trump Anti-Press Social Media Tracker*

71.    In order to function, FPF's Tracker relies on a web-scraping service that automatically scrapes President Trump's posts in real time to gather recent Truth Social posts. FPF does not scrape directly from President Trump's Truth Social account, because it wants to ensure that its database is complete. President Trump occasionally deletes or modifies posts, both for substantive reasons (for example, following backlash for depicting himself as Jesus) and for mundane ones, like correcting typos. FPF relies on a third-party scraping service to ensure that it gets the President's original and complete posts.

72.    Both FPF's own, direct access to President Trump's Truth Social posts and this third-party web-scraping service are now slower than the Truth API. FPF's access to the President's past and future Truth Social posts is also imperiled by the imminent plans, as part of the Truth API rollout, to interfere with third-party web-scraping tools that offer instant and archived access to Truth Social posts. By interfering with the Tracker's underlying data sources, Defendants' actions diminish the value of FPF's substantial investment of time, money, and resources in creating and operating the Tracker.

73. For legal, financial, and mission reasons, neither The Intercept nor FPF can or will subscribe to Truth API; nor can or will any of The Intercept's and FPF's reporters and other employees subscribe to Truth API. As a result, both will suffer, as both organizations will have slower access to the President's official government announcements.

74. Timely access to the President's posts is critical for both groups.

**G.    The Burden on Plaintiffs' Ability to Cover the President Is Caused by State Action**

75. The burden Truth API places on The Intercept and FPF's ability to cover the President is the result of state action.

76. Defendants are public officials and government entities, and Defendant Trump has authority to speak on behalf of the Presidency of the United States and the Executive Branch of the federal government. Defendant Trump regularly exercises this authority by posting social media posts exclusively on Truth Social. Under federal law, such posts constitute Presidential records and are the property of the United States. *See* 44 U.S.C. §§ 2201, 2202. By posting President Trump's public comments exclusively on Truth Social, Defendants subject those comments to the preferencing of Truth API.

77. Trump Media's deployment, operation, and expansion of Truth API occurs as part of joint and symbiotic action with its largest shareholder and Truth Social's most prominent user, President Trump. President Trump's continued exclusive use of Truth Social to post market-moving government information is necessary to attract and retain subscribers to the platform. Subscriptions to Truth API, in turn, directly benefit President Trump, who owns 41.4% of Trump Media.

78. Since President Trump returned to office, many of his exclusive social media posts to his Truth Social account constitute the first and only public notice of official presidential actions.

21

Historically, such actions have been simultaneously announced to the public writ large through the publication of executive orders, notices, press releases, and similar formal mechanisms. President Trump has continued to exclusively publish such official government announcements on Truth Social after the launch of Truth API, such as the recent appointment of a new White House counsel.[27]

79.    Defendants, including President Trump, are on notice that Trump Media deployed Truth API on August 1, 2026. Defendants have, nevertheless, continued to post official government announcements, and President Trump has purported to exercise the power of the presidency, exclusively through posts to President Trump's social media account on Truth Social.

## CLAIMS FOR RELIEF

### FIRST CLAIM
**(Violation of the First Amendment to the U.S. Constitution: Unlawful Burden on Right of Access to Public Information)**

80.    Plaintiffs incorporate and reallege all other paragraphs in this complaint as if fully set forth herein.

81.    This Court has inherent equitable power to enjoin unlawful Executive Branch conduct. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

82.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I.

83.    The freedoms of speech and press necessarily protect the right to receive information, and the constitutionally protected right to receive information extends to the

---

[27]    https://truthsocial.com/@realDonaldTrump/posts/117067668006565228.

22

public communications of public officials. *Am. Broad. Companies, Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977).

84.     Even content-neutral restrictions on the First Amendment right to access public officials' public comments "must serve a legitimate governmental purpose, must be rationally related to the accomplishment of that purpose, and must outweigh the systemic benefits inherent in unrestricted (or lesser-restricted) access." *Stevens v. New York Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987).

85.     Plaintiffs have a First Amendment right to access President Trump's public comments on equal terms with other members of the press and public.

86.     Defendants' Truth API scheme burdens Plaintiffs' First Amendment right to access President Trump's public comments on equal terms with other members of the press and public.

87.     The burden on Plaintiffs' First Amendment right to access President Trump's public comments on equal terms with other members of the press and public is the result of state action.

88.     There is no legitimate, let alone significant, governmental interest in giving preferential access to government information to those who pay the President's private company. This is particularly true because President Trump retains a direct financial interest in Truth Social, and Presidents "can themselves have no pecuniary interest or proprietorship, as against the public at large, in the fruits of their [executive] labors." *Banks v. Manchester*, 128 U.S. 244, 253 (1888); *see also* U.S. Const. art. I, § 9, cl. 8 (Foreign Emoluments Clause); U.S. Const. art. II, § 1, cl. 7 (Domestic Emoluments Clause).

89.     Even if there were some legitimate governmental interest at stake (and there is none) in participating in a scheme in which the President benefits by giving early access to government information, Defendants' scheme would not be narrowly tailored to serve that interest.

90.     Nor do Defendants simultaneously post President Trump's speech on other social media platforms, meaning they regularly leave open no alternative channels to receive the President's public comment on equal terms.

91.     Trump Media has made clear that those who subscribe to Truth API will receive Trump's posts faster than those who do not. Any delay in access is unconstitutional as "[t]here is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001).

92.     Because Defendants burden Plaintiffs' right to receive President Trump's public comments without any legitimate government interest, they violate the First Amendment.

## SECOND CLAIM
### (Violation of the First Amendment to the U.S. Constitution: Unlawful Time, Place, or Manner Restriction on Access to Public Fora)

93.     Plaintiffs incorporate and reallege all other paragraphs in this complaint as if fully set forth herein.

94.     In addition to protecting the right to receive a public official's public comment, the First Amendment limits the government's right to restrict access to certain government-controlled fora.

95.     In traditional and designated public fora, "regulations of the time, place, and manner of expression" must be "content-neutral, . . . narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983).

24

96.    A public official's social media posts—which users can like, share, reply to, and comment on—constitute designated public fora where there is state action, and the official has made their posts generally available to the public at large. *See Lindke v. Freed*, 601 U.S. 187, 204 (2024).

97.    Many, if not all, of President Trump's posts on Truth Social using his @realDonaldTrump handle are designated public fora. President Trump's Truth Social account is generally available to the public and he does not generally regulate content posted in response to his posts.

98.    Plaintiffs have a First Amendment right to access those designated public fora.

99.    Defendants' Truth API scheme burdens Plaintiffs' First Amendment right to access those designated fora.

100.    The burden on Plaintiffs' First Amendment right to access those designated fora is the result of state action.

101.    There is no legitimate, let alone significant, governmental interest in the differential access Defendants grant paying Truth API subscribers to these designated public fora.

102.    Even if there were some legitimate governmental interest at stake (and there is none), directly enabling Truth Social to charge $100,000 per month for expedited access to the President's posts in his official capacity would not be narrowly tailored to serve that interest.

103.    Because Defendants' actions burden Plaintiffs' right to access designated public fora without any legitimate government interest, they violate the First Amendment.

### THIRD CLAIM
**(Violation of the First and Fifth Amendments to the U.S. Constitution: Unconstitutional Conditions)**

104.    Plaintiffs incorporate and reallege all other paragraphs in this complaint as if fully set forth herein.

105.    The unconstitutional conditions doctrine prohibits the government from imposing extortionate or unreasonable conditions on the availability of government benefits. Although some conditions are permissible, conditions that "utterly fail[] to further the end advanced as the justification" are not. *Nollan v. Ca. Coastal Comm'n*, 483 U.S. 825, 837 (1987).

106.    As the Supreme Court explained in *Moody v. NetChoice*, social media platforms like Truth Social express a specific message through their editorial decisions about which speakers to allow to the platform and what content to exclude. 603 U.S. 707 (2024). These messages are matters of significant public interest and can be quite controversial.

107.    The First Amendment protects Americans' rights *not* to subsidize Truth Social's message and to choose *not* to associate with Truth Social by making an account. As the Supreme Court has explained, "[The state] violates . . . free speech rights" when it compels individuals to "subsidize private speech on matters of substantial public concern." *Janus v. AFSCME*, 585 U.S. 878, 884 (2018).

108.    Plaintiffs have First Amendment rights not to associate with Truth Social or subsidize its expressive activity.

109.    Defendants' Truth API scheme burdens Plaintiffs' First Amendment rights not to associate with Truth Social or subsidize its expressive activity by conditioning access to official government information on associating with Truth Social and faster access to that information on subsidizing Truth Social's expressive activity.

110.    The burden on Plaintiffs' First Amendment rights not to associate with Truth Social or subsidize its expressive activity is the result of state action and violates the unconstitutional conditions doctrine.

111.    Conditions that amount to "an out-and-out plan of extortion" also violate the unconstitutional conditions doctrine. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013). These precedents come into play when would-be recipients of a government benefit are required to pay unreasonable sums that are not justified to recoup or offset the costs of the government benefit, because such costs represent unconstitutional "takings" under the Fifth Amendment. *Koontz*, 570 U.S. at 606; *Nollan*, 483 U.S. at 837.

112.    Plaintiffs have a Fifth Amendment right not to be charged unreasonable sums to access official government information.

113.    Defendants' Truth API scheme burdens Plaintiffs' Fifth Amendment right not to be charged unreasonable sums to access official government information, and that burden is unrelated to defraying any costs related to providing access to official government information. Truth Social's own executives have explained that the fees charged to access the Truth API are significantly greater than required to offset the cost of the service. As Trump Media CEO Kevin McGurn explained in the July 2026 news release, the API is designed to be a "high-margin" product that brings in significant profits to Trump Media.

114.    The burden on Plaintiffs' Fifth Amendment right not to be charged unreasonable sums to access official government information is the result of state action. The out-and-out plan of extortion embodied by Truth API violates the Fifth Amendment.

**FOURTH CLAIM**
**(Violation of the Fifth Amendment to the U.S. Constitution: Equal Protection)**

115.    Plaintiffs incorporate and reallege all other paragraphs in this complaint as if fully set forth herein.

116.    The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

117. The Fifth Amendment's Due Process Clause prohibits the federal government from denying a person equal protection of the laws, and the "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995) (cleaned up).

118. "The Equal Protection Clause . . . keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). When the government "distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause" and such distinctions must, at a minimum, "rationally further[] a legitimate [government] purpose." *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 618 (1985).

119. Defendants are granting Truth API subscribers preferential and valuable access to President Trump's official government statements—a form of a benefit—based solely on their payment to the President's private company to subsidize its speech, and depriving other similarly situated persons of that benefit.

120. This "distinction" fails any standard of scrutiny, as it is wholly "arbitrary" and "irrational." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985).

121. There is no legitimate governmental interest in giving preferential access to government information to those who pay the President's private company, especially where those sums are unreasonable, not justified to recoup or offset the costs of the government benefit, and not paid to the government.

122. Because Defendants' actions subject Plaintiffs to differential treatment from others similarly situated without a rational connection to any legitimate government interest, they violate the equal protection component of the Fifth Amendment.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

A.      Declare that Defendants' practice of posting official government information exclusively on Truth Social, which maintains a paid API for such official government information, is unconstitutional and unlawful;

B.      Enjoin Defendants, their agents, and anyone acting in concert or participation with Defendants from posting, or allowing to be posted, official government information exclusively on Truth Social, which maintains a paid API for such official government information;

C.      Award Plaintiffs' reasonable costs and attorneys' fees incurred in this action; and

D.      Grant such other and further relief as the Court may deem just and proper.

Dated: August 12, 2026                    Respectfully Submitted,

                                          /s/ John Langford
Scott A. Kronland*                        John Langford (JL-2367)
Barbara J. Chisholm*                      Stacy Livingston
Matthew J. Murray*                        David A. Schulz
ALTSHULER BERZON LLP                      MEDIA FREEDOM & INFORMATION
177 Post Street, Suite 300                    ACCESS CLINIC
San Francisco, California 94108           YALE LAW SCHOOL[28]
Tel. 415-421-7151                         127 Wall Street
Fax. 415-362-8064                         New Haven, CT 06511
skronland@altber.com                      Tel. (203) 432-2366
bchisholm@altber.com                      Fax (203) 432-3034
mmurray@altber.com                        john.langford@ylsclinics.org

Nikhel S. Sus*                            Brendan Ballou*
Jonathan E. Maier*                        Steven R. Semler*
Stuart C. McPhail                         PUBLIC INTEGRITY PROJECT FUND
CITIZENS FOR RESPONSIBILITY AND           1763 Columbia Rd. NW Ste. 175
ETHICS IN WASHINGTON                      Washington, DC 20009
P.O. Box 14596                            (917) 684-3900

---

[28]    The views expressed herein do not purport to represent the institutional views of Yale Law School, if it has any.

Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jmaier@citizensforethics.org
smcphail@citizensforethics.org

ballou@publicintegrityproject.org

*Pro hac vice* motion forthcoming

*Counsel for Plaintiffs*