**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE INTERCEPT MEDIA, INC., *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:26-cv-6867 |

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION


Scott A. Kronland
Barbara J. Chisholm
Matthew J. Murray
Marisa C. Lowe*
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Tel. 415-421-7151
Fax. 415-362-8064
skronland@altber.com
bchisholm@altber.com
mmurray@altber.com

John Langford
Stacy Livingston
David A. Schulz
MEDIA FREEDOM & INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
Tel. (203) 432-2366
Fax (203) 432-3034
john.langford@ylsclinics.org

Nikhel S. Sus
Jonathan E. Maier*
Stuart C. McPhail
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jmaier@citizensforethics.org
smcphail@citizensforethics.org

Brendan Ballou*
Andrea Dobson-Forsee
PUBLIC INTEGRITY PROJECT
1763 Columbia Rd. NW Ste. 175
Washington, DC 20009
(917) 684-3900
ballou@publicintegrityproject.org

*Counsel for Plaintiffs*
**Pro hac vice* motion forthcoming

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. President Trump Uses Truth Social to Make Official Government Announcements ..... 2

II. President Trump and Truth Social Are Intertwined and Benefit Each Other ..... 3

III. Truth Social Charges $100,000 Per Month for Early Access to the President's Posts ..... 4

IV. Defendants' Scheme Harms Plaintiffs ..... 5

ARGUMENT ..... 7

I. Standard ..... 7

II. Plaintiffs Are Likely to Succeed on the Merits ..... 7

A. Defendants' Scheme Unlawfully Discriminates Against Plaintiffs' First Amendment Rights to Receive Information the Government Has Made Publicly Available (Claim One) ..... 7

1. Plaintiffs Have a Right of Equal Access to President Trump's Official Government Announcements Published on Truth Social ..... 8

2. Defendants' Scheme Unlawfully Burdens Plaintiffs' Right of Equal Access to President Trump's Posts ..... 9

3. Defendants Cause Substantial and Irreparable Harm ..... 11

B. Defendants' Scheme Unlawfully Burdens Plaintiffs' First Amendment Rights to Access Truth Social Posts That Are Designated Public Fora (Claim Two) ..... 11

1. President Trump's Official Government Announcements on Truth Social Are Designated Public Fora ..... 12

2. Defendants' Scheme Imposes Substantial and Unconstitutional Burdens on Plaintiffs' First Amendment Rights ..... 13

C. Defendants' Scheme Imposes Unconstitutional Conditions (Claim Three) ..... 13

1. Defendants' Scheme Burdens Plaintiffs' Right Not to Subsidize Truth Social ..... 14

2. Defendants' Scheme Burdens Plaintiffs' Right to Receive Information Free from Unreasonable Fees ..... 15

D. Defendants' Scheme Violates Plaintiffs' Equal Protection Rights (Claim Four) ..... 15

E. Plaintiffs' Harms Result from State Action ..... 16

1. Defendants Engage in State Action When They Publish Official Announcements on Truth Social ..... 17

2. Trump Media's Participation in Defendants' Scheme Also Constitutes State Action ..... 19

III. Plaintiffs Have Standing and Are Irreparably Harmed by Defendants' Unconstitutional Scheme ..... 21

A. Plaintiffs Have Been Injured ..... 21

1. The Intercept Is Injured ..... 22

2. FPF Is Injured ..... 23

3. Plaintiffs' Injuries Are Irreparable ..... 24

B. Plaintiffs' Injuries Are Traceable to Defendants and Redressable by this Court ..... 26

IV. The Balance of Equities and Public Interest Weigh Heavily in Favor of Injunctive Relief ..... 26

V. This Court Has Authority to Issue Plaintiffs' Requested Injunction ..... 27

CONCLUSION ..... 28

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Adarand Constructors, Inc. v. Peña*,
515 U.S. 200 (1995)....................15

*Agudath Israel of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020)....................24

*Am. Atheists, Inc. v. Port Auth. of NY & NJ*,
936 F. Supp. 2d 321 (S.D.N.Y. 2013), *aff'd*, 760 F.3d 227 (2d Cir. 2014)....................20

*Am. Broad. Companies, Inc. v. Cuomo*,
570 F.2d 1080 (2d Cir. 1977)....................8

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
880 F. Supp. 2d 456 (S.D.N.Y. 2012)....................13

*Am. Hist. Ass'n v. Trump*,
2026 WL 1412395 (D.D.C. May 20, 2026)....................23, 25, 28

*Anthropic PBC v. U.S. Dep't of War*,
825 F. Supp. 3d 1101 (N.D. Cal. 2026)....................18

*Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*,
88 F.4th 344 (2d Cir. 2023)....................26

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014)....................14

*Banks v. Manchester*,
128 U.S. 244 (1888)....................10

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)....................8

*Betts v. Shearman*,
751 F.3d 78 (2d Cir. 2014)....................20

*Biden v. Knight First Amend. Inst. at Columbia Univ.*,
141 S. Ct. 1220 (2021)....................12

*Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health and Hum. Servs.*,
150 F.4th 76 (2d Cir. 2025)....................13, 14

*Breault v. Heckler*,
763 F.2d 62 (2d Cir. 1985)....20

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*,
531 U.S. 288 (2001)....19

*C.R. Corps v. LaSalle*,
741 F. Supp. 3d 112 (S.D.N.Y. 2024)....21, 22, 23

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017)....22

*Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
561 U.S. 661 (2010)....12

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)....15, 16

*Clinton v. Jones*,
520 U.S. 681 (1997)....27

*Cmty.-Serv. Broad. of Mid-Am., Inc. v. F.C.C.*,
593 F.2d 1102 (D.C. Cir. 1978)....11

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
167 F.4th 605 (2d Cir. 2026)....22

*Cornelio v. Connecticut*,
32 F.4th 160 (2d Cir. 2022)....11

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)....12

*Cox v. New Hampshire*,
312 U.S. 569 (1941)....15

*CREW v. OMB*,
791 F. Supp. 3d 29 (D.D.C. 2025)....23, 24, 25

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)....23, 26

*District of Columbia v. Trump*,
291 F. Supp. 3d 725 (D. Md. 2018)....27

*Elrod v. Burns*,
427 U.S. 347 (1976)....11, 13, 24

*FEC v. Akins*,
524 U.S. 11 (1998)....23

*FEC v. Cruz*,
596 U.S. 289 (2022)....21

*First Nat. Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978)....9

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)....27

*Garnier v. O'Connor-Ratcliff*,
136 F.4th 1181 (9th Cir. 2025)....12

*Georgia v. Public.Resource.Org, Inc.*,
590 U.S. 255 (2020)....10

*Gilmore v. City of Montgomery*,
417 U.S. 556 (1974)....19

*Griffin v. United States*,
935 F. Supp. 1 (D.D.C. 1995)....9

*Haas v. Henkel*,
216 U.S. 462 (1910)....9

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)....22

*Hooper v. Bernalillo Cnty. Assessor*,
472 U.S. 612 (1985)....16

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978)....8

*Illinois v. Trump*,
2025 WL 2886645 (N.D. Ill. Oct. 10, 2025), *stay denied,* 146 S. Ct. 432 (2025)....28

*Int'l News Serv. v. Associated Press*,
248 U.S. 215 (1918)....22

*Janus v. AFSCME, Council 31*,
585 U.S. 878 (2018)....14

*Knight First Amend. Inst. at Columbia Univ. v. Trump ("KFAI I")*,
302 F. Supp. 3d 541 (S.D.N.Y. 2018)....12, 13, 28

*Knight First Amend. Inst. at Columbia Univ. v. Trump ("KFAI II")*,
928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. KFAI*, 141 S. Ct. 1220 (2021) ....................18, 23

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013)....................14, 22

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965)....................15

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................24, 27

*Legi-Tech, Inc. v. Keiper*,
766 F.2d 728 (2d Cir. 1985)....................9

*Lindke v. Freed*,
601 U.S. 187 (2024)....................12, 16, 17, 18

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001)....................11, 13

*Metro. Transp. Auth. v. Duffy*,
784 F. Supp. 3d 624 (S.D.N.Y. 2025)....................27

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018)....................12

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................14

*Murdock v. Pennsylvania.*,
319 U.S. 105 (1943)....................15

*N. Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013)....................11, 26

*Nat'l Awareness Found. v. Abrams*,
50 F.3d 1159 (2d Cir. 1995)....................15

*Nat'l Inst. of Fam. & Life Advocs. v. James*,
160 F.4th 360 (2d Cir. 2025) ....................24, 25

*Nat'l Org. for Marriage, Inc. v. Walsh*,
714 F.3d 682 (2d Cir. 2013)....................21

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ....................28

*New York v. DHS*,
969 F.3d 42 (2d Cir. 2020)....................21, 24, 25, 26

*Nicholas v. Bratton*,
376 F. Supp. 3d 232 (S.D.N.Y. 2019)....................8, 9

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982)....................27

*Norwood v. Harrison*,
413 U.S. 455 (1973)....................19

*Oregon v. Trump*,
809 F. Supp. 3d 1193 (D. Or. 2025) ....................18

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009)....................12

*Public Citizen v. DOJ*,
491 U.S. 440 (1989)....................23

*Regeneron Pharms., Inc. v. HHS*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020)....................25

*Reyes v. City of New York*,
141 F.4th 55 (2d Cir. 2026) ....................24

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019) ....................27, 28

*Soule v. Conn. Ass'n of Schs., Inc.*,
90 F.4th 34 (2d Cir. 2023) (en banc) ....................26

*Stanley v. Georgia*,
394 U.S. 557 (1969)....................8

*State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*,
120 F.4th 59 (2d Cir. 2024) ....................7

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
108 F.4th 1128 (9th Cir. 2024) ....................23

*Stevens v. New York Racing Ass'n, Inc.*,
665 F. Supp. 164 (E.D.N.Y. 1987) ....................8, 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................21, 23

*Travis v. Owego-Apalachin Sch. Dist.*,
927 F.2d 688 (2d Cir. 1991)....................13

*Trump v. Hawaii*,
585 U.S. 667 (2018)....................17

*Trump v. United States*,
603 U.S. 593 (2024)....................17

*USDA v. Moreno*,
413 U.S. 528 (1973)....................16

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)....................24

*Volokh v. James*,
148 F.4th 71 (2d Cir. 2025)....................24, 26

*West v. Atkins*,
487 U.S. 42 (1988)....................17

*WPIX, Inc. v. League of Women Voters*,
595 F. Supp. 1484 (S.D.N.Y. 1984)....................8

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....................27

*Zobel v. Williams*,
457 U.S. 55 (1982)....................16

**Federal Statutes**

5 U.S.C. §552....................23

18 U.S.C. §641....................9

18 U.S.C. §1902....................9

18 U.S.C. §1903....................9

18 U.S.C. §1905....................9

44 U.S.C. §2202....................18

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................................................ passim

U.S. Const. amend. V.........................................................................................................27

U.S. Const. amend. XIV ....................................................................................................15

## INTRODUCTION

President Trump is selling his official government announcements. Subscribers and supplicants willing to pay Trump's personal company $100,000 a month can get early access to the posts he makes on his social media site, Truth Social. In these posts, the President declares wars and ceasefires; announces economic, trade, and immigration policy; and hires and fires cabinet members. His and his subordinates' scheme to sell this information is astoundingly corrupt. It is also unconstitutional, because paying President Trump's personal company for official information serves no legitimate government interest and disadvantages those people who are unwilling or unable to pay a private benefit to his business.

Plaintiffs—The Intercept Media, Inc., and Freedom of the Press Foundation—are and will be irreparably harmed by this scheme. Both depend on fast and accurate access to the President's official announcements. Neither will get it because they cannot afford to pay $100,000 per month and refuse to endorse or subsidize the President's personal social media company or the specific viewpoints it espouses. As a result, Plaintiffs' free speech and equal protection rights are infringed, and both face practical and economic harms if the President's plan continues.

For this reason, Plaintiffs move to preliminarily enjoin President Trump and his co-defendants, including White House aides who operate his Truth Social account, from continuing to carry out this obviously corrupt scheme and imposing discriminatory access to official government announcements. Because the President cannot legally sell government information for private profit, Defendants' scheme must be enjoined.

## BACKGROUND

### I. President Trump Uses Truth Social to Make Official Government Announcements.

Truth Social is a social media platform, like X (formerly Twitter) or Bluesky, on which users can post short messages, images, and videos. In 2021, President Trump created Truth Social's parent company, Trump Media & Technology Group ("Trump Media" or "TMTG"), and a few months later, launched Truth Social itself. Decl. of Andrea Dobson-Forsee ¶2, Ex. 1.

President Trump uses Truth Social to conduct the business of his presidency. There, he announces military actions and ceasefires, directs foreign affairs, sets trade policy, guides immigration enforcement, and hires and fires government officials. *Id*. ¶8, Ex. 7. In total, since returning to office, President Trump has published approximately 11,000 posts or reposts on Truth Social. *Id*. ¶7, Ex. 6. His announcements on Truth Social are typically not accompanied by a simultaneous corresponding announcement from President Trump, the White House, or federal government in any other forum, making President Trump's posts the only way to get official government announcements as they happen. Decl. of Stephanie Sugars (Freedom of the Press Foundation) ¶7.

President Trump's Truth Social posts are announcements of official government policy. When asked whether one of Trump's posts represented the position of the United States, the White House Press Secretary said:

> The post should be taken as the policy of the Trump Administration. It's coming straight from the horse's mouth. When you see it on Truth Social, you know it's directly from President Trump. That's the beauty of this President and his transparency in relaying this Administration's policies. . .

Dobson-Forsee Decl. ¶10, Ex. 9. Moreover, Trump relies on Defendants Natalie Harp and Daniel Scavino, both employees of the White House Office and Executive Office of the President, to draft and publish many of his posts on Truth Social. *Id.* ¶¶11-13, Exs. 10-12.

## II. President Trump and Truth Social Are Intertwined and Benefit Each Other.

President Trump and Truth Social have been entwined from the start. In addition to creating Truth Social's parent company, Trump Media, President Trump remains—through a revocable trust for which he is the sole beneficiary—Trump Media's largest shareholder, and benefits financially when his company benefits. *Id*. ¶4, Ex. 3.

Trump Media's SEC filings demonstrate just how deeply Truth Social's business model relies on President Trump's use of the platform to make official announcements. They acknowledge that much of Truth Social's business value comes from President Trump's agreement to make most of his social media announcements first and exclusively on Truth Social, and to not post them elsewhere for six hours. *Id*. ¶5, Ex. 4.[1] Truth Social depends on this entwinement with President Trump. The prospectus for Trump Media's initial public offering warned would-be shareholders that the business would suffer if President Trump curtailed his "politically related" speech on the platform, or if his public popularity decreased. *Id.* ¶6, Ex. 5 at 49, 103, 129.

President Trump and Trump Media have entangled themselves in other ways. President Trump has granted Trump Media an "exclusive, worldwide" license to use his likeness to promote Truth Social and has agreed not to compete with Truth Social by buying or creating another social media platform. *Id.* ¶5, Ex. 4 at 4. For its part, Trump Media has promised to stand for and by President Trump, no matter what—its licensing agreement promises not to "use any of the DJT Likeness in any manner that denigrates or causes the ridicule of the name, image, or reputation of Donald J. Trump," and not to disassociate itself from President Trump, even if he engaged in

[1] This "Social Media 6-Hour Exclusive" clause nominally lets President Trump circumvent the six-hour waiting period for posts about "government, politics, political messaging, political fundraising, get-out-the-vote efforts." Dobson-Forsee Decl. ¶5, Ex. 4 at 2. But Trump has not regularly exercised that option since resuming office.

conduct (even illegal conduct) that would be "harmful to TMTG's brand or reputation." *Id.* ¶5, Ex. 4 at 6-7.

## III. Truth Social Charges $100,000 Per Month for Early Access to the President's Posts.

On July 16, 2026, Trump Media announced "Truth API": a "new business-to-business data feed that provides licensed, real-time access to posts from the highest-ranking Truth Social accounts." Dobson-Forsee Decl. ¶14, Ex. 13. Truth API (short for "Application Programming Interface") is a "machine-readable" feed that delivers posts from certain high-ranking accounts exclusively to paying users faster than those same posts are delivered to the public. *Id.* ¶15, Ex. 14.

Truth API provides this faster access to the posts of the ten most popular accounts on Truth Social. Currently these include President Donald Trump, Defendant and White House Deputy Chief of Staff Daniel Scavino, the White House itself, Vice President JD Vance, FBI Director Kash Patel, the White House Press Secretary, Secretary of Transportation Sean Duffy, and Health and Human Services Secretary Robert F. Kennedy Jr. *Id.* ¶15, Ex. 14; *id.* ¶16, Ex. 15.

By selling early access to government information, Trump Media—and its largest investor, Trump—make money. Access to Truth API costs $100,000 per month, or $60,000 per month if users commit to subscribing for three years. *Id.* ¶17, Ex. 16. Trump Media CEO Kevin McGurn described the scheme as a "high-margin" product intended to provide a "meaningful, ongoing source of revenue." *Id.* ¶14, Ex. 13.

Just as Truth API makes Trump Media—and Trump himself—money, the service aims to help its subscribers profit too. McGurn said in a press release that "markets already move on Truth Social posts," and that Truth API is meant to provide early access to the "most market-moving" posts on the platform. *Id.* Truth API was thus designed to target "organizations that place a premium on immediate, verified access" to that important information. *Id.*

People and companies are already subscribing. In an August 24 interview on CNBC, McGurn noted that the company has already secured more than ten subscribers, including "one of the largest financial data and information distributors" in the world. *Id.* ¶19, Ex. 18 at 3. Earlier, McGurn said that Truth API was "designed to serve . . . news and media organizations," and that it was "in active conversations with . . . some of the largest news organizations" to pay for the service. *Id.* ¶18, Ex. 17 at 4.

Truth API privileges subscribers in two ways. *First*, the API will be "significantly faster" than the web version of Truth Social. *Id.* ¶15, Ex. 14. Those who pay for Truth API will get the President's, the White House's, and other high government officials' posts faster than those who do not. *Second*, Truth API provides "a historical archive of posts dating back to 2022." *Id.* To increase the value of this archive, Trump Media's CEO said the company "launched an initiative" to disrupt web-scraping tools aiming to create their own archives of Truth Social posts. *Id.* ¶15, Ex. 14; *id.* ¶18, Ex. 17 at 4. Consistent with this promise, a Trump Media spokesperson responded to this lawsuit by incorrectly accusing Plaintiff Freedom of the Press Foundation ("FPF") of running afoul of Truth Social's anti-scraping initiative. *Id.* ¶20, Ex. 19.

## IV. Defendants' Scheme Harms Plaintiffs.

Plaintiffs, The Intercept Media, Inc. and FPF, are harmed by the Defendants' scheme to enrich the President by selling early access to the President's and others' posts.

The Intercept is a nonprofit investigative news organization critically covering the President and other government officials. Decl. of David Bralow (The Intercept) ¶2. The organization frequently reports on statements from President Trump made exclusively on Truth Social. *Id.* ¶5. The Intercept has referenced Truth Social in dozens of articles. *Id.* ¶6.

For The Intercept and its reporters, timeliness matters: speedy, accurate reporting drives reader traffic and, in turn, subscriptions and donations, allowing The Intercept to continue its non-profit reporting mission. *Id.* ¶8. In addition to publishing investigative journalism, The Intercept's reporters also engage their readers on social media to inform their readers of new developments and to build their audience. Decl. of Nick Turse (The Intercept) ¶¶3-6. That includes reporting on President Trump's Truth Social posts in near real-time. *Id.* ¶6. The Intercept can and would develop code to ingest an API feed to access President Trump's posts on Truth Social if the service were free. Bralow Decl. ¶20. But The Intercept is both unwilling and unable to subscribe to the Truth API service, because the cost is prohibitive and because financially supporting the President (and thus subsidizing Truth Social's speech and specific viewpoint) at any price would harm its reputation for fairness and journalistic objectivity. *Id.* ¶¶14, 19.

Truth API kneecaps The Intercept's effort at timely reporting, as those news organizations that subscribe to the service will receive—and report on—the President's announcements faster than The Intercept can. *Id.* ¶18; Turse Decl. ¶¶15-16.

FPF faces a similar dilemma. Like The Intercept, FPF is both unwilling and unable to subscribe to the Truth API, but would ingest a similar API feed if it were free. Sugars Decl. ¶¶12-13. FPF is a nonprofit organization committed to protecting and defending press freedom. It created, hosts, and maintains the "Trump Anti-Press Social Media Tracker," a database of President Trump's social media posts attacking journalists, news organizations, and other members of the press. *Id.* ¶3. To do this work, FPF largely relies on a web service that automatically collects President Trump's Truth Social posts in real time. *Id.* ¶6. FPF relies on this third-party service because President Trump occasionally deletes posts from Truth

Social. *Id*. The third-party service ensures that FPF collects all Trump's posts, even those he deleted. *Id*.

The Truth API scheme interferes with FPF's work. *Id*. ¶¶14-15. FPF's direct access to President Trump's Truth Social posts and this third-party auto-archiving service are now slower than the Truth API. *Id.* ¶14. FPF's access to the President's past and future Truth Social posts is also imperiled by Trump Media's claim that FPF is violating Truth Social's terms of service. *Id.* ¶15. By interfering with the Tracker's underlying data sources, Defendants diminish the value of FPF's substantial investment of time, money, and resources in creating and operating the Tracker. *Id.* ¶16.

## ARGUMENT

### I. Standard

To obtain a preliminary injunction, a plaintiff "must show '(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.'" *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024) (citation omitted). Each factor weighs heavily in favor of granting preliminary relief.

### II. Plaintiffs Are Likely to Succeed on the Merits.

Defendants' scheme is unconstitutional. Plaintiffs are likely to succeed on at least four independent grounds, any one of which supports preliminary relief.

#### A. Defendants' Scheme Unlawfully Discriminates Against Plaintiffs' First Amendment Rights to Receive Information the Government Has Made Publicly Available (Claim One).

Defendants' scheme unlawfully burdens Plaintiffs' First Amendment right to access public, newsworthy information. Specifically, the scheme burdens their right to access President

Trump's official announcements on equal terms with other members of the press and the public and does so in service of no legitimate government interest.

**1. Plaintiffs Have a Right of Equal Access to President Trump's Official Government Announcements Published on Truth Social.**

The First Amendment protects Plaintiffs' rights to receive public, newsworthy information. The freedoms of speech and press "necessarily protect[] the right to receive" information. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (citation omitted); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (citation omitted). "[P]ress organizations have a . . . right of access to newsworthy events in their capacity as representatives of the public and on their own behalf as members of the press." *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 259 (S.D.N.Y. 2019) (quoting *WPIX, Inc. v. League of Women Voters*, 595 F. Supp. 1484, 1489 (S.D.N.Y. 1984)).

These rights guarantee Plaintiffs a right of equal access to the President's public announcements. A President need not talk to press pools or the public, but "[o]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media." *Am. Broad. Companies, Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977); *Nicholas*, 376 F. Supp. 3d at 259-60; *see Stevens v. New York Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987); *Houchins v. KQED, Inc.*, 438 U.S. 1, 16 (1978) (Stewart, J., concurring in the judgment) ("The Constitution . . . assure[s] the public and the press equal access once [the] government has opened its doors.").

To be clear, Plaintiffs do not assert a freestanding right to access information that happens to be in the government's control but is not otherwise publicly available. But once the government *chooses* to publish information "to either the general public or to some members of the press, the First Amendment restricts the government's ability to selectively regulate . . . access." *Nicholas*,

376 F. Supp. 3d at 259; *see generally First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978) ("[T]he First Amendment . . . prohibit[s] government from limiting the stock of information from which members of the public may draw."); *Legi-Tech, Inc. v. Keiper*, 766 F.2d 728, 733 (2d Cir. 1985) ("The evils inherent in allowing government to create a monopoly over the dissemination of public information in any form seem too obvious to require extended discussion."). Accordingly, once the President chooses to speak to the public on Truth Social, Plaintiffs—like everyone else—have the right to equally access that speech.

**2. Defendants' Scheme Unlawfully Burdens Plaintiffs' Right of Equal Access to President Trump's Posts.**

Defendants' scheme to extract payments to the President's personal business for preferential access to his official announcements serves no "significant governmental interest," never mind being "narrowly tailored" to one, and leaves no "alternative channels for communication." *Nicholas*, 376 F. Supp. 3d at 270; *Stevens*, 665 F. Supp. at 176.

**No Legitimate Government Interest.** There is no legitimate—let alone significant—government interest in allowing the President to personally profit by selling early access to official government announcements. Congress has criminalized similar conduct, *see, e.g.*, 18 U.S.C. §§ 641, 1902, 1903, 1905; *Haas v. Henkel*, 216 U.S. 462, 480 (1910) (upholding criminal conviction of Department of Agriculture employee who sold advance access to crop reports), and the Founders sought to prohibit schemes like Defendants' through the Foreign and Domestic Emoluments Clauses. *See Griffin v. United States*, 935 F. Supp. 1, 3 (D.D.C. 1995) ("The Framers of the Constitution forbade the President from receiving any emolument other than a fixed compensation" precisely because "they feared the consequences of allowing a President to convert his or her office into a vehicle for personal profit."). Moreover, like judges and legislators, Presidents "can themselves have no pecuniary interest or proprietorship, as against the public at

large," in the fruits of their labors, *Banks v. Manchester*, 128 U.S. 244, 253 (1888), and the government cannot "launch a subscription" to "monetize" "first-class" access to the official work of public officials, *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 275 (2020). Simply put, there is no legitimate government interest in helping the President personally profit by selling early access to government information.

**No Tailoring.** Even if Truth API were aimed at serving some legitimate government interest (and it is not), Defendants' scheme is not narrowly tailored. For starters, the $100,000 per-month fee is paid not to the government but rather to the President's personal company. Moreover, unlike the provision of some government services (e.g., maintaining national parks), which cost money, it costs Defendants nothing to make President Trump's social media posts available to the public simultaneously, free of charge. There are plenty of other avenues for the President to post his official announcements to the public on an equal basis, including the White House website. The $100,000 per month fee is not only excessive, it is completely detached from any attendant costs of simultaneously speaking to the public in 2026. *See infra* at pp. 15–16 (explaining that fees must bear some relationship to defraying costs).

**No Alternative Channels.** Defendants' Truth API scheme preserves no alternative channels of communication. That is its entire purpose: only by foreclosing contemporaneous access through other channels does President Trump profit from the scheme. Thanks to Defendants' plan, there is nowhere else for Plaintiffs to get President Trump's official announcements on equal terms with those who are willing to pay into the President's self-enrichment scheme.

### 3. Defendants Cause Substantial and Irreparable Harm.

The burden imposed on Plaintiffs' First Amendment rights only confirms their likelihood of success on the merits. Defendants' scheme causes substantial harm to Plaintiffs: because Plaintiffs cannot pay $100,000 a month to restore equal access to government announcements, they must settle for unequal and delayed access.

Regardless of the duration of the delay in access, Plaintiffs are suffering irreparable constitutional injury because "there is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001); *Cornelio v. Connecticut*, 32 F.4th 160, 176 (2d Cir. 2022) (same); *see also Cmty.-Serv. Broad. of Mid-Am., Inc. v. F.C.C.*, 593 F.2d 1102, 1122 (D.C. Cir. 1978) ("The First Amendment does not . . . tolerate even minimal burdens on protected rights where no legitimate government interest is truly being served."). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The harm here is "particularly irreparable" because the upstream restriction on access burdens Plaintiffs' ability to cover the President of the United States. *See N. Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).

Moreover, Truth API's product is premised on the extraordinary monetary value of "early" access, for which subscribers are already paying an incredible $100,000 per month. The financial value of this advantage shows that the impact of delayed information is not *de minimis*.

## B. Defendants' Scheme Unlawfully Burdens Plaintiffs' First Amendment Rights to Access Truth Social Posts That Are Designated Public Fora (Claim Two).

Defendants' Truth API scheme separately unlawfully burdens Plaintiffs' access to Truth Social posts that are designated public fora.

### 1. President Trump's Official Government Announcements on Truth Social Are Designated Public Fora.

To determine whether various speech restrictions on government-controlled property are permissible, courts apply a "forum analysis." *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985); *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018). Akin to traditional fora—and distinct from nonpublic (or "limited public") fora—designated public fora arise when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009); *see generally Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 679 n.11 (2010).

President Trump's account—and certainly his official posts—on Truth Social are designated public fora. In 2018, another judge in this District held that President Trump's entire Twitter account was a designated public forum. *Knight First Amend. Inst. at Columbia Univ. v. Trump ("KFAI I")*, 302 F. Supp. 3d 541, 574 (S.D.N.Y. 2018).[2] Like his posts on Twitter, the President's official posts on Truth Social are designated public fora, and Truth Social is designed so that it has virtually identical features to Twitter. Dobson-Forsee Decl. ¶3, Ex. 2. At a minimum, his posts purporting to exercise the powers of the Presidency are designated public fora. *See Lindke v. Freed*, 601 U.S. 187, 198 (2024); *Garnier v. O'Connor-Ratcliff*, 136 F.4th 1181, 1187 (9th Cir. 2025) (explaining that once there is state action for the relevant posts under *Lindke*, public forum analysis applies); *see infra* at pp. 17–22 (addressing state action).

---

[2] The case was ultimately dismissed as moot when President Trump left office. *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).

#### 2. Defendants' Scheme Imposes Substantial and Unconstitutional Burdens on Plaintiffs' First Amendment Rights.

Defendants' Truth API scheme unlawfully burdens Plaintiffs' right to access the designated public fora of President Trump's official government announcement posts on Truth Social. In designated public fora, even content-neutral restrictions must be "narrowly tailored to serve a significant government interest" and "leave[] open ample alternative channels of communications." *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991); *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 469 (S.D.N.Y. 2012). Defendants' Truth API scheme fails this test for the reasons explained above. It burdens the access of users who refuse to pay, rendering their access to the public fora slower and less convenient than others'. It interferes with their ability to collect, store, and access an archive of the information conveyed there. Plaintiffs' harm is not *de minimis*—they would be required to pay $100,000 for equal access—but even if it were, there is no *de minimis* exception for such unjustified restrictions. *KFAI I*, 302 F. Supp. 3d at 577 ("[T]he law is also clear: the First Amendment recognizes, and protects against, even *de minimis* harms."); *see generally Lorillard Tobacco Co.*, 533 U.S. at 567; *Elrod*, 427 U.S. at 373.

### C. Defendants' Scheme Imposes Unconstitutional Conditions (Claim Three).

Defendants' scheme is independently unconstitutional because it forces Plaintiffs to make a choice prohibited by the First Amendment: subsidize the President's personal social media company—and thus the specific viewpoints it expresses through its content moderation decisions—or get slower, less accurate, access to the President's official announcements. The unconstitutional conditions doctrine prohibits the government from "burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health and Hum. Servs.*, 150 F.4th 76, 96 (2d Cir. 2025)

(quoting *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013)). That remains true even when there is no right to the benefit, *id.*, and even when the benefit has no economic value, *Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014).

Defendants' scheme is coercive in two ways. To get faster access to official government information, Plaintiffs *first* must subsidize the President's personal company and its speech, which they disagree with (Bralow Decl. ¶14, Sugars Decl. ¶12), and *second* must pay a facially unreasonable fee, not to the government, but to the President's personal business.

**1. Defendants' Scheme Burdens Plaintiffs' Right Not to Subsidize Truth Social.**

Defendants attempt to force Plaintiffs to subsidize speech of the President's personal social media company—much of which they disagree with—to get official government information. The "compelled subsidization of private speech seriously impinges on First Amendment rights." *Janus v. AFSCME, Council 31,* 585 U.S. 878, 894 (2018). Social media companies engage in private speech "in the business . . . of combining 'multifarious voices' to create a distinctive expressive offering" that reflects the platform's specific "beliefs about which messages are appropriate and which are not." *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024). This is especially true for Trump Media, which was created by President Trump and expresses a clear and staunchly pro-Trump message, even going so far as agreeing not to denigrate or embarrass President Trump and promising not to disassociate from him, even if the affiliation harms shareholders. Dobson-Forsee Decl. ¶5, Ex. 4.

Defendants' scheme obviously subsidizes Truth Social's speech. Defendants cannot require people to subsidize a social media company like Trump Media without satisfying robust First Amendment scrutiny, which, as described above, they cannot. *See Moody*, 603 U.S. at 740.

**2. Defendants' Scheme Burdens Plaintiffs' Right to Receive Information Free from Unreasonable Fees.**

Defendants' scheme also attempts to coerce Plaintiffs into paying unreasonable fees for government information. Even the government cannot generate profits for itself by imposing fees to exercise First Amendment rights. *Nat'l Awareness Found. v. Abrams*, 50 F.3d 1159, 1165 (2d Cir. 1995) (collecting cases). Instead, the government may impose only fees that "defray the expenses" the speech imposes on governments. *Murdock v. Pennsylvania.*, 319 U.S. 105, 113-14 (1943); *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). The same principles apply whether the government imposes a fee to listen or to speak. *See Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 306–07 (1965) (invalidating burden on receipt of speech that was unrelated to costs of processing mail).

Here, Defendants' scheme exacts fees for the benefit of receiving public information. But these fees do nothing to defray the expenses of government speech; in fact, the fees do not even go to the government. The fees are constitutionally impermissible.

**A. Defendants' Scheme Violates Plaintiffs' Equal Protection Rights (Claim Four).**

Defendants' scheme separately violates Plaintiffs' equal protection rights under the Fifth Amendment. The Fifth Amendment's Due Process Clause prohibits the federal government from denying a person equal protection of the laws, and the "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 224 (1995) (citation omitted). Equal protection requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). When the government "distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause" and such distinctions must, at a

minimum, be "rationally further[] a legitimate [government] purpose." *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 618 (1985).

Defendants' Truth API scheme "cannot pass even the minimum rationality test." *Id.* The President is granting Truth API subscribers preferential, early access to his official government announcements based solely on their paying his personal company $100,000 per month. By doing so, the President has effectively created two tiers of access to valuable government information: a preferred tier with faster and more fulsome data access for paid subscribers, and a second tier for everyone else, including Plaintiffs.

This "distinction" fails any standard of scrutiny, as it is wholly "arbitrary" and "irrational." *City of Cleburne*, 473 U.S. at 446. As explained above, there is no legitimate governmental interest in granting preferential access to government information to those who pay the President's company, as those sums are not paid to the government, are unreasonable, and are not justified to recoup or offset the costs of the government benefit. *See Hooper*, 472 U.S. at 623 (statute failed rational basis scrutiny under Equal Protection Clause where it granted an "economic benefit" (a tax exemption) to Vietnam War veterans only if they resided in the state before May 8, 1976, and there was no "identifiable state interest" in "[t]his discrimination on the basis of residence"); *Zobel v. Williams*, 457 U.S. 55, 59 (1982) (state benefit program irrationally made "distinctions . . . between . . . classes of concededly bona fide residents, based on how long they have been in the State"); *USDA v. Moreno*, 413 U.S. 528, 538 (1973) (federal food stamp program's exclusion of households with individuals who were unrelated was "wholly without any rational basis").

**B. Plaintiffs' Harms Result from State Action.**

Government officials are bound by the Constitution when they act in their official (as opposed to personal) capacity. *Lindke*, 601 U.S. at 193. "State" action occurs when "the official is

performing an actual or apparent duty of his office." *Id.* at 194 (internal quotations omitted). Because communicating official government announcements is a duty of the Presidency, Defendants' actions are bound by the Constitution.

**1. Defendants Engage in State Action When They Publish Official Announcements on Truth Social.**

President Trump's posts on Truth Social constitute state action. "[A] public official's social-media activity constitutes state action . . . if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Lindke*, 601 U.S. at 198. Both requirements are easily met here.

President Trump has authority to speak on behalf of the government. "[A]ctual authority" is "rooted in written law or longstanding custom to speak for the State." *Lindke*, 601 U.S. at 201. The Supreme Court has recognized that "[t]he President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018); *see Trump v. United States*, 603 U.S. 593, 618 (2024) ("[S]ome Presidential conduct—for example, speaking to and on behalf of the American people, certainly can qualify as official even when not obviously connected to a particular constitutional or statutory provision.") (citation omitted).

When Defendants post the Presidents' statements on Truth Social, they exercise their official government authorities. An official "purports to speak on behalf of the State while speaking 'in his official capacity or' when he uses his speech to fulfill 'his responsibilities pursuant to state law.'" *Lindke*, 601 U.S. at 201 (quoting *West v. Atkins*, 487 U.S. 42, 50 (1988)).

President Trump and the White House have made clear that President Trump's posts on Truth Social are exercises of his official authority. Dobson-Forsee Decl. ¶¶9-10, Exs. 8-9. The

topics of President Trump's posts—from declaring military actions and ceasefires to conducting trade policy and hiring and firing officials—are all part of his official duties.

Moreover, "an official who uses government staff to make a post will be hard pressed to deny that he was conducting government business." *Lindke*, 601 U.S. at 203. President Trump's White House staff, including Defendants Scavino and Harp, post on his behalf. Dobson-Forsee Decl. ¶¶11-13, Exs. 10-12. And the National Archives, the agency "responsible for maintaining the government's records," concluded that the President's social media posts are "official records that must be preserved under the Presidential Records Act." *KFAI v. Trump ("KFAI II")*, 928 F.3d 226, 232 (2d Cir. 2019), *vacated as moot sub nom. Biden v. KFAI*, 141 S. Ct. 1220; *see* 44 U.S.C. § 2202 (establishing public ownership of Presidential records). Unsurprisingly, courts have repeatedly treated President Trump's Truth Social posts as official government directives. *See, e.g.*, *Anthropic PBC v. U.S. Dep't of War*, 825 F. Supp. 3d 1101, 1114 (N.D. Cal. 2026) (enjoining implementation of "Presidential Directive" in President's Truth Social post); *Oregon v. Trump*, 809 F. Supp. 3d 1193, 1204, 1208-09 (D. Or. 2025) (referring to President's Truth Social post as a "federalization order" and documenting military actions taken based on that order).

Public officials speaking for the state on social media violate the First Amendment when they impose unreasonable restrictions on access to that speech, even if they do so for personal rather than official reasons. *See Lindke*, 601 U.S. at 204. A government official may not burden listeners' First Amendment rights for private reasons any more than they may do so for public reasons. And when restrictions apply to a public official's entire account—like the Truth API does—those restrictions must comply with the Constitution so long as the official "had engaged in state action with respect to any post on which [the restricted person] wished to comment." *Id.*

Defendants engage in state action when they choose to post the President's official posts exclusively on Truth Social, thereby channeling users to Truth API, from which the President personally profits. By posting official pronouncements exclusively on a platform denying equal access to users, Defendants "grant the type of tangible financial aid" to the President that "has a significant tendency to facilitate, reinforce, and support private discrimination" between those willing and able to pay and those who are not. *Norwood v. Harrison*, 413 U.S. 455, 466 (1973) (state providing textbooks to discriminatory private institution violated Constitution notwithstanding choice to discriminate was private actor's); *Gilmore v. City of Montgomery*, 417 U.S. 556, 574 (1974) (states "ration[ing] [of] otherwise freely accessible" resources to discriminatory private organization violates the Constitution). Officials, like Defendants, must "steer clear" of discriminating entities by not providing "significant aid" such as exclusive access to official pronouncements. *Norwood,* 413 U.S. at 467.

**2. Trump Media's Participation in Defendants' Scheme Also Constitutes State Action.**

While Defendants' actions in themselves are unconstitutional and should be enjoined, Trump Media's participation in Defendants' pay-for-access scheme constitutes state action, too. The actions of a private entity may be attributable to the state (1) when the "government is 'entwined in [its] management or control,'" (2) "when a private actor operates as a 'willful participant in joint activity with the State or its agents,'" or (3) "when the State provides 'significant encouragement, either overt or covert.'" *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001) (citations omitted). Trump Media's actions are attributable to the government under each of these independent tests.

A corporation's actions may be attributable even to a state that is not "involved directly" if "the relevant facts show pervasive entwinement to the point of largely overlapping identity

between the State and the entity." *Am. Atheists, Inc. v. Port Auth. of NY & NJ*, 936 F.Supp.2d 321, 331 (S.D.N.Y. 2013), *aff'd*, 760 F.3d 227 (2d Cir. 2014). President Trump and Trump Media—as the company's name suggests—are so entwined. The President created Trump Media and remains the company's largest shareholder. Dobson-Forsee Decl. ¶2, Ex. 1; ¶4, Ex. 3. He and Trump Media are contractually bound to each other, and he benefits financially from Trump Media's—and Truth Social's—success. *Id.* ¶¶5-6, Exs. 4-5. Trump Media, in turn, makes clear that the company's "success depends in part on the popularity of its brand and the reputation and popularity of President Donald J. Trump." *Id.* ¶6, Ex. 5. The obvious biggest draw to Truth API subscribers paying the exorbitant fee of $100,000 per month is preferential access to the President's posts. *See id.* ¶17, Ex. 16.

Trump Media is also a "willful participant in joint activity with" President Trump, *Brentwood Acad.*, 531 U.S. at 296, making the company's role in Defendants' scheme state action. A private actor can "be 'a willful participant in joint activity with the State or its agents' if the two share some common goal to violate the plaintiff's rights." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (citation omitted). Here, Trump Media and the President share the common goal of providing unequal access to the President's announcements for financial gain.

The President has also provided "significant encouragement" to the Truth API scheme by making official announcements exclusively on the site. Sugars Decl. ¶7; *Am. Atheists, Inc.*, 936 F. Supp. 2d at 330-31 (significant encouragement includes "when a plaintiff 'allege[s] that the state was involved with the activity that caused the injury giving rise to the action.'") (alteration in original) (citation omitted). As detailed above, President Trump is intimately involved with Truth API. *See Breault v. Heckler*, 763 F.2d 62, 64 (2d Cir. 1985) (emphasizing "overt participation by

state officials" and "conduct . . . which, in the eyes of the public, . . . appears to be intertwined") (citation omitted).

## III. Plaintiffs Have Standing and Are Irreparably Harmed by Defendants' Unconstitutional Scheme.

The Intercept and FPF have standing to challenge Defendants' unconstitutional scheme because they are suffering (1) "injur[ies] in fact that [are] concrete, particularized, and actual or imminent," (2) that are "likely caused by the defendant[s]," and (3) that "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Because Plaintiffs' injuries "cannot be remedied by an award of monetary damages," they are irreparable. *New York v. DHS*, 969 F.3d 42, 86 (2d Cir. 2020) (looking to same injuries to establish both standing and irreparable harm).

### A. Plaintiffs Have Been Injured.

Plaintiffs have been injured by Defendants' unlawful scheme. Most fundamentally, when the President makes official government announcements, Plaintiffs have the right to receive those announcements on equal terms with anyone else. Defendants' scheme subverts that right, creating exactly the kind of harm that federal courts recognize and remedy.

"[C]oncrete injuries under Article III" include "harms specified by the Constitution itself" as well as "monetary harms" and "informational" injuries. *TransUnion*, 594 U.S. at 424-25, 441-42. Where, as here, "First Amendment principles are at stake, the rules of standing are 'somewhat relaxed' to avoid an irreparable chilling effect on protected speech." *C.R. Corps v. LaSalle*, 741 F. Supp. 3d 112, 137 (S.D.N.Y. 2024) (quoting *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013)), *aff'd*, 184 F.4th 104 (2d Cir. 2026). And "[f]or standing purposes," the Court must "accept as valid the merits of [Plaintiffs'] legal claims"—*i.e.*, the Court "must assume" that Defendants' Truth API scheme is "unconstitutional[]." *FEC v. Cruz*, 596 U.S. 289, 298 (2022).

As the Second Circuit has "repeatedly held," an organizational plaintiff such as the Intercept and FPF can establish an "injury-in-fact if it can show that it was 'perceptibly impaired' by a defendant's actions." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *accord Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 167 F.4th 605, 617-19 (2d Cir. 2026). That is the case here.

**1. The Intercept Is Injured.**

The Intercept is harmed when its access to official government information is delayed or otherwise hindered. To win readers and, thus, financial support, The Intercept must report the news quickly, accurately, and completely. As the Supreme Court has observed, "[t]he value of the [news] service, and of the news furnished, depends upon the promptness of transmission, as well as the accuracy and impartiality of the news; it being essential that the news be transmitted to members of subscribers as early or earlier than similar information can be furnished by . . . other news services." *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 230-31 (1918). Accordingly, news organizations experience cognizable harm when they face delay or other obstacles to their "ability to have informed discussions about the work of their elected officials, an interest closely guarded by the First Amendment." *C.R. Corps*, 741 F. Supp. 3d at 137-39, 144.

Defendants have also forced The Intercept to face an intolerable choice: either pay the President's company—compromising their journalistic objectivity, reputation, and legal security—or face impaired access to the President's official announcements. This forced choice, as much as the delay itself, harms The Intercept, as the "coercive[] withholding [of government] benefits" inflicts a "constitutionally cognizable injury" on The Intercept, "regardless of whether" the government's coercive tactics "ultimately succeed[]." *Koontz*, 570 U.S. at 606-07; *see also*

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1138 (9th Cir. 2024) ("forced choice" imposed by an unconstitutional condition is a cognizable injury).

The Intercept has already been harmed and imminently faces further harm by Defendants' actions. *See supra* at pp. 5-6 (discussing harms to the Intercept resulting from Defendants' scheme); *TransUnion*, 594 U.S. at 435 (recognizing "material risk of future harm" can qualify as concrete harm for injunctive relief); *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) ("substantial risk that the harm will occur" suffices to obtain injunctive relief).

**2. FPF Is Injured.**

FPF is harmed when its work is made slower and less accurate, as described above. *See supra* pp. 6-7. If the scraping services upon which FPF relies are shut down, FPF will have to rely exclusively on Truth API's archive of the President's posts, giving the President the opportunity to delete and rewrite history as he chooses. *See* Sugars Decl. ¶¶6, 7, 14, 15. This too is a harm that courts recognize. *See C.R. Corps*, 741 F. Supp. 3d at 137 ("Denial of information to which a plaintiff is otherwise entitled constitutes a concrete and particularized injury-in-fact." (citing, among others, *FEC v. Akins*, 524 U.S. 11, 21 (1998), and *Public Citizen v. DOJ*, 491 U.S. 440, 449 (1989)). This harm is particularly clear where, as here, the Presidential Records Act ("PRA") requires that Trump's social media posts be preserved and eventually made accessible through the Freedom of Information Act ("FOIA"). *See KFAI II*, 928 F.3d at 235 (finding that the President's social media posts are Presidential records under the PRA); *Am. Hist. Ass'n v. Trump*, 2026 WL 1412395, at *9 (D.D.C. May 20, 2026) (finding FPF and other plaintiffs had standing based on threatened permanent loss of Presidential records).

Defendants' scheme also diminishes the value of FPF's substantial investment of time, money, and resources in creating and operating its tracker of President Trump's anti-press statements. This pocketbook harm is a quintessential Article III injury. *See CREW v. OMB*, 791 F.

Supp. 3d 29, 51 (D.D.C. 2025) (non-profit watchdog established a "cognizable economic injury" where agency's removal of federal spending database "diminished the value of [the plaintiff's] investments" in creating its own tracker that relied on the federal database to function); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977) (non-profit corporation suffered "economic injury" where it "expended thousands of dollars" on certain plans that would have been made "worthless" by defendant's actions).

**3. Plaintiffs' Injuries Are Irreparable.**

Plaintiffs' current and anticipated injuries are irreparable. "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York*, 969 F.3d at 86.

Plaintiffs' injuries are irreparable because Defendants infringe on Plaintiffs' First Amendment rights. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373 (plurality). This is so when "First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought." *Id.*; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) ("As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall on appellants before the court will issue an injunction.") (citation omitted).

The Second Circuit has repeatedly reaffirmed that "[b]ecause the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases 'the likelihood of success on the merits is the dominant, if not the dispositive, factor.'" *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020); *accord Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 379 (2d Cir. 2025); *Volokh v. James*, 148 F.4th 71, 82 (2d Cir. 2025); *see also Reyes v. City of New York*, 141 F.4th 55, 68 (2d Cir. 2026) ("[L]oss of the ability timely to communicate with

others on matters of public concern—whether constitutionally or statutorily protected—is not compensable with money damages."). Because Plaintiffs here "have shown a likelihood of success on their First Amendment claim[s], they have also established an irreparable injury." *Nat'l Inst. of Fam. & Life Advocs.*, 160 F.4th at 379.

On top of these irreparable constitutional harms, Plaintiffs are irreparably harmed by monetary losses that cannot be recovered. FPF risks losing its economic investment into its tracker. Sugars Decl. ¶16. The Intercept risks losing news stories, and with them, readers and donors. Bralow Decl. ¶¶8, 18-19. Since both The Intercept and FPF lack a "money damages" remedy against the President and White House officials for their constitutional violations, their "economic harms" are necessarily "irreparable" *New York*, 969 F.3d at 86; *see also Regeneron Pharms., Inc. v. HHS*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020) ("where a plaintiff cannot recover damages due to sovereign immunity, monetary loss may amount to irreparable harm," and such "unrecoverable damages may be irreparable harm" regardless of the "amount of the loss") (citing cases); *CREW*, 791 F. Supp. 3d at 51, 58 (plaintiff established irreparable "economic loss" where removal of federal spending database "diminished the value of [the plaintiff's] investments" in a tracker that relied on access to the federal database to function).

Plaintiffs are irreparably harmed in yet another way: Truth API's restrictions on external archiving and scraping creates a substantial risk that Presidential records generated on Truth Social will not be preserved as required by law. This means these records will be "lost forever to history" and later inaccessible to Plaintiffs through FOIA. *See Am. Hist. Ass'n*, 2026 WL 1412395, at *25. This too is a textbook "irreparable harm." *See id.* at *25-26 (finding irreparable harm to FPF and other plaintiffs based on "substantial risk" of loss of Presidential records, including "electronic messages" from "non-official accounts").

### B. Plaintiffs' Injuries Are Traceable to Defendants and Redressable by this Court.

Plaintiffs' injuries are traceable to Defendants. "[T]he causal-connection element of Article III standing . . . does not create an onerous standard. . . . It requires no more than *de facto* causality, a standard that is, of course, lower than for proximate causation." *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352–53 (2d Cir. 2023) (citations omitted). Here, Defendants choose to post official government information exclusively on the President's personal social media site. That site offers unequal access to the President's announcements, creating the harms described above. But for Defendants' actions, Plaintiffs would not be injured, constituting "*de facto* causality." *Dep't of Com.*, 588 U.S. at 768.

Correspondingly, Plaintiffs' injuries would be redressed by their requested relief. "Plaintiffs need not show that a favorable decision will relieve their every injury. Article III only requires that" the requested relief "would at least partially redress the alleged injury." *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 48 (2d Cir. 2023) (en banc) (cleaned up) (citation omitted). Here, Plaintiffs' injuries can easily be redressed. Specifically, this Court can direct Defendants not to post official government announcements on Truth Social first or exclusively, so long as the President's company offers unequal access to those announcements. Such a ruling would relieve Plaintiffs of the forced choice of paying the President's personal company $100,000 per month or receiving unequal access to official government information.

## IV. The Balance of Equities and Public Interest Weigh Heavily in Favor of Injunctive Relief.

The balance of equities and the public interest—which "merge" when "the government is a party to the suit," *New York*, 969 F.3d at 58-59—weigh heavily in favor of injunctive relief. "[S]ecuring First Amendment rights is in the public interest." *N. Y. Progress & Prot. PAC,* 733 F.3d at 488; *accord Volokh*, 148 F.4th at 82. While Plaintiffs' "extremely high likelihood of

success on the merits" would be a "strong indicator that a preliminary injunction would serve the public interest" in any case, *Newby*, 838 F.3d at 12; *accord Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019), the First Amendment interests at stake here heighten that showing.

Defendants, meanwhile, can assert no legitimate countervailing interests, tipping the balance decidedly in Plaintiffs' favor. "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citations omitted); *accord Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 696 (S.D.N.Y. 2025) (citing cases). Defendants' conduct violates the First and Fifth Amendments precisely because the government has no legitimate interest in curtailing Plaintiffs' constitutional rights on the basis that they have not paid President Trump's personal media company for equal access to government information.

## V. This Court Has Authority to Issue Plaintiffs' Requested Injunction.

This Court may remedy Plaintiffs' constitutional injuries by enjoining the President and his subordinates so long as they continue their Truth API scheme. "[I]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Clinton v. Jones*, 520 U.S. 681, 705 (1997) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 753–54 (1982)). Among permissible exercises of jurisdiction is "'the power to restrain unconstitutional presidential action' through injunctive and declaratory relief." *District of Columbia v. Trump*, 291 F. Supp. 3d 725, 750 (D. Md. 2018) (quoting *Clinton v. Jones*, 520 U.S. 681, 703 (1997), and citing *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992), and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952)), *vacated as moot*, *District of Columbia v. Trump*, 838 F. App'x. 789 (mem) (4th Cir. 2021) (vacating due to Trump leaving office).

Following the Supreme Court's guidance, lower courts routinely conclude that they have the authority to issue injunctive and declaratory relief against the President for his official acts. *See, e.g.*, *Illinois v. Trump*, 2025 WL 2886645 (N.D. Ill. Oct. 10, 2025) (issuing injunctive relief against President), *stay denied,* 146 S. Ct. 432 (2025); *Saget*, 375 F. Supp. 3d at 333–35 (same); *KFAI I*, 302 F. Supp. 3d at 578-79 (concluding court had authority to enjoin President's practice on social media of blocking others).

The President's subordinates who assist or carry out his social media posts—here, Natalie Harp and Daniel Scavino—are also plainly "within judicial control when [the President] and/or the Congress has delegated the performance of duties to [them] and one or more of them can be named as a defendant." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 613 (D.C. Cir. 1974); *see, e.g.*, *Am. Hist. Ass'n*, 2026 WL 1412395, at *3-4 & nn.2-3, *28 (preliminarily enjoining the White House Chief of Staff, the White House Office, the Executive Office of the President, and other White House components and personnel). But where the President can perform the injurious act himself and need not rely exclusively on subordinates, "it would be exalting form over substance [to say] the President's acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant." *Nat'l Treasury Emps. Union*, 492 F.2d at 613.

## CONCLUSION

Defendants are engaged in a corrupt scheme to sell government information. For the foregoing reasons, the scheme is unconstitutional and harms Plaintiffs and Plaintiffs' motion for a preliminary injunction should be granted.

Dated: August 31, 2026

Respectfully Submitted,

*/s/ Barbara J. Chisholm*

Scott A. Kronland
Barbara J. Chisholm

Matthew J. Murray
Marisa C. Lowe*
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Tel. 415-421-7151
Fax. 415-362-8064
skronland@altber.com
bchisholm@altber.com
mmurray@altber.com

Nikhel S. Sus*
Jonathan E. Maier*
Stuart C. McPhail
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jmaier@citizensforethics.org
smcphail@citizensforethics.org

John Langford
Stacy Livingston
David A. Schulz
MEDIA FREEDOM & INFORMATION ACCESS CLINIC
YALE LAW SCHOOL[3]
127 Wall Street
New Haven, CT 06511
Tel. (203) 432-2366
Fax (203) 432-3034
john.langford@ylsclinics.org

Brendan Ballou*
Andrea Dobson-Forsee
PUBLIC INTEGRITY PROJECT FUND
1763 Columbia Rd. NW Ste. 175
Washington, DC 20009
(917) 684-3900
ballou@publicintegrityproject.org

[3] The views expressed herein do not purport to represent the institutional views of Yale Law School, if it has any.

**Pro hac vice* motion forthcoming
*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

I certify that this memorandum complies with the 8,750 word limit of Local Rule 7.1(c). Including footnotes, but excluding the caption, tables, signature blocks, and required certificate, this memorandum contains 8,570 words according to Microsoft Word's word count.

*/s/ Barbara J. Chisholm*