# EXHIBIT 5

424B3 1 ny20031506x5_424b3.htm 424B3

TABLE OF CONTENTS

**Filed Pursuant to Rule 424(b)(3)**
**Registration No. 333-280691**

**PROSPECTUS**

TMTG

# TRUMP MEDIA & TECHNOLOGY GROUP CORP.

## 37,969,380 Shares of Common Stock

This prospectus relates to the resale of 37,969,380 shares of common stock of Trump Media & Technology Group Corp. ("**TMTG**," "**Company**," "**we**" or "**our**") consisting of (i) 37,644,380 shares of the common stock, par value $.0001 per share (the "**Shares**"), by YA II PN, LTD., a Cayman Islands exempt limited partnership ("**Yorkville**"), (ii) 200,000 shares of Common Stock to be issued to Yorkville concurrently or within one business day of the filing of this registration statement as consideration for entering into the SEPA (as hereinafter defined) (the "**Commitment Shares**") and (iii) 125,000 shares of Common Stock (the "**Placement Agent Shares**") issuable to EF Hutton LLC ("**EF Hutton**") concurrently or within one business day of the filing of this registration statement, as exclusive placement agent in connection with the transactions contemplated by the SEPA (as defined below). The shares of common stock included in this prospectus consist of Shares that we may, in our discretion, elect to issue and sell to Yorkville, from time to time after the date of this prospectus, pursuant to a standby equity purchase agreement we entered into with Yorkville on July 3, 2024 (the "**SEPA**"), in which Yorkville has committed to purchase from us, at our direction, up to $2,500,000,000 of Shares, subject to terms and conditions specified in the SEPA. As of the date of this prospectus, we have not issued any Shares to Yorkville.

The Company may not effect any sales under the SEPA and Yorkville will not have any obligation to purchase Shares under the SEPA to the extent that after giving effect to such purchase and sale the aggregate number of shares of Common Stock issued under the SEPA together with any shares of Common Stock issued in connection with any other transactions that may be considered part of the same series of transactions, where the average price of such sales would be less than $31.73 and the number of shares issued would exceed the number of shares representing 19.99% of the outstanding voting common stock as of June 25, 2024 (the "**Exchange Cap**"). Thus, the Company may not have access to the right to sell the full $2,500,000,000 of Shares to Yorkville.

In connection with the SEPA, we are registering herein 37,969,380 shares of Common Stock, which represents the number of shares of Common Stock representing the Exchange Cap as of the date hereof, which amount includes (i) 200,000 Commitment Shares and (ii) 125,000 Placement Agent Shares. As of the date of the SEPA, there were 189,941,870 shares of Common Stock outstanding, and therefore the Exchange Cap would be 37,969,380 shares of Common Stock. Thus we are registering the maximum amount that we could register without obtaining approval of stockholders in accordance with Nasdaq's "minimum price rule." However, if the Company desires to issue more than 37,969,380 Shares at an average price per share that does not equal or exceed $31.73 (which represents the lower of (i) the Nasdaq Official Closing Price (as reflected on Nasdaq.com) immediately preceding the date of the SEPA; or (ii) the average Nasdaq Official Closing Price for the five trading days immediately precedent the date of the SEPA), it would be required to obtain stockholder approval under the Nasdaq listing rules.

See the section entitled "Committed Equity Financing" for a description of the SEPA and the section entitled "Selling Securityholders" for additional information regarding Yorkville and EF Hutton (collectively, the "**Selling Securityholders**").

Our registration of the securities covered by this prospectus does not mean that Yorkville will offer or sell any of the Shares. Yorkville may offer, sell or distribute all or a portion of their Shares publicly or through private transactions at prevailing market prices or at negotiated prices. We will not receive any proceeds from the sale of Shares by Yorkville pursuant to this prospectus. However, we may receive up to $2,500,000,000 in aggregate gross proceeds from sales of Shares to Yorkville that we may, in our discretion, elect to make, from time to time after the date of this prospectus, pursuant to the SEPA. The sale of the Shares being offered by Yorkville pursuant to this prospectus, or the perception that these sales could occur, could result in a decline in the public trading price of our Common Stock. Yorkville is an "underwriter" within the meaning of Section 2(a)(11) of the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and any profits on the sales of shares of our Common Stock by the Yorkville and any discounts, commissions or concessions received by Yorkville are deemed to be underwriting discounts and commissions under the Securities Act.

Our shares of Common Stock and Public Warrants are currently listed on the Nasdaq Global Market ("**Nasdaq**") under the symbols "DJT" and "DJTWW," respectively. On July 2, 2024, the closing price of our Common Stock was $31.73 per share and the closing price of our Public Warrants was $20.26 per Public Warrant.

We are an "emerging growth company" and a "smaller reporting company" under the federal securities laws and are subject to reduced public company reporting requirements.

---

**Investing in our securities involves a high degree of risk. You should review carefully the risks and uncertainties described in the section titled "Risk Factors" beginning on page 17 of this prospectus, and under similar headings in any**

**amendments or supplements to this prospectus. Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities to be issued under this prospectus or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

**Prospectus dated July 15, 2024**

TABLE OF CONTENTS

**TABLE OF CONTENTS**


| | |
|---|---|
| ABOUT THIS PROSPECTUS | 1 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 8 |
| SUMMARY OF THE PROSPECTUS | 10 |
| THE OFFERING | 16 |
| RISK FACTORS | 17 |
| COMMITTED EQUITY FINANCING | 66 |
| USE OF PROCEEDS | 70 |
| MARKET INFORMATION FOR COMMON STOCK AND DIVIDEND POLICY | 71 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 73 |
| OUR BUSINESS | 98 |
| MANAGEMENT | 116 |
| EXECUTIVE AND DIRECTOR COMPENSATION | 124 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 128 |
| PRINCIPAL SECURITYHOLDERS | 132 |
| SELLING SECURITYHOLDERS | 134 |
| DESCRIPTION OF SECURITIES | 135 |
| UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS | 143 |
| PLAN OF DISTRIBUTION | 148 |
| LEGAL MATTERS | 150 |
| EXPERTS | 150 |
| CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 150 |
| WHERE YOU CAN FIND MORE INFORMATION | 152 |

TABLE OF CONTENTS

## ABOUT THIS PROSPECTUS

This prospectus is part of a registration statement on Form S-1 that we filed with the Securities and Exchange Commission (the "**SEC**") using the "shelf" registration process. Under this shelf registration process, the Selling Securityholders may, from time to time, sell the securities offered by them described in this prospectus. We will not receive any proceeds from the sale by such Selling Securityholders of the securities offered by them described in this prospectus.

Neither we nor the Selling Securityholders have authorized anyone to provide you with any information or to make any representations other than those contained or incorporated by reference in this prospectus or in any free writing prospectuses we have authorized for use in connection with this offering. We and the Selling Securityholders take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. We and the Selling Securityholders are offering to sell, and seeking offers to buy, shares of our Common Stock only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or sale of our securities. Our business, financial condition, results of operations and prospects may have changed since those dates.

We may also provide a prospectus supplement or post-effective amendment to the registration statement to add information to, or update or change information contained in, this prospectus. You should read both this prospectus and any applicable prospectus supplement or post-effective amendment to the registration statement together with the additional information to which we refer you in the sections of this prospectus entitled "Where You Can Find More Information."

For investors outside of the United States: Neither we nor the Selling Securityholders, have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about and observe any restrictions relating to, the offering of our securities and the distribution of this prospectus outside the United States.

On March 25, 2024 (the "**Closing Date**"), Digital World Acquisition Corp., now known as Trump Media & Technology Group Corp. ("**TMTG**"), consummated a business combination pursuant to that certain Agreement and Plan of Merger, dated as of October 20, 2021 (as amended by the First Amendment to Agreement and Plan of Merger, dated May 11, 2022, the Second Amendment to Agreement and Plan of Merger, dated August 9, 2023, the Third Amendment to Agreement and Plan of Merger, dated September 29, 2023, and as it may be further amended or supplemented from time to time, the "**Merger Agreement**"), by and among TMTG, DWAC Merger Sub Inc., a Delaware corporation ("**Merger Sub**"), Trump Media & Technology Group Corp., a Delaware corporation now known as TMTG Sub Inc. ("**Private TMTG**"), ARC Global Investments II, LLC, a Delaware limited liability company (which was replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024), in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in its capacity as representative of the stockholders of Private TMTG, pursuant to which, among other transactions, Merger Sub merged with and into Private TMTG, with TMTG continuing as the surviving corporation and as a wholly owned subsidiary of Digital World (the "**Business Combination**"). In addition, in connection with the consummation of the Business Combination, Digital World was renamed "Trump Media & Technology Group Corp." and Private TMTG was renamed "TMTG Sub Inc."

TABLE OF CONTENTS

## FREQUENTLY USED TERMS

Unless the context otherwise requires, "we," "us," "our" and the "Company" refer to TMTG. All references herein to the "Board" refer to the board of directors of TMTG. References to "DWAC" or "Digital World" refer to our predecessor company prior to the consummation of the Business Combination.

In this document:

"**Adeptus**" means Adeptus Partners LLC, Digital World's and, upon the Closing, TMTG's independent registered public accounting firm between August 8, 2023 and April 1, 2024.

"**Amended Charter**" means the Second Amended and Restated Certificate of Incorporation of the Company, effective as of March 25, 2024.

"**Anchor Investors**" means (i) accounts or funds managed by Radcliffe Capital Management, L.P., (ii) Meteora Capital Partners, LP (an affiliate of Glazer Capital LLC), (iii) Castle Creek Strategies (and sub-funds associated with Castle Creek), (iv) The K2 Principal Fund L.P., (v) Context Partners Master Fund LP, (vi) Boothbay Absolute Return Strategies, LP (or its affiliate Boothbay Diversified Alpha Master Fund LP, commonly controlled by Boothbay Fund Management LLC), (vii) investment funds and accounts managed by Shaolin Capital Management, LLC, (viii) Hudson Bay Master Fund Ltd. and/or its affiliates, (ix) Saba Capital Master Fund, Ltd., Saba Capital Master Fund II, Ltd., Saba Capital Master Fund III, LP and Saba Capital SPAC Opportunities, Ltd., and/or its affiliates, (x) D. E. Shaw Valence Portfolios, L.L.C. and (xi) Yakira Capital Management, Inc. (none of which are affiliated with any member of Digital World management, ARC or any other anchor investor), each of which entered into an investment agreement pursuant to which it expressed an interest to purchase up to 8.3% of the Public Units sold in the Digital World IPO.

"**ARC**" means ARC Global Investments II, LLC.

"**Board**" or "**TMTG Board**" means the board of directors of TMTG.

"**Bylaws**" means the Amended and Restated Bylaws of the Company.

"**Closing**" means the consummation of the Business Combination pursuant to the Merger Agreement.

"**Closing Date**" means March 25, 2024.

"**Code**" means the Internal Revenue Code, as amended.

"**Company**" "**TMTG**" "**we**" "**our**" or "**us**" means Trump Media & Technology Group Corp.

"**Company common stock**" or "**TMTG common stock**" or "**Common Stock**" means the common stock, par value $0.0001 per share, of the Company following the Business Combination.

"**Convertible Note Compensation Plan**" mean that certain convertible note compensation plan approved by the requisite holders of Class A common stock of Digital World at the annual meeting of Digital World's stockholders on December 19, 2023, pursuant to which Digital World issued Digital World Convertible Notes to certain officers, directors and affiliates for an aggregate amount of $9,651,250, which were converted into 965,125 shares of Common Stock upon the Closing of the Business Combination.

"**Convertible Note Post IPO Warrants**" means up to 369,509 shares of Common Stock that are issuable upon the exercise of warrants originally issued in connection with the conversion of Digital World Convertible Notes, immediately prior to the consummation of the Business Combination.

"**DGCL**" means the Delaware General Corporation Law.

"**Digital World**" or "**DWAC**" means Digital World Acquisition Corp., a Delaware corporation, which has been renamed to "Trump Media & Technology Group Corp." in connection with the Closing.

"**Digital World Alternative Financing Notes**" means up to $50,000,000 in 8.00% interest bearing convertible promissory notes due on March 22, 2025, in either (i) Working Capital Units, (ii) cash or (iii) a combination of both Working Capital Units and cash, in each case, at the election of the holder. Such Digital World Alternative Financing Notes may be redeemed by the Company, in whole or in part, commencing on the date on which all Company common stock issuable to the holders has been registered with the SEC, by providing a 10-day notice of such redemption (the "**Alternative Notes Redemption**

TABLE OF CONTENTS

**Right" or "Redemption Right**"). This Alternative Notes Redemption Right is contingent upon the trading price of Company common stock exceeding 130% of the applicable conversion price on at least three (3) trading days, whether consecutive or not, within the 15 consecutive trading days ending on the day immediately preceding the day on which a redemption notice is issued by the Company. The redemption price will be the total of the principal amount redeemed under such note plus any applicable portion of accrued and unpaid interest up to, but excluding, the redemption date. The Digital World Alternative Financing Notes have a floor conversion price of $8.00 or greater.

"**Digital World Alternative Warrants**" means the 3,055,000 Post IPO-Warrants issued to certain institutional investors in settlement of the terminated PIPE Investment.

"**Digital World Charter**" means Digital World's first amended and restated certificate of incorporation as filed with the Secretary of State of the State of Delaware as amended on September 6, 2023.

"**Digital World Class A common stock**" means the shares of Class A common stock of Digital World, par value $0.0001 per share.

"**Digital World Class B common stock**" means the shares of Class B common stock of Digital World, par value $0.0001 per share, including the Founder Shares.

"**Digital World common stock**" means any of the Digital World Class A common stock or Digital World Class B common stock.

"**Digital World Convertible Notes" or "DWAC Convertible Notes**" means the $16,853,950 in non-interest-bearing convertible promissory notes paid upon the stockholders' approval of the Business Combination, (A) either (i) Working Capital Units or (ii) cash or Working Capital Units, at the election of the holder or (B) in the case of such convertible promissory notes issued pursuant to the Convertible Note Compensation Plan, Company common stock. $4,832,700 of such convertible promissory notes were issued to ARC or its affiliates or Digital World's officers or directors in connection with any loans made by them to Digital World prior to Closing. Up to $10,000,000 of such convertible promissory notes may be issued to either third parties providing services or making loans to Digital World or to ARC or its affiliates or Digital World's officers or directors in connection with any loans made by them to Digital World prior to the Closing.

"**Digital World IPO**" "**IPO**" or "**Initial Public Offering**" means Digital World's initial public offering that was consummated on September 8, 2021.

"**Earnout Period**" means the three (3)-year period following March 25, 2024 to determine the contingent right to Earnout Shares.

"**Earnout Shares**" means the additional 40,000,000 shares of Company common stock that were issued by the Company based on a contingent right based on the price performance of Company common stock during the Earnout Period. The Earnout Shares were to be earned and payable during the Earnout Period as follows: (i) if the dollar volume-weighted average price ("VWAP") of TMTG's shares of Common Stock equals or exceeds $12.50 per share for any 20 trading days within any 30 trading day period, TMTG will issue to certain holders an aggregate of 15,000,000 Earnout Shares; if the VWAP of TMTG shares of Common Stock equals or exceeds $15.00 per share for any 20 trading days within any 30 trading day period, TMTG will issue to certain holders an aggregate of 15,000,000 Earnout Shares; and if the VWAP of TMTG shares of Common Stock equals or exceeds $17.50 per share for any 20 trading days within any 30 trading day period, TMTG will issue to certain holders an aggregate of 10,000,000 Earnout Shares. As of April 26, 2024, the Earnout Shares had been earned and issued, and President Donald J. Trump received 36,000,000 Earnout Shares.

"**Effective Time**" means the effective time of the Closing, as determined in accordance with the Merger Agreement.

"**Equity Incentive Plan**" means the Digital World Acquisition Corp. 2024 Equity Incentive Plan, as such may be amended, supplemented or modified from time to time, which was adopted by TMTG and approved in accordance with the Incentive Plan Proposal and became effective as of Closing.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

TABLE OF CONTENTS

"**FASB**" means the Financial Accounting Standards Board.

"**FINRA**" means the Financial Industry Regulatory Authority.

"**First Amendment to the Agreement**" means the First Amendment to Agreement and Plan of Merger, dated May 11, 2022, by and among Digital World, Merger Sub, Private TMTG, ARC (which has been replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024) in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in the capacity as the representative of the stockholders of Private TMTG.

"**Founder Shares**" means the shares of Digital World Class B common stock initially purchased by ARC in the Private Placement.

"**Insiders**" means the Digital World directors, officers or other initial stockholders named in an amendment on May 12, 2022 to that certain letter agreement dated September 2, 2021.

"**Investigation**" means the investigation by the SEC with respect to certain statements, agreements and the timing thereof included in Digital World's registration statements on Form S-1 in connection with its IPO and Form S-4 relating to the Business Combination.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended.

"**JOBS Act**" means the Jumpstart Our Business Startups Act of 2012.

"**Lock-up Period**" means the period beginning on March 25, 2024 and ending on the earliest of (i) September 25, 2024, (ii) the date on which the closing price for the Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalization and the like) for any 20 trading days within any 30-trading day period commencing on August 22, 2024, and (iii) the date on which the Company consummates a liquidation, merger, share exchange or other similar transaction that results in all of the Company's stockholders having the right to exchange their equity holdings in the Company for cash, securities or other property.

"**Locked-up Shares**" means certain shares of TMTG common stock held by certain TMTG stockholders and certain of TMTG's directors and officers, including (i) their shares of TMTG common stock held immediately following the Closing and (ii) any of their shares of TMTG common stock that resulted from converting securities held immediately following the Closing, that are subject to a lock-up agreement contractually restricting the holders from selling or transferring the shares and/or to lock-up restrictions applicable under the Amended Charter.

"**Management**" or "**Management Team**" means the Company's executive officers and directors.

"**Merger**" means the merger of Merger Sub with and into Private TMTG, with Private TMTG continuing as the surviving corporation and as a wholly owned subsidiary of TMTG, in accordance with the terms of the Merger Agreement.

"**Merger Agreement**" means the Agreement and Plan of Merger, dated October 20, 2021, as amended by the First Amendment to the Agreement, the Second Amendment to the Agreement and the Third Amendment to the Agreement, and as it may further be amended or supplemented from time to time, by and among Digital World, Merger Sub, Private TMTG, ARC (which has been replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024) in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in the capacity as the representative of the stockholders of Private TMTG.

"**Merger Consideration**" means the aggregate merger consideration paid to TMTG securityholders (other than holders of TMTG Convertible Notes) as of immediately prior to the Effective Time in an amount equal to $875,000,000.

"**Merger Sub**" means DWAC Merger Sub Inc., a Delaware corporation that, until the Closing, was a wholly owned subsidiary of Digital World.

"**Nasdaq**" means Nasdaq Global Market.

TABLE OF CONTENTS

“**Odyssey**” means Odyssey Transfer and Trust Company, our transfer agent, warrant agent, and escrow agent.

“**Order**” means the cease-and-desist order entered into by the SEC against Digital World in connection with the Investigation.

“**PCAOB**” means the Public Company Accounting Oversight Board (United States).

“**PIPE Investment**” means that certain private placement originally entered into on December 4, 2021 pursuant to certain securities purchase agreements with certain institutional investors, pursuant to which such investors agreed to purchase shares of Digital World’s Series A Convertible Preferred Stock for a purchase price of $1,000 per share. The PIPE Investment was terminated in full on January 10, 2024.

“**Placement Shares**” means the shares of Digital World Class A common stock included within the Placement Units purchased by ARC in the Private Placement.

“**Placement Units**” means 1,133,484 units issued to ARC in the Private Placement (including the additional units purchased after the Digital World IPO in connection with underwriters’ exercise of the over-allotment option to purchase additional securities). Each Placement Unit consisted of one Placement Share and one-half of one Placement Warrant.

“**Placement Warrants**” means the warrants included within the Placement Units purchased by ARC in the Private Placement. Each Placement Warrant entitles the holder thereof to purchase one share of TMTG common stock for $11.50 per share.

“**Post-IPO Financing**” means any financing transaction undertaken by Digital World following its IPO but prior to Closing, pursuant to which Digital World Convertible Notes, Digital World Alternative Financing Notes or Digital World Alternative Warrants were issued.

“**Post-IPO Warrants**” means any additional warrants issued pursuant to the Warrant Agreement by Digital World after the IPO, including any Digital World Alternative Warrants. Each Post-IPO Warrant entitles the holder thereof to purchase one share of TMTG common stock for $11.50 per share and each Post-IPO Warrant and has made on substantially the same terms and in the same form as the Public Warrants.

“**Private Placement**” means the private placement consummated simultaneously with the Digital World IPO in which Digital World issued to ARC the Placement Units.

“**Private TMTG**” means the pre-merger TMTG entity.

“**Public Shares**” means shares of Digital World Class A common stock included in the Public Units and shares of Digital World Class A common stock underlying the Public Warrants.

“**Public Stockholders**” means holders of Public Shares.

“**Public Units**” means units issued in the Digital World IPO, consisting of one Public Share and one-half of one Public Warrant.

“**Public Warrants**” means warrants underlying the Units issued in the Digital World IPO. Each whole Public Warrant entitles the holder thereof to purchase one share of TMTG common stock for $11.50 per share.

“**Registration Rights Agreement**” means the agreement, dated as of September 2, 2021, by Digital World to register for resale under a registration statement all of the shares held by holders of Founder Shares and issuable upon conversion of Digital World Warrants.

“**Sarbanes-Oxley Act**” means the Sarbanes-Oxley Act of 2002.

“**SEC**” means the U.S. Securities and Exchange Commission.

“**Second Amendment to the Agreement**” means the Second Amendment to Agreement and Plan of Merger, dated August 9, 2023, by and among Digital World, Merger Sub, Private TMTG, ARC (which was

replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024) in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in the capacity as the representative of the stockholders of Private TMTG.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Semple**" means Semple, Marchal & Cooper, LLC, TMTG's independent registered public accounting firm as of May 4, 2024.

"**Third Amendment to the Agreement**" means the Third Amendment to Agreement and Plan of Merger, dated September 29, 2023, by and among Digital World, Merger Sub, Private TMTG, ARC (which was replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024) in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in the capacity as the representative of the stockholders of Private TMTG.

"**TMTG**" means Trump Media & Technology Group Corp., a Delaware corporation, formerly known as Digital World Acquisition Corp. References in this prospectus to TMTG include its subsidiaries to the extent reasonably applicable.

"**TMTG Convertible Notes**" means the series of convertible promissory notes in the aggregate principal amount of up to $60,000,000 issued by Private TMTG pursuant to those certain note purchase agreements, by and among Private TMTG and the holders party thereto including any additional convertible promissory notes of like tenor entered into after the date of the Merger Agreement.

"**TMTG Convertible Securities**" means, collectively, any TMTG Options, TMTG RSUs, warrants or rights to subscribe for or purchase any capital stock of TMTG or securities convertible into or exchangeable for, or that otherwise confer on the holder any right to acquire any capital stock of TMTG.

"**TMTG Executive Promissory Notes**" means, collectively, the $6,900,000 in non-interest-bearing promissory notes entered into with certain TMTG directors and officers, which automatically converted into TMTG common stock prior to the Effective Time.

"**TMTG Options**" means, collectively, all outstanding options to purchase shares of TMTG common stock, whether or not exercisable and whether or not vested.

"**TMTG RSUs**" means all outstanding restricted stock units with respect to shares of TMTG common stock, whether or not vested.

"**TMTG securities**" means any of the TMTG common stock and any TMTG Convertible Securities following the Merger.

"**TMTG securityholders**" means, collectively, the holders of TMTG securities (other than, and to the extent that, such TMTG securities were received as a result of the conversion of the TMTG Convertible Notes).

"**TMTG stockholders**" means, collectively, the holders of TMTG common stock, each a "**TMTG stockholder**" (other than, and to the extent that, such TMTG common stock was received as a result of the conversion of the TMTG Convertible Notes).

"**TMTG Sub**" means, with respect to the period following the Closing, TMTG Sub Inc., a Delaware corporation and the surviving corporation of the Merger between Merger Sub and Private TMTG.

"**Treasury**" means the U.S. Department of Treasury.

"**Trust Account**" means the trust account of Digital World, which held the net proceeds of (i) the Digital World IPO, including from over-allotment securities sold by Digital World's underwriters, (ii) the sale of the Placement Units and (iii) the additional funds deposited by ARC to the Trust Account to extend the period of time to consummate an initial business combination, together with interest earned thereon, less amounts released to pay tax obligations and up to $100,000 for dissolution expenses, and amounts paid pursuant to Redemptions.

"**U.S. GAAP**" means generally accepted accounting principles in the United States.

"**Units**" means the Public Units, Placement Units, and the Working Capital Units.

TABLE OF CONTENTS

"**Warrant Agreement**" means the warrant agreement, dated September 2, 2021, as amended, by and between the Company and Continental Stock Transfer & Trust Company, as succeeded by Odyssey, as warrant agent.

"**Warrants**" means any of the Post-IPO Warrants, Public Warrants, the Placement Warrants and the warrants underlying the Working Capital Units, excluding any warrants of Private TMTG.

"**Working Capital Units**" means the units issued pursuant to the Digital World Convertible Notes or the Digital World Alternative Financing Notes, as applicable. Each unit consists of one share of Digital World Class A common stock and one-half Warrant. Each unit issuable pursuant to the applicable Digital World Convertible Notes or the Digital World Alternative Financing Notes, subject to the terms and conditions of each such applicable note, has a price not lower than $8.00 per unit.

TABLE OF CONTENTS

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus includes forward-looking statements regarding, among other things, the plans, strategies and prospects, both business and financial, of TMTG. We have based these forward-looking statements on our current expectations and projections about future events. Although we believe that our plans, intentions and expectations reflected in or suggested by these forward-looking statements are reasonable, we cannot assure you that we will achieve or realize these plans, intentions or expectations. Forward-looking statements are inherently subject to risks, uncertainties and assumptions. Generally, statements that are not historical facts, including statements concerning possible or assumed future actions, business strategies, events or results of operations, are forward-looking statements. These statements may be preceded by, followed by or include the words "believes," "estimates," "expects," "projects," "forecasts," "may," "will," "should," "seeks," "plans," "scheduled," "anticipates" or "intends" or similar expressions. The forward-looking statements are based on projections prepared by, and are the responsibility of, our Management Team. Semple, our independent auditor, has not examined, compiled or otherwise applied procedures with respect to the accompanying forward-looking financial information presented herein and, accordingly, expresses no opinion or any other form of assurance on it. Our financial statements included in this prospectus relate only to TMTG's historical financial information. It does not extend to the forward-looking information and should not be read as if it does. Forward-looking statements contained in this prospectus include, but are not limited to, statements about:

- the ability of TMTG to realize the benefits from the Business Combination;
- the ability of TMTG to maintain the listing of TMTG common stock on Nasdaq;
- future financial performance following the Business Combination;
- the impact of the outcome of any known or unknown litigation or other legal proceedings;
- the ability of TMTG to forecast and maintain an adequate rate of revenue growth and appropriately plan its expenses;
- expectations regarding future expenditures of TMTG;
- the future revenue and effect on gross margins of TMTG;
- the attraction and retention of qualified directors, officers, employees and key personnel of TMTG;
- the ability of TMTG to compete effectively in a competitive industry;
- the impact of the ongoing legal proceedings in which President Donald J. Trump is involved on TMTG's corporate reputation and brand;
- expectations concerning the relationships and actions of TMTG and its affiliates with third parties;
- the short- and long-term effects of the consummation of the Business Combination on TMTG's business relationships, operating results and business generally;
- the impact of future regulatory, judicial, and legislative changes in TMTG's industry;
- the ability to locate and acquire complementary products or product candidates and integrate those into TMTG's business;
- Truth Social, TMTG's initial product, and its ability to generate users and advertisers;
- future arrangements with, or investments in, other entities or associations;
- competition and competitive pressures from other companies in the industries in which TMTG operates;
- changes in domestic and global general economic and macro-economic conditions;
- TMTG's ability to meet conditions precedent to issue shares to Yorkville under the SEPA;
- the volatility of the price of Common Stock that may result from sales of Shares by Yorkville or other Shares we previously registered for resale;
- the dilution of holders of Common Stock from TMTG's issuance of Shares to Yorkville. There can be no guarantee that how many Shares TMTG will issue under the SEPA, if at all; and

TABLE OF CONTENTS

- other factors detailed under the section entitled “*Risk Factors*.”

These and other factors that could cause actual results to differ from those implied by the forward-looking statements in this prospectus are more fully described under the heading “Risk Factors” and elsewhere in this prospectus. The risks described under the heading “Risk Factors” are not exhaustive. Other sections of this prospectus describe additional factors that could adversely affect our business, financial condition or results of operations. New risk factors emerge from time to time and it is not possible to predict all such risk factors, nor can we assess the impact of all such risk factors on our business, or the extent to which any factor or combination of factors may cause actual results to differ materially from those contained in any forward-looking statements. Forward-looking statements are not guarantees of performance. You should not put undue reliance on these statements, which speak only as of the date hereof. All forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the foregoing cautionary statements. We undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## SUMMARY OF THE PROSPECTUS

*This summary highlights selected information included in this prospectus and does not contain all of the information that may be important to you in making an investment decision. This summary is qualified in its entirety by the more detailed information included in this prospectus. Before making your investment decision with respect to our securities, you should carefully read this entire prospectus, including the information under "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the financial statements included elsewhere in this prospectus.*

### The Company

***Trump Media & Technology Group Corp.***

TMTG believes free and open communication, particularly political speech, is essential to self-government and democracy. Free expression allows citizens to keep their government in check and inform themselves as voters. Free speech also enables the discovery of truth through the uninhibited marketplace of ideas. Truth often emerges only when opposing ideas can compete against each other on a level playing field. TMTG further believes that the ability to freely express core political speech is among the inalienable rights affirmed by the Declaration of Independence that underlay America's system of government.

TMTG therefore aspires to build a media and technology powerhouse to rival the liberal media consortium and promote free expression. TMTG was founded to fight back against the big tech companies — Meta (Facebook, Instagram and Threads), X (formerly Twitter), Netflix, Alphabet (Google), Amazon and others — that may curtail debate in America and censor voices that contradict their "woke" ideology. As confirmed by the "Twitter Files" exposés, X has long suppressed conservative speech (including at the behest of U.S. government officials) through various means, including "shadow banning" — a surreptitious process in which users may not even know their posts are being hidden from other users. X also outright banned conservative users such as President Donald J. Trump, who was banned for one year and ten months — even while X continued to allow the Taliban to freely post their views to the world. In July 2023, a federal district court judge found that Biden White House personnel likely colluded with big tech companies to violate Americans' First Amendment rights. The opinion expressed that "targeted suppression of conservative ideas is a perfect example of viewpoint discrimination of political speech." Big tech companies' transformation into the arbiters of public speech and organs of state-sponsored censorship contradicts American values. Their suppression of dissident speech constitutes the most serious threat today to a free and democratic debate. Thus, TMTG aims to safeguard public debate and open dialogue, and to provide a platform for all users to freely express themselves.

TMTG's first product, Truth Social, is a social media platform aiming to disrupt big tech's control on free speech by opening up the internet and giving the American people their voices back. It is a public, real-time platform where any user can create content, follow other users and engage in an open and honest global conversation without fear of being censored or "cancelled" due to their political viewpoints. TMTG does not restrict whom a user can follow, which greatly enhances the breadth and depth of available content. Additionally, users can be followed by other users without requiring a reciprocal relationship, enhancing the ability of TMTG users to reach a broad audience.

### Background

TMTG was incorporated on December 11, 2020 as Digital World Acquisition Corp., a blank check company formed for the purpose of entering into an initial business combination with one or more businesses or entities. On the Closing Date, Digital World, now known as Trump Media & Technology Group Corp., consummated the Business Combination with Private TMTG pursuant to the Merger Agreement. In connection with the consummation of the Business Combination, Digital World was renamed "Trump Media & Technology Group Corp." and Private TMTG, which became a wholly owned subsidiary of TMTG, was renamed "TMTG Sub Inc."

Effective upon consummation of the Business Combination, DWAC authorized the issuance of new Common Stock described in the section of this prospectus titled "*Description of Securities*."

TABLE OF CONTENTS

**Recent Developments**

***Committed Equity Financing***

On July 3, 2024, we entered into the Standby Equity Purchase Agreement ("SEPA") with Yorkville pursuant to which we have the right to sell to Yorkville up to $2,500,000,000 of shares our Common Stock, subject to certain limitations and conditions set forth in the SEPA, from time to time during the term of the SEPA. Sales of Shares to Yorkville under the SEPA, and the timing of any such sales, are at our option, and we are under no obligation to sell any securities to Yorkville under the SEPA. In accordance with our obligations under the SEPA, we have filed the registration statement that includes this prospectus with the SEC to register under the Securities Act the resale by Yorkville of 37,644,380 Shares that we may elect, in our sole discretion, to issue and sell to Yorkville, under the SEPA as well as 200,000 Commitment Shares to be issued to Yorkville concurrently or within one business day of the filing of this registration statement issued as consideration for its entrance into the SEPA and 125,000 Placement Agent Shares issuable to EF Hutton concurrently or within one business day of the filing of this registration statement.

We shall not effect any sales under the SEPA and Yorkville shall not have any obligation to purchase Shares under the SEPA to the extent that after giving effect to such purchase and sale the aggregate number of shares of Common Stock issued under the SEPA together with any shares of Common Stock issued in connection with any other transactions that may be considered part of the same series of transactions, where the average price of such sales would be less than $31.73 and the number of shares issued would exceed the number of shares representing 19.99% of the outstanding voting common stock as of June 25, 2024. Thus, we may not have access to the right to sell the full $2,500,000,000 Shares to Yorkville.

In connection with the SEPA, we are registering herein 37,969,380 shares of Common Stock, which amount shall include the (i) 200,000 Commitment Shares and (ii) 125,000 Placement Agent Shares, and which represents the maximum amount that we could register without obtaining approval of stockholders in accordance with Nasdaq's "minimum price rule." However, if the Company desires to issue more than 37,969,380 Shares at an average price per share that does not equal or exceed $31.73 (which represents the lower of (i) the Nasdaq Official Closing Price (as reflected on Nasdaq.com) immediately preceding the date of the SEPA; or (ii) the average Nasdaq Official Closing Price for the five trading days immediately precedent the date of the SEPA), it would be required to obtain stockholder approval under the Nasdaq listing rules.

Upon the satisfaction of the conditions to Yorkville's purchase obligation set forth in the SEPA, we will have the right, but not the obligation, from time to time at our discretion until the first day of the month following the 36-month period after the date of the SEPA, to direct Yorkville to purchase a specified amount of Shares (each such sale, an "Advance") by delivering written notice to Yorkville (each, an "Advance Notice").

The per share subscription price Yorkville will pay for the Shares will be 97.25% of the market price during a three-day pricing period. The "Market Price" is defined in the SEPA as the lowest daily VWAPs (as defined below) during the three consecutive trading days, commencing on either (i) the trading day upon which TMTG submits an Advance Notice to Yorkville or (ii) the first trading day immediately following the date TMTG submits an Advance Notice to Yorkville. "VWAP" means, for any trading day, the daily volume weighted average price of the Shares for such date on NASDAQ as reported by Bloomberg L.P. during regular trading hours. There is no upper limit on the subscription price per share that Yorkville could be obligated to pay for the Shares.

We will control the timing and amount of any sales of Shares to Yorkville. Actual sales of Shares to Yorkville under the SEPA will depend on a variety of factors to be determined by us from time to time, which may include, among other things, market conditions, the trading price of our Common Stock and determinations by us as to the appropriate sources of funding for our business and its operations.

Yorkville will not be obligated to subscribe to Shares under the SEPA which, when aggregated with all other shares of Common Stock then beneficially owned by Yorkville and its affiliates (as calculated pursuant to Section 13(d) of the Exchange Act, and Rule 13d-3 promulgated thereunder), would result in the beneficial ownership by Yorkville and its affiliates to exceed 4.99% of the outstanding voting power or number of our shares of Common Stock (the "Beneficial Ownership Limitation").

TABLE OF CONTENTS

The net proceeds under the SEPA to us will depend on the frequency and prices at which we sell Shares to Yorkville. We expect that any proceeds received by us from such sales to Yorkville will be used for working capital and general corporate purposes.

Yorkville has agreed that it and its affiliates will not engage in any short sales of the Shares nor enter into any transaction that establishes a net short position in the Shares during the term of the SEPA.

The SEPA will automatically terminate on the earliest to occur of (i) the first day of the month next following the 36-month anniversary of the date of the SEPA or (ii) the date on which Yorkville shall have made payment of Advances pursuant to the SEPA for Shares equal to $2,500,000,000. We have the right to terminate the SEPA at no cost or penalty upon five (5) trading days' prior written notice to Yorkville, provided that there are no outstanding Advance Notices for which Shares need to be issued and TMTG has paid all amounts owed to Yorkville pursuant to the SEPA. We and Yorkville may also agree to terminate the SEPA by mutual written consent. Neither we nor Yorkville may assign or transfer our respective rights and obligations under the SEPA, and no provision of the SEPA may be modified or waived by us or Yorkville other than by an instrument in writing signed by both parties.

As consideration for Yorkville's commitment to purchase Shares at our direction upon the terms and subject to the conditions set forth in the SEPA, we paid YA Global II SPV, LLC, a subsidiary of Yorkville, (i) a structuring fee in the amount of $25,000 and (ii) a commitment fee in the form of 200,000 Commitment Shares.

EF Hutton acted as the exclusive placement agent in connection with the transactions contemplated by the SEPA, for which we will issue to EF Hutton 125,000 Placement Agent Shares concurrently with or within one business day of the filing of this registration statement.

The SEPA contains customary representations, warranties, conditions and indemnification obligations of the parties. The representations, warranties and covenants contained in such agreements were made only for purposes of such agreements and as of specific dates, were solely for the benefit of the parties to such agreements and may be subject to limitations agreed upon by the contracting parties.

We do not know what the subscription price for our Shares will be and therefore cannot be certain as to the number of shares we might issue to Yorkville under the SEPA. The number of shares ultimately offered for resale by Yorkville is dependent upon the number of Shares we may elect to sell to Yorkville under the SEPA.

If and when we elect to issue and sell shares to Yorkville, we may need to register for resale under the Securities Act additional shares in order to receive aggregate gross proceeds equal to the $2,500,000,000 available to us under the SEPA. If we elect to issue and sell more than the 37,644,380 Shares to Yorkville, such additional issuance of shares could cause additional dilution to existing shareholders. The number of shares ultimately offered for resale by Yorkville is dependent upon the number of shares we may elect to sell to Yorkville under the SEPA.

There are substantial risks to our stockholders as a result of the sale and issuance of Shares to Yorkville under the SEPA. These risks include the potential for substantial dilution and significant declines in the price of our Common Stock. See the section entitled "*Risk Factors*." Issuances of the Shares in this offering will not affect the rights or privileges of our existing stockholders, except that the economic and voting interests of each of our existing shareholders will be diluted as a result of any such issuance. Although the number of shares of Common Stock that our existing shareholders own will not decrease as a result of sales, if any, under the SEPA, the shares of Common Stock owned by our existing shareholders will represent a smaller percentage of our total outstanding Common Stock after any such issuance to Yorkville.

For more detailed information regarding the SEPA, see the section entitled "*Committed Equity Financing.*"

***WCT Asset Acquisition***

On July 3, 2024, TMTG, WorldConnect Technologies, L.L.C. ("**WCT**"), WorldConnect IPTV Solutions, LLC ("**Solutions**") and JedTec, L.L.C. ("**JedTec**") entered into an asset acquisition agreement (the "**Asset Acquisition Agreement**"), pursuant to which TMTG agreed to acquire substantially all of the assets of WCT or its affiliate, which mainly included certain agreements, including an option agreement (the "**Option Agreement**"), dated February 5, 2024, by and between WCT, Perception Group, Inc., Perception TVCDN Ltd., and FORA, FOrum RAčunalništva, d.o.o., as amended (each of the parties thereto other than WCT, collectively, "**Perception**"), as well as ancillary agreements related to the source code purchase (the "**Source Code Purchase Agreement**") and support and maintenance (the "**Support and Maintenance Agreement**", together with the Source Code Purchase Agreement, the

TABLE OF CONTENTS

"**CDN Agreements**"). The transaction is expected to close on the date TMTG has implemented the Perception Software and Network (as defined below) with all back-end API services having become generally available on iOS, Google/Android, and web media services and with streaming enabled from at least one data-center, which closing is expected to occur as early as July 2024 (the "**Asset Closing Date**"). Pursuant to the Option Agreement on the Asset Closing Date, WCT entered and will assign on the Asset Closing Date to TMTG the CDN Agreements, which are expected to be used for the roll out of the CDN technology for the Truth platform (the updated version of TMTG's Truth Social web and mobile application with streaming enabled using intellectual property obtained from Perception, the "**Perception Software and Network**"). In addition, Perception and its affiliates agreed not to use or permit other parties to use the source code for a period of five (5) years after the closing of the Asset Acquisition Agreement for any purpose that competes, in the United States, with the Truth platform or commercialization of such source code in the United States. In addition, the Option Agreement grants the (i) option to purchase Perception, until July 3, 2026, subject to a future negotiation of the price and terms of such acquisition and (ii) right of first refusal, until February 5, 2026, to purchase Perception in the event of a bona fide written offer from an unaffiliated third party to purchase more than 50% of the assets of Perception. TMTG does not have any current intention to exercise those rights.

Pursuant to the Asset Acquisition Agreement, TMTG agreed to issue to Solutions and JedTec as consideration up to 5,100,000 shares (the "**Asset Acquisition Shares**") of TMTG common stock, 2,600,000 of which will be issued on the Asset Closing Date and 2,500,000 of which will be issuable upon the satisfaction of certain Milestones (as defined in the Asset Acquisition Agreement). In addition, with respect to all of the Asset Acquisition Shares, for a period of 12 months after the Asset Closing Date, neither JedTec, Solutions nor their respective affiliates will be permitted to collectively sell an amount of the Asset Acquisition Shares during any consecutive two trading week period (the **"Two Week Sale Period"**) exceeding the "Set Percentage." For the purposes of this restriction, the "**Set Percentage**" means a percentage of the average daily trading volume of the TMTG common stock during the immediately preceding two consecutive trading weeks as reported on the primary exchange on which the TMTG common stock is traded (i.e., currently the NASDAQ) (the **"Prior Two Week ADTV"**). Unsold amounts from a Two Week Sale Period do not carry over to a subsequent Two Week Sale Period. The "Set Percentage" is 3% for the first six months after the Asset Closing Date and 5% from six to 12 months after the Asset Closing Date. For example, if during the first six months after the Asset Closing Date a Prior Two Week ADTV is 5,000,000 Asset Acquisition Shares, restricted holders cannot sell more than 150,000 Asset Acquisition Shares during the following Two Week Sale Period. Under the same fact pattern during six to 12 months after the Asset Closing Date, restricted holders could not sell more than 250,000 Asset Acquisition Shares during such Two Week Sale Period.

Concurrently with the execution of the Asset Acquisition Agreement, and as a condition and inducement to the willingness of TMTG to enter into it, WCT agreed to exercise the Option Agreement and enter into the Source Code Purchase Agreement and the Support and Maintenance Agreement, which agreements will be assigned to TMTG on the Asset Closing Date. Under the Source Code Purchase Agreement, Perception agreed to sell a copy of the source code of the software related to the CDN technology ("**Source Code**") and grant the WCT (which grant was assigned under the Asset Acquisition Agreement to TMTG) an irrevocable, non-exclusive, worldwide, perpetual right and license to forever retain, copy, reproduce, use, modify, enhance, create modifications and derivative works of, display, distribute, perform, compile, execute, sublicense, and otherwise exploit the Source Code and all resulting compiled software for commercial exploitation. The purchase price of $17,500,000 will be payable by TMTG in four installments to be completed by the third anniversary of the execution date of the Source Code Purchase Agreement. Further to supplement the Source Code Purchase Agreement, WCT entered into a Support and Maintenance Agreement, under which Perception is to assist TMTG in commercializing the Source Code to develop, launch, and grow the platform. The acquisition of the Source Code is effective as of the Asset Closing Date. Pursuant to the Asset Acquisition Agreement, TMTG will assume on the Asset Closing Date WCT's rights and obligations under the Source Code Purchase Agreement and the Support and Maintenance Agreement. In connection with the Source Code Agreement, TMTG entered into a source code escrow agreement related to the sale of the Source Code. Pursuant to such agreement, Perception will deposit a copy of the Source Code into an escrow account. Subject to certain terms and conditions, immediately after the Asset Closing Date, the escrow agent will hold the Source Code until Perception receives the full purchase price of $17,500,000 for the Source Code. Upon full payment, the Source Code and any modifications will be released to TMTG. TMTG will enter into a registration rights agreement with Solutions and JedTec on the Asset Closing Date, pursuant to which TMTG will file a registration statement with the SEC to register for resale the Asset Acquisition Shares as soon as practicable upon the Asset Closing Date and use its reasonable best efforts to cause such registration statement to become effective and remain effective until all the Asset Acquisition Shares covered by such registration statement have been sold.

TABLE OF CONTENTS

**Stock Exchange Listing**

Our Common Stock and Public Warrants are currently listed on Nasdaq and trade under the symbols “DJT” and “DJTWW,” respectively. On June 25, 2024, the closing price of our Common Stock was $36.37 per share and the closing price of our Public Warrants was $24.73 per Public Warrant.

**Summary of Risk Factors**

Investing in our securities involves risks. You should carefully consider the risks described in “Risk Factors” beginning on page 17 before making a decision to invest in our Common Stock. If any of these risks actually occurs, our business, financial condition and results of operations would likely be materially adversely affected. Some of the risks related TMTG’s business and industry are summarized below.

***Risks Related to TMTG’s Business***

- TMTG has a limited operating history, making it difficult to evaluate TMTG’s business and prospects and may increase the risks associated with your investment.
- TMTG’s actual financial position and results of operations may differ materially from the expectations of TMTG’s Management Team.
- If Truth Social fails to develop and maintain followers or a sufficient audience, if adverse trends develop in the social media platforms generally, or if President Donald J. Trump were to cease to be able to devote substantial time to Truth Social, TMTG’s business would be adversely affected.
- Digital World previously identified material weaknesses in its internal control over financial reporting, and TMTG may identify additional material weaknesses in its previously issued financial statements and in the future, which may cause TMTG to fail to meet its reporting obligations or result in material misstatements of its financial statements.
- Adeptus, TMTG’s former independent registered public accounting firm, has indicated that TMTG’s financial condition raises substantial doubt as to its ability to continue as a going concern.
- TMTG’s estimates of market opportunity and forecasts of market growth may be inaccurate.
- TMTG’s business is subject to complex and evolving U.S. and foreign laws and regulations regarding privacy, data protection, and other matters.
- In the future, TMTG may be involved in numerous class action lawsuits and other lawsuits and disputes.
- Computer malware, viruses, hacking, phishing attacks, and spamming could adversely affect TMTG’s business and results of operations.

***Risks Related to President Donald J. Trump***

- TMTG’s success depends in part on the popularity of its brand and the reputation and popularity of President Donald J. Trump. Adverse reactions to publicity relating to President Donald J. Trump, or the loss of his services, could adversely affect TMTG’s revenues and results of operations.
- President Donald J. Trump is the subject of numerous legal proceedings. An adverse outcome in one or more of the ongoing legal proceedings could negatively impact TMTG.
- The terms of a license agreement with President Donald J. Trump are not terminable by TMTG when it may be desirable to TMTG. In addition, the license agreement does not require President Donald J. Trump to use Truth Social in certain circumstances, including with respect to posts that he determines, in his sole discretion, to be politically-related. If TMTG disagrees with President Donald J. Trump about the scope of his obligation to use, or first post on, Truth Social, TMTG lacks any meaningful remedy with respect to such disagreement—which could have a material adverse effect on the business and/or operations of TMTG.
- Because President Donald J. Trump is a candidate for president, he may, subject to the Lock-up Period, divest his interest in Truth Social.
- TMTG depends on numerous third-parties to operate successfully, and many of these third parties may not want to engage with TMTG to provide any services.

***Risks Related to Ownership of TMTG Securities***

- Nasdaq may delist TMTG's securities from trading on its exchange, which could subject TMTG to trading restrictions.
- The market price of TMTG's common stock may decline as a result of the Business Combination.
- TMTG has discretion in the use of the funds available to it after the Closing and may not use them effectively.
- TMTG stockholders may experience significant dilution in the future.
- As of June 25, 2024, President Donald J. Trump holds approximately 60.4% of the outstanding TMTG Common Stock, which limits other stockholders' ability to influence the outcome of matters submitted to stockholders for approval.
- The sale and issuance of Shares to Yorkville will cause dilution to our existing stockholders, and the sale of Shares acquired by Yorkville, or the perception that such sales may occur, could cause the price of our Common Stock to fall.

**Emerging Growth Company**

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have taken advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) (a) December 31, 2026, (b) the last day of the fiscal year in which we have total annual gross revenue of at least $1.235 billion, or (c) the last day of the fiscal year in which we are deemed to be a large accelerated filer, which means the market value of our Common Stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our Common Stock held by non-affiliates equals or exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues equaled or exceeded $100 million during such completed fiscal year and the market value of our Common Stock held by non-affiliates exceeds $700 million as of the prior June 30th.

We expect to lose our emerging growth company and smaller reporting company status at the end of the fiscal year ended December 31, 2024, when we expect to qualify as a large accelerated filer based on the worldwide market value of our common equity held by non-affiliates as at June 30, 2024.

**Corporate Information**

TMTG's principal executive office is located at 401 N. Cattlemen Rd., Suite 200, Sarasota, FL 34232. TMTG's telephone number is (941) 735-7346.

TABLE OF CONTENTS

## THE OFFERING

| | |
|---|---|
| **Issuer** | Trump Media & Technology Group Corp. |
| **Shares of Common Stock offered by us** | Up to 37,969,380 shares of Common Stock, consisting of:<br>• 37,644,380 Shares that we may sell to Yorkville, from time to time at our sole discretion, pursuant to the SEPA;<br>• 200,000 shares of our Common Stock to be issued to Yorkville as consideration for its commitment to purchase shares of our Common Stock under the SEPA (the "Commitment Shares");<br>• 125,000 shares of our Common Stock to be issued to EF Hutton as the exclusive placement agent in connection with the transactions contemplated by the SEPA. |
| **Shares of Common Stock outstanding after the Offering** | 227,911,250 shares of Common Stock. |
| **Use of Proceeds** | We may receive up to $2,500,000,000 in aggregate gross proceeds from the sale of Shares under the SEPA to be offered in this offering. We intend to use the net proceeds from this offering for working capital and general corporate purposes. See "Use of Proceeds." |
| **Listing** | Our Common Stock and Warrants are currently traded on Nasdaq under the symbol "DJT" and "DJTWW," respectively. |
| **Risk Factors** | Before investing in our securities, you should carefully read and consider the information set forth in "Risk Factors" beginning on page 17. |

For additional information concerning the offering, see "*Plan of Distribution*" beginning on page 148.

Unless otherwise indicated, all information in this prospectus relating to the number of shares of our common stock outstanding is based on 189,941,870 shares of Common Stock outstanding as of June 25, 2024 and does not include:

- 14,499,940 shares of Common Stock issuable upon the exercise of certain outstanding warrants outstanding as of June 25, 2024; or
- 4,667,033 shares of Common Stock being held in escrow pending a resolution of a dispute with certain stockholders.

TABLE OF CONTENTS

## RISK FACTORS

*An investment in our securities involves a high degree of risk. You should carefully consider the following risk factors, together with all of the other information included in this prospectus, before making an investment decision. Our business, prospects, financial condition or operating results could decline due to any of these risks and, as a result, you may lose all or part of your investment.*

*Unless the context otherwise requires, all references in this section to the "Company," "we," "us" or "our" refer to the business of TMTG and its subsidiaries following the consummation of the Business Combination.*

### Risks Related to TMTG's Business

*The value of your investment in us will be subject to the significant risks affecting us and inherent to the industry in which we operate. You should carefully consider the risks and uncertainties described below and other information included in this prospectus. If any of the events described below occur, the business and financial results could be adversely affected in a material way. This could cause the trading price of our Common Stock to decline, perhaps significantly, and you therefore may lose all or part of your investment. As used in the risks described in this subsection, references to "we," "us" and "our" are intended to refer to TMTG unless the context clearly indicates otherwise.*

***TMTG has a limited operating history, making it difficult to evaluate TMTG's business and prospects and may increase the risks associated with your investment.***

Private TMTG was formed on February 8, 2021 and started formulating its business plan at that time. Private TMTG did not begin developing the Truth Social platform until June 2021. Private TMTG made Truth Social available for general use in the first quarter of 2022. We pride ourselves on building Truth Social without relying on hostile technology companies. Working exclusively with alternative technology firms that share our commitment to free speech, Private TMTG fully launched Truth Social for iOS in April 2022. Private TMTG debuted the Truth Social web application in May 2022, and the Truth Social Android App became available in the Samsung Galaxy and Google Play stores in October 2022. Private TMTG introduced direct messaging to all versions of Truth Social in 2022, released a new "Groups" feature for users in May 2023, and announced the general availability of Truth Social internationally in June 2023. TMTG cannot assure you that it will be able to operate its business successfully or implement its operating policies and strategies as described elsewhere in this prospectus. TMTG may encounter risks and challenges frequently experienced by growing companies in rapidly developing industries, including risks related to its ability to:

- build a reputation for providing a superior platform and customer service, and for creating trust and long-term relationships with its potential customers;
- implement a revenue model allowing it to develop predictable revenues;
- distinguish itself from competitors and navigate political issues;
- develop and offer a competitive platform that meets TMTG's customers' needs as they change;
- improve TMTG's current operational infrastructure and non-platform technology to support its growth and to respond to the evolution of TMTG's market and competitors' developments;
- develop, maintain and expand TMTG's relationships with suppliers of quality advertising;
- respond to complex, evolving, stringent, contradictory industry standards and government regulation on an international scale that impact TMTG's business;
- prevent, detect, respond to, or mitigate failures or breaches of privacy and security; and
- hire and retain qualified and motivated employees.

If TMTG is unable to do so, its business may suffer, its revenue and operating results may decline and TMTG may not be able to achieve further growth or sustain profitability.

TABLE OF CONTENTS

TMTG's intellectual property rights. TMTG cannot predict whether third parties will assert claims of infringement against it, the subject matter of any of these claims or whether these assertions or prosecutions will adversely affect TMTG's business. If TMTG is forced to defend itself against any of these claims, whether they are with or without merit or are determined in TMTG's favor, TMTG may face costly litigation, diversion of technical and management personnel, inability to use TMTG's current branding or website technology or inability to market TMTG's service or merchandise TMTG's products. As a result of a dispute, TMTG may have to develop non-infringing technology, rebrand, enter into royalty or licensing agreements, adjust TMTG's merchandizing or marketing activities or take other action to resolve the claims. These actions, if required, may be unavailable on terms acceptable to TMTG, costly or unavailable.

***If TMTG is unable to protect TMTG's domain names, TMTG's reputation and brand could be affected adversely.***

TMTG may hold various domain names relating to TMTG's brand, including TMTGcorp.com and Truthsocial.com. Failure to protect TMTG's domain names could affect adversely TMTG's reputation and brand and make it more difficult for users to find TMTG's website and TMTG's service. The acquisition and maintenance of domain names generally are regulated by governmental agencies and their designees. The regulation of domain names in the United States may change in the near future. Governing bodies may establish additional top-level domains, appoint additional domain name registrars, or modify the requirements for holding domain names. As a result, TMTG may be unable to acquire or maintain relevant domain names. Furthermore, the relationship between regulations governing domain names and laws protecting trademarks and similar proprietary rights is unclear. TMTG may be unable to prevent third parties from acquiring domain names that are similar to, infringe upon, or otherwise decrease the value of TMTG's trademarks and other proprietary rights.

***In the future, TMTG may be involved in numerous class action lawsuits and lawsuits and disputes that are expensive and time consuming, and, if resolved adversely, could harm TMTG's business, financial condition or results of operations.***

In addition to intellectual property and licensing claims, TMTG may also be involved in numerous other lawsuits, many of which typically include claims for statutory damages, including putative class action lawsuits brought by users and claims brought by contractual counterparties such as vendors, current or former employees, convertible noteholders or advertising partners, or by stockholders, many of which claim statutory damages. Recent putative class action complaints against other companies in TMTG's industry have included claims for violations of the Electronic Communications Privacy Act, 18 U.S.C. §§ 1030, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, The California Invasion of Privacy Act, Cal. Penal Code § 631, the California Unfair Competition Law, Business and Professions Code §§ 17200, *et seq*., the New York General Business Law §§ 349, *et seq*., and tort claims for negligence, invasion of privacy, intrusion upon seclusion, larceny/receipt of stolen property, conversion, and unjust enrichment. In fact, TMTG anticipates that TMTG will continue to be a target for numerous lawsuits in the future, and that prospective or actual litigation involving TMTG may generate significant negative attention. If TMTG is able to build an expansive user base, the plaintiffs in class action cases filed against TMTG typically will claim enormous monetary damages even if the alleged per-user harm is small or non-existent. Any litigation to which TMTG may in the future be a party may result in an onerous or unfavorable judgment that may not be reversed upon appeal, or TMTG may decide to settle lawsuits on similarly unfavorable terms. Any such negative outcome could result in payments of substantial monetary damages or fines, or changes to TMTG's products or business practices, and accordingly TMTG's business, financial condition, or results of operations could be materially and adversely affected. However, defending any future claims may be costly and can impose a significant burden on management and employees, and TMTG may receive unfavorable preliminary or interim rulings in the course of litigation, which could adversely affect the market price of TMTG common stock. There can be no assurances that a favorable final outcome will be obtained in any cases in the future.

***President Donald J. Trump has significant influence over key decision making as a result of his control of a significant portion of TMTG's voting stock.***

As of June 25, 2024, President Donald J. Trump beneficially owns approximately 60.4% of the voting power of the outstanding TMTG common stock. As a result, President Donald J. Trump has the ability to significantly influence the outcome of matters submitted to TMTG's stockholders for approval, including the election of directors and any merger, consolidation, or sale of all or substantially all of the TMTG's assets. In the

event that President Donald J. Trump controls the TMTG Board at the time of his death, control may be transferred to a person or entity that he designates as his successor. As a stockholder, even a controlling stockholder, President Donald J. Trump is entitled to vote his shares in his own interests, which may not always be in the interests of TMTG's stockholders generally.

***TMTG cannot be certain that additional financing will be available on reasonable terms when required, or at all.***

From time to time, TMTG may need additional financing. TMTG's ability to obtain additional financing, if and when required, will depend on investor demand, TMTG's operating performance, the condition of the capital markets, and other factors. If TMTG raises additional funds through the issuance of equity, equity-linked or debt securities, those securities may have rights, preferences, or privileges senior to the rights of the TMTG common stock and TMTG's existing stockholders may experience dilution. Certain financial-industry service providers have expressed, or may be reasonably expected to express, an unwillingness or reluctance to work on TMTG's products or provide services due to TMTG's connection with President Donald J. Trump. Similarly, to the extent TMTG needs to raise additional capital, TMTG will need to engage with investment bankers and investors and it is possible that some will not want to engage with TMTG for similar reasons. Hostility from financial institutions could adversely affect TMTG's ability to obtain banking services, including additional financing on reasonable terms when required, or at all, which could adversely affect TMTG's business and financial results.

***TMTG's costs may grow more quickly than TMTG's revenue, harming TMTG's business and profitability.***

TMTG expects its expenses to continue to increase in the future as it broadens its user base, as users increase the number of connections and amount of data they share with us, as TMTG develops and implements new product features that require more computing infrastructure, and as TMTG hires additional employees. TMTG expects to incur increasing costs, in particular for servers, storage, power, and data centers, to support TMTG's anticipated future growth. TMTG expects to continue to invest in TMTG's infrastructure in order to provide TMTG's products rapidly and reliably to all users around the world, including in countries where TMTG does not expect significant short-term monetization. TMTG's expenses may be greater than TMTG anticipates, and TMTG's investments to make TMTG's business and TMTG's technical infrastructure more efficient may not be successful. In addition, TMTG may increase marketing, sales, and other operating expenses in order to grow and expand TMTG's operations and to remain competitive. Increases in TMTG's costs may adversely affect TMTG's business and profitability.

***TMTG's business is dependent on its ability to maintain and scale TMTG's technical infrastructure, and any significant disruption in TMTG's service could damage TMTG's reputation, result in a potential loss of users and engagement, and adversely affect TMTG's financial results.***

TMTG's reputation and ability to attract, retain and serve TMTG's users is dependent upon the reliable performance of Truth Social and TMTG's underlying technical infrastructure. TMTG's systems may not be adequately designed with the necessary reliability and redundancy to avoid performance delays or outages or service disruptions that could be harmful to TMTG's business. If Truth Social is unavailable when users attempt to access it, or if it does not load as quickly as they expect, users may not return to TMTG's website as often in the future, or at all. As TMTG's user base and the amount and types of information shared on Truth Social continue to grow, TMTG will need an increasing amount of technical infrastructure, including network capacity, and computing power, to continue to satisfy the needs of TMTG's users. It is possible that TMTG may fail to effectively scale and grow TMTG's technical infrastructure to accommodate these increased demands. In addition, as stated above, TMTG's business is subject to interruptions, delays, or failures resulting from earthquakes, other natural disasters, terrorism, or other catastrophic events.

A substantial portion of TMTG's network infrastructure will be provided by third parties. Any disruption or failure in the services TMTG receives from these providers could harm TMTG's ability to handle new or increased traffic and could significantly harm TMTG's business. Any financial or other difficulties these providers face may adversely affect TMTG's business, and TMTG exercise little control over these providers, which increases TMTG's vulnerability to problems with the services they provide.

***TMTG's software is highly technical, and if it contains undetected errors, TMTG's business could be adversely affected. TMTG's business and operating results may be harmed by a disruption in TMTG's service, or by TMTG's failure to timely and effectively scale and adapt TMTG's existing technology and infrastructure.***

One of the reasons people will come to Truth Social is for real-time information. TMTG in the future may experience service disruptions, outages, and other performance problems due to a variety of factors, including

TABLE OF CONTENTS

resources, and TMTG may not be able to manage the process successfully. TMTG may not successfully evaluate or utilize the acquired technology or personnel, or accurately forecast the financial impact of an acquisition transaction, including accounting charges. TMTG may have to pay cash, incur debt, or continue to issue equity securities to pay for any such acquisition, any of which could adversely affect TMTG's financial results. The sale of equity or issuance of debt to finance any such acquisitions, such as the Asset Acquisition Agreement with WCT, would continue to dilute existing TMTG's stockholders. The incurrence of indebtedness would result in increased fixed obligations and could also include covenants or other restrictions that would impede TMTG's ability to manage TMTG's operations.

***TMTG may be subject to greater risks than typical social media platforms because of the focus of its offerings and the involvement of President Donald J. Trump. These risks include active discouragement of users, harassment of advertisers or content providers, increased risk of hacking of TMTG's platform, lesser need for Truth Social if First Amendment speech is no longer believed to be suppressed by other similar platforms, criticism of Truth Social for its moderation practices, and increased stockholder suits.***

TMTG is aware that big tech platforms, such as YouTube, "de-monetize" certain content because they disagree with its message. There have been numerous calls to ban or encourage advertisers to boycott content providers who express or permit views contrary to the prevailing narrative. It is likely that these same people calling for boycotts will seek to do the same for companies that may advertise on Truth Social. To the extent these calls are successful, or the mere threat of them sufficient, to prevent advertisers from appearing on TMTG's platform, TMTG may not generate the revenues TMTG anticipates and the price of TMTG's stock could decline as a result.

To foster a flourishing digital public forum, TMTG seeks to prevent illegal and other prohibited content from contaminating its platform. In accordance with Truth Social's terms of service, illegal and prohibited content includes, but is not limited to, depictions or threats of violence, harassment, incitement of or threats of physical harm. Using human moderators and an artificial intelligence vendor known as HIVE, Truth Social has developed what TMTG believes is a robust, fair, and viewpoint-neutral moderation system and that its moderation practices are consistent with, and indeed help facilitate, TMTG's objective of maintaining "a public, real-time platform where any user can create content, follow other users, and engage in an open and honest global conversation without fear of being censored or cancelled due to their political viewpoints." However, there is a risk that TMTG's moderation practices will be criticized as inconsistent with its promotion of free-speech principles or may result in inadvertent violations of Truth Social's terms of use as Truth Social's user base increases and becomes increasingly more challenging to moderate adherence to such terms. To the extent that TMTG is unable to prevent illegal or other prohibited content from appearing on the Truth Social platform, users and/or advertisers may find the Truth Social platform less appealing, which could have an adverse effect on TMTG's ability to attract grow its advertisers and user base, negatively impacting TMTG's revenues and jeopardizing Truth Social's access to the Apple and Google Play stores, the latter of which delayed its initial approval of the app due to alleged violations of Google's content-moderation policies.

In July 2023, U.S. District Court Judge Terry Doughty issued a preliminary injunction barring numerous federal officials and agencies - including Surgeon General Vivek Murthy, Health and Human Services Secretary Xavier Becerra, White House press secretary Karine Jean-Pierre and all employees of the Justice Department and FBI — from having any contact with social media firms for the purpose of discouraging or removing First Amendment-protected speech. The judge's decision cites a wide range of topics that he found "were suppressed" on social media at the urging of administration officials, including opposition to COVID-19 vaccines, masking, lockdowns and the lab-leak theory; opposition to President Biden's and other officials' policies; and the statements supporting the authenticity of the contents of a laptop abandoned by President Biden's son, Hunter Biden, at a Delaware computer shop. (On October 20, 2023, the United States Supreme Court stayed Judge Doughty's injunction, as modified by the United States Court of Appeals for the Fifth Circuit, pending a forthcoming Supreme Court ruling in this matter.) The United States Supreme Court heard oral arguments on the case on March 18, 2024. To the extent that Judge Doughty's opinion signals increasing judicial enforcement of free speech rights against big tech tyrants otherwise inclined to suppress them, such enforcement could reduce Truth Social's comparative advantage. All social media sites are subject to risks of hackers or people who try to disrupt their operations and post false or malicious information or make it seem as if innocent third persons are posting such information. Such people may also try to steal personal information about TMTG's users. TMTG believes it will be subject to greater risks in this regard than other social media companies currently are. Accordingly, TMTG will have to spend more money to build more robust security to protect against these

attacks. There can be no assurance that these efforts will be successful. Any increase of expenditures to protect against attacks will increase TMTG's expense and thus, decrease its ability to achieve and remain profitable. In the event these attacks are successful, TMTG will have to devote resources to correct problems as well as possibly pay damages to its users for losses they suffer.

TMTG is a Delaware corporation which allows TMTG's stockholders certain rights under Delaware law to information and to make inquiries of the TMTG Board. It is possible that people will invest in TMTG's common stock simply with the intention to see such information and disrupt TMTG's Management Team's attention on TMTG's business. The costs of these matters will increase TMTG's expenses and thus decrease TMTG's ability to achieve profitability and remain profitable.

***TMTG depends on numerous third-parties to operate successfully, and many of these third parties may not want to engage with TMTG to provide any services. This may limit TMTG's ability to operate, raise capital, or generate revenue.***

To operate successfully, TMTG relies on third parties to provide services such as web hosting, content monitoring and technology development. TMTG also partners with third parties to provide various non-technical business services, and generates revenue from third-party advertisers who place advertisements on Truth Social via TMTG's advertising partners. To date, several potential third-party partners have expressed an unwillingness or reluctance to work on TMTG's products or provide services for reasons including TMTG's connection with President Donald J. Trump. To the extent TMTG needs to raise additional capital or generate additional advertising revenue, TMTG will need to engage with investment bankers, investors, or prospective advertisers, and it is possible that some third parties will refuse to engage with TMTG. For example, it was widely reported that at least one of the initial investors of Digital World sold their stock rather than invest in a company associated with President Donald J. Trump. If TMTG is unable to successfully engage third parties, TMTG's ability to develop and improve its products, raise additional capital, or generate advertising revenue will be limited. Additionally, if current technical or non-technical service providers discontinue an existing relationship with TMTG, such discontinuity could disrupt or cause inconvenience to TMTG's business operations until replacement service providers are identified and engaged.

**Risks Related to President Donald J. Trump**

***TMTG's success depends in part on the popularity of its brand and the reputation and popularity of President Donald J. Trump. The value of TMTG's brand may diminish if the popularity of President Donald J. Trump were to suffer. Adverse reactions to publicity relating to President Donald J. Trump, or the loss of his services, could adversely affect TMTG's revenues, results of operations and its ability to maintain or generate a consumer base.***

While TMTG believes there is sufficient demand for a true free speech platform, the image, reputation, popularity and talent of President Donald J. Trump will be important factors to its success. According to The Hill-HarrisX polls, only one-third of voters surveyed said they would use a social media site associated with President Donald J. Trump. In addition, according to a survey published in *The New York Post*, only 61% of Republicans would use the Truth Social platform "a lot" or "some" of the time. In order to be successful, TMTG will need millions of those people to register and regularly use TMTG's platform. If President Donald J. Trump becomes less popular or there are new controversies that damage his credibility or the desire of people to use a platform associated with him, and from which he will derive financial benefit, TMTG's results of operations could be adversely affected.

***The death, incarceration, or incapacity of President Donald J. Trump, or discontinuation or limitation of his relationship with TMTG, would negatively impact TMTG's business.***

TMTG is highly dependent on the popularity and presence of President Donald J. Trump, its largest stockholder. President Donald J. Trump has a significant influence on TMTG's business plan. TMTG believes President Donald J. Trump's reputation and relationships are a critical element to the success of TMTG's business. TMTG's future success will depend, to a significant extent, upon the continued presence and popularity of President Donald J. Trump. If President Donald J. Trump were to discontinue his relationship with TMTG due to death, disability, criminal conviction, incarceration, or any other reason, or limit his involvement with TMTG due to his ongoing candidacy for political office, TMTG would be significantly disadvantaged.

TABLE OF CONTENTS

***President Donald J. Trump is the subject of numerous legal proceedings, the scope and scale of which are unprecedented for a former President of the United States and current candidate for that office. An adverse outcome in one or more of the ongoing legal proceedings in which President Donald J. Trump is involved could negatively impact TMTG and its Truth Social platform.***[2]

On September 21, 2022, the Attorney General of the State of New York-who pledged to pursue President Donald J. Trump even before taking office-launched a civil suit against President Donald J. Trump and affiliated individuals and entities. Included among these affiliated entities was The Trump Organization. Donald J. Trump, Jr., who is a TMTG director, is the Executive Vice President of The Trump Organization.

The suit alleged business fraud relating to misrepresentations in the preparation of President Donald J. Trump's annual statements of financial condition in the years 2011 through 2021. President Donald J. Trump had previously been held in civil contempt in April 2022 for failing to comply with a subpoena for documents during the course of the New York Attorney General's investigation related to these charges. In June 2023, a New York appeals court narrowed the fraud case, the trial for which commenced in October 2023 and closing oral arguments were concluded on January 11, 2024. New York Supreme Court Justice Arthur Engoron, in a Decision and Order dated February 16, 2024, held President Donald J. Trump and defendants liable under the following five causes of action. Specifically, (i) for repeatedly and persistently falsifying business records, thus violating Executive Law § 63(12) and New York Penal Law 175.05; (ii) for conspiracy to falsify business records; (iii) for repeatedly and persistently issuing false financial statements, thus violating Executive Law § 63(12) and New York Penal Law 175.45; (iv) for repeatedly and persistently committing insurance fraud in violation of Executive Law § 63(12) and New York Penal Law 176.05; and (v) for conspiracy to commit insurance fraud. The court ordered President Donald J. Trump and defendants to pay approximately $354,868,768 in aggregate disgorgement of ill-gotten gains, including $168,040,168 with pre-judgment interest from March 4, 2019; $126,828,600, with pre-judgment interest from May 11, 2022, and $60,000,000, with pre-judgment interest from June 26, 2023. The trial court enjoined President Donald J. Trump, among others, from serving as an officer or director of any New York corporation or other legal entity in New York for a period of three years, and from applying for loans from any financial institution chartered by or registered with the New York Department of Financial Services for a period of three years. However, the foregoing injunctions were subsequently stayed pending appeal.

In its February 16, 2024 ruling, the court ordered Judge Barbara Jones (ret.) to continue in her role as an Independent Monitor, tasked with overseeing the Trump Organization's financial disclosures to any third parties and any transfer or other dissipation of assets, for a period of no less than three years following the ruling. In addition to the continued monitorship, the court also ordered that an Independent Director of Compliance be installed at the Trump Organization, who will be responsible for ensuring good financial and accounting practices, will establish internal written protocols for financial reporting, and will also approve any financial disclosures to third parties in advance of submission.

On March 30, 2023, the Manhattan District Attorney indicted President Donald J. Trump on 34 counts of falsifying business records in the first degree under the New York State Penal Law, in connection with a so-called "hush money" payment made before the 2016 presidential election. On May 30, 2024, President Trump was found guilty on all 34 counts. Sentencing has been scheduled for September 18, 2024.

On May 9, 2023, a jury found President Donald J. Trump liable for both battery and defamation against E. Jean Carroll, and Ms. Carroll was awarded $5 million in total damages for both claims (the latter of which arose from a 2022 post by President Donald J. Trump on Truth Social). The jury also determined that Ms. Carroll did not prove, by a preponderance of the evidence, that President Donald J. Trump raped her. On July 19, 2023, a federal district court judge denied President Donald J. Trump's request for a new trial and/or reduction in damages. President Donald J. Trump appealed, and a panel of the U.S. Court of Appeals heard oral arguments on October 23, 2023. On January 26, 2024, following a second civil trial in the U.S. District Court for the Southern District of New York, Ms. Carroll was awarded an additional $83.3 million in connection with statements made by President Donald J. Trump in 2019. On February 7, 2024, the judge denied President Donald J. Trump's motion for a mistrial. An appeal is pending. President Donald J. Trump's countersuit against Ms. Carroll for defamation was dismissed on August 7, 2023.

On June 8, 2023, President Donald J. Trump was indicted on 37 federal charges, including willful retention of national defense information related to documents seized during an FBI raid at Mar-a-Lago in August 2022.

2 Note to TMTG/NM: Please update as needed.

TABLE OF CONTENTS

The indictment did not address President Donald J. Trump's authority with respect to such information under the Presidential Records Act, and President Donald J. Trump pleaded not guilty to all 37 charges. On July 27, 2023, a superseding indictment added three additional charges against President Donald J. Trump. A trial in the U.S. District Court for the Southern District of Florida had been scheduled to begin on May 20, 2024, but as indefinitely postponed on May 7, 2024.

On August 1, 2023, President Donald J. Trump was indicted on four (4) federal charges-conspiracy to violate rights, conspiracy to defraud the government, and one count each of obstructing an official proceeding and conspiring to do so-in connection with the 2020 election and events related to the certification thereof on January 6, 2021. President Donald J. Trump pleaded not guilty, and a trial in the U.S. District Court for the District of Columbia was previously scheduled to begin on March 4, 2024. However, in light of an ongoing appeal, that trial date was vacated on February 2, 2024. On December 1, 2023, the U.S. District Court for the District of Columbia ruled that President Donald J. Trump was not immune from prosecution in this matter, which was affirmed by a panel of the U.S. Court of Appeals for the D.C. Circuit on February 6, 2024. The U.S. Supreme Court agreed to decide the immunity issue and heard oral arguments on April 25, 2024. The U.S. Supreme Court ruled in favor of President Donald J. Trump on July 1, 2024. Separately, on December 1, 2023, the U.S. Court of Appeals for the District of Columbia Circuit ruled that President Donald J. Trump is not immune from certain civil claims in connection with the events of January 6, 2021.

On August 14, 2023, President Donald J. Trump and 18 co-defendants were indicted on state racketeering charges brought by the district attorney in Fulton County, Georgia in connection with the aftermath of the 2020 election. In September and October 2023, four of President Donald J. Trump's co-defendants pleaded guilty. President Donald J. Trump pleaded not guilty. In November 2023, the prosecutor requested an August 5, 2024 trial date. On January 25, 2024, President Donald J. Trump filed a motion to join a co-defendant's motion to dismiss the grand jury indictment and disqualify the district attorney. On March 13, 2024, the judge dismissed three counts against President Trump. On March 15, 2024, the judge declined to disqualify the district attorney, provided that a special prosecutor with whom she had a romantic relationship left the case. President Donald J. Trump and several of his co-defendants have filed an appeal and are continuing to seek the district attorney's disqualification. The Georgia Court of Appeals has tentatively scheduled oral argument of the appeal for October 4, 2024, and no trial date for President Donald J. Trump has been set.

The foregoing does not purport to be an exhaustive list of legal proceedings in which President Donald J. Trump is or has been involved. In June 2016, USA Today published an analysis of litigation involving President Donald J. Trump, which found that over the previous three decades President Donald J. Trump and his businesses had been involved in at least 3,500 legal cases in U.S. federal and state courts. Of the approximately 3,500 suits, President Donald J. Trump or one of his companies were plaintiffs in 1,900; defendants in 1,450; and bankruptcy, third party, or other in 150. President Donald J. Trump was named personally in at least 169 suits in federal court. Over 150 other cases were in the Seventeenth Judicial Circuit Court of Florida (covering Broward County, Florida) since 1983. In the 1,300 cases where the record establishes the outcome, President Donald J. Trump settled 175 times, lost 38, won 450, and had another 137 cases end with some other outcome. In the other 500 cases, judges dismissed plaintiffs' claims against President Donald J. Trump. However, you should not rely on or infer any trends based on the disposition of such prior cases against President Donald J. Trump as no assurance can be given regarding the results of the pending legal proceedings.

Although TMTG is not a party to any of the above-referenced matters, TMTG cannot predict what effect, if any, an adverse outcome to such matters, or even their continued existence, may have on President Donald J. Trump's personal reputation and TMTG's business or prospects.

***A publicly-traded entity controlled by President Donald J. Trump has previously been subject to a cease and desist order issued by the Securities and Exchange Commission.***

On January 16, 2002, the SEC issued a cease and desist order against Trump Hotels & Casino Resorts, Inc. ("THCR") for violations of the anti-fraud provisions of the Exchange Act. As discussed in more detail in the SEC Release No. 45287, on October 25, 1999, THCR had issued a press release announcing its results for the third quarter of 1999 (the "Earnings Release"). To announce those results, the Earnings Release used a net income figure that differed from net income calculated in conformity with U.S. GAAP. Using that non-GAAP figure, the Earnings Release touted THCR's purportedly positive operating results for the quarter and stated that the Company had beaten analysts' earnings expectations. The Earnings Release was materially misleading because it created the false and misleading impression that THCR had exceeded earnings expectations primarily

TABLE OF CONTENTS

through operational improvements, when in fact it had not. The Earnings Release expressly stated that the net income figure excluded a one-time charge. The undisclosed one-time gain was material, because it represented the difference between positive trends in revenues and earnings and negative trends in revenues and earnings, and the difference between exceeding analysts' expectations and falling short of them. SEC stated that by knowingly or recklessly issuing a materially misleading press release, THCR violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The SEC accepted THCR's offer of settlement.

Any failure to maintain effective disclosure controls and internal control over financial reporting could have a material and adverse effect on its business and operating results and cause a decline in the price of TMTG common stock.

***A number of companies that were associated with President Donald J. Trump have filed for bankruptcy. There can be no assurances that TMTG will not also become bankrupt.***

Entities associated with President Donald J. Trump have filed for bankruptcy protection in the past. The Trump Taj Mahal, which was built and owned by President Donald J. Trump, filed for Chapter 11 bankruptcy in 1991. The Trump Plaza, the Trump Castle, and the Plaza Hotel, all owned by President Donald J. Trump at the time, filed for Chapter 11 bankruptcy in 1992. THCR, which was founded by President Donald J. Trump in 1995, filed for Chapter 11 bankruptcy in 2004. Trump Entertainment Resorts, Inc., the new name given to Trump Hotels & Casino Resorts after its 2004 bankruptcy, declared bankruptcy in 2009. While all of the foregoing were in different businesses than TMTG, there can be no guarantee that TMTG's performance will exceed the performance of those entities.

***A number of companies that had license agreements with President Donald J. Trump have failed. There can be no assurances that TMTG will not also fail.***

Trump Shuttle, Inc., launched by President Donald J. Trump in 1989, defaulted on its loans in 1990 and ceased to exist by 1992. Trump University, founded by President Donald J. Trump in 2005, ceased operations in 2011 amid lawsuits and investigations regarding that company's business practices. Trump Vodka, a brand of vodka produced by Drinks Americas under license from The Trump Organization, was introduced in 2005 and discontinued in 2011. Trump Mortgage, LLC, a financial services company founded by President Donald J. Trump in 2006, ceased operations in 2007. GoTrump.com, a travel site founded by President Donald J. Trump in 2006, ceased operations in 2007. Trump Steaks, a brand of steak and other meats founded by President Donald J. Trump in 2007, discontinued sales two months after its launch. While all these businesses were in different industries than TMTG, there can be no guarantee that TMTG's performance will exceed the performance of these entities.

***The terms of a license agreement with President Donald J. Trump are not terminable by TMTG when it may be desirable to TMTG. In addition, the license agreement does not require President Donald J. Trump to use Truth Social in certain circumstances, including with respect to posts that he determines, in his sole discretion, to be politically-related. If TMTG disagrees with President Donald J. Trump about the scope of his obligation to use, or first post on, Truth Social, TMTG lacks any meaningful remedy with respect to such disagreement — which could have a material adverse effect on the business and/or operations of TMTG.***

The License Agreement includes a provision that obligates President Donald J. Trump to make any non-political social media post from any of his personal (i.e., non-business) accounts on Truth Social and to refrain from making the same post on another social media site for 6 hours (the "Exclusivity Obligation"). Thereafter, he is free to post on any site to which he has access. Thus, TMTG has limited time to benefit from his posts and followers may not find it compelling to use Truth Social to read his posts that quickly.

In addition, he may make any post that he deems, in his sole discretion, to be politically-related ("Political Related Posts") on any social media site at any time, regardless of whether that post originates from a personal account. As a candidate for president, most or all of President Donald J. Trump's social media posts may be deemed by him to be politically related. For example, certain video posts initially made by his campaign to other social media platforms in June 2024 were not posted in exactly the same form on Truth Social. Consequently, TMTG may lack any meaningful remedy if President Donald J. Trump minimizes his future use of Truth Social and/or broadly construes the definition of Political Related Posts.

President Donald J. Trump may terminate the Exclusivity Obligation upon thirty days prior written notice provided at any time on or after February 2, 2025. From and after termination of the Exclusivity Obligation,

President Donald J. Trump must make reasonable, good faith efforts to contemporaneously post on Truth Social any non-political posts that he makes from a personal account to another social media platform. However, that obligation is also subject to the exception for Political Related Posts.

Under the License Agreement with President Donald J. Trump, neither the personal nor political conduct of President Donald J. Trump, even if such conduct could negatively reflect on TMTG's reputation or brand or be considered offensive, dishonest, illegal, immoral, or unethical, or otherwise harmful to TMTG's brand or reputation, will be considered a breach of the license agreement. TMTG expressly acknowledges the controversial nature of being associated with President Donald J. Trump and the possibility of any associated controversies affecting TMTG adversely.

TMTG Sub may not terminate the License Agreement based on the personal or political conduct of President Donald J. Trump, even if such conduct could negatively reflect on TMTG's reputation or brand or be considered offensive, dishonest, illegal, immoral, or unethical, or otherwise harmful to TMTG's brand or reputation. Further, TMTG Sub may be obligated to indemnify President Donald J. Trump for losses of any type that relate in any way to the License Agreement, including any such losses attributable to President Donald J. Trump's own offensive, dishonest, illegal, immoral, unethical or otherwise harmful conduct.

***If TMTG encounters issues with the rollout and implementation of its streaming content plans, TMTG may delay or decide not to fully implement the service, which may affect TMTG's growth strategy and operations.***

TMTG plans to roll out its streaming content in three phases: Phase 1: Introduce Truth Social's content delivery network ("**CDN**") for streaming live TV to the Truth Social app for Android, iOS, and Web. Phase 2: Release stand-alone Truth Social over-the-top streaming apps for phones, tablets, and other devices. Phase 3: Release Truth Social streaming apps for home TV. As part of the roll out of its own CDN, TMTG entered into the Asset Acquisition Agreement and the related ancillary maintenance and support agreements with WCT and its affiliates, pursuant to which upon the closing of the Asset Acquisition Agreement WCT will assign TMTG an irrevocable, non-exclusive, worldwide, perpetual right and license to forever retain, copy, reproduce, use, modify, enhance, create modifications and derivative works of, display, distribute, perform, compile, execute, sublicense, and otherwise exploit the Source Code and all resulting compiled software for commercial exploitation. In addition, Perception and its affiliates agreed not to use or permit other parties to use the source code for a period of five (5) years after the closing of the Asset Acquisition Agreement for any purpose that competes, in the United States, with the Truth platform or commercialization of such source code in the United States.

TMTG expects to distribute a beta version of Phase 1 in the third quarter of 2024 and fully launch Phase 1 by the end of 2024. Beta versions of Phases 2 and 3 are expected to follow shortly after the launch of the beta version of Phase 1. TMTG anticipates starting to generate revenue from this technology during 2025, contingent upon the successful implementation of all three phases.

The foregoing timeline and revenue generation expectations are preliminary and depend on several factors, many of which are outside of TMTG's control, including TMTG's ability to economically launch its CDN technology. This may depend on TMTG's ability to develop, integrate and effectively capitalize on the benefits of such technology, successfully complete beta testing, and list the relevant apps on leading app stores. Any delays or challenges in these areas could materially affect the timeline and/or implementation of the CDN technology. If TMTG is unable to address these challenges effectively, it could result in significant delays, increased costs, and the inability to meet revenue timeline expectations. Any of these risks may lead to TMTG deciding to cease the implementation of the rollout of TMTG's streaming content and CDN technology altogether, which would have a material adverse effect on TMTG's growth strategy and may result in a material adverse effect on the results and operations of TMTG. See "*— TMTG plans to expand its operations abroad where TMTG has limited operating experience and may be subject to increased business and economic risks that could affect TMTG's financial results.*"

**Risks Related to Ownership of TMTG common stock**

***Apart from this prospectus, we filed on June 18, 2024 a prospectus for the resale of shares of Common Stock, which represent a substantial percentage of our outstanding Common Stock, and the sales of such shares and the securities under this prospectus, or the perception that these sales could occur, could cause a significant decline in the trading price of our Common Stock.***

The prospectus we filed on June 18, 2024 relates to the offer and sale from time to time by the selling securityholders named in that prospectus or their permitted transferees of 146,108,680 shares of Common Stock.

TABLE OF CONTENTS

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis provides information which TMTG's Management Team believes is relevant to an assessment and understanding of TMTG's results of operations and financial condition. Our financial condition and results of operations should be read together with our consolidated financial statements and the related notes appearing in this prospectus. In addition to historical information, this discussion and analysis contains forward-looking statements that involve risks, uncertainties, assumptions and other factors that could cause actual results to differ materially from those made, projected or implied in the forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to, those discussed below and elsewhere, particularly in the "Cautionary Note Regarding Forward-Looking Statements" section of this prospectus, and in the "Risk Factors" section of this prospectus.*

*Unless otherwise indicated or the context otherwise requires, references in this section to "we," "our," "us," the "Company" and other similar terms refer to TMTG.*

### Overview

TMTG aspires to build a media and technology powerhouse to rival the liberal media consortium and promote free expression. Private TMTG was founded to fight back against the big tech companies-Meta (Facebook, Instagram, and Threads), X (formerly Twitter), Netflix, Alphabet (Google), Amazon and others-that it believes collude to curtail debate in America and censor voices that contradict their "woke" ideology. TMTG aims to safeguard public debate and open dialogue, and to provide a platform for all users to freely express themselves.

Private TMTG was incorporated on February 8, 2021, and launched its first product, Truth Social, which is a social media platform aiming to end big tech's assault on free speech by opening up the internet and giving the American people their voices back. It is a public, real-time platform where any user can create content, follow other users, and engage in an open and honest global conversation without fear of being censored or cancelled due to their political viewpoints. TMTG does not restrict whom a user can follow, which it believes will greatly enhance the breadth and depth of available content. Additionally, users can be followed by other users without requiring a reciprocal relationship, enhancing the ability of TMTG users to reach a broad audience.

Truth Social was generally made available in the first quarter of 2022. TMTG prides itself on operating its platform, to the best of its ability, without relying on big tech companies. Partnering with pro-free-speech alternative technology firms, Private TMTG fully launched Truth Social for iOS in April 2022. Private TMTG debuted the Truth Social web application in May 2022, and the Truth Social Android App became available in the Samsung Galaxy and Google Play stores in October 2022. Private TMTG introduced direct messaging to all versions of Truth Social in 2022, released a "Groups" feature for users in May 2023, and announced the general availability of Truth Social internationally in June 2023. Since its launch, Truth Social has experienced substantial growth, from zero to an aggregate of approximately 9.0 million signups for Truth Social via iOS, Android and the web as of mid-February 2024. However, investors should be aware that since its inception, TMTG has not relied on any specific key performance metric to make business or operating decisions. Consequently, it has not been maintaining internal controls and procedures for periodically collecting such information, if any. While many mature industry peers may gather and analyze certain metrics, given the early development stage of the Truth Social platform, TMTG's Management Team believes that such metrics are not critical in the near future for the business and operation of the platform. This stance is due to TMTG's long-term commitment to implementing a robust business plan, which may involve introducing innovative features and potentially incorporating new technologies, such as advanced video streaming services on its platform. These initiatives may enhance the range of services and experiences TMTG can offer on its Truth Social platform.

At this juncture in its development, TMTG believes that adhering to traditional key performance indicators, such as signups, average revenue per user, ad impressions and pricing, or active user accounts including monthly and daily active users, could potentially divert its focus from strategic evaluation with respect to the progress and growth of its business. TMTG believes that focusing on these KPIs might not align with the best interests of TMTG or its stockholders, as it could lead to short-term decision-making at the expense of long-term innovation and value creation. Therefore, TMTG believes that this strategic evaluation is critical and aligns with its

TABLE OF CONTENTS

commitment to a robust business plan that includes introducing innovative features and new technologies. See the section below titled "— *Key Operating Metrics*" and the section titled "*Risk Factors — Risk Factors Related to TMTG — TMTG does not currently, and may never, collect, monitor or report certain key operating metrics used by companies in similar industries*" in this prospectus.

To foster a flourishing digital public forum, TMTG seeks to prevent illegal and other prohibited content from contaminating its platform. In accordance with Truth Social's terms of service, illegal and prohibited content includes, but is not limited to a) sexual content or language; b) content that includes sexual activity, sexual intercourse or any type of sexual act; c) any content that portrays or suggest explicit sexual acts or sexually suggestive positions or poses; d) sexually suggestive (explicit or vague) statements, texts or phrases; or e) content in which sexual acts are requested or offered, including pornography, prostitution, sugar babies, sex trafficking or sexual fetishes. Using human moderators and an artificial intelligence vendor known as HIVE, Truth Social has developed what TMTG believes is a robust, fair, and viewpoint-neutral moderation system and that its moderation practices are consistent with, and indeed help facilitate, TMTG's objective of maintaining "a public, real-time platform where any user can create content, follow other users, and engage in an open and honest global conversation without fear of being censored or cancelled due to their political viewpoints." See "*Risk Factors — Risks Related to TMTG's Business — TMTG may be subject to greater risks than typical social media platforms because of the focus of its offerings and the involvement of President Donald J. Trump. These risks include active discouragement of users, harassment of advertisers or content providers, increased risk of hacking of TMTG's platform, lesser need for Truth Social if First Amendment speech is not suppressed, criticism of Truth Social for its moderation practices, and increased stockholder suits"* in this prospectus.

Prior to Closing, Private TMTG relied primarily on bridge financing, in the form of convertible promissory notes, to build the Truth Social platform. TMTG aims to use the funds available as a result of the Business Combination to catalyze growth, including through strategic investments in marketing, advertising sales, and the technology described below, while continuing to prioritize feature development and user experience. Private TMTG has historically incurred operating losses and negative cash flows from operating activities. For the reasons described below, TMTG expects to continue to incur operating losses and negative cash flows from operating activities for the foreseeable future, as it works to expand its user base, attracting more platform partners and advertisers. TMTG's ability to become profitable and generate positive cash flow depends on TMTG's success in growing its user base, platform partners, and advertisers. This growth is expected to come from the overall appeal of the Truth Social Platform. TMTG may enhance this appeal through new initiatives or by acquiring new technologies or other platforms that may supplement its growth strategy. Private TMTG conducted extensive technological due diligence regarding, and has begun testing, a particular, state-of-the-art technology that supports video streaming and provides a "home" for cancelled content creators, and which TMTG aims to acquire and incorporate into its product offerings and/or services as soon as practicable. On April 16, 2024, TMTG announced that, after six months of testing on its Web and iOS platforms, the Company has finished the research and development phase of a new live TV streaming platform and expects to begin scaling up its own content delivery network, or CDN.

TMTG plans to roll out its streaming content in three phases: Phase 1: Introduce Truth Social's CDN for streaming live TV to the Truth Social app for Android, iOS, and Web. Phase 2: Release stand-alone Truth Social over-the-top streaming apps for phones, tablets, and other devices. Phase 3: Release Truth Social streaming apps for home TV. As part of the roll out of its own CDN, TMTG entered into the Asset Acquisition Agreement and the related ancillary maintenance and support agreements with WCT and its affiliates, pursuant to which upon the closing of the Asset Acquisition Agreement WCT will assign TMTG an irrevocable, non-exclusive, worldwide, perpetual right and license to forever retain, copy, reproduce, use, modify, enhance, create modifications and derivative works of, display, distribute, perform, compile, execute, sublicense, and otherwise exploit the Source Code and all resulting compiled software for commercial exploitation. In addition, under such license Perception and its affiliates agreed not to use or permit to use the source code for a period of five (5) years after the closing of the Asset Acquisition Agreement for any purpose that competes, in the United States, with the Truth platform or commercialization of such source code in the United States. TMTG expects to obtain data center services and purchase e-servers and related equipment for the project. Additionally, as part of its growth strategy, TMTG expects to continue negotiating improved licensing terms for the CDN technology and may even pursue the potential acquisition of such technology. In addition to developing its CDN, TMTG is continuing to explore potential acquisitions and partnership opportunities to advance its strategic objectives of growing Truth Social and its user base, increasing product offerings, and investing in the patriot economy. TMTG expects such

TABLE OF CONTENTS

acquisitions, if any, to align with its vision of maintaining a safe harbor for free expression and building an uncancellable tech stack. TMTG expects to distribute a beta version of Phase 1 in the third quarter of 2024 and fully launch Phase 1 by the end of 2024. Beta versions of Phases 2 and 3 are expected to follow shortly after the launch of the beta version of Phase 1. TMTG expects to start generating revenue from this technology during 2025, which is subject to the successful implementation of all three phases. The foregoing timeline and expectation for revenue generation are preliminary and subject to certain risks. See "*Risk Factors — Risks Related to TMTG's Business — If TMTG Encounters Issues with the Rollout and Implementation of its Streaming Content Plans, TMTG May Delay or Decide Not to Fully Implement the Service, Which May Affect TMTG's Growth Strategy and Operation*."

Many of TMTG's initiatives and potential future acquisitions are still preliminary and subject to material changes and risks, some of which are beyond TMTG's control. Given these uncertainties, TMTG believes it is premature for TMTG to predict when it will attain profitability and positive cash flows from its operations. See "*Risk Factors — Risks Related to TMTG's Business*" and "*Our Business — Company Growth Strategy*" in this prospectus.

In order to fund its operations, prior to Closing, Private TMTG issued approximately two dozen convertible promissory notes in the aggregate principal amount of $48,155.0 (net of repayments) from May 2021 through March 2024. All Private TMTG Convertible Notes, including the foregoing, converted to shares of TMTG common stock immediately before the Closing of the Business Combination. See the section titled "*— Liquidity and Capital Resources*" below.

The mailing address of TMTG's principal executive office is 401 N. Cattlemen Rd., Suite 200, Sarasota, Florida 34232.

## Recent Developments

### *Business Combination*

On October 20, 2021, Digital World, Merger Sub, Private TMTG, ARC, in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in his capacity as the representative of the stockholders of Private TMTG, entered into the Merger Agreement, pursuant to which, among other transactions, Merger Sub merged with and into Private TMTG, with Private TMTG continuing as the surviving corporation and as a wholly owned subsidiary of Digital World. On March 25, 2024 (the "**Closing Date**"), the Business Combination was consummated.

In connection with the Business Combination, all shares of TMTG common stock issued and outstanding immediately prior to the Effective Time (other than those properly exercising any applicable dissenters rights under Delaware law) were exchanged for the Merger Consideration (or, as applicable, the separate and additional consideration received by former holders of Private TMTG Convertible Notes issued by Private TMTG). Each Private TMTG Convertible Note that was outstanding immediately prior to the Effective Time was automatically converted immediately prior to the Effective Time into a number of shares of Private TMTG common stock, in accordance with each such Private TMTG Convertible Note as set forth therein. At the Closing, Digital World changed its name to "Trump Media & Technology Group Corp." and Private TMTG changed its name to "TMTG Sub Inc."

Notwithstanding the legal form of the Merger pursuant to the Merger Agreement, the Merger was accounted for as a reverse recapitalization in accordance with U.S. GAAP because Private TMTG was determined to be the accounting acquirer under ASC 805. The determination was primarily based on the evaluation of the following facts and circumstances taking into consideration:

- The pre-combination equity holders of Private TMTG hold the majority of voting rights in TMTG;
- The pre-combination equity holders of Private TMTG have the right to appoint the majority of the directors on TMTG's Board;
- Private TMTG senior management (executives) are the senior management (executives) of TMTG; and
- Operations of Private TMTG comprise the ongoing operations of TMTG.

Under the reverse recapitalization model, the Merger is treated as Private TMTG issuing equity for the net assets of Digital World, with no goodwill or intangible assets recorded.

TABLE OF CONTENTS

As of the Closing Date, (i) President Donald J. Trump beneficially held approximately 57.6% of the outstanding shares of TMTG common stock and (ii) the public stockholders of TMTG held approximately 21.9% of the outstanding shares of TMTG common stock. As of June 25, 2024, President Donald J. Trump beneficially holds approximately 60.4% of the outstanding shares of TMTG common stock, including 36,000,000 Earnout Shares. President Trump's entitlement to the Earnout Shares was officially determined by TMTG on April 26, 2024 in accordance with the Merger Agreement, after which President Trump was issued the Earnout Shares.

***Convertible Promissory Notes***

Through March 31, 2024, Private TMTG issued Private TMTG Convertible Notes in the aggregate principal amount of $48,155.0 (net of repayments) that accrued interest at a range between 5% and 10% per annum until converted. See the section titled "— *Liquidity and Capital Resources*" below. Immediately prior to the Closing, all Private TMTG Convertible Notes were converted into Private TMTG common stock.

***Committed Equity Financing***

On July 3, 2024, we entered into the SEPA with Yorkville pursuant to which we have the right to sell to Yorkville up to $2,500,000,000 of shares our Common Stock, subject to certain limitations and conditions set forth in the SEPA, from time to time during the term of the SEPA. Sales of Shares to Yorkville under the SEPA, and the timing of any such sales, are at our option, and we are under no obligation to sell any securities to Yorkville under the SEPA. In accordance with our obligations under the SEPA, we have filed the registration statement that includes this prospectus with the SEC to register under the Securities Act the resale by Yorkville of 37,644,380 Shares that we may elect, in our sole discretion, to issue and sell to Yorkville, under the SEPA as well as 200,000 Commitment Shares to be issuable to Yorkville and 125,000 Placement Agent Shares issuable to EF Hutton. The Commitment Shares and the Placement Agent Shares are expected to be issued concurrently or within one business day of the filing of this registration statement.

We may not effect any sales under the SEPA and Yorkville will not have any obligation to purchase Shares under the SEPA to the extent that after giving effect to such purchase and sale the aggregate number of shares of Common Stock issued under the SEPA together with any shares of Common Stock issued in connection with any other transactions that may be considered part of the same series of transactions, where the average price of such sales would be less than $31.73 and the number of shares issued would exceed the number of shares representing 19.99% of the outstanding voting common stock as of June 25, 2024. Thus, we may not have access to the right to sell the full $2,500,000,000 Shares to Yorkville.

The per share subscription price Yorkville will pay for the Shares will be 97.25% of the market price during a three-day pricing period. The "Market Price" is defined in the SEPA as the lowest daily VWAPs (as defined below) during the three consecutive trading days, commencing on either (i) the trading day upon which TMTG submits an Advance Notice to Yorkville or (ii) the first trading day immediately following the date TMTG submits an Advance Notice to Yorkville. There is no upper limit on the subscription price per share that Yorkville could be obligated to pay for the Shares.

We will control the timing and amount of any sales of Shares to Yorkville. Actual sales of Shares to Yorkville under the SEPA will depend on a variety of factors to be determined by us from time to time, which may include, among other things, market conditions, the trading price of our Common Stock and determinations by us as to the appropriate sources of funding for our business and its operations.

Yorkville will not be obligated to subscribe to Shares under the SEPA which, when aggregated with all other shares of Common Stock then beneficially owned by Yorkville and its affiliates (as calculated pursuant to Section 13(d) of the Exchange Act, and Rule 13d-3 promulgated thereunder), would result in the beneficial ownership by Yorkville and its affiliates to exceed 4.99% of the outstanding voting power or number of our shares of Common Stock (the "Beneficial Ownership Limitation").

The net proceeds under the SEPA to us will depend on the frequency and prices at which we sell Shares to Yorkville. We expect that any proceeds received by us from such sales to Yorkville will be used for working capital and general corporate purposes.

The SEPA will automatically terminate on the earliest to occur of (i) the first day of the month next following the 36-month anniversary of the date of the SEPA or (ii) the date on which Yorkville shall have made

TABLE OF CONTENTS

payment of Advances pursuant to the SEPA for Shares equal to $2,500,000,000. We have the right to terminate the SEPA at no cost or penalty upon five (5) trading days' prior written notice to Yorkville, provided that there are no outstanding Advance Notices for which Shares need to be issued and TMTG has paid all amounts owed to Yorkville pursuant to the SEPA. We and Yorkville may also agree to terminate the SEPA by mutual written consent. Neither we nor Yorkville may assign or transfer our respective rights and obligations under the SEPA, and no provision of the SEPA may be modified or waived by us or Yorkville other than by an instrument in writing signed by both parties.

As consideration for Yorkville's commitment to purchase Shares at our direction upon the terms and subject to the conditions set forth in the SEPA, we paid YA Global II SPV, LLC, a subsidiary of Yorkville, (i) a structuring fee in the amount of $25,000 and (ii) a commitment fee in the form of 200,000 Commitment Shares. EF Hutton acted as the exclusive placement agent in connection with the transactions contemplated by the SEPA, for which we will issue to EF Hutton 125,000 Placement Agent Shares concurrently with or within one business day of the filing of this registration statement.

We do not know what the subscription price for our Shares will be and therefore cannot be certain as to the number of shares we might issue to Yorkville under the SEPA. The number of shares ultimately offered for resale by Yorkville is dependent upon the number of Shares we may elect to sell to Yorkville under the SEPA.

For more detailed information regarding the SEPA, see the section entitled "*Committed Equity Financing*."

***WCT Asset Acquisition***

On July 3, 2024, TMTG, WCT, Solutions and JedTec entered into the Asset Acquisition Agreement, pursuant to which TMTG agreed to acquire substantially all of the assets of WCT or its affiliate, which mainly included certain agreements, including the Option Agreement as well as the CDN Agreements. The transaction is expected to close on the date TMTG has implemented the Perception Software and Network (as defined below) with all back-end API services having become generally available on iOS, Google/Android, and web media services and with streaming enabled from at least one data-center, which closing is expected to occur as early as July, 2024. Pursuant to the Option Agreement on the Asset Closing Date, WCT entered and will assign on the Asset Closing Date to TMTG the CDN Agreements, which are expected to be used for the roll out of the CDN technology for the Truth platform. In addition, Perception and its affiliates agreed not to use or permit other parties to use the source code for a period of five (5) years after the closing of the Asset Acquisition Agreement for any purpose that competes, in the United States, with the Truth platform or commercialization of such source code in the United States. In addition, the Option Agreement grants the (i) option to purchase Perception, until July 3, 2026, subject to a future negotiation of the price and terms of such acquisition and (ii) right of first refusal, until February 5, 2026, to purchase Perception in the event of a bona fide written offer from an unaffiliated third party to purchase more than 50% of the assets of Perception. The Company does not have any current intention to exercise those rights.

Pursuant to the Asset Acquisition Agreement, TMTG agreed to issue to Solutions and JedTec as consideration up to 5,100,000 Asset Acquisition Shares, 2,600,000 of which will be issued on the Asset Closing Date and 2,500,000 of which will be issuable upon the satisfaction of certain Milestones (as defined in the Asset Acquisition Agreement). In addition, with respect to all of the Asset Acquisition Shares, for a period of 12 months after the Asset Closing Date, neither JedTec, Solutions nor their respective affiliates will be permitted to collectively sell an amount of the Asset Acquisition Shares during any Two Week Sale Period exceeding the Set Percentage. For the purposes of this restriction, the "Set Percentage" means a percentage of the average daily trading volume of the TMTG common stock during the immediately preceding two consecutive trading weeks as reported on the primary exchange on which the TMTG common stock is traded (i.e., currently the NASDAQ. Unsold amounts from a Two Week Sale Period do not carry over to a subsequent Two Week Sale Period. The "Set Percentage" is 3% for the first six months after the Asset Closing Date and 5% from six to 12 months after the Asset Closing Date. For example, if during the first six months after the Asset Closing Date a Prior Two Week ADTV is 5,000,000 Asset Acquisition Shares, restricted holders cannot sell more than 150,000 Asset Acquisition Shares during the following Two Week Sale Period. Under the same fact pattern during six to 12 months after the Asset Closing Date, restricted holders could not sell more than 250,000 Asset Acquisition Shares during such Two Week Sale Period.

Concurrently with the execution of the Asset Acquisition Agreement, and as a condition and inducement to the willingness of TMTG to enter into it, WCT agreed to exercise the Option Agreement and enter into the

TABLE OF CONTENTS

Source Code Purchase Agreement and the Support and Maintenance Agreement, which agreements will be assigned to TMTG on the Asset Closing Date. Under the Source Code Purchase Agreement, Perception agreed to sell a copy of the Source Code and grant the WCT (which grant was assigned under the Asset Acquisition Agreement to TMTG) an irrevocable, non-exclusive, worldwide, perpetual right and license to forever retain, copy, reproduce, use, modify, enhance, create modifications and derivative works of, display, distribute, perform, compile, execute, sublicense, and otherwise exploit the Source Code and all resulting compiled software for commercial exploitation. The purchase price of $17,500,000 will be payable by TMTG in four installments to be completed by the third anniversary of the execution date of the Source Code Purchase Agreement. Further to supplement the Source Code Purchase Agreement, WCT entered into a Support and Maintenance Agreement, under which Perception is to assist TMTG in commercializing the Source Code to develop, launch, and grow the platform. The acquisition of the Source Code is effective as of the Asset Closing Date. Pursuant to the Asset Acquisition Agreement, the Company will assume on the Asset Closing Date WCT's rights and obligations under the Source Code Purchase Agreement and the Support and Maintenance Agreement. In connection with the Source Code Agreement, the Company entered into a source code escrow agreement related to the sale of the Source Code. Pursuant to such agreement, Perception will deposit a copy of the Source Code into an escrow account. Subject to certain terms and conditions, immediately after the Asset Closing Date, the escrow agent will hold the Source Code until Perception receives the full purchase price of $17,500,000 for the Source Code. Upon full payment, the Source Code and any modifications will be released to TMTG. TMTG will enter into a registration rights agreement with Solutions and JedTec on the Asset Closing Date, pursuant to which TMTG will file a registration statement with the SEC to register for resale the Asset Acquisition Shares as soon as practicable upon the Asset Closing Date and use its reasonable best efforts to cause such registration statement to become effective and remain effective until all the Asset Acquisition Shares covered by such registration statement have been sold.

## Key Factors Affecting Results of Operations

### *Executive Promissory Notes*

Private TMTG issued TMTG Executive Promissory Notes to certain executives prior to the Closing Date. The principal amounts of such notes were as follows: $1,150,000 for Devin Nunes, our Chief Executive Officer, President and Chairman, $4,900,000 for Phillip Juhan, our Chief Financial Officer, and $200,000 for Andrew Northwall, our Chief Operating Officer, and the aggregate amount of such notes for other executives was $650,000. Private TMTG was not required to pay any interest pursuant to such notes. Such notes were issued without the payment of any consideration. Upon the closing of the Merger, such notes automatically converted in whole, without any further action by the holders thereof, into 690,000 shares of TMTG common stock.

### *Inflation and the Global Supply Chain*

Currently the U.S. economy is experiencing a bout of increased inflation, resulting in rising prices. The U.S. Federal Reserve, as well as its counterparts in other countries, have engaged in a series of interest rate hikes in an effort to combat rising inflation. Although inflation did not have a significant impact on our results of operations for the periods ended March 31, 2024 and 2023, we anticipate that inflation will have an impact on our business going forward, including through a material increase in our cost of revenue and operating expenses in the coming years, if not permanently. Continued or permanent rises in core costs could impact our growth negatively.

### *Current Economic Conditions*

We are subject to risks and uncertainties caused by events with significant macroeconomic impacts, including, but not limited to, the COVID-19 pandemic, the Russian invasion of Ukraine, the Israel-Hamas war, and actions taken to counter inflation. Supply chain constraints, labor shortages, inflation, and rising interest rates and reduced consumer confidence have caused advertisers in a variety of industries to be cautious in their spending and to either pause or slow their campaigns.

In order to manage our cost structure in light of the current macroeconomic environment and pending TMTG's access to additional capital via the Business Combination, we sought opportunities to reduce our expense growth. Following the elimination of several positions in March 2023, we paused hiring in the second quarter of 2023. We were subsequently more selective about the roles that we filled, resulting in some attrition. We also reduced non-labor spend in areas such as travel, rent, consulting fees, and professional services.

TABLE OF CONTENTS

The extent of the ongoing impact of these macroeconomic events on our business and on global economic activity is uncertain and may continue to adversely affect our business, operations and financial results. Our past results may not be indicative of our future performance, and historical trends in revenue, income (loss) from operations, net income (loss), and net income (loss) per share may differ materially. The risks related to our business are further described in the section titled "*Risk Factors — Risks Related to TMTG's Business*" in this prospectus.

***Private TMTG's Former Chairman President Donald J. Trump***

TMTG's success depends in part on the popularity of our brand and the reputation and popularity of President Donald J. Trump. The value of TMTG's brand may diminish if the popularity of President Donald J. Trump were to suffer. Adverse reactions to publicity relating to President Donald J. Trump, or the loss of his services, could adversely affect TMTG's revenues, results of operations and its ability to maintain or generate a consumer base. President Donald J. Trump is involved in numerous lawsuits and other matters that could damage his reputation. Additionally, TMTG's business plan relies on President Donald J. Trump bringing his former social media followers to TMTG's platform. In the event any of these, or other events, cause his followers to lose interest in his messages, the number of users of our platform could decline or not grow as we have assumed. To the extent users prefer a platform that is not associated with President Donald J. Trump, TMTG's ability to attract users may decrease.

***Growth in User Base***

We currently rely on the sale of advertising services for all of our revenue. If we experience a decline in the number of users or a decline in user engagement, including as a result of the loss of high-profile individuals and entities who generate content on Truth Social, advertisers may not view Truth Social as attractive for their marketing expenditures, and may reduce their spending with us, which would harm our business and operating results.

Truth Social is being developed as a global platform for public self-expression and conversation in real time and our business depends on continued and unimpeded access to Truth Social on the internet by our users and advertisers. We face strong competition to attract and engage users, including other social media platforms that focus on the same audience that Truth Social focuses on, competitors that develop products, features, or services that are similar to ours or that achieve greater market acceptance, companies which have greater financial resources and substantially larger user bases, which offer a variety of internet and mobile device-based products, services and content.

The growth of our user base depends upon many factors both within and beyond our control, including the popularity, usefulness, ease of use, performance and reliability of our products and services compared to those of our competitors; the amount, quality and timeliness of content generated by our users; the frequency and relative prominence of the ads displayed by us or our competitors; the safety and security of Truth Social; and whether there is improper access to or disclosure of our users' information, which could harm our reputation.

Prior to the Closing, Private TMTG relied primarily on bridge financing, in the form of convertible promissory notes, to build the Truth Social platform. TMTG intends to use the funds available as a result of the Business Combination to catalyze growth, including through strategic investments in marketing, advertising sales, and new technologies as described above, while continuing to prioritize feature development and user experience. Private TMTG has historically incurred operating losses and negative cash flows from operating activities. For the reasons described below, TMTG expects to continue to incur operating losses and negative cash flows from operating activities for the foreseeable future, as it works to expand its user base, attracting more platform partners and advertisers. See "*Risk Factors — Risks Related to TMTG's Business — Since inception, TMTG has continuously sought to improve its business model by developing its technology as an early stage company. TMTG expects to incur operating losses for the foreseeable future*" in this prospectus.

***Attract, Retain and Motivate Talented Employees***

Our results of operations rely on the leadership and experience of our relatively small number of key executive management personnel, and the loss of key personnel or the inability of replacements to quickly and successfully perform in their new roles could adversely affect our business. We have experienced management departures and may continue to experience management departures. Any significant diversion of management attention away from ongoing business concerns and any difficulties encountered in the transition and integration

process could have a material adverse effect on our business, financial condition and results of operations. The loss of the services of these key employees or our executive management members could have a material adverse effect on our business and prospects, as we may not be able to find suitable individuals to replace such personnel on a timely basis or without incurring increased costs.

Furthermore, although the risk is somewhat mitigated by the non-competition agreement signed by certain key employees in connection with the Closing of the Business Combination, if we lose or terminate the services of one or more of our key employees or if one or more of our current or former executives or key employees joins a competitor or otherwise competes with us, it could impair our business and our ability to successfully implement our business plan. Additionally, if we are unable to hire qualified replacements for our executive and other key positions in a timely fashion, our ability to execute our business plan would be harmed. Even if we can quickly hire qualified replacements, we could experience operational disruptions and inefficiencies during any such transition. We believe that our future success will depend on our continued ability to attract and retain highly skilled and qualified personnel. In addition, many of our key technologies and systems will be custom-made for our business by our personnel. The loss of key engineering, product development, marketing and sales personnel could disrupt our operations and have an adverse effect on our business.

***Expansion into New Geographic Markets***

We plan to continue expanding our business operations by offering our products around the globe, and Truth Social is generally available internationally. As a result, we have entered new international markets where we have limited or no experience in marketing, selling, and deploying our products and may be subject to increased business and economic risks. We may not be able to monetize our products and services internationally as a result of competition, advertiser demand, differences in the digital advertising market and digital advertising conventions, as well as differences in the way that users in different countries access or utilize our products and services. Differences in the competitive landscape in international markets may impact our ability to monetize our products and services. It is possible that governments of one or more countries may seek to censor content available on Truth Social in their country or impose other restrictions that may affect the accessibility of Truth Social in their country for an extended period of time or indefinitely.

In addition, governments in other countries may seek to restrict access to Truth Social from their country entirely if they consider us to be in violation of their laws. In the event that access to Truth Social is restricted, in whole or in part, in one or more countries or our competitors are able to successfully penetrate geographic markets that we cannot access, our ability to retain or increase our user base and user engagement may be adversely affected, we may not be able to maintain or grow our revenue as anticipated, and our financial results could be adversely affected. We may be subject to greater risks than typical social media platforms because of the focus of our offerings and the involvement of President Donald J. Trump. If we fail to deploy or manage our operations in international markets successfully, our business may suffer.

***Key Operating Metrics***

From its inception through the Closing, Private TMTG focused on developing Truth Social by enhancing features and user interface rather than relying on traditional performance metrics like average revenue per user, ad impressions and pricing, or active user accounts, including monthly and daily active users. While many industry peers may gather and report on these or similar metrics, given the early development stage of the Truth Social platform, TMTG's Management Team has not relied on any particular key performance metric to make business or operating decisions. TMTG believes that this evaluation is critical and in line with its commitment to implement a robust business plan that may involve introducing innovative features and potentially incorporating new technologies. At this juncture in its development, TMTG believes that adhering to traditional key performance indicators, such as signups, average revenue per user, ad impressions and pricing, or active user accounts including monthly and daily active users, could potentially divert its focus from strategic evaluation with respect to the progress and growth of its business. TMTG believes that focusing on these KPIs might not align with the best interests of TMTG or its stockholders, as it could lead to short-term decision-making at the expense of long-term innovation and value creation. Therefore, TMTG believes that this strategic evaluation is critical and aligns with its commitment to a robust business plan that includes introducing innovative features and new technologies.

In connection with such an evaluation, and consistent with SEC guidance, TMTG will consider the relevant key performance indicators for its current business operations and determine whether it has effective controls and

TABLE OF CONTENTS

## OUR BUSINESS

*Unless the context otherwise requires, all references in this section to the "Company," "we," "us," or "our" refer to the business of TMTG and its subsidiaries.*

### Overview

TMTG believes free and open communication, particularly political speech, is essential to self-government and democracy. Free expression allows citizens to keep their government in check and inform themselves as voters. Free speech also enables the discovery of truth through the uninhibited marketplace of ideas. Truth often emerges only when opposing ideas can compete against each other on a level playing field. TMTG further believes that the ability to freely express core political speech is among the inalienable rights affirmed by the Declaration of Independence that underlay America's system of government.

TMTG therefore aspires to build a media and technology powerhouse to rival the liberal media consortium and promote free expression. TMTG was founded to fight back against the big tech companies — Meta (Facebook, Instagram and Threads), X (formerly Twitter), Netflix, Alphabet (Google), Amazon and others — that may curtail debate in America and censor voices that contradict their "woke" ideology. As confirmed by the "Twitter Files" exposés, X has long suppressed conservative speech (including at the behest of U.S. government officials) through various means, including "shadow banning"— a surreptitious process in which users may not even know their posts are being hidden from other users. X also outright banned conservative users such as President Donald J. Trump, who was banned for one year and ten months — even while X continued to allow the Taliban to freely post their views to the world. In July 2023, a federal district court judge found that Biden White House personnel likely colluded with big tech companies to violate Americans' First Amendment rights. The opinion expressed that "targeted suppression of conservative ideas is a perfect example of viewpoint discrimination of political speech." Big tech companies' transformation into the arbiters of public speech and organs of state-sponsored censorship contradicts American values. Their suppression of dissident speech constitutes the most serious threat today to a free and democratic debate. Thus, TMTG aims to safeguard public debate and open dialogue, and to provide a platform for all users to freely express themselves.

TMTG's first product, Truth Social, is a social media platform aiming to disrupt big tech's control on free speech by opening up the internet and giving the American people their voices back. It is a public, real-time platform where any user can create content, follow other users and engage in an open and honest global conversation without fear of being censored or "cancelled" due to their political viewpoints. TMTG does not restrict whom a user can follow, which greatly enhances the breadth and depth of available content. Additionally, users can be followed by other users without requiring a reciprocal relationship, enhancing the ability of TMTG users to reach a broad audience.

Truth Social was generally made available in the first quarter of 2022. TMTG prides itself on operating its platform, to the best of its ability, without relying on big tech companies. Partnering with pro-free-speech alternative technology firms, Private TMTG fully launched Truth Social for iOS in April 2022. Private TMTG debuted the Truth Social web application in May 2022, and the Truth Social Android App became available in the Samsung Galaxy and Google Play stores in October 2022. Private TMTG introduced direct messaging to all versions of Truth Social in 2022, released a "Groups" feature for users in May 2023 and announced the general availability of Truth Social internationally in June 2023. Since its launch, Truth Social has experienced substantial growth, from zero to an aggregate of approximately 9.0 million signups for Truth Social via iOS, Android and the web as of mid-February 2024. However, investors should be aware that since its inception, Private TMTG and, following the Closing, TMTG has not relied on any specific key performance metric to make business or operating decisions. Consequently, it has not been maintaining internal controls and procedures for periodically collecting such information, if any. While many mature industry peers may gather and analyze certain metrics, given the early development stage of the Truth Social platform, TMTG's Management Team believes that such metrics are not critical in the near future for the business and operation of the platform. This stance is due to TMTG's long-term commitment to implementing a robust business plan, which may involve introducing innovative features and potentially incorporating new technologies, such as advanced video streaming services on its platform. These initiatives may enhance the range of services and experiences TMTG can offer on its Truth Social platform.

At this juncture in its development, TMTG believes that adhering to traditional key performance indicators, such as signups, average revenue per user, ad impressions and pricing, or active user accounts including monthly

TABLE OF CONTENTS

and daily active users, could potentially divert its focus from strategic evaluation with respect to the progress and growth of its business. TMTG believes that focusing on these KPIs might not align with the best interests of TMTG or its stockholders, as it could lead to short-term decision-making at the expense of long-term innovation and value creation. Therefore, TMTG believes that this strategic evaluation is critical and aligns with its commitment to a robust business plan that includes introducing innovative features and new technologies. See "*Risk Factors — Risk Factors Related to TMTG — TMTG does not currently, and may never, collect, monitor or report certain key operating metrics used by companies in similar industries.*"

To foster a flourishing digital public forum, TMTG seeks to prevent illegal and other prohibited content from contaminating its platform. In accordance with Truth Social's terms of service, illegal and prohibited content includes, but is not limited to, depictions or threats of violence, harassment, incitement of or threats of physical harm. Using human moderators and an artificial intelligence vendor known as HIVE, Truth Social has developed what TMTG believes is a robust, fair, and viewpoint-neutral moderation system and that its moderation practices are consistent with, and indeed help facilitate, TMTG's objective of maintaining "a public, real-time platform where any user can create content, follow other users, and engage in an open and honest global conversation without fear of being censored or cancelled due to their political viewpoints." See "*Risk Factors — Risks Related to TMTG's Business — TMTG may be subject to greater risks than typical social media platforms because of the focus of its offerings and the involvement of President Donald J. Trump. These risks include active discouragement of users, harassment of advertisers or content providers, increased risk of hacking of TMTG's platform, lesser need for Truth Social if First Amendment speech is no longer believed to be suppressed by other similar platforms, criticism of Truth Social for its moderation practices, and increased stockholder suits.*"

**Industry Overview**

Today many people get their news from the internet, including websites operated by newspapers and cable news providers. According to a 2020 Pew Research Center survey, a large majority of Americans read news from digital devices. More than eight-in-ten U.S. adults (86%) say they get news from a smartphone, computer or tablet "often" or "sometimes," including 60% who say they do so often. This is higher than the portion who get news from television, though 68% get news from TV at least sometimes and 40% do so often. Americans turn to radio and print publications for news far less frequently, with half saying they turn to radio at least sometimes (16% do so often) and about a third (32%) saying the same of print (10% get news from print publications often).

Social media sites such as X and Facebook have become popular platforms for public discussions and information gathering. These sites were originally characterized by the free exchange of ideas — in fact, the companies' founders were often free-speech idealists. The freewheeling marketplace of ideas they created, however, has been eviscerated by an overbearing censorship regime implemented by the few large, powerful corporations that now dominate the sector. Even the founder and former CEO of X has lamented that "centralizing discovery and identity into corporations" has "really damaged the internet."

These corporations increasingly decide which viewpoints can and cannot be expressed on their platforms. No one, not even a sitting President of the United States, is beyond the reach of big tech censorship. This dynamic has become — as X's (formerly Twitter's) founder predicted it would —"destructive to the noble purpose and ideals of the open internet." Social media companies employ, rely on, and have largely become captive to an ever-expanding faction of content moderators and so-called "fact checkers" who suppress content and promote so-called "algorithmic justice." The means of censorship include shadow bans, temporary suspensions, misinformation warnings, removal of offending posts, and outright bans on users and accounts. Alarmingly, viewpoints are frequently suppressed simply for contradicting the prevailing media narrative on topics of public interest. As a result, users increasingly engage in self-censorship in an attempt to avoid takedowns, suspensions, and bans meted out by anonymous big tech censors.

This oppressive censorship creates opportunities for TMTG, which seeks to create a free-speech haven in the social media sphere. Moreover, as America and the world have emerged from the isolation of a years-long pandemic, Truth Social intends to provide a global platform to help reconnect people and communities by fostering each individual's unique and unencumbered free expression.

TABLE OF CONTENTS

**Company Growth Strategy**

As TMTG seeks to create a fully integrated media and technology company, it is pursuing these growth strategies:

*Grow Truth Social.* TMTG believes that growth in Truth Social's user base will drive more unique content, which in turn will drive the viral, organic promotion of content on Truth Social, thereby attracting more platform partners and advertisers. TMTG also plans to grow Truth Social through the addition and refinement of user-friendly features — including the integration of video — and continued global expansion. As Truth Social attracts more users, the value proposition for advertisers increases, thereby incentivizing advertisers to develop unique and compelling content for the platform.

*Increase Product Offerings and Services.* Organically and/or in acquisitions or partnership with third parties, TMTG intends to develop one or more additional cutting-edge products and/or services to complement the Truth Social platform. TMTG has conducted extensive technological due diligence regarding, and begun testing, a particular, state-of-the-art technology that supports video streaming and provides a "home" for cancelled content creators, and which TMTG is exploring with the aim to incorporate into its product offerings and/or services as soon as practicable. On April 16, 2024, TMTG announced that, after six months of testing on its Web and iOS platforms, the Company has finished the research and development phase of a new live TV streaming platform and expects to begin scaling up its own content delivery network, or CDN.

TMTG plans to roll out its streaming content in three phases: Phase 1: Introduce Truth Social's CDN for streaming live TV to the Truth Social app for Android, iOS, and Web. Phase 2: Release stand-alone Truth Social over-the-top streaming apps for phones, tablets, and other devices. Phase 3: Release Truth Social streaming apps for home TV. As part of the roll out of its own CDN, TMTG entered into the Asset Acquisition Agreement and the related ancillary maintenance and support agreements with WCT and its affiliates, pursuant to which upon the closing of the Asset Acquisition Agreement WCT will assign TMTG an irrevocable, non-exclusive, worldwide, perpetual right and license to forever retain, copy, reproduce, use, modify, enhance, create modifications and derivative works of, display, distribute, perform, compile, execute, sublicense, and otherwise exploit the Source Code and all resulting compiled software for commercial exploitation. In addition, under such license Perception and its affiliates agreed not to use or permit to use the source code for a period of five (5) years after the closing of the Asset Acquisition Agreement for any purpose that competes, in the United States, with the Truth platform or commercialization of such source code in the United States. TMTG expects to distribute a beta version of Phase 1 in the third quarter of 2024 and fully launch Phase 1 by the end of 2024. Beta versions of Phases 2 and 3 are expected to follow shortly after the launch of the beta version of Phase 1. TMTG expects to start generating revenue from this technology during 2025, which is subject to the successful implementation of all three phases. The foregoing timeline and expectation for revenue generation are preliminary and subject to certain risks. See "Risk Factors — Risks Related to TMTG's Business — If TMTG Encounters Issues with the Rollout and Implementation of its Streaming Content Plans, TMTG May Delay or Decide Not to Fully Implement the Service, Which May Affect TMTG's Growth Strategy and Operation."

In addition to developing its CDN, TMTG is continuing to explore potential acquisitions and partnership opportunities to advance its strategic objectives of growing Truth Social and its user base, increasing product offerings, and investing in the patriot economy. TMTG expects such acquisitions, if any, to align with its vision of maintaining a safe harbor for free expression and building an uncancellable tech stack. Many of TMTG's Such initiatives and potential acquisitions are still preliminary and subject to material changes and risks, some of which are beyond TMTG's control. Given these uncertainties, TMTG believes it is premature for TMTG to predict when it will attain profitability and positive cash flows from its operations.

*Pursue Strategic Acquisitions and/or Partnerships.* As cancel culture sweeps through corporate America, businesses are facing increasing pressure to silence or disavow certain customers — or are more frequently taking controversial stands on political issues that alienate many consumers. Concurrently, an increasing number of entrepreneurs are catering to conservatives across various industries. TMTG is actively seeking out, and from time to time intends to seek out, opportunities to partner with and/or acquire other participants in this growing "parallel economy."

As an early-stage company in the rapidly evolving technology sector, Private TMTG experienced significant shifts in its business strategy since October 2021. Private TMTG's plans were notably impacted by a delay in accessing capital due to the postponed merger with Digital World. Despite these challenges, Private TMTG

TABLE OF CONTENTS

remained agile, focusing primarily on enhancing the features and user interface of Truth Social since its launch in the first quarter of 2022. This focus on improving the user experience led Private TMTG to reassess the development of a subscription video on demand service while exploring alternatives, including the streaming technology referenced above, and adjust its business plan and capital needs accordingly.

The successful launch of Truth Social, coupled with a strategic shift towards less capital-intensive technology, significantly reduced TMTG's capital requirements. This shift reflected TMTG's adaptability and responsiveness to market conditions and the challenges in the broader sector. As TMTG continues to evolve, the potential integration of innovative technologies with Truth Social, not only signifies a strategic pivot but also opens new avenues for growth and engagement, positioning TMTG to capitalize on the synergies between advanced network infrastructure and social media platforms in the ever-changing technology landscape.

**Company Products and Services**

***Truth Social***

TMTG has designed Truth Social to create a user-centric, interactive experience. TMTG's development efforts focus on simplicity and ensuring that content can be accessed by, or shared with, all participants without discrimination.

***Description of Business***

Truth Social is a free expression application that offers social networking services.

***TMTG's Social Network***

Truth Social, TMTG's social networking platform, relies on free, publicly available software. Regardless of whether Truth Social's administrators, outside activist pressure groups, cancel-culture internet mobs, foreign governments or any other persons agree with any user's political viewpoints, TMTG strives to ensure that any user's protected political speech will be allowed on the site.

**Competition**

TMTG's business is characterized by rapid technological change, frequent product innovation, and the continuously evolving preferences and expectations of its users, advertisers, content partners, platform partners and developers. TMTG will likely face significant competition in every aspect of its business, including from companies that provide tools to facilitate communications and the sharing of information, companies that enable marketers to display advertising, and other online ad networks, exchanges, and platforms. TMTG will need to compete in order to attract, engage, and retain people who use its products, and to attract and retain marketers, content and platform partners, and developers. TMTG expects continued, robust competition for digital ad spending. TMTG will also need to compete to attract and retain employees, especially software engineers, designers, and product managers. TMTG further expects that it will face criticism, and its users may face criticism, from legacy social media sites and others that are opposed to views that may be expressed by TMTG's users. While TMTG will welcome dissenting voices to respond on TMTG's platform, others may prefer to ignore or disparage TMTG or its users in other forums.

TMTG expects to face significant competition with the following companies for people's attention and for advertisers' budgets:

- Companies that that offer products that enable people to create and share ideas, videos, and other content and information. These offerings include, for example, X (formerly Twitter), Meta (including Facebook, Instagram and Threads), Alphabet (including Google and YouTube), Microsoft (including LinkedIn), Snapchat, TikTok and Verizon Media Group, as well as largely regional social media and messaging companies that have strong positions in particular countries (including WeChat, Kakao, and Line). Although TMTG will seek differentiated content from other licensors, TMTG will face competition for live premium video content rights from other digital distributors and traditional television providers, which may limit TMTG's ability to secure such content on acceptable economic and other terms.
- Companies that offer advertising inventory and opportunities to advertisers.

- Companies that develop applications, particularly mobile applications, that create, syndicate, and distribute content across internet properties.
- Traditional, online, and mobile businesses that enable people to consume content or marketers to reach their audiences and/or develop tools and systems for managing and optimizing advertising campaigns.

As TMTG introduces new products, as its products evolve or as competing companies introduce new products and services, TMTG may become subject to additional competition. TMTG's industry is evolving rapidly and is highly competitive. See the sections titled "*Risk Factors — Risks Related to TMTG's Business — TMTG's business is highly competitive. Competition presents an ongoing threat to the success of TMTG's business. If TMTG is unable to compete effectively for users and advertiser spend, TMTG's business and operating results could be harmed,*" and "*Risk Factors — Risks Related to TMTG's Business — The loss of key personnel or the inability of replacements to quickly and successfully perform in their new roles could adversely affect TMTG's business*."

**Sales and Marketing**

Pending access to additional capital, TMTG intends to have a sales force and sales support staff that is focused on attracting and retaining advertisers. TMTG expects that its sales force and sales support staff will assist advertisers throughout the advertising campaign cycle, from pre-purchase decision making to real-time optimizations as they utilize TMTG's campaign management tools, and to post-campaign analytics reports to assess the effectiveness of their advertising campaigns.

TMTG expects that its marketing campaigns will focus on celebrating and highlighting the voices of all people who make Truth Social unique. TMTG believes advertisers could eventually be attracted to a platform that encourages free and open debate among all users rather than to a platform that seeks to silence diverse perspectives — including views held by large swaths of Americans.

**License Agreement**

Private TMTG entered into a royalty-free license agreement with President Donald J. Trump and DTTM Operations, LLC, an entity that licenses President Donald J. Trump's name and regulates his personal media assets and is beneficially wholly owned by President Donald J. Trump. The License Agreement required Private TMTG to pay $100 upon the execution of this License Agreement and that such amount constituted full consideration and a fully paid-up royalty covering the entire term of the License Agreement for the licenses granted in the License Agreement. Private TMTG did not, and, as of the date of this prospectus, TMTG Sub has not, paid any other amounts to President Donald J. Trump pursuant to the License Agreement.

Under the License Agreement, as amended, TMTG Sub has a royalty-free license to use "Trump Media & Technology Group Corp." as its name. In addition, TMTG Sub has a royalty-free license to use the name and likeness of President Donald J. Trump, solely as necessary for TMTG Sub to commercialize Truth Social. The License Agreement prohibits use of President Donald J. Trump's name or likeness for any other purpose and specifically excludes any use in connection with political activities, including political messaging, political fundraising, get-out-the vote efforts and uses that are controlled by or supportive of any political committees, candidates, policies or initiatives or associated with advocacy or electioneering. All uses of (and any modifications to) President Donald J. Trump's name or likeness are subject to his prior approval. Further, the quality of any products or services offered under the License Agreement in connection with President Donald J. Trump's name or likeness is subject to his control, and those products or services must in any event satisfy the highest standards for quality and reputation. The rights granted to use President Donald J. Trump's name and likeness do not extend to any other member of his family.

Until February 2, 2025, (the "TMTG Social Media Exclusivity Term"), President Donald J. Trump has agreed to channel non-political communications and posts coming from his personal profile to the Truth Social platform before posting that same social media communication and/or post to any other social media platform that is not Truth Social (collectively, "Non-TMTG Social Media") until the expiration of the "DJT/TMTG Social Media 6-Hour Exclusive" which means the period commencing when President Donald J. Trump posts any social media communication onto the Truth Social platform and ending six hours thereafter; provided that he may post social media communications from his personal profile that he deems, in his sole discretion, to be politically-related on any social media site at any time, regardless of whether that post originates from a personal

account. As a candidate for president, most or all of President Donald J. Trump's social media posts may be deemed by him to be politically related. Consequently, TMTG may lack any meaningful remedy if President Donald J. Trump minimizes his use of Truth Social. Additionally, none of the limitations or exclusivity contained in the License Agreement shall apply to any business ventures of President Donald J. Trump or The Trump Organization or their respective affiliates.

Unless notice is given, the TMTG Social Media Exclusivity Term extends in perpetuity for additional 180-day terms. In the event of a force majeure as described in the License Agreement that lasts longer than three days, or if the TMTG Platform is not available to President Donald J. Trump for a period of three or more consecutive days, President Donald J. Trump will have the right to invoke the suspension of the DJT/TMTG Social Media 6-Hour Exclusive. If the TMTG Social Media Exclusivity Term were to expire but the License Agreement remained in effect, President Donald J. Trump would be required to post non-political communications contemporaneously to Truth Social and Non-TMTG Social Media. However, that obligation would also exempt any communications that President Donald J. Trump deems, in his sole discretion, to be politically-related.

President Donald J. Trump has the right to terminate the License Agreement if (i) the quality of any product or service falls below the required level and is not restored immediately (but not later than 30 days) after notification or (ii) TMTG Sub causes or permits (a) any use of President Donald J. Trump's name, likeness or other characteristic in any manner that denigrates or ridicules the name, image or reputation of President Donald J. Trump, any member of his family, or any of his or her business properties, (b) uses of such name, likeness or other characteristic other than as permitted in the License Agreement, (c) alternations or distortions of such name, likeness or other characteristic without President Donald J. Trump's written consent, or (d) creation of any direct, indirect or implied endorsement or commercial tie-in with any product or service that is not offered by TMTG Sub, and the applicable foregoing condition ((a)-(d)) is not cured within 30 days after notice. The license is in any event revocable by President Donald J. Trump and subject to all of the conditions and limitations in the License Agreement.

The License Agreement also provides that, if it is not sooner terminated, and if TMTG Sub becomes listed on a public market exchange in the United States via, inter alia, the Business Combination before December 31, 2024, the term of the License Agreement will continue in perpetuity, except that it may be terminated by TMTG Sub for convenience or by President Donald J. Trump for a breach of TMTG Sub's obligation to ensure that any products or services offered or marketed using President Donald J. Trump's name or likeness meet the highest standards of quality and reputation if such breach is not cured immediately (but no later than 30 days) after notification. As a result, following the completion of the Business Combination, the License Agreement will continue in perpetuity.

President Donald J. Trump has agreed not to compete with Truth Social by founding, developing or obtaining a controlling interest in a social media platform that includes one or more material features that directly compete with any of the material features of Truth Social. President Donald J. Trump may otherwise compete with Truth Social, including by managing or otherwise working with any other social media platform.

TMTG Sub may not terminate the License Agreement based on the personal or political conduct of President Donald J. Trump, even if such conduct could negatively reflect on TMTG Sub's reputation or brand or be considered offensive, dishonest, illegal, immoral, or unethical, or otherwise harmful to TMTG Sub's brand or reputation. Further, TMTG and TMTG Sub may be obligated to indemnify President Donald J. Trump for any losses of any type that relate in any way to the License Agreement, including any such losses attributable to President Donald J. Trump's own offensive, dishonest, illegal, immoral, unethical, or otherwise harmful conduct.

**Intellectual Property**

One of the core strengths of TMTG's business is its intellectual property portfolio and unique experience, both of which guide product development activities and TMTG's approach to intellectual property filings.

TMTG's future success and competitive position depend in part upon its ability to obtain and maintain protection of its proprietary technologies. TMTG also relies on a combination of non-disclosure agreements and other contractual provisions, as well as its employees' commitment to confidentiality and loyalty, to protect TMTG's technology and processes. Further, as noted above, TMTG Sub has entered into the License Agreement with President Donald J. Trump, and DTTM Operations, LLC, for the right to use the likeness of President Donald J. Trump.

TABLE OF CONTENTS

TMTG seeks to protect its intellectual property rights by relying on federal, state, and common law rights in the United States and other countries, as well as contractual restrictions. TMTG will enter into confidentiality and invention assignment agreements with its employees and contractors, and confidentiality agreements with other third parties, in order to limit access to, and disclosure and use of, TMTG's confidential information and proprietary technology. In addition to these contractual arrangements, TMTG also relies on a combination of trademarks filed in the name of T Media Tech LLC and TMTG Sub (under its former name, Trump Media & Technology Group Corp.), trade dress, domain names, copyrights, trade secrets and patents to help protect its brand and its other intellectual property.

On February 14, 2023, a trademark for "TRUTH SOCIAL" in classes 21 and 25 was registered with USPTO by T Media Tech LLC for use with cups, mugs and certain types of clothing. Trademark applications for "Truth Social" in classes 9 and 42; for "RETRUTH" in classes 9, 35, 38, 41, 42, and 45; for "TRUTHSOCIAL" in classes 9, 35, 38, 41, 42 and 45; and for "TRUTHPLUS" in classes 9, 35, 38, 41, and 42 are the subject of suspension notices received from USPTO on October 24, 2022; January 13, 2023; February 14, 2023 and February 17, 2023, respectively, in each case based on alleged similarity to existing registered (and pending) trademarks. In particular, the USPTO has issued non-final rejections of all of the foregoing applications to register marks for use with a social media network or a streaming video service. Although Private TMTG pursued certain appeal rights, there can be no assurance that TMTG will be able to overcome the objections of the trademark examiner or that the challenged marks will be approved. Several additional trademark applications remain pending, but have not been the subject of adverse action by USPTO.

TMTG may be unable to obtain patent or trademark protection for its technologies and brands, and any patents or trademarks that may be issued in the future, may not provide TMTG with competitive advantages or distinguish its products and services from those of its competitors. In addition, any patents and trademarks may be contested, circumvented, or found unenforceable or invalid, and TMTG may not be able to prevent third parties from infringing, diluting or otherwise violating them. For example, TMTG is currently evaluating its options with respect to apparent bad faith registrations of the Truth Social trademark in the European Union and Sweden.

Companies in the internet, technology, and media industries own large numbers of patents, copyrights, trademarks, and trade secrets and frequently enter into litigation based on allegations of infringement, misappropriation, or other violations of intellectual property or other rights. In addition, various "non-practicing entities" that own patents and other intellectual property rights often attempt to aggressively assert their rights in order to extract value from technology companies. TMTG expects to face future allegations that TMTG has infringed or otherwise violated the patents, copyrights, trademarks, trade secrets, and other intellectual property rights of third parties, including its competitors and non-practicing entities. As TMTG faces increasing competition and as its business grows, TMTG will likely face more intellectual property-related claims and litigation matters. For additional information, see the sections titled "*Risk Factors — Risks Related to TMTG's Business — If TMTG's trademarks and other proprietary rights are not adequately protected to prevent use or appropriation by TMTG's competitors, the value of TMTG's brand and other intangible assets may be diminished, and TMTG's business may be adversely affected. The USPTO has issued a non-final rejection of TMTG's or its affiliate's applications to register the trademarks "Truth Social" and "TRUTHSOCIAL" for use with a social media network because of alleged similarity to other registered and pending trademarks. If TMTG is unable to overcome the objections of the trademark examiner to successfully register the pending "Truth Social" and "TRUTHSOCIAL" trademarks with the USPTO and otherwise protect TMTG's intellectual property, the value of TMTG's brand and other intangible assets may be diminished, TMTG may be forced to rebrand its offerings, and TMTG's business may be adversely affected*."

## Government Regulation

TMTG is subject to a number of U.S. federal and state and foreign laws and regulations that involve matters central to TMTG's business. These laws and regulations may involve privacy, rights of publicity, data protection, content regulation, intellectual property, competition, protection of minors, consumer protection, taxation, or other subjects. Many of these laws and regulations are still evolving and being tested in courts and could be interpreted in ways that could harm TMTG's business and revenue. In addition, the application and interpretation of these laws and regulations often are uncertain, particularly in the new and rapidly evolving industry in which TMTG operates.

TABLE OF CONTENTS

TMTG is also subject to federal, state and foreign laws regarding privacy and the protection of user data, and most recently updated Truth Social's privacy policy in accordance with such laws in December 2022. In the U.S., state privacy laws such as the California Consumer Privacy Act, as amended by the California Privacy Rights Act, the Arkansas Social Media Safety Act, and the Utah Social Media Regulation Act, the Texas Capture or Use of Biometric Identifiers Act, the Illinois Biometric Information Privacy Act, and others, both currently in effect and scheduled to take effect through 2026, may affect TMTG. There are also a number of legislative proposals pending before the U.S. Congress, various state legislative bodies, and foreign governments concerning data protection that could affect TMTG. Foreign data protection, privacy, consumer protection, content regulation and other laws and regulations are often more restrictive than those in the United States. For example, the CCPA, as amended by the CPRA, provide new data privacy rights for consumers and new operational requirements for companies, effective in 2020 and 2023 respectively. The CCPA gives California residents rights to access and require deletion of their personal information, opt out of certain personal information sharing, and receive detailed information about how their personal information is collected, used, and shared. The CCPA provides for civil penalties for violations and creates a private right of action for security breaches that could lead to consumer class actions and other litigation against the Company. Truth Social as an internet platform is subject to 47 U.S. Code § 230 and COPPA in addition to the regulations discussed above. The FTC has adopted revisions to COPPA that expands liability for the collection of information by operators of websites and other electronic solutions that are directed to children. 47 U.S. Code § 230 provides a potential defense for Truth Social from incurring liability for restricting access to or the availability of material that a user may consider to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable whether or not such material is protected by the First Amendment of the U.S. Constitution. However, such defense may be costly financially. Pursuant to the statute, Truth Social will at the time of entering an agreement with a customer, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available and may assist the customer in limiting access to material that is harmful to minors. For example, the Company is subject to the GDPR, which applies to all members of the EEA and, in some circumstances, to processors in a state outside the EEA including any business, regardless of its location, that provides goods or services to individuals located in the EEA. The GDPR imposes significant obligations on data controllers and data processors, requiring the implementation of more stringent requirements for the processing of personal data. If the Company fails to comply with the GDPR, it may lead to regulatory investigation with possible enforcement of monetary penalties ranging from 10 million to 20 million euro, or 2% to 4% of annual worldwide revenue (whichever is higher), private or class action lawsuits and/or reputational damage.

On July 10, 2023, the European Commission adopted an adequacy decision concluding that the United States ensures an adequate level of protection for personal data transferred from the European Union to organizations in the United States that are included in the "Data Privacy Framework List," which is maintained by the U.S. Department of Commerce pursuant to the EU-U.S. Data Privacy Framework. The impact of the European Commission's adequacy decision is complex, evolving, and may be reviewed by the CJEU. A future invalidation of the Privacy Shield by the CJEU will create additional uncertainty and mean there are few if any viable alternatives to the Privacy Shield and the SCCs for the foregoing purposes, which may lead to government enforcement actions, litigation, fines and penalties or adverse publicity that could have an adverse effect on TMTG's reputation and business.

Further, in Canada, the Company is subject to Canada's PIPEDA. PIPEDA provides Canadian residents with privacy protections and sets out rules for how companies may collect, use and disclose personal information in the course of commercial activities. Truth Social users may be restricted from accessing Truth Social from certain countries, and other countries may intermittently restrict access to Truth Social. It is possible that other governments may seek to restrict access to or block TMTG's website or mobile applications, censor content available through TMTG's products or impose other restrictions that may affect the accessibility or usability of Truth Social for an extended period of time or indefinitely.

For additional information, see the section titled "*Risk Factors — Risks Related to TMTG's Business — TMTG's business is subject to complex and evolving U.S. and foreign laws and regulations regarding privacy, data protection, and other matters. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to TMTG's business practices, increased cost of operations, or declines in user growth or engagement, or otherwise harm TMTG's business*."

TABLE OF CONTENTS

**Emerging Growth Company**

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have taken advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) (a) December 31, 2026, (b) the last day of the fiscal year in which we have total annual gross revenue of at least $1.235 billion, or (c) the last day of the fiscal year in which we are deemed to be a large accelerated filer, which means the market value of our Common Stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our Common Stock held by non-affiliates equals or exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues equaled or exceeded $100 million during such completed fiscal year and the market value of our Common Stock held by non-affiliates exceeds $700 million as of the prior June 30th.

We expect to lose our emerging growth company and smaller reporting company status at the end of the fiscal year ended December 31, 2024, when we expect to qualify as a large accelerated filer based on the worldwide market value of our common equity held by non-affiliates as at June 30, 2024.

**Periodic Reporting and Financial Information**

We have registered our common stock and warrants under the Exchange Act and have reporting obligations, including the requirement that we file annual, quarterly and current reports with the SEC. In accordance with the requirements of the Exchange Act, our annual reports will contain financial statements audited and reported on by our independent registered public accountants.

We are required to evaluate our internal control procedures for the fiscal year ended December 31, 2023 as required by the Sarbanes-Oxley Act. Only in the event we are deemed to be a large accelerated filer or an accelerated filer, and no longer qualify as an emerging growth company, will we be required to have our internal control procedures audited. We have filed a Registration Statement on Form 8-A with the SEC to register our securities under Section 12 of the Exchange Act. As a result, we are subject to the rules and regulations promulgated under the Exchange Act. We have no current intention of filing a Form 15 to suspend our reporting or other obligations under the Exchange Act. We are an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

TABLE OF CONTENTS

### Available Information

Our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Exchange Act are filed with the SEC. We are subject to the informational requirements of the Exchange Act and file or furnish reports, proxy statements, and other information with the SEC. Such reports and other information filed by us with the SEC are available free of charge on our website at https://tmtgcorp.com/ when such reports are available on the SEC's website.

The SEC maintains an internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC at www.sec.gov.

The contents of the websites referred to above are not incorporated into this filing. Further, our references to the URLs for these websites are intended to be inactive textual references only.

### Human Capital Resources

As of December 31, 2023, Private TMTG had approximately 36 full-time employees. None of Private TMTG's employees are subject to a collective bargaining agreement. Private TMTG has never experienced a material work stoppage or disruption to its business relating to employee matters. We consider our relationship with our employees to be good.

Our human capital resources objectives include, as applicable, identifying, recruiting, retaining, incentivizing and integrating our existing and new employees.

### Corporate Information

Our executive offices are located at 401 N. Cattlemen Rd., Ste. 200, Sarasota, Florida 34232. Our telephone number is (941) 735-7346. Our website is *https://tmtgcorp.com/.* Information contained on our website or connected thereto does not constitute part of, and is not incorporated by reference into, this prospectus or the registration statement of which it is a part.

### Recent Developments

*Business Combination*

The Closing of the Business Combination took place on March 25, 2024.

*Agreements Related to the Business Combination*

*Indemnification Agreements*

On March 25, 2024, in connection with the Closing, Digital World caused the Amended Charter to take effect. The Amended Charter provides that, to the fullest extent permitted by Delaware law, no director will be personally liable to TMTG or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to TMTG or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit. TMTG also is expressly authorized to carry directors and officers' liability insurance providing indemnification for TMTG's directors, officers, and certain employees for some liabilities.

In connection with the foregoing, on March 25, 2024, TMTG entered into separate indemnification agreements with each of its directors and executive officers. Each indemnification agreement provides for the indemnification and advancement by TMTG of certain expenses and costs relating to claims, suits or proceedings arising from service to TMTG or, at its request, service to other entities, as officers or directors, to the maximum extent permitted by applicable law.

*Escrow Agreement in Relation to the Merger Consideration*

On March 21, 2024, Digital World entered into that certain Share Escrow Agreement with Odyssey pursuant to Section 1.16 of the Merger Agreement providing that 614,640 shares of TMTG common stock (together with any equity securities paid as dividends or distributions with respect to such shares or into which such shares are exchanged or converted, the "Escrow Shares") will be held in escrow for 12 months following Closing with respect to any indemnification claims made in accordance with the Merger Agreement (the "Share Escrow Agreement").

TABLE OF CONTENTS

*Escrow Agreements in Connection with the Delaware Litigation*

On February 29, 2024, ARC, which was controlled by Mr. Patrick Orlando, Digital World's former chairman of its board of directors and chief executive officer, filed the Delaware Lawsuit in the Court of Chancery of the State of Delaware (the "Chancery Court"). ARC's complaint, among other matters, alleges impending violation of the Digital World Charter for failure to commit to issue the number of conversion shares to ARC and other holders of Digital World Class B Common Stock (the "Non-ARC Class B Shareholders") that ARC claims it is owed upon the consummation of the Business Combination. As previously disclosed, on March 5, 2024, the Chancery Court held a hearing to decide ARC's motion to expedite the case schedule, during which, the Vice Chancellor denied and declined to hold a merits hearing or issue an injunction before Digital World's special meeting of stockholders held on March 22, 2024. The Chancery Court ruled that Digital World's proposal to place disputed shares into an escrow account upon the Closing of the Business Combination was sufficient to preclude a possibility of irreparable harm related to the conversion of the ARC's shares in connection with the Business Combination into TMTG common stock. Additionally, the Chancery Court requested that the parties stipulate to the establishment of an escrow account for the placement of disputed shares following the Business Combination, to be held pending conclusion of the action.

Based on the foregoing, on March 21, 2024, Digital World entered into two escrow agreements with Odyssey, as follows: (i) an escrow agreement for the benefit of ARC (the "ARC Escrow Agreement"), pursuant to which TMTG deposited into escrow 3,579,480 shares of TMTG common stock, and (ii) an escrow agreement for the benefit of the Non-ARC Class B Shareholders (the "Non-ARC Class B Shareholders Escrow Agreement" and, together with the ARC Escrow Agreement, the "Disputed Shares Escrow Agreements"), pursuant to which TMTG deposited into escrow 1,087,553 shares of TMTG common stock, which amounts represent the difference between the actual conversion ratio, determined by Digital World's board of directors upon Closing of the Business Combination (which was determined to be 1.348:1), and a conversion ratio of 2.00. Any release of shares is subject to the terms and conditions of the Disputed Shares Escrow Agreements.

*Convertible Notes*

On February 8, 2024, Digital World agreed to issue up to $50,000,000 in Digital World Convertible Notes pursuant to a note purchase agreement entered into by and between Digital World and certain institutional investors (the "Note Purchase Agreement"). Upon the Closing, on March 25, 2024, and pursuant to the Note Purchase Agreement, the final drawdown for $40,000,000 (the "Final Drawdown") in Digital World Convertibles Notes was issued to the certain institutional investors (the "Accredited Investors"). The Final Drawdown was deposited into a control account and may only be released to TMTG pursuant to the terms of the Note Purchase Agreement and the Convertible Notes.

*Lock-Up Agreements*

On March 25, 2024, Digital World entered into separate Lock-Up Agreements with: Andrew Northwall, Daniel Scavino Jr., Devin G. Nunes, Donald J. Trump, Jr., President Donald J. Trump, Kashyap "Kash" Patel, Phillip Juhan, Scott Glabe and Vladimir Novachki, pursuant to which they are each contractually restricted from selling or transferring any of (i) their shares of TMTG's common stock held immediately following the Closing and (ii) any of their shares of TMTG's common stock that result from converting securities held immediately following the Closing. Such restrictions became applicable commencing from the Closing Date and end the earliest of (i) the six-month anniversary of the Closing Date, (ii) on the date on which the closing stock price for TMTG common stock equals or exceeds $12.00 per share for any 20 trading days within any 30-trading day period commencing at least 150 days after the Closing Date, and (iii) such date on which TMTG completes a liquidation, merger, stock exchange, reorganization or other similar transaction that results in all of the TMTG stockholders having the right to exchange their shares of TMTG common stock for cash, securities or other property.

*Lock-Up Provisions Pursuant to the Amended Charter*

In addition, subject to certain customary exceptions, the Amended Charter also includes Lock-Up Trading Restrictions, which apply to holders who received TMTG common stock in exchange for their Private TMTG common stock (but excluding shares of TMTG common stock issued to the former holders of TMTG Convertible Notes in connection with the conversion of such TMTG Convertible Notes into Private TMTG common stock prior to the Closing and exchanged for TMTG common stock at the Closing).

TABLE OF CONTENTS

The Amended Charter does not provide for waiver of its Lock-Up Trading Restrictions applicable to certain of TMTG's pre-Business Combination equity holders, including President Trump. A waiver of the of the Lock-Up Trading Restrictions under the (i) Lock-Up Agreements applicable to President Trump and certain other equity holders of the Company (other than ARC) requires the prior consent of TMTG, Eric Swider, Digital World's former Chief Executive Officer and current member of TMTG's board of directors, and the locked-up party thereunder and (ii) Lock-Up and Support Letter applicable to ARC requires the prior consent of all of the parties thereunder, including Eric Swider, Digital World's former Chief Executive Officer and current member of TMTG's board of directors. The Company has no plans or agreements, tacit or explicit, with respect to the early release of shares subject to Lock-Up Trading Restrictions. Following expiration of the Lock-Up Trading Restrictions, locked-up parties may sell their Common Stock in privately negotiated transactions or in the open market upon the effectiveness of any resale registration statement the Company files or otherwise in accordance with Rule 144 under the Securities Act. Such sales could have the effect of increasing the volatility in the trading price of the Common Stock or putting significant downward pressure on the price of the Common Stock. These shares may be resold for so long as the Registration Statement on Form S-1 is available for use.

*Non-Competition and Non-Solicitation Agreements*

In connection with the Closing and pursuant to the Merger Agreement, on March 25, 2024, Devin G. Nunes, Phillip Juhan, Andrew Northwall, Vladimir Novachki, Scott Glabe, Kashyap "Kash" Patel and Donald J. Trump, Jr. (the "Significant Company Holders") each separately entered into a Non-Competition and Non-Solicitation Agreement (the "Non-Competition and Non-Solicitation Agreements") in favor of Digital World and Private TMTG and their respective successors, assigns and affiliates (the "Covered Parties"). Under the Non-Competition and Non-Solicitation Agreements, each Significant Company Holder has agreed that, for a period of (i) four years, the Significant Company Holder will not engage in any business activity similar to, or competitive with, the business conducted by the Covered Parties, in particular, Truth Social and the business of developing and operating media platforms for social media and digital video streaming, and of developing and operating products and services relating and incidental thereto or any other business being conducted by a Covered Party (including any of a Covered Party's subsidiaries), as of the Closing Date and (ii) three years, it will not, directly or indirectly (a) hire, engage, solicit, induce or encourage certain employees, independent contractors, consultants, or other certain personnel to leave a Covered party; or (b) in any way interfere with or attempt to interfere with the relationship between such persons and a Covered Party.

***WCT Asset Acquisition***

On July 3, 2024, TMTG, WCT, Solutions and JedTec entered into the Asset Acquisition Agreement, pursuant to which TMTG agreed to acquire substantially all of the assets of WCT or its affiliate, which mainly included certain agreements, including the Option Agreement as well as the CDN Agreements. The transaction is expected to close on the date TMTG has implemented the Perception Software and Network with all back-end API services having become generally available on iOS, Google/Android, and web media services and with streaming enabled from at least one data-center, which closing is expected to occur as early as July, 2024. Pursuant to the Option Agreement on the Asset Closing Date, WCT entered and will assign to TMTG on the Asset Closing Date the CDN Agreements, which are expected to be used for the roll out of the CDN technology for the Truth platform. In addition, Perception and its affiliates agreed not to use or permit other parties to use the source code for a period of five (5) years after the closing of the Asset Acquisition Agreement for any purpose that competes, in the United States, with the Truth platform or commercialization of such source code in the United States. In addition, the Option Agreement grants the (i) option to purchase Perception, until July 3, 2026, subject to a future negotiation of the price and terms of such acquisition and (ii) right of first refusal, until February 5, 2026, to purchase Perception in the event of a bona fide written offer from an unaffiliated third party to purchase more than 50% of the assets of Perception. TMTG does not have any current intention to exercise those rights.

Pursuant to the Asset Acquisition Agreement, TMTG agreed to issue to Solutions and JedTec as consideration up to 5,100,000 Asset Acquisition Shares, 2,600,000 of which will be issued on the Asset Closing Date and 2,500,000 of which will be issuable upon the satisfaction of certain Milestones (as defined in the Asset Acquisition Agreement). In addition, with respect to all of the Asset Acquisition Shares, for a period of 12 months after the Asset Closing Date, neither JedTec, Solutions nor their respective affiliates will be permitted to collectively sell an amount of the Asset Acquisition Shares during any Two Week Sale Period exceeding the

TABLE OF CONTENTS

## MANAGEMENT

### Management and Board of Directors

The following is a list of the persons who are our directors and executives and their ages and positions.

| Name | Age | Position(s) |
|---|---|---|
| Devin G. Nunes | 50 | Chief Executive Officer, President and Chairman |
| Phillip Juhan | 49 | Chief Financial Officer, Treasurer |
| Andrew Northwall | 38 | Chief Operating Officer |
| Vladimir Novachki | 36 | Chief Technology Officer |
| Sandro De Moraes | 49 | Chief Product Officer |
| Scott Glabe | 40 | General Counsel, Secretary |
| Eric Swider | 51 | Director |
| Donald J. Trump, Jr | 46 | Director |
| Kashyap "Kash" Patel | 44 | Director |
| W. Kyle Green | 51 | Independent Director |
| Robert Lighthizer | 76 | Independent Director |
| Linda McMahon | 75 | Independent Director |

**Information regarding the executive officers, key employees, and directors is set forth below:**

***Executive Officers***

**Devin G. Nunes**, TMTG's Chief Executive Officer and a Director since 2022 and Chairman since April 1, 2024, previously served in the U.S. House of Representatives from 2011 to 2022. He was the Republican leader and former Chairman of the HPSCI, a senior Republican on the Ways and Means Committee, and the Republican leader of the Ways and Means Health Subcommittee. Mr. Nunes was a vital contributor to the 2017 tax system overhaul, authoring a key provision to allow same-year expensing of all business investments for entrepreneurs and businesses. He also championed telemedicine to improve healthcare in underserved, rural areas. In his role on HPSCI, Mr. Nunes spent extensive time overseas working with U.S. military personnel, Central Intelligence Agency officials, and world leaders while promoting freedom and democratic values around the globe. During his time in Congress, many regarded Mr. Nunes as the House of Representatives' preeminent investigator of government malfeasance and corruption; he was awarded the Presidential Medal of Freedom, America's highest civilian honor, in 2021. Mr. Nunes graduated from Cal Poly San Luis Obispo, where he received a bachelor's degree in agricultural business and a master's degree in agriculture. He is the author of "Restoring the Republic" and "Countdown to Socialism," and was an early and prominent critic of big tech censorship.

**Phillip Juhan**, TMTG's Chief Financial Officer, has over 20 years of progressive experience in finance leadership roles. From March 2020 until July 2021, Mr. Juhan served as the Chief Financial Officer of Town Sports International Holdings, Inc., a public company listed on Nasdaq (CLUBQ) which owned and operated fitness clubs in the Northeast and mid-Atlantic regions of the United States, as well as in California, Florida, Puerto Rico, and Switzerland. During this time, Mr. Juhan led an organizational restructuring by optimizing the company's portfolio of assets and recapitalizing the balance sheet, raising $100 million of fresh capital to position the company for a post-pandemic recovery. From August 2018 until his appointment as CFO in March 2020, Mr. Juhan was Vice President of Business Operations for Town Sports. Previously, Mr. Juhan worked in the Investment Banking Divisions of Prudential Financial (from June 2022 to May 2006) and the Bank of Montreal (from July 2007 to March 2014), where he led consumer focused research within the Financial Services (Real Estate, Gaming and Lodging) and Consumer (Broadlines Retail and Restaurants) sectors. Mr. Juhan attended the U.S. Air Force Academy where he earned the Western Athletic Conference Scholar Athlete Award while playing football for the Falcons. In 1998, he graduated *magna cum laude* from The Georgia Institute of Technology, earning a Bachelor of Science in Management with a concentration in Finance.

TABLE OF CONTENTS

**Andrew Northwall**, TMTG's Chief Operating Officer since December 2021, is a successful entrepreneur with over fifteen years' experience building and maintaining high-availability web applications and technologies for government affairs and political organizations. From June 2021 until October 2021, he previously served as Chief Architect at Parler, a free-speech-focused social networking service, to help restore Parler to functionality after it was cut off from the internet by a consortium of big tech companies. Mr. Northwall also worked extensively with successful political campaigns, government entities, and non-profits serving as CEO of NorthStar Campaign Systems (March 2008 to December 2016), CEO of EZPolitix (December 2015 to December 2021) and owner and president of Northwall Strategies (November 2016 to December 2021). Mr. Northwall attended the University of Nebraska at Omaha, where he studied political science. He oversees general business operations and work with TMTG's technologists to successfully develop and maintain products.

**Sandro De Moraes**, TMTG's Chief Product Officer since July 2023, has over a decade of experience leading teams in building customer-facing products that deliver business value. He previously held product management leadership roles at Blue Shield of California (February 2018 to June 2019), a health insurance provider with over $24 billion in annual revenues; BOLD North America, a fast-growing business support services corporation, from June 2019 to June 2021; and two social networking startups Mr. De Moraes cofounded between November 2009 and December 2017. He has a Bachelor of Science in Business Management and Marketing from Cornell University and a Master of Business Administration from the University of Geneva, Switzerland. Mr. De Moraes sets product vision, builds the product organization, and ensures that all roles within it are performed efficiently and effectively to deliver on TMTG's strategic and business objectives.

***Key Employees***

**Vladimir Novachki,** TMTG's Chief Technology Officer since June 2023, has more than a decade of experience engineering software and developing high-performance, scalable web applications that can handle a large volume of real-time users. Between March 2012 and January 2023, Mr. Novachki was an employee at Cosmic Development, a Canadian IT support services company and served as its Chief Technology Officer beginning in 2016. During that time, Cosmic Development developed many projects, including Little Things (a top Facebook publisher in 2017), Bookmark, America's Funniest Home Videos and TMTG's partner, Rumble. In 2010, while unaffiliated with any company, Mr. Novachki created one of the first Android mobile applications. Mr. Novachki holds a Bachelor in Computer Science and Engineering degree from the Faculty of Electrical Engineering and Information Technologies in Skopje. He also pursued a master's degree in Software Engineering from the Faculty of Computer Science and Engineering in Skopje. Mr. Novachki brings impressive breadth, depth, and expertise in the technology sector to our Management Team.

**Scott Glabe,** TMTG's General Counsel since April 2022, is a seasoned attorney and counselor. He was most recently a Partner at an Am Law 100 firm from February 2021 until April 2022, where his practice focused on investigations and compliance. Mr. Glabe previously led a 200-person team including members of the Office of Cyber, Infrastructure, Risk and Resilience-as Acting Under Secretary for Policy at the U.S. Department of Homeland Security (DHS) from July 2020 until January 2021. He also held multiple other positions at DHS from May 2019 to January 2021. Before DHS, he represented the White House as an Associate Counsel to President Donald J. Trump from February 2019 until May 2019 and worked for the U.S. House of Representatives in progressively senior legal and policy roles from April 2015 until February 2019. Earlier in his career, Mr. Glabe practiced in the Washington office of an international law firm from October 2013 to April 2015, clerked for a federal appellate judge from October 2012 to September 2013, and served as an intelligence officer in the U.S. Navy Reserve, including time in inactive reserve from September 2008 until January 2020 (including time in the inactive reserve). He is a graduate of Yale Law School and Dartmouth College.

***Directors***

**Eric S. Swider** served as Digital World's Chief Executive Officer from July 2023 to March 2024. He previously served as our Interim Chief Executive Officer from March 2023 until July 2023 and as a director since September 2021. He also served on the Compensation and Audit Committees and serves as the Chair for both Committees. Mr. Swider has been serving as the Chief Executive Officer of RUBIDEX since January 2020, a start-up company focusing on data security. Mr. Swider founded Renatus Advisors and has been serving as the Managing Partner of Renatus LLC since June 2016. Renatus Advisors works with private clients to resolve complex legal, strategic, and operational matters as well as public clients, providing services related to disaster and economic recovery. From February 2021 to October 2022, Mr. Swider served as a director of Benessere

TABLE OF CONTENTS

Capital Acquisition Corp., a special purpose acquisition company. From September 2016 to January 2018, Mr. Swider served as the Managing Director of Great Bay Global where he oversaw the launch of a new business division focused on investing in alternative strategies. From December 2014 to June 2016, Mr. Swider served as the Managing Director of OHorizons Global, where he oversaw expansion of a new investment team and was responsible for working on a global basis to expand its client base and investment portfolio. From February 2010 to December 2015, Mr. Swider served as the Managing Director of Oceano Beach Resorts, where he was responsible for growing its new property and resort management group. Mr. Swider received his education in Mechanics Engineering and Nuclear Science Studies at U.S. Naval Engineering and Nuclear A Schools, an intensive two-year program studying nuclear physics, heat transfer and fluid flow, advanced mathematical practices and engineering principles.

**Donald J. Trump, Jr.** has been an Executive Vice President at The Trump Organization since September 2001, where he helps oversee the company’s extensive real estate portfolio, media and other business interests around the globe. He is and has been an officer of hundreds of entities related to President Donald J. Trump and The Trump Organization. Over the course of his career, Mr. Trump has played a critical role in many of the company’s most successful real estate development projects, including the Trump International Hotel & Tower in Chicago, Trump International Hotel in Washington D.C. and many others. Mr. Trump’s involvement in those projects was extensive, ranging from the initial deal evaluation stage, analysis and pre-development planning to construction, branding, marketing, operations, sales, and leasing. Mr. Trump has also spearheaded efforts to further expand the Trump brand globally and has overseen large segments of The Trump Organization’s commercial leasing business involving properties such as Trump Tower on Fifth Avenue and 40 Wall Street in downtown Manhattan. In addition to his real estate interests, Mr. Trump is an accomplished and sought-after speaker. He has spoken extensively throughout the United States and around the world and maintains an influential social media presence. He was also featured as an advisor on the highly acclaimed NBC shows “The Apprentice” and the “The Celebrity Apprentice.” Mr. Trump received his bachelor’s degree in Finance and Real Estate from the Wharton School of Finance at the University of Pennsylvania.

**Kashyap “Kash” Patel** is founder and president of The Kash Foundation, Inc., which supports educational and legal efforts to facilitate government transparency, since 2022. Mr. Patel also currently serves as a national security adviser to President Donald J. Trump as a private citizen and receives payment for such services from Save America PAC. He previously served as the Chief of Staff at the Department of Defense (DOD) from November 2020 to January 2021, where his responsibilities included implementing the Secretary’s mission leading 3 million plus personnel, operating a $740 billion budget, and managing $2 trillion in assets. Before the DOD, from January 2019 to October 2021, Mr. Patel served as Senior Director for Counterterrorism (CT) on the National Security Council (NSC); acting principal deputy at the Office of the Director of National Intelligence (ODNI) from April 2021 to July 2021; and National Security Advisor and Senior Counsel for the U.S. House of Representatives Permanent Select Committee on Intelligence (HPSCI) from April 2017 to December 2018. Prior to HPSCI, Mr. Patel was a career national security prosecutor at the Department of Justice (DOJ) during the Obama administration from 2014 to 2017. At DOJ, he coordinated investigations around the globe and served as a Liaison Officer to Joint Special Operations Command (JSOC). Mr. Patel began his career in 2005 as a public defender, trying scores of complex cases in federal and state courts. He completed his undergraduate studies at the University of Richmond before returning to his native New York to earn his law degree.

**W. Kyle Green** is an attorney with over 20 years of experience in civil litigation and criminal prosecutions. Since 2007, Mr. Green has been Lead Counsel at the Law Office of W. Kyle Green L.L.C., where he represents both plaintiffs and defendants in various matters including civil and criminal litigation and commercial transactions. Previously, Mr. Green served as Assistant District Attorney for the Louisiana Third Judicial District Court between 2015 and 2018 where he was responsible for major felony prosecutions. From 2007 to 2015, Mr. Green served as the City Prosecutor for the city of Ruston, Louisiana where he successfully prosecuted more than 20,000 criminal defendants. In 2006, the Governor of Louisiana appointed Mr. Green to the state’s Judiciary Commission where he oversaw alleged misconduct involving members of the judiciary until 2007. Mr. Green’s experience also includes time as the in-house counsel and later Vice President of Hogan Hardwood and Moulding, a lumber wholesale company, from 2003 to 2007, and as an attorney at the Law Firm of Coyle and Green, L.L.C. engaged in a civil and criminal legal practice from 1998 to 2003. Mr. Green received a Bachelor of Science degree in Management, *magna cum laude*, from Louisiana Tech University, and a Juris Doctor degree from Louisiana State University.

TABLE OF CONTENTS

**Robert Lighthizer** has served as the Chairman of the Center for American Trade in the America First Policy Institute since 2021, promoting fair trade policies that put America's families, workers, manufacturers, and farmers ahead of the interests of global competitors. Mr. Lighthizer previously served as the 18th United States Trade Representative (USTR) under President Donald J. Trump from 2017 to 2021. Mr. Lighthizer was an architect of American trade policy during the Trump presidency, engineering historic trade agreements with China that prioritized the American economy. An experienced trade negotiator and litigator, Mr. Lighthizer has dedicated his life working for equitable trade enforcement for the U.S. and has an impressive record for fighting for American workers and businesses. Prior to joining the Trump Administration, from 1985 to 2017, Mr. Lighthizer was a partner at Skadden, Arps, Slate, Meagher & Flom, LLP, where he practiced international trade law for over three decades and led the firm's International Trade Department. Before joining Skadden, Mr. Lighthizer served as Deputy U.S. Trade Representative for President Ronald Reagan from 1983 to 1985. During his tenure, Mr. Lighthizer negotiated over two dozen bilateral international agreements, including agreements on steel, automobiles, and agricultural products. As Deputy USTR, he also served as Vice Chairman of the Board of Overseas Private Investment Corporation, a U.S. government agency whose purpose is to promote economic growth in developing countries through U.S. investment. Previously, from 1978 to 1981, Mr. Lighthizer served as chief minority counsel for the U.S. Senate Committee on Finance, and from 1981 to 1983, Mr. Lighthizer served as chief counsel and staff director for the U.S. Senate Committee on Finance. Mr. Lighthizer earned a bachelor's degree from Georgetown University and his Juris Doctor from Georgetown University Law Center.

**Linda McMahon** has over 40 years of business, media, and political leadership experience, and has served since 2021 as the Chair of the Board and Chair of the Center for the American Worker within the America First Policy Institute, a non-profit organization advocating for American career and educational opportunities. In 1980, Ms. McMahon helped co-found the World Wrestling Foundation which was later renamed World Wrestling Entertainment ("**WWE**"), the world's largest professional wrestling promotion company, where she served as President and later Chief Executive Officer from 1993 until 2009. Under Ms. McMahon's innovative leadership, the WWE saw expansive growth from a small regional business to a global enterprise and publicly listed company on the New York Stock Exchange (WWE) with over 800 employees and offices worldwide. While leading the WWE, Ms. McMahon specifically negotiated the company's global media and television contracts and spearheaded the successful commercial launch of its first line of action figures. In 2016, President Donald J. Trump nominated Ms. McMahon to be the administrator of the United States Small Business Administration ("**SBA**") and the U.S. Senate overwhelmingly confirmed her to that position in 2017. Ms. McMahon led the SBA until 2019, advocating on behalf of America's 30 million small businesses as a member of President Donald J. Trump's cabinet where she directed the agency's effort to issue over $1 billion in loans to assist small business owners in the aftermath of Hurricane Harvey. Ms. McMahon's political career also includes an appointment to the Connecticut Board of Education from 2009 until 2010, and serving as the Republican nominee to represent the state of Connecticut in the 2010 and 2012 U.S. Senate elections. Previously, from 2019 to 2020, Ms. McMahon also served as Chair of the America First Action political action committee supporting President Donald J. Trump's 2020 reelection campaign and as co-Founder and Chief Executive Officer, from 2017 to 2019, of Women's Leadership LIVE, a company that hosts events to inspire entrepreneurial women to launch their own businesses. Ms. McMahon received a Bachelor of Arts degree in French from East Carolina University and also holds Honorary Doctorates from East Carolina University and Sacred Heart University.

Except as provided below, to the knowledge of the TMTG Management, the Management Team has not been the subject of any events that occurred during the past ten years that are material to an evaluation of the ability or integrity of a director, person nominated to become a director or executive officer of a company such as TMTG, as it is required to be reported by Item 401(f) and (g) of Regulation S-K.

1. Donald J. Trump, Jr. is the subject of numerous legal proceedings. Specifically, Donald J. Trump, Jr. is a named defendant in the New York Attorney General's case mentioned in *Risk Factor: President Donald J. Trump is the subject of numerous legal proceedings, the scope and scale of which are unprecedented for a former President of the United States and current candidate for that office. An adverse outcome in one or more of the ongoing legal proceedings in which President Donald J. Trump is involved could negatively impact TMTG and its Truth Social platform.* On September 21, 2022, the Attorney General of the State of New York launched a civil suit against Donald J. Trump, Jr. and affiliated individuals and entities. The suit alleged Donald J. Trump, Jr. was aware of and knowingly participated in business fraud relating to misrepresentations in the preparation of President Donald J. Trump's annual statements of financial condition in the years 2011 to 2021. In

TABLE OF CONTENTS

a decision dated November 3, 2022, the court ordered that an independent monitor be appointed to oversee compliance with the court's order enjoining the defendants from, among other things, selling, transferring or otherwise disposing of certain assets of President Donald J. Trump. In a decision dated September 26, 2023, the court found that the defendants were liable for persistent violations of New York Executive Law 63(12). Pursuant to that same order, the court also ordered that an independent receiver be appointed to oversee the dissolution of certain entities owned by the defendants. In June 2023, a New York appeals court narrowed the fraud case, the trial for which commenced in October 2023 and closing oral arguments were concluded on January 11, 2024.

New York Supreme Court Justice Arthur Engoron, in a Decision and Order dated February 16, 2024, held President Donald J. Trump, Donald Trump, Jr., and defendants liable under the following five causes of action. Specifically, (i) for repeatedly and persistently falsifying business records, thus violating Executive Law § 63(12) and New York Penal Law 175.05; (ii) for conspiracy to falsify business records; (iii) for repeatedly and persistently issuing false financial statements, thus violating Executive Law § 63(12) and New York Penal Law 175.45; (iv) for repeatedly and persistently committing insurance fraud in violation of Executive Law § 63(12) and New York Penal Law 176.05; and (v) for conspiracy to commit insurance fraud. The court ordered President Donald J. Trump and defendants to pay approximately $354,868,768 in aggregate disgorgement of ill-gotten gains. Donald Trump, Jr., was specifically ordered to pay $4,013,024 with pre-judgment interest from May 11, 2022. The court enjoined Donald Trump, Jr., among others from serving as an officer or director of any New York corporation or other legal entity in New York for a period of two years, and from applying for loans from any financial institution chartered by or registered with the New York Department of Financial Services for a period of three years. An appeals court subsequently stayed this injunction with respect to Donald J. Trump, Jr. Separately, the Trump Organization was found guilty of criminal tax fraud in December 2022, and fined $1.6 million in January 2023.

In its February 16, 2024 ruling, the court ordered Judge Barbara Jones (ret.) to continue in her role as an Independent Monitor, tasked with overseeing the Trump Organization's financial disclosures to any third parties and any transfer or other dissipation of assets, for a period of no less than three years following the ruling. In addition to the continued monitorship, the court also ordered that an Independent Director of Compliance be installed at the Trump Organization, who will be responsible for ensuring good financial and accounting practices, will establish internal written protocols for financial reporting, and will also approve any financial disclosures to third parties in advance of submission.

The foregoing does not purport to be an exhaustive list of legal proceedings in which Donald J. Trump, Jr. is or has been involved.

2. Phillip Juhan, Chief Financial Officer: In March of 2020, Mr. Juhan became the CFO at Town Sports International Holdings, Inc., a public company (listed on Nasdaq) that operated nearly 200 "big box" fitness clubs. The majority of the company's assets were in markets such as New York, Boston, D.C., and Philadelphia, where governmental COVID restrictions forced gyms to close for up to six months during 2020. The disruption to cash flow and uncertainty of business recovery precluded Town Sports from refinancing its (approximately $180 million) term loan that came due during the year. As a result, the Company was forced to file for bankruptcy and restructure its business.

**Board of Directors**

The Board consists of seven members, including TMTG's President and Chief Executive Officer. In accordance with the Amended Charter, the Board is divided into three classes, Classes I, II and III, each to serve a three year term, except for the initial term after the Closing, for which the Class I directors will be up for reelection at the first annual meeting of stockholders occurring after the Closing, and for which the Class II directors will be up for reelection at the second annual meeting of stockholders occurring after the Closing. At each annual meeting of stockholders, the successors to directors whose terms then expire will be elected to serve from the time of election and qualification until the third annual meeting following the election. Directors will not be able to be removed during their term except for cause, and then only by the affirmative vote of the holders of not less than two thirds (2/3) of the outstanding shares of capital stock then entitled to vote at an election of directors. The directors are divided among the three classes as follows:

- the Class I directors are Kashyap "Kash" Patel and W. Kyle Green, and their terms expire at the annual meeting of stockholders to be held in 2024;

TABLE OF CONTENTS

- the Class II directors are Linda McMahon and Donald J. Trump, Jr., and their terms expire at the annual meeting of stockholders to be held in 2025; and
- the Class III directors are Eric Swider, Devin Nunes and Robert Lighthizer, and their terms expire at the annual meeting of stockholders to be held in 2026.

TMTG expects that any additional directorships resulting from an increase in the number of directors will be distributed among the three classes so that, as nearly as possible, each class will consist of one-third of the directors. The division of the Board into three classes with staggered three-year terms may delay or prevent a change of our Board or a change in control.

**Director Independence**

**Controlled Company Exception**

After the completion of the Business Combination, President Donald J. Trump beneficially owned approximately 57.6% of the combined voting power of TMTG common stock. As of June 25, 2024, he holds approximately 60.4% of the outstanding shares of TMTG common stock, including 36,000,000 Earnout Shares. As a result, TMTG is a "controlled company" within the meaning of Nasdaq's corporate governance standards. Under these corporate governance standards, a company of which more than 50% of the voting power for the election of directors is held by an individual, group or other company is a "controlled company" and may elect not to comply with certain corporate governance standards, including the requirements (1) that a majority of TMTG's board of directors consists of independent directors, (2) that TMTG's board of directors has a compensation committee that consists entirely of independent directors with a written charter addressing the committee's purpose and responsibilities, and (3) that TMTG's director nominations be made, or recommended to TMTG's full board of directors, by TMTG's independent directors or by a nominations committee that consists entirely of independent directors and that TMTG adopts a written charter or board resolution addressing the nominations process. Accordingly, investors will not have the same protections afforded to stockholders of companies that are subject to these corporate governance requirements. In the event that TMTG ceases to be a "controlled company" and its common stock continues to be listed on Nasdaq, TMTG will be required to comply with these provisions within the applicable transition periods.

TMTG relies on the "controlled company" exemption. As a result, TMTG does not have a majority of independent directors on its board of directors. In addition, the TMTG's Compensation Committee and TMTG's Nominating and Corporate Governance Committee are not required to consist entirely of independent directors and are not subject to annual performance evaluations. Accordingly, you may not have the same protections afforded to stockholders of companies that are subject to all of Nasdaq's corporate governance requirements.

**Committees of the Board of Directors**

The Board has the authority to appoint committees to perform certain management and administration functions. TMTG is a "controlled company" and therefore, in the future its compensation committee and nominating and corporate governance committee may not be comprised of only independent directors. The composition and responsibilities of the audit committee, compensation committee and nominating and corporate governance committee of TMTG are described below. Members will serve on the audit committee, compensation committee and nominating and corporate governance committee until their resignation or until otherwise determined by the Board. The charters for the audit committee, compensation committee, and nominating and corporate governance committee of TMTG are available on TMTG's website at *https://tmtgcorp.com/*. Information contained on or accessible through such website is not a part of this prospectus, and inclusion of the website address in this prospectus is an inactive textual reference only.

***Audit Committee***

The audit committee of the Board consists of W. Kyle Green, Robert Lighthizer, and Linda McMahon. TMTG's Board has determined that each proposed member is independent under Nasdaq's listing standards and Rule 10A-3(b)(1) under the Exchange Act. The chairperson of the audit committee is W. Kyle Green. W. Kyle Green also qualifies as an "audit committee financial expert" as such term is defined in Item 407(d)(5) of Regulation S-K and possesses financial sophistication, as defined under the rules of Nasdaq.

TABLE OF CONTENTS

The primary purpose of the audit committee is to discharge the responsibilities of the Board with respect to the TMTG's accounting, financial, and other reporting and internal control practices and to oversee TMTG's independent registered accounting firm. Specific responsibilities of TMTG's audit committee include:

- selecting a qualified firm to serve as the independent registered public accounting firm to audit TMTG's financial statements;
- helping to ensure the independence and performance of the independent registered public accounting firm;
- discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, TMTG's interim and year-end operating results;
- developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters;
- reviewing policies on risk assessment and risk management;
- reviewing related party transactions;
- obtaining and reviewing a report by the independent registered public accounting firm at least annually, that describes TMTG's internal quality-control procedures, any material issues with such procedures, and any steps taken to deal with such issues when required by applicable law; and
- approving (or, as permitted, pre-approving) all audit and all permissible non-audit service to be performed by the independent registered public accounting firm.

***Compensation Committee***

The compensation committee of TMTG's Board consists of W. Kyle Green, Robert Lighthizer and Linda McMahon. TMTG's Board has determined each proposed member is a "non-employee director" as defined in Rule 16b-3 promulgated under the Exchange Act. The chairperson of the compensation committee is Robert Lighthizer. The primary purpose of the compensation committee is to discharge the responsibilities of the board of directors to oversee its compensation policies, plans and programs and to review and determine the compensation to be paid to TMTG's executive officers, directors and other senior management, as appropriate.

Specific responsibilities of the compensation committee include:

- reviewing and approving on an annual basis the corporate goals and objectives relevant to TMTG's Chief Executive Officer's compensation, evaluating TMTG's Chief Executive Officer's performance in light of such goals and objectives and determining and approving the remuneration (if any) of TMTG's Chief Executive Officer based on such evaluation;
- reviewing and approving the compensation of TMTG's other executive officers;
- reviewing and recommending to TMTG's Board the compensation of the TMTG's directors;
- reviewing TMTG's executive compensation policies and plans;
- reviewing and approving, or recommending that TMTG's Board approve, incentive compensation and equity plans, severance agreements, change-of-control protections and any other compensatory arrangements for TMTG's executive officers and other senior management, as appropriate;
- administering TMTG's incentive compensation equity-based incentive plans;
- selecting independent compensation consultants and assessing whether there are any conflicts of interest with any of the committee's compensation advisors;
- assisting management in complying with TMTG's proxy statement and annual report disclosure requirements;
- if required, producing a report on executive compensation to be included in TMTG's Annual Report on Form 10-K and annual proxy statement;

TABLE OF CONTENTS

- reviewing and establishing general policies relating to compensation and benefits of TMTG's employees; and
- reviewing TMTG's overall compensation philosophy.

***Nominating and Corporate Governance Committee***

The nominating and corporate governance committee of TMTG's Board consists of W. Kyle Green, Robert Lighthizer and Linda McMahon. The chairperson of the nominating and corporate governance committee is Linda McMahon.

Specific responsibilities of the nominating and corporate governance committee include:

- identifying, evaluating and selecting, or recommending that TMTG's Board approve, nominees for election to TMTG's Board;
- evaluating the performance of TMTG's Board and of individual directors;
- reviewing developments in corporate governance practices;
- evaluating the adequacy of TMTG's corporate governance practices and reporting;
- reviewing management succession plans; and
- developing and making recommendations to TMTG's Board regarding corporate governance guidelines and matters.

**Code of Ethics and Business Conduct**

TMTG has adopted a Code of Ethics and Business Conduct that applies to all of its employees, officers and directors, including those officers responsible for financial reporting. The Code of Ethics and Business Conduct is available on TMTG's website at *https://tmtgcorp.com*. Information contained on or accessible through such website is not a part of this prospectus, and the inclusion of the website address in this prospectus is an inactive textual reference only. TMTG intends to disclose any amendments to the Code of Ethics and Business Conduct, or any waivers of its requirements, on its website to the extent required by the applicable rules and exchange requirements.

**Compensation Committee Interlocks and Insider Participation**

No member of TMTG's compensation committee has ever been an officer or employee of the Company. None of TMTG's executive officers serve, or have served during the last completed fiscal year, as a member of the board of directors, compensation committee, or other board committee performing equivalent functions of any other entity that has one or more executive officers serving as one of our directors or the Company's compensation committee.

TABLE OF CONTENTS

## Director Compensation

No compensation awards were granted to Private TMTG directors during the fiscal year ended December 31, 2023 or December 31, 2022 (except as described below) and no fees were paid to Private TMTG directors for service on Private TMTG's board of directors (or a committee thereof). We may award our directors shares of TMTG common stock as non-cash compensation as determined by the Board from time to time. The Private TMTG board of directors will base its decision to grant TMTG common stock as compensation on the level of skill required to perform the services rendered and the time committed to providing services to us. The following Private TMTG directors have entered into consulting agreements with Private TMTG as further described below.

| Name and Principal Position | All Other Compensation ($)(1) | Total ($) |
|---|---|---|
| Kash Patel | $50,000 | $50,000 |

(1) Represents fees paid pursuant to the consulting agreements described above.

### Agreements with Directors

### Consulting Agreement with Kashyap "Kash" Patel

On June 13, 2022 as amended on April 21, 2023, Private TMTG entered into a Consulting Agreement with Trishul, LLC, owned by Kashyap "Kash" Patel, to be effective as of February 1, 2022 until June 8, 2023. Pursuant to the agreement and subsequent performance by the parties thereto, Mr. Patel served as an independent contractor of Private TMTG in exchange for an annual payment of $120,000. Additionally, Private TMTG reimbursed Mr. Patel for all reasonable out-of-pocket business expenses incurred by Mr. Patel, subject to certain pre-approval requirements. The consulting relationship was terminated by Private TMTG effective March 25, 2024, the Closing Date of the Business Combination, and Mr. Patel thereafter received all fees payable for his services through the date of termination.

### Consulting Agreement with Daniel Scavino Jr. (former director of TMTG)

While Daniel Scavino Jr. did not join the Private TMTG board of directors until January 2023, on August 1, 2021, Private TMTG entered into a Consulting Agreement with Hudson Digital, LLC, owned by Daniel Scavino. Pursuant to the agreement, as amended, Mr. Scavino serves as an independent contractor of TMTG in exchange for an annual payment of $240,000 through December 31, 2024. Additionally, Private TMTG will reimburse Mr. Scavino for all reasonable out-of-pocket business expenses incurred by Mr. Scavino, subject to certain pre-approval requirements. Either party can terminate the consulting relationship for any or no reason at any time. In such an event, Mr. Scavino will receive all fees payable for his services through the date of termination.

Private TMTG issued Mr. Scavino a TMTG Executive Promissory Note in the principal amount of $4,000,000. Prior to the Closing, Private TMTG entered into an agreement with Mr. Scavino which provides that (i) following and contingent upon the Closing, Mr. Scavino would receive a retention bonus in the amount of $600,000, payable in a lump sum within 30 days after the Closing Date, and (ii) Private TMTG acknowledged the TMTG Executive Promissory Note.

### Director Compensation Table

Except as described below, no non-employee Private TMTG director received any compensation during the fiscal year ended December 31, 2023.

| Name and Principal Position | All Other Compensation ($)(1) | Total ($) |
|---|---|---|
| Kashyap "Kash" Patel(1) | $130,000 | $130,000 |
| Daniel Scavino Jr | $240,000 | $240,000 |

(1) Represents fees paid pursuant to and consistent with the consulting agreements. As described above, Mr. Patel is entitled to $120,000 annually, but received $130,000 in 2023 due to the consolidation of payments for two months of services, which payments were made in January 2023.

TABLE OF CONTENTS

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

**Digital World Arrangements**

On May 12, 2022, Digital World entered into an amendment to the Lock-Up and Support Letter ("Insider Letter"), with ARC and Digital World's directors, officers or other initial stockholders named therein (the "Insiders"). Pursuant to the Insider Letter, among other matters, ARC and the Insiders agreed in Section 9 thereof, that ARC, an affiliate of ARC or certain of Digital World's officers and directors may make up to $30,000,000 loans against Digital World Convertible Notes with a conversion price of $10 per Working Capital Unit.

In November 2021, ARC committed to provide loans of up to an aggregate of $1,000,000 to Digital World through September 8, 2023, in the form of a Digital World Convertible Note. On April 21, 2023, Digital World issued two Digital World Convertible Notes (one for $625,700 and the other for $500,000) in the aggregate principal amount of $1,125,700 to ARC to pay costs and expenses in connection with completing an initial business combination. As of September 30, 2023 there were $1,275,000 outstanding in Digital World Convertible Notes with a conversion price of $10 per Working Capital Unit (which exceeds the aggregate amount ARC committed to provide).

On September 8, 2022, Digital World issued a Digital World Convertible Note with a conversion price of $10 per Working Capital Unit with an aggregate principal amount of $2,875,000 to ARC, in connection with the extension of the termination date for the Digital World's initial business combination from September 8, 2022 to December 8, 2022.

On June 2, 2023, Digital World issued a Digital World Convertible Note with a conversion price of $10 per Working Capital Units, with an aggregate principal amount of $2,000,000 to Renatus, of which Eric Swider, Chief Executive Officer and Director of Digital World, is a founder and partner and another Digital World Convertible Notes in the aggregate principal amount of $10,000,000 to Renatus. As of September 30, 2023, $1,205,333 was outstanding in Digital World Convertible Note to Renatus.

The issuances of the Digital World Convertible Notes described above were made pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act of 1933, as amended.

We have entered into the Registration Rights Agreement with respect to the Founder Shares, the Placement Units, the Working Capital Units, and the securities underlying the foregoing and upon conversion of the Founder Shares.

**License Agreement**

Private TMTG entered into a royalty-free license agreement with President Donald J. Trump and DTTM Operations, LLC, an entity that licenses President Donald J. Trump's name and regulates his personal media assets and is beneficially wholly owned by President Donald J. Trump. The License Agreement required Private TMTG to pay $100 upon the execution of this License Agreement and that such amount constituted full consideration and a fully paid-up royalty covering the entire term of the License Agreement for the licenses granted in the License Agreement. Private TMTG did not, and, as of the date of this prospectus, TMTG Sub has not, paid any other amounts to President Donald J. Trump pursuant to the License Agreement.

Under the License Agreement, as amended, TMTG Sub has a royalty-free license to use "Trump Media & Technology Group Corp." as its name. In addition, TMTG Sub has a royalty-free license to use the name and likeness of President Donald J. Trump, solely as necessary for TMTG Sub to commercialize Truth Social. The License Agreement prohibits use of President Donald J. Trump's name or likeness for any other purpose and specifically excludes any use in connection with political activities, including political messaging, political fundraising, get-out-the vote efforts and uses that are controlled by or supportive of any political committees, candidates, policies or initiatives or associated with advocacy or electioneering. All uses of (and any modifications to) President Donald J. Trump's name or likeness are subject to his prior approval. Further, the quality of any products or services offered under the License Agreement in connection with President Donald J. Trump's name or likeness is subject to his control, and those products or services must in any event satisfy the highest standards for quality and reputation. The rights granted to use President Donald J. Trump's name and likeness do not extend to any other member of his family.

TABLE OF CONTENTS

Until February 2, 2025, President Donald J. Trump has agreed to channel non-political communications and posts coming from his personal profile to the Truth Social platform before posting that same social media communication and/or post to any other social media platform that is not Truth Social until the expiration of the "DJT/TMTG Social Media 6-Hour Exclusive" which means the period commencing when President Donald J. Trump posts any social media communication onto the Truth Social platform and ending six hours thereafter; provided that he may post social media communications from his personal profile that he deems, in his sole discretion, to be politically-related on any social media site at any time, regardless of whether that post originates from a personal account. As a candidate for president, most or all of President Donald J. Trump's social media posts may be deemed by him to be politically related. Consequently, TMTG may lack any meaningful remedy if President Donald J. Trump minimizes his use of Truth Social. Additionally, none of the limitations or exclusivity contained in the License Agreement will apply to any business ventures of President Donald J. Trump or The Trump Organization or their respective affiliates.

Unless notice is given, the TMTG Social Media Exclusivity Term (i.e. February 2, 2025) extends in perpetuity for additional 180-day terms. In the event of a force majeure as described in the License Agreement that lasts longer than three days, or if the TMTG Platform is not available to President Donald J. Trump for a period of three or more consecutive days, President Donald J. Trump will have the right to invoke the suspension of the "DJT/TMTG Social Media 6-Hour Exclusive." If the TMTG Social Media Exclusivity Term were to expire but the License Agreement remained in effect, President Donald J. Trump would be required to post non-political communications contemporaneously to Truth Social and Non-TMTG Social Media. However, that obligation would also exempt any communications that President Donald J. Trump deems, in his sole discretion, to be politically-related.

President Donald J. Trump has the right to terminate the License Agreement if (i) the quality of any product or service falls below the required level and is not restored immediately (but not later than 30 days) after notification or (ii) TMTG Sub causes or permits (a) any use of President Donald J. Trump's name, likeness or other characteristic in any manner that denigrates or ridicules the name, image or reputation of President Donald J. Trump, any member of his family, or any of his or her business properties, (b) uses of such name, likeness or other characteristic other than as permitted in the License Agreement, (c) alternations or distortions of such name, likeness or other characteristic without President Donald J. Trump's written consent, or (d) creation of any direct, indirect or implied endorsement or commercial tie-in with any product or service that is not offered by TMTG Sub, and the applicable foregoing condition ((a)-(d)) is not cured within thirty days after notice. The license is in any event revocable by President Donald J. Trump and subject to all of the conditions and limitations in the License Agreement.

The License Agreement also provides that, if it is not sooner terminated, and if TMTG Sub becomes listed on a public market exchange in the United States via, inter alia, the Business Combination before December 31, 2024, the term of the License Agreement will continue in perpetuity, except that it may be terminated by TMTG Sub for convenience or by President Donald J. Trump for a breach of TMTG Sub's obligation to ensure that any products or services offered or marketed using President Donald J. Trump's name or likeness meet the highest standards of quality and reputation if such breach is not cured immediately (but no later than 30 days) after notification. As a result, following the completion of the Business Combination the License Agreement will continue in perpetuity.

President Donald J. Trump has agreed not to compete with Truth Social by founding, developing or obtaining a controlling interest in a social media platform that includes one or more material features that directly compete with any of the material features of Truth Social. President Donald J. Trump may otherwise compete with Truth Social, including by managing or otherwise working with any other social media platform.

TMTG Sub may not terminate the License Agreement based on the personal or political conduct of President Donald J. Trump, even if such conduct could negatively reflect on TMTG Sub's reputation or brand or be considered offensive, dishonest, illegal, immoral, or unethical, or otherwise harmful to TMTG Sub's brand or reputation. Further, TMTG Sub may be obligated to indemnify President Donald J. Trump for any losses of any type that relate in any way to the License Agreement, including any such losses attributable to President Donald J. Trump's own offensive, dishonest, illegal, immoral, unethical or otherwise harmful conduct.

TABLE OF CONTENTS

**Voting Agreement**

Simultaneously with the execution of the Merger Agreement the majority stockholder of TMTG entered into a voting agreement with Digital World and TMTG.

**Lock-Up Agreements**

On March 25, 2024, Digital World entered into separate Lock-Up Agreements with: Andrew Northwall, Daniel Scavino Jr., Devin G. Nunes, Donald J. Trump, Jr., President Donald J. Trump, Kashyap "Kash" Patel, Phillip Juhan, Scott Glabe and Vladimir Novachki, pursuant to which they are each contractually restricted from selling or transferring any of (i) their shares of TMTG's Common Stock held immediately following the Closing and (ii) any of their shares of TMTG's Common Stock that result from converting securities held immediately following the Closing. Such restrictions became applicable commencing from the Closing Date and end the earliest of (i) the six-month anniversary of the Closing Date, (ii) on the date on which the closing stock price for TMTG common stock equals or exceeds $12.00 per share for any 20 trading days within any 30-trading day period commencing at least 150 days after the Closing Date, and (iii) such date on which TMTG completes a liquidation, merger, stock exchange, reorganization or other similar transaction that results in all of the TMTG stockholders having the right to exchange their shares of TMTG common stock for cash, securities or other property.

**Lock-Up Provisions Pursuant to the Amended Charter**

Subject to certain customary exceptions, the Amended Charter also includes Lock-Up Trading Restrictions, which applies to holders who received TMTG common stock in exchange for their Private TMTG common stock (but excluding shares of TMTG common stock issued to the former holders of TMTG Convertible Notes in connection with the conversion of such TMTG Convertible Notes into Private TMTG common stock prior to the Closing and exchanged for TMTG common stock at the Closing).

The Amended Charter restricts holders from selling or transferring any of (i) their shares of TMTG common stock held immediately following the Closing and (ii) any of their shares of TMTG common stock that result from converting securities held immediately following the Closing, if any. Such restrictions begin at Closing and end on the earliest of: (i) the six-month anniversary of the Closing, (ii) on the date on which the closing stock price for TMTG common stock equals or exceeds $12.00 per share for any 20 trading days within any 30-day trading period commencing at least 150 days after the Closing, and (iii) such date on which TMTG completes a liquidation, merger, stock exchange, reorganization or other similar transaction that results in all of the Company stockholders having the right to exchange their shares of TMTG common stock for cash, securities or other property.

The Amended Charter does not provide for waiver of its Lock-Up Trading Restrictions applicable to certain of TMTG's pre-Business Combination equity holders, including President Trump. A waiver of the Lock-Up Trading Restrictions under the (i) Lock-Up Agreements applicable to President Trump and certain other equity holders of the Company (other than ARC) requires the prior consent of TMTG, Eric Swider, Digital World's former Chief Executive Officer and current member of TMTG's board of directors, and the locked-up party thereunder and (ii) Lock-Up and Support Letter applicable to ARC requires the prior consent of all of the parties thereunder, including Eric Swider, Digital World's former Chief Executive Officer and current member of TMTG's board of directors. The Company has no plans or agreements, tacit or explicit, with respect to the early release of shares subject to Lock-Up Trading Restrictions. Following expiration of the Lock-Up Trading Restrictions, locked-up parties may sell their Common Stock in privately negotiated transactions or in the open market upon the effectiveness of any resale registration statement the Company files or otherwise in accordance with Rule 144 under the Securities Act. Such sales could have the effect of increasing the volatility in the trading price of the Common Stock or putting significant downward pressure on the price of the Common Stock. These shares may be resold for so long as the Registration Statement on Form S-1 is available for use.

**Indemnification Agreements**

On March 25, 2024, TMTG entered into indemnification agreements with each of its directors and executive officers. Each indemnification agreement provides for the indemnification and advancement by TMTG of certain expenses and costs relating to claims, suits or proceedings arising from service to TMTG or, at its request, service to other entities, as officers or directors, to the maximum extent permitted by applicable law.

TABLE OF CONTENTS

**Non-Competition and Non-Solicitation Agreements**

On March 25, 2024, the Significant Company Holders entered into a Non-Compete and Non-Solicitation Agreement in favor of TMTG. Under the Non-Competition and Non-Solicitation Agreement, each Significant Company Holder has agreed that, for a period of (i) four years, it will not engage in any business activity similar to, or competitive with, the business conducted by TMTG or its affiliates, in particular, Truth Social and the business of developing and operating media platforms for social media and digital video streaming, and of developing and operating products and services relating and incidental thereto or any other business being conducted by TMTG or any of its subsidiaries, as of the Closing Date, and (ii) three years, it will not, directly or indirectly (a) hire, engage, solicit, induce or encourage certain employees, independent contractors, consultants, or other certain personnel to leave TMTG; or (b) in any way interfere with or attempt to interfere with the relationship between such persons and TMTG.

**Director Independence**

Nasdaq listing standards require that a majority of our board of directors be independent. An "independent director" is defined generally as a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship which in the opinion of the company's board of directors, would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director. Our board of directors has determined that Messrs. Green and Lighthizer and Ms. McMahon are "independent directors" as defined in Nasdaq's listing standards and applicable SEC rules. Our independent directors will have regularly scheduled meetings at which only independent directors are present.

**Policies and Procedures for Related Person Transactions**

On the Closing Date, TMTG's Board adopted a formal written policy effective upon the Closing providing that TMTG's officers, directors, nominees for election as directors, beneficial owners of more than 5% of any class of TMTG common stock, any member of the immediate family of any of the foregoing persons and any firm, corporation or other entity in which any of the foregoing persons is employed or is a general partner or principal or in a similar position or in which such person has a 5% or greater beneficial ownership interest, are not permitted to enter into a related party transaction with TMTG without the approval of TMTG's audit committee, subject to certain exceptions.

**Controlled Company Exception**

As of June 25, 2024, President Donald J. Trump beneficially owns approximately 60.4% of the combined voting power of TMTG common stock. As a result, TMTG is a "controlled company" within the meaning of Nasdaq's corporate governance standards. Under these corporate governance standards, a company of which more than 50% of the voting power for the election of directors is held by an individual, group or other company is a "controlled company" and may elect not to comply with certain corporate governance standards, including the requirements (1) that a majority of TMTG's Board consist of independent directors, (2) that TMTG's Board have a compensation committee that consists entirely of independent directors with a written charter addressing the committee's purpose and responsibilities, and (3) that TMTG's director nominations be made, or recommended to TMTG's full Board, by TMTG's independent directors or by a nominations committee that consists entirely of independent directors and that MTG adopts a written charter or board resolution addressing the nominations process. Accordingly, investors do not have the same protections afforded to stockholders of companies that are subject to these corporate governance requirements. In the event that TMTG ceases to be a "controlled company" and its common stock continues to be listed on Nasdaq, TMTG will be required to comply with these provisions within the applicable transition periods.

TMTG relies on the "controlled company" exemption. As a result, TMTG does not have a majority of independent directors on its board of directors. In addition, in the future, TMTG's Compensation Committee and TMTG's Nominating and Corporate Governance Committee may not consist entirely of independent directors or be subject to annual performance evaluations. Accordingly, investors may not have the same protections afforded to stockholders of companies that are subject to all of Nasdaq's corporate governance requirements.

TABLE OF CONTENTS

## PRINCIPAL SECURITYHOLDERS

The following table sets forth information known to the Company regarding the beneficial ownership of TMTG common stock as of June 25, 2024, by:

- each person known by the Company to be the beneficial owner of more than 5% of TMTG common stock;
- each of TMTG's current executive officers and directors; and
- all executive officers and directors of TMTG as a group,

in each case, giving effect to the (A) conversion of securities issued in the Post-IPO Financings (unless otherwise specified) and (B) issuance of (i) 200,000 Commitment Shares to be issued to Yorkville, (ii) 125,000 Placement Agent Shares and (iii) up to 5,100,000 Asset Acquisition Shares.

In addition, the information in the table below gives effect to the conversion of the Founder Shares into shares of Common Stock applying the 1.348:1 conversion ratio determined at the Closing of the Business Combination to give effect to the anti-dilution rights of the Founder Shares in Digital World's charter. However, in connection with the Delaware Lawsuit, TMTG deposited into escrow 4,667,033 shares of Common Stock, which represent the difference between the 1.348:1 conversion ratio and a conversion ratio of 2.00:1. The release of any such shares is subject to the terms and conditions of the Disputed Shares Escrow Agreements and would result in changes to the beneficial ownership information presented below. See "*Risk Factors — Risks Related to Ownership of TMTG Common Stock — Ongoing litigation over ownership of shares beneficially owned by ARC may negatively impact investor confidence and market perception and materially and adversely affect TMTG's business, financial condition and stock price*" and "*Our Business — Litigation — Lawsuit Against ARC and Patrick Orlando*."

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and Warrants that are currently exercisable or exercisable within 60 days.

The SEC has defined "beneficial ownership" of a security to mean the possession, directly or indirectly, of voting power and/or investment power over such security. A stockholder is also deemed to be, as of any date, the beneficial owner of all securities that such stockholder has the right to acquire within 60 days after that date through (a) the exercise of any option, warrant or right, (b) the conversion of a security, (c) the power to revoke a trust, discretionary account or similar arrangement, or (d) the automatic termination of a trust, discretionary account or similar arrangement.

In computing the number of shares beneficially owned by a person and the percentage ownership of that person, ordinary shares subject to options or other rights (as set forth above) held by that person that are currently exercisable, or will become exercisable within 60 days, are deemed outstanding, while such shares are not deemed outstanding for purposes of computing percentage ownership of any other person. In computing the number of shares of Common Stock beneficially owned by a person, we deemed to be outstanding all shares of Common Stock subject to warrants and convertible notes held by the person that are currently exercisable or convertible or may be exercised or converted within 60 days of June 25, 2024. We did not deem such shares outstanding, however, for the purpose of computing the percentage ownership of any other person.

TABLE OF CONTENTS

This table is based upon TMTG's shareholder registry and information supplied by officers, directors and principal stockholders. Unless otherwise indicated in the footnotes to the following table and subject to community property laws where applicable, TMTG believes that all persons named in the table have sole voting and investment power with respect to all shares of Common Stock beneficially owned by them. Applicable percentages are based on 189,941,870 shares of Common Stock, which number is based on shares outstanding as of June 25, 2024 and adjusting as required by the rules promulgated by the SEC to give effect to the issuance of (i) 200,000 Commitment Shares to be issued to Yorkville, (ii) 125,000 Placement Agent Shares and (iii) up to 5,100,000 Asset Acquisition Shares.

| Name and Address of Beneficial Owner | Number of Shares | % of Outstanding Shares* |
|---|---|---|
| *Directors and Executive Officers Post-Business Combination* | | |
| Devin G. Nunes | 115,000 | * |
| Phillip Juhan | 490,000 | * |
| Andrew Northwall | 20,000 | * |
| Vladimir Novachki | 45,000 | * |
| Sandro De Moraes(1) | 45 | * |
| Scott Glabe | 20,000 | * |
| Eric Swider(2) | 158,043 | * |
| Donald J. Trump, Jr. | — | — |
| Kashyap "Kash" Patel | — | — |
| W. Kyle Green | — | — |
| Robert Lighthizer | — | — |
| Linda McMahon | — | — |
| *All Directors and Executive Officers of TMTG as a Group (12 Individuals)* | * | * |
| *Five Percent Holders:* | | |
| President Donald J. Trump(3) | 114,750,000 | 58.7% |
| ARC Global Investments II LLC(4) | 13,126,581 | 6.7% |
| United Atlantic Ventures, LLC(5) | 10,965,000 | 5.6% |

* less than 1%

The business address of each of the directors and officers is 401 N. Cattlemen Rd., Ste. 200, Sarasota, Florida 34232.

(1) Purchased by Mr. De Moraes in the public market.

(2) The shares reported as beneficially owned by Mr. Swider consist of (a) (i) 10,110 shares as a result of the conversion of his 7,500 Founder Shares as adjusted by the conversion ratio (1.348) applicable to the Digital World Class B common stock and (ii) 4,890 Founder and Anchor Investors Shares that may be issuable to Mr. Swider, representing the difference between the 1.348:1 conversion ratio and a conversion ratio of 2.00:1; and (b) 143,043 shares issued to Renatus LLC ("Renatus") upon conversion, immediately prior to the consummation of the Business Combination, of certain Digital World Convertible Notes, at a conversion price of $10.00 per share, in connection with working capital loans. Mr. Eric Swider is the managing member of Renatus. As a result, Mr. Swider may be deemed to share voting and dispositive power with respect to the shares held of record by Renatus. Mr. Swider expressly disclaims beneficial ownership of the shares held by Renatus. The address for Renatus is 370 Harbour Drive, Humacao, Puerto Rico 00791.

(3) The shares reported as beneficially owned by President Donald J. Trump consist of (a) 78,750,000 shares issued upon the Business Combination and (b) 36,000,000 Earnout Shares. The business address for President Donald J. Trump is c/o Trump Media & Technology Group Corp., 401 N. Cattlemen Rd., Ste. 200, Sarasota, Florida 34232.

(4) The shares reported as beneficially owned by ARC, and held are held in the name of ARC, and consist of (a) (i) 7,400,520 shares as a result of the conversion of ARC's 5,490,000 Founder Shares as adjusted by the conversion ratio (1.348) applicable to the Digital World Class B common stock and (ii) 3,579,480 shares of Common Stock that may be issuable to ARC, representing the difference between the 1.348:1 conversion ratio and a conversion ratio of 2.00:1; (b) 1,700,226 shares (including the Placement Warrants, which are exercisable within 60 days) as a result of the conversion of the Placement Units and (c) 446,355 shares (including Convertible Note Post IPO Warrants that are exercisable within 60 days) as a result of the conversion of ARC's Working Capital Units in connection with outstanding working capital loans made by ARC pursuant to Digital World Convertible Notes. On April 4, 2024, ARC filed a Schedule 13G with the SEC claiming beneficial ownership to 13,325,331 shares of Common Stock, including 781,777 shares of Common Stock underlying Warrants that are exercisable within 60 days, which reflects a difference of 198,750 shares of Common Stock and 66,250 Warrants. The Company cannot substantiate or verify the basis for ARC's claims to such additional securities and therefore such information has not been included in ARC's beneficial ownership holdings shown above. Mr. Patrick Orlando is the current managing member of ARC and has sole voting and dispositive power with respect to the shares held of record by ARC. By virtue of this relationship, Mr. Orlando may be deemed to share beneficial ownership of the securities held of record by ARC. The business address of ARC Global Investments II LLC is 78 SW 7th Street, Miami, Florida 33130. See "*Risk Factors — Risks Related to Ownership of TMTG Common Stock — Ongoing litigation over ownership of shares beneficially owned by ARC may negatively impact investor confidence and market perception and materially and adversely affect TMTG's business, financial condition and stock price.*"

(5) The shares reported as beneficially owned by United Atlantic Ventures, LLC ("UAV") consist of (a) 7,525,000 shares issued upon the Business Combination and (b) 3,440,000 shares that were issued to UAV for no additional consideration based on the performance of our shares of Common Stock, in each case, pursuant to the terms of the Merger Agreement. The address for United Atlantic Ventures, LLC is 900 SE 2nd St., Apt. 503, Fort Lauderdale, Florida 33301.