**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

THE INTERCEPT MEDIA, INC. et al,

*Plaintiff*,

v.

TRUMP et al,

*Defendant.*

Case No. **1:26-CV-06867-JPO**

**AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

David Greene
*Counsel of Record*
Sophia Cope
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993
Email: davidg@eff.org
sophia@eff.org

Dated: September 17, 2026

## CORPORATE DISCLOSURE STATEMENT OF PROPOSED AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION

Proposed amicus curiae Electronic Frontier Foundation, by its attorneys and pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, hereby states that it is a corporation organized under Section 501(c)(3) of the Internal Revenue Code. Electronic Frontier Foundation does not have a parent corporation, and no publicly held company has a 10 percent or greater ownership interest in it.

Dated: September 17, 2026

*/s/ David Greene*
David Greene
*Counsel of Record*
Sophia Cope
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993
Email: davidg@eff.org
sophia@eff.org

*Counsel for Electronic Frontier Foundation*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT OF PROPOSED AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION ........ ii

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ iv

INTEREST OF AMICUS CURIAE ........ 1

INTRODUCTION ........ 2

ARGUMENT ........ 3

I. GOVERNMENTS AT ALL LEVELS PERVASIVELY USE SOCIAL MEDIA TO COMMUNICATE TO THEIR CONSTITUENTS IN FURTHERANCE OF A WIDE RANGE OF OFFICIAL DUTIES ........ 3

A. Emergency Services, Public Health & Safety ........ 9

B. Official Announcements ........ 25

II. MEMBERS OF THE PUBLIC HAVE A QUALIFIED FIRST AMENDMENT RIGHT OF ACCESS TO THE PUBLIC STATEMENTS OF GOVERNMENTAL OFFICIALS AND AGENCIES, INCLUDING WHEN MADE ON SOCIAL MEDIA ........ 27

A. The First Amendment Right of Access to the Official Public Statements of Government Actors is Broadly Established ........ 28

B. The First Amendment Protects Against Delays in and Other Barriers to Access to the Official Public Statements of Government Actors ........ 34

III. DEFENDANTS' USE OF TRUTH SOCIAL TO DELAY PUBLIC ACCESS TO THEIR STATEMENTS ABSENT PAYMENT VIOLATES THE FIRST AMENDMENT ........ 35

CONCLUSION ........ 36

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS ........ 37

# TABLE OF AUTHORITIES

## Cases

*Alaska Landmine LLC v. Dunleavy*,
514 F. Supp. 3d 1123 (D. Alaska 2021) ........ 33
*Am. Broadcasting Co. v. Cuomo*,
570 F.2d 1080, 1083-84 (2d Cir. 1977) ........ 29
*Anderson v. Cryovac, Inc.*,
805 F.2d 1 (1st Cir. 1986) ........ 30
*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025) ........ 33, 35
*Baltimore Sun v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) ........ 33
*Borreca v. Fasi*,
369 F. Supp. 906 (D. Haw. 1974) ........ 30, 31
*Campbell v. Reisch*,
986 F.3d 822 (8th Cir. 2021) ........ 1
*Courthouse News Service v. Corsones*,
131 F.4th 59 (2d Cir. 2025) ........ 35
*Courthouse News Service v. New Mexico Administrative Office of Courts*,
53 F.4th 1245 (10th Cir. 2022) ........ 35
*Courthouse News Service v. Omundson*,
___ F.4th ___, 2026 WL 2603864, (9th Cir., Sept. 3, 2026) ........ 34
*D'Amario v. Providence Civic Ctr. Auth.*,
639 F. Supp. 1538 (D.R.I. 1986) ........ 31, 32
*Houchins v. KQED, Inc.*,
438 U.S. 1, 10 (1978) ........ 28
*Knight First Amendment Institute at Columbia University v. Trump*,
928 F.3d 226 (2d Cir. 2019) ........ 1
*Leigh v. Salazar*,
677 F.3d 892 (9th Cir. 2012) ........ 32
*Lindke v. Freed,*
601 U.S. 187 (2024) ........ 1
*McCoy v. Providence Journal Co.*,
190 F.2d 760 (1st Cir. 1951) ........ 30
*Nicholas v. Bratton*,
376 F. Supp. 3d 232 (S.D.N.Y. 2019) ........ 35
*PETA v. Tabak*,
109 F.4th 627 (D.C. Cir. 2024) ........ 1
*PETA v. Young*,
No. 4:18-cv-01547 (S.D. Tex. 2018) ........ 1
*PETA v. Young*,
No. 4:20-cv-02913 (S.D. Tex. 2020) ........ 1
*Press-Enterprise Co. v. Superior Court*,
478 U.S. 1 (1986) ........ 31, 32

*Pulliam v. Fort Bend County, Texas*,
2024 WL 4068767 (S.D. Tex., Sept. 5, 2024) ........ 29
*Quad-City Cmty. News Serv., Inc. v. Jebens*,
334 F. Supp. 8 (S.D. Iowa 1971) ........ 30
*Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555 (1980) ........ 29
*Robinson v. Hunt County*,
921 F.3d 440 (5th Cir. 2019) ........ 1
*S.H.A.R.K v. Metro Parks Serving Summit County*,
499 F.3d 553 (6th Cir. 2007) ........ 29
*Southeastern Promotions Ltd. v. Conrad*,
420 U.S. 546 (1975) ........ 34
*Southwestern Newspapers v. Curtis*,
584 S.W.2d 362 (Tex. Civ. App. 1979) ........ 34
*Stevens v. New York Racing Ass'n*,
665 F. Supp. 164 (E.D.N.Y. 1987) ........ 31
*Telemundo of Los Angeles v. City of Los Angeles*,
283 F. Supp. 2d 1095 (C.D. Cal. 2003) ........ 29, 33
*Times-Picayune Pub. Corp. v. Lee*,
Civ. A. No. 88–1325, 1988 WL 36491 (E.D. La. Apr. 15, 1988) ........ 30
*United Teachers of Dade v. Stierheim*,
213 F.Supp. 2d 1368 (S.D. Fla. 2002) ........ 30, 34
*Westinghouse Broad. Co. v. Dukakis*,
409 F. Supp. 895 (D. Mass. 1976) ........ 30, 34

## Statutes

601 U.S. 187 (2024) ........ 1

## Other Authorities

@CAgovernor, X (July 1, 2025, 10:10 AM) ........ 25
@FDArecalls, X (Aug. 29, 2026, 10:34 AM) ........ 17
@gtbynum, X (June 21, 2023, 3:50 PM) ........ 11
@JSOPIO, X (Aug. 26, 2018, 11:57 AM) ........ 23
@mayor.nyc.gov, Bluesky (August 20, 2026, 4:23 PM) ........ 15
@mayor.nyc.gov, Bluesky (August 21, 2026, 7:18 AM) ........ 15
@mayorwu.boston.gov, Bluesky (June 25, 2026, 11:36 AM) ........ 25
@NashvilleFD, X (Mar. 27, 2023, 8:39 AM) ........ 22
@NashvilleFD, X (Mar. 27, 2023, 8:54 AM) ........ 22
@NYCMayor, X (August 20, 2026, 4:05 PM) ........ 12
@NYCMayor, X (August 21, 2026, 7:05 AM) ........ 14
@SarahHuckabee, X (January 22, 2026, 11:17 AM) ........ 10
@SenRandPaul, X (August 6, 2026, 4:17 PM) ........ 26
@SenTedCruz, X (July 30, 2026, 11:10 AM) ........ 26
@uscensusbureau, x (Sep 15, 2026, 7:23 AM) ........ 6
@uscourts, X (June 26, 2026, 7:00AM) ........ 7
Amador Fire, Facebook (Aug. 12, 2026) ........ 24

Anita Saroj & Sukomal Pal, *Use of Social Media in Crisis Management: A Survey*, Intern'l Journal of Disaster Risk Reduction, Vol. 48 (Sept. 2020)........................................................ 9
Arthur Mickoleit, Social Media Use By Governments, OECD Working Paper on Public Governance No. 26 (Dec. 22, 2014) ......................................................................... 5
Clare R. Norins & Mark L. Bailey, *Campbell v. Reisch: The Dangers of the Campaign Loophole in Social-Media-Blocking Litigation*, 25 U. Pa. J. Const. L. 146 (2023).................................. 4
Colin Atagi, *Santa Rosa Shifts to CivicReady, No Longer Using Nixle,* Press Democrat (Dec. 15, 2022) ........................................................................................................................ 6
Congressional Management Foundation, #SocialCongress2015 (2015) ..................................... 3
David Greene & Karen Gullo, When Tweets Are Governmental Business, Officials Don't Get to Pick and Choose Who Gets to Receive, Comment On, and Reply to Them. That Goes for the President, Too, EFF Deeplinks (Nov. 30, 2017) ............................................................ 1
Emily Tury, Ashlin Oglesby-Neal & KiDeuk Kim, Social Media Guidebook for Law Enforcement Agencies, Urban Institute (February 2019)........................................................ 9
Everbridge Nixle, https://www.nixle.com/about-us/ .................................................................... 6
Fumiko Sasaki, *Does Internet Use Provide a Deeper Sense of Political Empowerment to the Less Educated?*, Information, Communication & Society, 20:10 (2017).......................................... 7
Jill Lepore, *The State of the Presidential Debate*, New Yorker (Sept. 12, 2016).......................... 2
Lexington County Sheriff's Department, Facebook (Sept. 8, 2026) ........................................... 19
*Mass Notification System*, https://www.civicplus.com/civicready/mass-notification-system........ 6
Mayor Cherelle L. Parker, Facebook (July 17, 2026).................................................................. 16
Mayor GT Bynum, Facebook (June 21, 2023, 3:45 PM) ............................................................ 11
Mayor Sylvester Turner, Facebook (Aug. 27, 2017).................................................................... 20
National Conference of State Legislatures, *Legislative Social Media Sites* ................................. 6
Pew Research Center, Americans' Social Media Use 2025 (Nov. 20, 2025)................................ 5
Pew Research Center, *Civic Engagement in the Digital Age* (April 25, 2013) ............................. 7
Pew Research Center, Large Increase in Social Media Use Compared With a Decade Ago (Dec. 5, 2022) ........................................................................................................................... 5
Pew Research Center, The Congressional Social Media Landscape (July 16, 2020).................... 3
Phil Norris, *50 Government Agencies Doing an Amazing Job on Social*, Social Media Strategies Summit (March 30, 2026)........................................................................................................ 4
Quorum, 2026 State Legislative Trends Report (2026)................................................................ 4
Raina M. Merchant & Nicole Lurie, *Social Media and Emergency Preparedness in Response to Novel Coronavirus*, JAMA Network (March 23, 2020).......................................................... 9
Rutrell Yasin, *5 Ways to Use Social Media for Better Emergency Response*, GCN (Sept. 2, 2010) ........................................................................................................................................ 9
South Metro Fire Rescue, YouTube (July 5, 2025)...................................................................... 19
Tamara Keith, Commander-In-Tweet: Trump's Social Media Use and Presidential Media Avoidance, NPR (Nov. 18, 2016)............................................................................................ 2
Tess Eyirch, *The Future of the Town Hall is Online*, UC Riverside News (Oct. 1, 2018)............. 7
Twin Falls Police Department, Facebook (August 1, 2026)........................................................ 21
United Nations, *E-Government Survey 2018: Gearing E-Government to Support Transformation Towards Sustainable and Resilient Societies* (2018) ............................................................... 5
United Nations, *E-Government Survey 2020: Digital Government in the Decade of Action for Sustainable Development* (2020) ............................................................................................ 5
United Nations, E-Government Survey 2022: The Future of Digital Government (2022) ............ 5

United Nations, E-Government Survey 2024: Accelerating Digital Transformation for Sustainable Development (2024) .......... 8

## INTEREST OF AMICUS CURIAE

Recognizing the internet's power as a tool of democratization, the Electronic Frontier Foundation (EFF) has, for over 35 years, worked on behalf of its more than 30,000 dues-paying members to protect the rights of users to transmit and receive information online. EFF has written extensively on the issues presented in this appeal[1] and has filed *amicus* briefs in similar cases in courts around the country, including before the U.S. Supreme Court in *O'Connor-Ratcliff v. Garnier* (No. 22-324) and *Lindke v. Freed* (No. 22-611), *see* 601 U.S. 187 (2024), as well as federal courts of appeals cases including *Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226 (2d Cir. 2019); *Robinson v. Hunt County*, 921 F.3d 440 (5th Cir. 2019), *Campbell v. Reisch*, 986 F.3d 822 (8th Cir. 2021), and *PETA v. Tabak*, 109 F.4th 627 (D.C. Cir. 2024), and has represented plaintiffs in social media blocking cases involving government accounts, including *PETA v. Young*, No. 4:18-cv-01547 (S.D. Tex. 2018), and *PETA v. Young*, No. 4:20-cv-02913 (S.D. Tex. 2020).

---

[1] See, e.g., David Greene & Karen Gullo, When Tweets Are Governmental Business, Officials Don't Get to Pick and Choose Who Gets to Receive, Comment On, and Reply to Them. That Goes for the President, Too, EFF Deeplinks (Nov. 30, 2017), https://www.eff.org/deeplinks/2017/11/when-officials-tweet-about-government-business-they-dont-get-pick-and-choose-who.

## **INTRODUCTION**[2]

Given how common it is for government officials and agencies to conduct official business through social media, the First Amendment rights of people to access speech communicated through those accounts is critical to modern civic engagement. This court must thus act to affirmatively protect those rights.

Public officials' use of social media has familiar historical analogues. American political figures have long adopted new communication technologies to engage directly with the public. President Franklin Delano Roosevelt's Fireside Chats were delivered directly into Americans' homes by radio.[3] President Eisenhower broadcasted presidential news conferences on public access television.[4] And presidential debates have been televised since the 1960 election.[5]

It would have been plainly impermissible for any holder of elected office to make individuals pay to obtain timely access to these public pronouncements without satisfying some constitutional scrutiny. The same is true here: the First Amendment must provide some protection against President Trump and his staff's scheme that allows wealthy corporations and individuals to pay for early access to his official announcements via his social media platform Truth Social. At a minimum, the First Amendment requires a legitimate public interest to justify discriminatory access to historically public government statements. The personal financial enrichment that justifies the present delayed access policy is plainly inadequate.

---

[2] All parties consented to the filing of this amicus brief and to its filing on September 17, 2026.
[3] Tamara Keith, Commander-In-Tweet: Trump's Social Media Use and Presidential Media Avoidance, NPR (Nov. 18, 2016), https://www.npr.org/2016/11/18/502306687/commander-in-tweet-trumps-social-media-use-and-presidential-media-avoidance.
[4] *Id.*
[5] Jill Lepore, The State of the Presidential Debate, New Yorker (Sept. 12, 2016), https://www.newyorker.com/magazine/2016/09/19/the-state-of-the-presidential-debate.

# ARGUMENT

## I. GOVERNMENTS AT ALL LEVELS PERVASIVELY USE SOCIAL MEDIA TO COMMUNICATE TO THEIR CONSTITUENTS IN FURTHERANCE OF A WIDE RANGE OF OFFICIAL DUTIES

To help it answer the First Amendment questions raised in this case, this Court will benefit from an understanding of how government officials and agencies pervasively use various social media to conduct official business and inform the public about government practices and policies – and also how governmental social media posts have historically been broadly open to the public.

The adoption of social media by government officials and agencies as a means of conducting government business has spread rapidly.

A 2015 survey of members of Congress and their staffs found that 76% of respondents felt that social media enabled more meaningful interactions with constituents, 70% found that social media made them more accountable to their constituents, and 71% said that constituent comments directed to the representatives on social media would influence an undecided lawmaker.[6]

So, it is not surprising that as of 2020, "of the 715 members that have served in Congress since 2015, 711 have had one or more active accounts on Twitter[7] and 712 have had one or more active accounts on Facebook."[8] Between 2016 and 2020, members of Congress "increased

---

[6] Congressional Management Foundation, #SocialCongress2015, 10, 15 (2015), https://static1.squarespace.com/static/67ead1d67cfe8944d45170dd/t/6894ae1b1286607db781e8cc/1771948878481/cmf-social-congress-2015.pdf.

[7] Twitter was rebranded as X on July 23, 2023. X (social network), Wikipedia, https://en.wikipedia.org/wiki/X (social network) (last accessed September 14, 2026). The Twitter posts referenced in this brief are cited to their current source, X and x.com even if they were originally posted to twitter.com, so that the links remain operational.

[8] Pew Research Center, The Congressional Social Media Landscape, n. 1 (July 16, 2020), https://www.pewresearch.org/internet/2020/07/16/1-the-congressional-social-media-landscape/.

their Twitter followers by 300% and tweeted 81% more often. Members of Congress also increased their Facebook followers by 50% and posted 48% more often."[9]

Likewise, as of 2023, all state governors had official accounts on one or more social media sites, and at least 10 states had adopted social media policies to guide officials in using social media to interact with their constituents.[10] Some state legislators are prolific on social media; one Arizona state senator, Senator David Livingston, posted over 15,000 times between January and June 2026.[11]

Public engagement has also increased. "The average number of followers for each congressional social media account has grown from roughly 15,000 followers per member of Congress in 2016, to an average of 36,878 followers on Twitter and 27,605 followers on Facebook in 2020. On Congresspersons' Twitter accounts, the average number of user reactions per post has grown from only six per post in 2016 to [75] per post in 2020. On Facebook, the average number of reactions per post has grown from [66] per post in 2016 to 111 per post in 2020."[12]

Like individual officials, government agencies all over the country—indeed, all over the world—use social media platforms to disseminate important information to and interact with the public, all in a rapid and freely accessible manner.[13]

The use of social media to perform agency functions continues to grow globally. In 2018,

---

[9] Clare R. Norins & Mark L. Bailey, *Campbell v. Reisch: The Dangers of the Campaign Loophole in Social-Media-Blocking Litigation*, 25 U. Pa. J. Const. L. 146, 153 (2023).
[10] *Id.*
[11] Quorum, 2026 State Legislative Trends Report (2026), https://www.quorum.us/wp-content/uploads/2026/07/2026_STATE-TRENDS-REPORT_V05_DIGITAL.pdf.
[12] Norins & Bailey, *supra* note 7, at 153-54.
[13] See Phil Norris, *50 Government Agencies Doing an Amazing Job on Social*, Social Media Strategies Summit (March 30, 2026), https://blog.socialmediastrategiessummit.com/government-agencies-on-social-media/.

177 out of 193 U.N. member states (roughly 92%) included social media portals on their national websites.[14] In 2020, 79% of city portals globally provided links to social media networks.[15] By 2022, 90% of respondent cities "actively" used social media "to interact with residents and engage them in e-government activities."[16] This includes using social media "to inform the public about meetings and consultations, live-stream press conferences, invite users to public engagements and infrastructure inaugurations, issue public announcements, and answer queries."[17] But even as far back as 2014, an OECD report recognized the power and potential of social media to "drive innovation in public service delivery and government operations."[18]

In the last decade, as the use of social media has grown generally—as of 2025, 84 percent of Americans use YouTube, while 71 percent use Facebook[19]—the political use of social media has increasingly factored in U.S. federal and state elections and legislative processes, as well as

---

[14] United Nations, *E-Government Survey 2018: Gearing E-Government to Support Transformation Towards Sustainable and Resilient Societies*, 119, Fig. 5.29 (2018), https://publicadministration.un.org/egovkb/Portals/egovkb/Documents/un/2018-Survey/E-Government%20Survey%202018_FINAL%20for%20web.pdf.

[15] United Nations, *E-Government Survey 2020: Digital Government in the Decade of Action for Sustainable Development*, 98 (2020), https://publicadministration.un.org/egovkb/en-us/Reports/UN-E-Government-Survey-2020.

[16] United Nations, E-Government Survey 2022: The Future of Digital Government, 106 (2022), https://desapublications.un.org/sites/default/files/publications/2022-09/Web%20version%20E-Government%202022.pdf.

[17] *Id.*

[18] Arthur Mickoleit, Social Media Use By Governments, OECD Working Paper on Public Governance No. 26, 4 (Dec. 22, 2014), https://www.oecd.org/content/dam/oecd/en/publications/reports/2014/12/social-media-use-by-governments_g17a2596/5jxrcmghmk0s-en.pdf.

[19] Pew Research Center, Large Increase in Social Media Use Compared With a Decade Ago (Dec. 5, 2022), https://www.pewresearch.org/global/2022/12/06/social-media-seen-as-mostlygood-for-democracy-across-many-nations-but-u-s-is-a-majoroutlier/pg_2022-12-06_online-civic-engagement_0-06/; Pew Research Center, Americans' Social Media Use 2025, 4 (Nov. 20, 2025), https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/.

the ways that government agencies at all levels offer services to the public.[20]

Social media has proved to be an efficient way for government to communicate vital information to the public.[21]

For example, the U.S. Census Bureau regularly uses X to publicize the release of its new reports, including one recently on the country's social and economic well-being.[22]




[20] *See, e.g.,* National Conference of State Legislatures, *Legislative Social Media Sites*, https://www.ncsl.org/about-state-legislatures/legislative-social-media-sites (listing the websites and social media pages of state legislative bodies).
[21] Some social media platforms are specifically designed for such purposes. *See, e.g.,* Everbridge Nixle, https://www.nixle.com/about-us/; CivicPlus, *Mass Notification System*, https://www.civicplus.com/civicready/mass-notification-system; Colin Atagi, *Santa Rosa Shifts to CivicReady, No Longer Using Nixle,* Press Democrat (Dec. 15, 2022), https://www.pressdemocrat.com/article/news/santa-rosa-shifts-to-civicready-no-longer-using-nixle/.
[22] @uscensusbureau, x (Sep 15, 2026, 7:23 AM), https://x.com/uscensusbureau/status/2099866628070482361.

Notably, the Administrative Office of the U.S. Courts maintains an active social media presence on behalf of the federal judiciary.[23]




Social media platforms are generally, and usually by default, open to the public—potentially to every person with access to the internet around the world—and, unlike physical spaces, are not constrained by size, capacity, or time.

Online engagement with public officials has proven beneficial. Social scientists have found that online versions of town halls are more representative of the voting populace than their physical analogs.[24] Additionally, social media is associated with a feeling of greater political empowerment for the less educated,[25] and is associated with greater civic engagement and political activity by young people.[26] Around the world, "Municipalities are increasingly leveraging social media, using

---

[23] @uscourts, X (June 26, 2026, 7:00 AM), https://x.com/uscourts/status/2070507428509053317.

[24] Tess Eyirch, *The Future of the Town Hall is Online*, UC Riverside News (Oct. 1, 2018), https://news.ucr.edu/articles/2018/10/01/future-town-hall-online.

[25] Fumiko Sasaki, *Does Internet Use Provide a Deeper Sense of Political Empowerment to the Less Educated?*, Information, Communication & Society, 20:10, 1460 (2017), https://www.tandfonline.com/doi/full/10.1080/1369118X.2016.1229005.

[26] Pew Research Center, *Civic Engagement in the Digital Age* (April 25, 2013), https://www.pewresearch.org/internet/2013/04/25/civic-engagement-in-the-digital-age/ ("Political engagement on social networking sites is especially commonplace among the youngest Americans, as two-thirds (67%) of all 18-24 year olds (and nearly three quarters of those young adults who use social networking sites) engaged in some sort of social network-related political activity in the 12 months preceding our survey.").

a variety of tools to engage with residents and thereby enhancing the inclusivity and accessibility of e-government activities."[27]

Government officials and agencies conduct a wide range of official business via social media.[28] The following are just two categorical examples.

[27] United Nations, E-Government Survey 2024: Accelerating Digital Transformation for Sustainable Development, 154 (2024), https://publicadministration.un.org/egovkb/en-us/reports/un-e-government-survey-2024.
[28] Norris, *supra* note 11.

**A. Emergency Services, Public Health & Safety**

Government actors commonly use social media, and often several different platforms at the same time, to disseminate critical public safety information during natural disasters and man-made crises. The benefits of a direct engagement platform to both government actors and the public are readily apparent in the emergency services context. A 2010 survey by the American Red Cross found that 69% of respondents expected emergency response agencies to regularly monitor social media "so they can respond promptly to requests for help posted there."[29]

Local law enforcement agencies have found social media especially useful for updating the public with rapidly developing safety information. A 2019 study found that 91% of law enforcement agencies use social media to notify the public about public safety concerns.[30]

During the COVID-19 pandemic, although much misinformation swirled online, government social media channels were critical to disseminating up-to-date information based on the latest science.[31]

---

[29] Rutrell Yasin, *5 Ways to Use Social Media for Better Emergency Response*, GCN (Sept. 2, 2010), https://www.route-fifty.com/management/2010/09/5-ways-to-use-social-media-for-better-emergency-response/294176/. See also Anita Saroj & Sukomal Pal, *Use of Social Media in Crisis Management: A Survey*, Intern'l Journal of Disaster Risk Reduction, Vol. 48 (Sept. 2020) (stating that Twitter is preferred during disasters "due to its simple usability, ability to make a short and quick communication instantly and most importantly, easy access to the content through its APIs without privacy and/or authorization issues.").

[30] Emily Tury, Ashlin Oglesby-Neal & KiDeuk Kim, Social Media Guidebook for Law Enforcement Agencies, Urban Institute (February 2019), https://www.urban.org/sites/default/files/publication/99786/social_media_guidebook_for_law_enforcement_agencies_0.pdf.

[31] Raina M. Merchant & Nicole Lurie, *Social Media and Emergency Preparedness in Response to Novel Coronavirus*, JAMA Network (March 23, 2020), https://jamanetwork.com/journals/jama/article-abstract/2763596 ("The Centers for Disease Control and Prevention, the World Health Organization (WHO), numerous journals, and other health care organizations are regularly posting guidance across a host of platforms.").

Earlier this year, Arkansas Governor Sarah Huckabee Sanders used X to warn about severe winter weather and to provide a link to the latest resources.[32]




[32] @SarahHuckabee, X (January 22, 2026, 11:17 AM), https://x.com/SarahHuckabee/status/2014417272547197352.

In June 2023, Tulsa Mayor Ted Bynum used Twitter to provide information about ice distribution following severe thunderstorms,[33] and also to link to his official remarks as republished on his Facebook page.[34]




[33] @gtbynum, X (June 21, 2023, 3:50 PM), https://x.com/gtbynum/status/1671651712099291138.
[34] Mayor GT Bynum, Facebook (June 21, 2023, 3:45 PM), https://www.facebook.com/100044362842922/posts/pfbid021sQeXHwFAwZSuBCy828tjXtq151WmyD1mm36RbLtkvzoj2x6CvMFeDiNdyUKr1XLl.

Earlier this year, New York City Mayor Zohran Mamdani used X to warn his constituents about a potential tornado in Queens and to provide information on how to receive emergency alerts. In doing so he quote-posted to New York City Emergency Management's Notify NYC account.[35]



**Mayor Zohran Kwame Mamdani** @NYCMayor · Aug 20

NYC, there is potential for a tornado in Southeast Queens.

If you receive an emergency alert that a tornado is possible in your area, seek shelter immediately. Tornado winds are extremely strong and dangerous, and conditions can change quickly.

Sign up for emergency alerts by texting NOTIFYNYC to 692-692.

The safest place to be is inside a sturdy building, away from windows, in a small interior room on the lowest floor. But do not shelter in an actively flooding basement or flood-prone room.

If you cannot get indoors, stay away from trees, power lines, and scaffolding.

Check on your neighbors, especially older adults and people with disabilities, and call 911 if you are in danger.

---

[35] @NYCMayor, X (August 20, 2026, 4:05 PM), https://x.com/NYCMayor/status/2090575883232780636.

More safety tips for thunderstorms, high winds, and tornadoes are available at NYC.gov/BeReady

**NYCEM - Notify NYC** @NotifyNYC · Aug 20

.@NWSNewYorkNY Tornado Warning for Queens until 7:15 PM on 8/20. Take shelter NOW. Flying debris will be dangerous to those caught without shelter. Move to a lower floor & stay away from windows. weather.gov/nyc. #NYWx Multilingual & ASL Link: on.nyc.gov/2gcaubx.



147 330 2.7K 276K

After the storms tore through New York City, Mayor Mamdani used X, again quote-posting an NYCEM account, to tell those affected how to report damage and to provide an update on the potential for further storms.[36]

> **Mayor Zohran Kwame Mamdani**
> @NYCMayor
>
> Last night's severe storms brought heavy rain, flooding, strong winds, and significant disruptions across the city. New York City government and first responders are working hard to address the impacts.
>
> If your home, business, or nonprofit was damaged, document it and report it at reportdamage.nyc.gov. These reports help the City understand where damage occurred and delivery recovery assistance to the neighborhoods most in need.
>
> A damage report does not replace a 311 service request. Use @nyc311 for conditions that require a City response, including basement or street flooding, sewer backups, downed trees, structural concerns, mold, or blocked catch basins.
>
> Conditions are expected to remain mostly clear today, but another round of storms are possible this weekend. New Yorkers should use today to document damage, address immediate needs, and prepare for additional rainfall.

---

36 @NYCMayor, X (August 21, 2026, 7:05 AM), https://x.com/NYCMayor/status/2090802434431979892.

For updates, text NOTIFYNYC to 692-692. Preparedness information is available at nyc.gov/beready

**NYC Emergency Management** @nycemergencymgt · Aug 21

If you were affected by the storm on Thursday, August 20, please report damage you may have experienced: reportdamage.nyc.gov so we can assess damage and if the City is potentially eligible to apply for federal assistance.




7:05 AM · Aug 21, 2026 · **110.4K** Views

84 123 816 19

He made similar posts on Bluesky.[37]

[37] @mayor.nyc.gov, Bluesky (August 20, 2026, 4:23 PM), https://bsky.app/profile/mayor.nyc.gov/post/3mtkfajd3vk24; @mayor.nyc.gov, Bluesky (August 21, 2026, 7:18 AM), https://bsky.app/profile/mayor.nyc.gov/post/3mtlxbl5obs2x.

In July, Philadelphia Mayor Cherelle L. Parker alerted her constituents of a Code Purple Air Quality alert due to smoke from wildfires in Canada and advised them to stay indoors or wear an appropriate mask if outside.[38]



**Mayor Cherelle L. Parker**
July 17 ·

Philadelphia is under a Code Purple Air Quality Alert for particulate matter due to wildfire smoke from Canada.

This alert means the air is very unhealthy to breathe. Please protect yourselves by staying indoors, unless you absolutely need to be outdoors. If you have to be outside, please wear a well-fitted N-95 or KN-95 mask.

I want the people of Philadelphia to know that our **City of Philadelphia Government** is taking every step necessary to protect your health.

Please check in on your neighbors who may need attention. We will get through this significant weather-related health event together. **See less**

685 372 262

[38] Mayor Cherelle L. Parker, Facebook (July 17, 2026), https://www.facebook.com/PhillyMayor/posts/pfbid02uQiGUFj1xVNiAdTe4bb5JLQzH4kprz7KX7CEypi6DeT954tS8PvLWBi6GcuxL3sql.

The U.S. Food and Drug Administration ("FDA") posts on X at both a primary account[39] and at a special account dedicated to information about food and drug recalls.[40]




---

[39] https://x.com/FDA.

[40] @FDArecalls, X (Aug. 29, 2026, 10:34 AM), https://x.com/FDArecalls/status/2093754114161414466.

The U.S. Department of State Consular Affairs uses X to provide updates on passports and safe international travel, including updated travel advisories.[41]


TravelGov @TravelGov · Aug 1
Ceuta, Spain: The Department of State updated the Travel Advisory for Spain to raise Ceuta to Level 3 - Reconsider Travel due to unrest. The massive and uncontrolled arrival of migrants from Morocco to Ceuta may lead to unpredictable and dangerous security situations. Spain has deployed the Spanish military, Spanish National Police, and Guardia Civil as a result of this serious situation. Americans should reconsider travel to the area given the risks posed to their safety and security. Read the full Travel Advisory: travel.state.gov/en/internation...


[41] @TravelGov, X (August 1, 2026, 2:32 PM), https://x.com/TravelGov/status/2083667225764938016.

Locally, the Lexington County (South Carolina) Sheriff's Department is among the local law enforcement agencies who post arrests, including the arrest by the state attorney general of a local resident charged with possession of child sexual abuse material.[42]

The South Metro Fire Rescue of Centennial, Colorado is well-known for its YouTube channel on which it posts footage from its fire-fighting and other rescue operations.[43]




Timely access to real-time public emergency information can be critical.

During Hurricane Harvey in 2017, Houston Mayor Sylvester Turner conversed with his constituents on Facebook not only to deliver but also to receive important information from

[42] Lexington County Sheriff's Department, Facebook (Sept. 8, 2026), https://www.facebook.com/photo/?fbid=1532972708868941&set=a.248805237285701.

[43] South Metro Fire Rescue, YouTube (July 5, 2025), https://www.youtube.com/watch?v=O9OaL1yIaHc.

constituents, in one case dispelling disinformation and ensuring that emergency medical services could attend to a baby whose breathing machine would soon lose power.[44]



Mayor Sylvester Turner
August 27, 2017 ·

911 services are at capacity. If you can shelter in place do so, a few inches in your home is not imminent danger. Only call if in you're in imminent danger.

608 133 Comments 607 Shares

Share

**Sandra Nunez Lechuga** There is a baby on a ventilator on the last battery they've been waiting to be rescued. Address 10529 Aves st Houston 77034 please help them before they lose their baby!
2y 8

Hide 13 Replies

Most Relevant is selected, so some replies may have been filtered out.

**Sandra Nunez Lechuga** Christina Linza Itkonen no one is getting to them.. I'm simply trying to help. I would post the picture the family posted but unable to post
2y 1

Mayor Sylvester Turner Christina Linza Itkonen this is a false rumor
2y · Edited 16

Mayor Sylvester Turner Sandra Nunez Lechuga, we've submitted to dispatch - ^M.R.D.\
2y 5

---

44 Mayor Sylvester Turner, Facebook (Aug. 27, 2017), https://www.facebook.com/houstonmayor/posts/10155313481337535.

Just last month, the Twin Falls (Idaho) Police Department used its Facebook page to issue a public safety alert about an active shooter in which it urged residents to avoid the incident area and use alternate transportation routes. [45]




[45] Twin Falls Police Department, Facebook (August 1, 2026), https://www.facebook.com/photo/?fbid=1500778768760820&set=a.227073219464721.

Similarly, the Nashville Fire Department used Twitter to give the community real-time updates after the March 2023 shooting at an elementary school, including providing live instructions as conditions progressed for parents seeking to reunite with their children.[46]


Nashville Fire Dept @NashvilleFD · Mar 27
We are responding to an active aggressor at 33 Burton Hills Blvd Covenant School.
We can confirm we have multiple patients.
Parents coming to the school should go to 20 Burton Hills at this time. this is an active scene.
458 1,232 1,565 1.3M

Nashville Fire Dept @NashvilleFD · Mar 27
A reunification area has been established at 2100 Woodmont Blvd (Woodmont Baptist Church) for parents to meet their children who attend The Covenant School at 33 Burton Hills Blvd.
193 246 452 620.9K

[46] @NashvilleFD, X (Mar. 27, 2023, 8:39 AM), https://x.com/NashvilleFD/status/1640377987685130244; @NashvilleFD, X (Mar. 27, 2023, 8:54 AM), https://X.com/NashvilleFD/status/1640381880968118273.

In a mass shooting at a videogame tournament in 2018, the Jacksonville, Florida Sheriff's Office not only used Twitter to update the public on the status of the investigation, but also to communicate directly with victims so that the police department could rescue them from their hiding spots.[47]



Jax Sheriff's Office
@JSOPIO

**IMPORTANT** If you are hiding in The Landing. Call 911 so we can get to you. #TheLandingMassShooting

Jax Sheriff's Office @JSOPIO · Aug 26, 2018
Mass shooting at the Jacksonville Landing. Stay far away from the area. The area is not safe at this time. STAY AWAY #TheLandingMassShooting

11:57 AM · Aug 26, 2018 from Florida, USA

4,172 Retweets 235 Quotes 4,085 Likes 4 Bookmarks

---

[47] @JSOPIO, X (Aug. 26, 2018, 11:57 AM), https://x.com/JSOPIO/status/1033790582894878725.

The Fire Department of Amador County, California maintains an active Facebook page that frequently posts information about ongoing emergency responses including highway closures.[48]

**Amador Fire**
August 12 ·

6:51AM
August 12, 2026

TRAFFIC UPDATE | HIGHWAY 16

Amador Fire is on scene of a vehicle fire with extension into the vegetation on Highway 16 near Arditto Ranch Road in Willow Springs. Fire has been knocked down and there are no reported injuries.

Highway 16 at Ardito Ranch Road is currently reduced to one lane traffic.

The roadway is expected to fully reopen in approximately 30 minutes. **See less**




48 Amador Fire, Facebook (Aug. 12, 2026), https://www.facebook.com/AmadorFire/posts/pfbid034pmSqwoACVGcmEsc8s9HQGGMMVj2eCdtDqvZW73CVADRjTT96p4QRECfpXwpgDGnl.

### B. **Official Announcements**

Government actors commonly use social media to make official announcements.

For example, Governor Newsom went live on X to announce a new wildfire prevention strategy.[49]

Boston mayor Michelle Wu posted on Bluesky her official response to the U.S. Supreme Court's decision in *Mullin v. Doe* that resulted in the termination of Temporary Protected Status for many of her constituents from Haiti.[50]




---

[49] @CAgovernor, X (July 1, 2025, 10:10 AM), https://x.com/CAgovernor/status/1940095696801341493.
[50] @mayorwu.boston.gov, Bluesky (June 25, 2026, 11:36 AM), https://bsky.app/profile/did:plc:wvwvlbeizca367klhhyudf2n/post/3mp53445pf22l.

Senator Ted Cruz used X to promote and clarify the Protect College Sports Act.[51]

> **Senator Ted Cruz** @SenTedCruz · Jul 30
>
> There's confusion about how the cap and Associated Entity language work in the Protect College Sports Act. Let me clear it up.
>
> The cap is a hard cap. Full stop. That loophole is closed.
>
> Once a school hits the cap, a player can still do NIL deals on the open market — if the deal is genuinely commercial and the school isn't directing it.
>
> That's the line.
>
> Some commissioners want more: bar any company doing business with a school from signing that school's players. So a QB couldn't sign with Nike because Nike has a separate contract with his university. That's not protecting a cap. That's blocking a kid from selling his own name.
>
> Every pro league works this way. If the team doesn't direct it, the player earns it. What exactly is the objection?
>
> And we went further than anyone asked: players disclose all of their deals, and the university president AND the sponsor sign a letter certifying they stayed under the cap. Cheat, and you signed your name to it.
>
> Hard cap. Loophole closed. Players keep the right to earn what the school didn't arrange.
>
> Those aren't in tension — that's the whole point.
>
> 172 109 389 849K

Senator Rand Paul used X to publicly announce his request that the Department of Justice prosecute Dr. Anthony Fauci.[52]

---

[51] @SenTedCruz, X (July 30, 2026, 11:10 AM), https://x.com/SenTedCruz/status/2082891670152978802.

[52] @SenRandPaul, X (August 6, 2026, 4:17 PM), https://x.com/SenRandPaul/status/2085505665938673803.

**Senator Rand Paul** @SenRandPaul · Aug 6

It's official: letters to prosecute Fauci have been hand delivered to @DOJ.




12K 14K 85K 2.5M

## II. MEMBERS OF THE PUBLIC HAVE A QUALIFIED FIRST AMENDMENT RIGHT OF ACCESS TO THE PUBLIC STATEMENTS OF GOVERNMENTAL OFFICIALS AND AGENCIES, INCLUDING WHEN MADE ON SOCIAL MEDIA

Given the widespread governmental use of social media, public access to the government's posts is crucial. Denying individuals timely access to policy announcements—even partially delayed access—hinders their ability to monitor the performance of government officials and otherwise participate in democratic governance. And since, as shown above, officials and agencies

use social media to convey important emergency information, delayed access can endanger lives. For example, when the City of Vallejo, California blocked a resident from its official Twitter feed, he did not receive emergency information during a multi-day power shutdown.[53]


DannyB
@paperboy707

Hey, so uhhh, if anyone knows someone at @CityofVallejo can they please unblock me so I can find out emergency information during the 4th day of a blackout. Thanks. Guess I said something, sometime that offended them.

12:45 PM · Oct 29, 2019

2 Retweets 4 Quotes 13 Likes

### A. The First Amendment Right of Access to the Official Public Statements of Government Actors is Broadly Established

Americans have a qualified First Amendment right of access to government statements communicated generally to the public; any discrimination in access must satisfy First Amendment scrutiny. In *Houchins v. KQED, Inc.*, 438 U.S. 1, 10 (1978), the Supreme Court implied the existence of this right by rejecting an extension from it, rejecting "a constitutional right guaranteeing anyone access to government information *beyond that open to the public generally*." *Id.* (emphasis added).

The right of access to the public statements of the government exists independent of First Amendment forum analysis, regardless of whether any of their posts are deemed a forum for private speech. *See S.H.A.R.K v. Metro Parks Serving Summit County*, 499 F.3d 553, 559 (6th Cir.

[53] @paperboy707, X (Oct. 29, 2019, 12:45 PM), https://x.com/paperboy707/status/1189267139359920128.

2007); *Telemundo of Los Angeles v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1102 (C.D. Cal. 2003) (describing the right disjunctively: "discriminatory access to public forums or information is generally violative of the First Amendment").

This requirement of equal access was the law before the advent of social media, when government officials and agencies communicated to the public through the press. In those cases, the press was serving as a stand-in for its readers and other members of the public, playing a surrogate role in channeling information from the government to the public. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (explaining the press' surrogate role and its paramount importance in the right of public access). Discrimination against a newspaper was held to be, in effect, discrimination against that newspaper's readers and the public broadly. "Courts have forcefully held that restricting information from one reporter, when that same information is given to other reporters at the same event, is prohibited by the First Amendment." *Pulliam v. Fort Bend County, Texas*, 2024 WL 4068767, *7 (S.D. Tex., Sept. 5, 2024).

The Second Circuit thus held that the First Amendment rights of ABC News "and its viewing public" would "be impaired by their exclusion" from election night campaign rallies that were otherwise open to the news media. *Am. Broadcasting Co. v. Cuomo*, 570 F.2d 1080, 1083-84 (2d Cir. 1977). "[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable." *Id.* at 1083.

Likewise, the First Circuit made clear that no branch of government may "selectively exclude news media from access to information otherwise made available for public dissemination," because "granting favorable treatment to certain members of the media … allows the government to influence the type of substantive media coverage that public events will

receive," a practice that "is unquestionably at odds" with the First Amendment. *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986).

This First Amendment protection also applies to the public-at-large when the communication is made directly to them rather than through press surrogates. "The First Amendment guarantees a limited right of access to news regarding activities and operations of government. This right includes, at a minimum, a right of access to information made available to the public or made available generally to the press." *Times-Picayune Pub. Corp. v. Lee*, Civ. A. No. 88–1325, 1988 WL 36491, *9 (E.D. La. Apr. 15, 1988) (citations omitted).

Courts around the country have applied the equal access rule in a wide variety of contexts. The rule was applied, for example, to enjoin the exclusion of a teachers' union newspaper from the school board press room in Florida, *United Teachers of Dade v. Stierheim*, 213 F.Supp. 2d 1368, 1372-73 (S.D. Fla. 2002), and the exclusion of television stations being operated by management during a labor strike from city council meetings in Boston, *Westinghouse Broad. Co. v. Dukakis*, 409 F. Supp. 895, 896-97 (D. Mass. 1976). The equal access rule was also applied to ensure that an underground newspaper in Iowa had access to police records, *Quad-City Cmty. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 13 (S.D. Iowa 1971) (explaining that the information "has already been made available to the public insofar as other media's reporters are the public's representatives"), and to provide a reporter access to a press conference when the mayor of Honolulu sought to exclude the reporter for being "irresponsible, inaccurate, biased, and malicious" in his reporting, *Borreca v. Fasi*, 369 F. Supp. 906, 907 (D. Haw. 1974). *See also McCoy v. Providence Journal Co.*, 190 F.2d 760, 766 (1st Cir. 1951) (holding that the discriminatory refusal to allow a newspaper to inspect public records "constitutes a denial of equal protection of the laws").

"The rule which emerges" from all of these cases and others "is reasonably clear." *D'Amario v. Providence Civic Ctr. Auth.,* 639 F. Supp. 1538, 1543 (D.R.I. 1986), *aff'd without opinion*, 815 F.2d 692 (1st Cir. 1987).

> Although the press cannot command access wherever, whenever, and however it pleases, neither can government arbitrarily shroud genuinely newsworthy events in secrecy. Members of the press, to their own behoof and as representatives of the public, have some (limited) claim to access when government attempts selectively to delimit the audience (or when government cooperates in enforcing such restrictions). In such circumstances, the state's rulemaking power is not absolute: if the first amendment is to retain a reasonable degree of vitality, the limitations upon access must serve a legitimate governmental purpose, must be rationally related to the accomplishment of that purpose, and must outweigh the systemic benefits inherent in unrestricted (or lesser-restricted) access.

*Id.*

The exclusion of individuals from such access because of government disapproval of their viewpoints raises special concerns that officials could manipulate the public's perception of them by disseminating their messages only through favorable filters. "Hand-picking those in attendance," the *Borreca* court observed, "intensifies the manipulation." 369 F. Supp. at 910.

But the unequal treatment need not be content- or viewpoint-based; it is subject to First Amendment scrutiny even if not retaliatory. *See Stevens v. New York Racing Ass'n*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987). And to fail First Amendment scrutiny, the restriction need only be arbitrary. *See D'Amario*, 639 F. Supp. at 1543. That would include discrimination against those not willing or able to pay $100,000 per month.

Indeed, the right of access to the public statements of the government derives in part and remains a close cousin to the qualified First Amendment right of access to judicial proceedings and records, an access right that is commonly found, and found violated, in viewpoint-neutral settings. *See Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise*

*II*"). *See also D'Amario*, 639 F. Supp. at 1542-43 (deriving its rule from both court access and non-judicial access cases). Indeed, some courts have extended the court access analysis to nonjudicial operations of the government and have not relied on viewpoint discrimination to do so. In *Leigh v. Salazar*, the Ninth Circuit characterized the right broadly, as the "qualified right of access for the press and public to observe government activities." 677 F.3d 892, 898-900 (9th Cir. 2012) (applying the *Press-Enterprise II* test to find a First Amendment right of access to a BLM horse roundup); *id.* at 899 n.5 (cataloguing other nonjudicial applications).

The experience-and-logic test used to identify whether such a right exists for court records and proceedings is also helpful in identifying when the right of equal access to government statements exists. The Supreme Court created this two-part test to determine when the First Amendment right of access exists for any specific category of court records or proceedings: 1) "whether the place and process have historically been open to the press and general public," and 2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8-9.

For the right of access to public government statements, the experience prong is useful in determining whether the statements are indeed "public": have these statements historically been made available to the public broadly? As demonstrated above, social media is and has been used by government officials and agencies precisely because of its ability to reach the public broadly and its capacity as a means of general public communication. President Trump's voluminous use of social media is a quintessential example of this.

The logic prong helps focus on the inherent benefits of being able to read what the government has said and whether public access simply makes sense. Here, the operation of government is bettered by the public oversight access provides, and public access does not

categorically interfere with the operation of the government. Again, this is quintessentially true of the Trump Administration which conducts so much of its official business through Truth Social.

The experience-and-logic analysis highlights how the present case, with government statements that are broadly published to the world through social media, is distinguished from the "discretionarily afforded information" at issue in cases such as *Baltimore Sun v. Ehrlich*, 437 F.3d 410, 418 (4th Cir. 2006). In *Ehrlich*, the granting of extraordinary access to "nonpublic information" to some journalists was "a pervasive feature of journalism and of journalists' interaction with government," a routine type of favoritism inherent in highly competitive journalism. *Id.* at 417-18. Thus, there was no history of open public access. Moreover, the journalists in *Ehrlich* sought not only equal access to the governor's statements, but the ability to interview him so that he would answer their specific questions. *Id. See Associated Press v. Budowich*, 780 F. Supp. 3d 32, 53 (D.D.C. 2025), appeal docketed No. 25-5109 (D.C. Cir. 2025). *See also Alaska Landmine LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1133 (D. Alaska 2021) (distinguishing the right of access to information from the right to interaction). Access in that case was not supported by history and not supported by logic.

And just as the right of court access does not disappear when a government leases office space from a private building owner to house its courtrooms, the right of access to government's social media statements does not disappear just because a private company with its own editorial policies runs the platform: it matters little that the government shares some access decisions with a private actor. In *Telemundo*, 283 F. Supp.2d at 1103, the court found that a television station had a First Amendment right to cover the city's official El Grito ceremony because the city and its nongovernmental co-presenters permitted another broadcaster to do so. That the city shared, and in some situations yielded, decision-making authority with a private civic organization and another

broadcaster, did not diminish the city's obligation to provide equal access. *Id. See also Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546 (1975) (applying public forum doctrine to privately owned theater leased to the city).

**B. The First Amendment Protects Against Delays in and Other Barriers to Access to the Official Public Statements of Government Actors**

The fact that the Truth Social API delays rather than forever-blocks access in no way weakens the First Amendment analysis.

That the public could ultimately get the information from other, less direct channels does not remove the need for First Amendment scrutiny of the unequal access to a given source of information. In *Southwestern Newspapers v. Curtis*, 584 S.W.2d 362, 363, 369 (Tex. Civ. App. 1979), the court enjoined a district attorney from requiring that reporters from a certain newspaper make appointments to gain access to official news sources, while he made those news sources available without appointments to all other media. As the court in *Westinghouse*, 409 F. Supp. at 896, found, access must be provided with "equal convenience." *See also Stierheim*, 213 F. Supp. 2d at 1374 (finding First Amendment violation where reporters were "nevertheless deprived of the same newsgathering environment and opportunities" afforded to the other news media).

In the analogous context of access to court documents, federal appellate courts have generally recognized that mere delays, and especially artificial delays, in timely access trigger First Amendment scrutiny. Earlier this month, the Ninth Circuit confirmed that "press and public access to newly filed complaints may be constitutionally delayed, but only if the state's access restrictions survive the rigorous scrutiny test set out in the *Press-Enterprise* cases." *Courthouse News Service v. Omundson*, ___ F.4th ___, 2026 WL 2603864, *7 (9th Cir., Sept. 3, 2026). None of the state's proffered justification for the delay, clerical error prevention, reduced potential for public confusion, and protection of confidential information satisfied the First Amendment test. *Id.* at *8.

*See also Courthouse News Service v. Corsones*, 131 F.4th 59, 75 (2d Cir. 2025); *Courthouse News Service v. New Mexico Administrative Office of Courts*, 53 F.4th 1245, 1269 (10th Cir. 2022); *Courthouse News Service v. Planet*, 947 F.3d 581, 594-96 (9th Cir. 2020). *See also Associated Press*, 780 F. Supp. 3d at 56 (holding that the failure to get photographs in real time had a significantly adverse impact on the AP's reporting).

## III. DEFENDANTS' USE OF TRUTH SOCIAL TO DELAY PUBLIC ACCESS TO THEIR STATEMENTS ABSENT PAYMENT VIOLATES THE FIRST AMENDMENT

The First Amendment protects access to governmental communications, ensuring that individuals are not denied speech alerting them in times of crisis, distributing necessary information about governmental services, and providing transparency about elected and appointed officials' actions and statements.

Here, once First Amendment scrutiny is triggered, it is clear that the defendants cannot not satisfy it. As this Court has held, when there is a content-neutral restriction on access, a court must examine "whether that unequal access serves a legitimate governmental objective and the benefits derived from the restriction are greater than the benefits that would result from lifting the restriction." *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 260 (S.D.N.Y. 2019). As Plaintiffs have amply argued, here, there is no legitimate government interest in restricting timely access to the government's statements for the purposes of private financial gain. And the benefits of unrestricted access are clearly more important.

## CONCLUSION

Social media is well-established as a medium of official communication with the public. As such, the public has a qualified First Amendment right of access to the government's public social media posts, and any unequal access must withstand First Amendment scrutiny. The pay-for-early-access scheme cannot.

Dated: September 17, 2026

Respectfully submitted,

*/s/ David Greene*
David Greene
Sophia Cope
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Phone: 415-436-9333
Fax: 415-436-9993
davidg@eff.org
sophia@eff.org

*Counsel for amicus curiae Electronic Frontier Foundation*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

Pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.1 ("Local Rule 7.1"), I certify as follows:

1. This Amicus Curiae Brief of Electronic Frontier Foundation in Support of Plaintiffs' Motion for Preliminary Injunction complies with the type-volume limitation of Local Rule 7.1(c) because this brief contains 5,320 words, as calculated by Microsoft Word, excluding the parts of the brief exempted by Local Rule 7.1(c), and excluding the text in the screenshots which Microsoft Word does not count, the screenshots contain approximately an additional 2,082 words, for an approximate total of 7,402 words; and

2. This brief complies with the typeface and type style requirements of Local Rule 7.1(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365, the word processing system used to prepare the brief, in 12 point font in Times New Roman font.

Dated: September 17, 2026

Respectfully submitted,

*/s/ David Greene*

David Greene
Sophia Cope
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Phone: 415-436-9333
Fax: 415-436-9993
davidg@eff.org
sophia@eff.org

*Counsel for amicus curiae Electronic Frontier Foundation*