# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

THE INTERCEPT MEDIA, INC., *et al.*

*Plaintiffs*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*,

*Defendants*.

Case No. 1:26-cv-6867

**[PROPOSED] BRIEF OF *AMICUS CURIAE* 53 FORMER PROSECUTORS AND LAW ENFORCEMENT AGENTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICUS CURIAE* ........ 1

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. There is no government interest in permitting federal officeholders to exploit their public office for private profit. ........ 3

II. The Truth Social scheme may violate criminal laws. ........ 5

A. The scheme could violate the Securities Exchange Act. ........ 6

B. The scheme could constitute an illegal gratuity. ........ 7

C. The scheme could constitute an illegal conflict of interest. ........ 9

D. The scheme could constitute illicit outside compensation for federal employment. ........ 10

E. The scheme could violate the Trade Secrets Act. ........ 11

CONCLUSION ........ 12

CERTIFICATE OF COMPLIANCE ........ 13

CERTIFICATE OF SERVICE ........ 14

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985) ........................................................2

*Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37 (1983) ...........2

*New York Progress & Protection PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) .............................5

*Salman v. United States*, 580 U.S. 39 (2016)....................................................................................6

*State Farm Mutual Automobile Insurance Co. v. Tri-Borough NY Medical Practice P.C.*,
120 F.4th 59 (2d Cir. 2024) ..............................................................................................3

*Trump v. United States*, 603 U.S. 593 (2024) ..................................................................................5

*United States v. Chow*, 993 F.3d 125 (2d Cir. 2021) .........................................................................6

*United States v. McDade*, 827 F. Supp. 1153 (E.D. Pa. 1993) ..................................................8, 9

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013)..........................................................................9

*United States v. Schaller*, 401 F. App'x 419 (11th Cir. 2010).......................................................9

*United States v. Shvartsman*, 722 F. Supp. 3d 276 (S.D.N.Y. 2024) ............................................6

*United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999) .....................................................8

*United States v. Villanueva*, 410 F. App'x 638 (4th Cir. 2011).....................................................9

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 8...............................................................................................................4

U.S. Const. art. II, § 1, cl. 7 ...............................................................................................................4

**Statutes and Rules**

15 U.S.C. § 78j(b) ...............................................................................................................................6

15 U.S.C. § 78u-1(h)...........................................................................................................................6

15 U.S.C. § 78u-1(h)(2)(A)(ii)(I).......................................................................................................6

18 US.C. § 201(b)(1)(A) ....................................................................................................................9

18 US.C. § 201(b)(2)(A) ....................................................................................................................9

18 U.S.C. § 201(c)(1)(A) ...................................................................................................................8

18 U.S.C. § 201(c)(1)(B) ....................................................................................................8

18 U.S.C. § 208(a) ..............................................................................................................9

18 U.S.C. § 209(a) ........................................................................................................10, 11

18 U.S.C. § 1905...............................................................................................................11

House Rule 23, cl. 3 ...........................................................................................................4

Senate Rule 37.1 ................................................................................................................4

**Other Authorities**

Code of Ethics for Government Service, United States House Committee on Ethics, https://ethics.house.gov/manual/code-of-ethics-for-government-service/ (last visited Sep. 16, 2026) ..............................................................................................................................4

Kevin J. Hickey & Michael A. Foster, *The Emoluments Clauses of the U.S. Constitution* (Jan. 27, 2021)...................................................................................................................4

The Federalist No. 62 (James Madison) ...........................................................................3

The Federalist No. 72 (Alexander Hamilton) ...................................................................3

The Federalist No. 73 (Alexander Hamilton) ...................................................................4

The White House, *Press Secretary Karoline Leavitt Briefs Members of the Media, Feb 18, 2026*, at 35:39–45 (YouTube, Feb. 18, 2026) https://www.youtube.com/watch?v=RkMpdNeG2sA ..........................................................................................................................................10

## INTEREST OF *AMICUS CURIAE*

*Amici curiae* are 53 prosecutors and law enforcement agents who have worked on public corruption and public integrity matters for the Department of Justice, including in the Public Integrity Section of the Criminal Division of the U.S. Department of Justice, the Federal Bureau of Investigation, or United States Attorney's Offices across the country.[1] *Amici* have worked across 11 presidential administrations, Republican and Democratic alike, and have cumulatively devoted over 880 years to government service. *Amici* file this amicus brief to explain why there is no government interest that can undergird the Truth Social scheme at issue in this case. To the contrary, the scheme has potential criminal implications that demonstrate the scheme cannot have any legitimate government interest and that the public interest favors a preliminary injunction.

A full list of *Amici* can be found in Appendix A.

## INTRODUCTION

Plaintiffs, The Intercept Media, Inc. and Freedom of the Press Foundation, invoke their constitutionally protected rights of freedom of speech and equal protection of the laws to challenge a scheme that seeks to profit from early access to government information. That scheme has no legitimate public interest. It also risks public corruption, which *Amici* have spent much of their professional life prosecuting.

There is no legitimate, let alone significant, government interest in allowing public officials to profit personally by selling early access to official government announcements. But Truth Social's new scheme to charge up to $100,000 per month for users to get early access to messages from the President and other officials on the platform (the "Truth Social scheme") seeks to do precisely that. Trump Media & Technology Group owns and operates Truth Social. Because

[1] Unless expressly noted otherwise, *Amici* sign this brief in their personal, individual capacities and not as representatives of their current employers or any other affiliations.

President Trump is the beneficiary of Trump Media & Technology Group, he benefits when Truth Social's value increases, including through the Truth Social scheme. Dkt. 36-8.

The most galling aspect of the Truth Social scheme is that, in the service of their own self-enrichment, Defendants give preferential access to announcements of presidential acts. Defendants keep business owners affected by tariffs, military families affected by the war in Iran, and parents affected by public health decisions in the dark on presidential decisions, while whispering those decisions in ears of potential traders, who are willing to pay a premium so that they can front-run American and global financial markets.

As a result, the Truth Social scheme poses an obvious risk of corruption, defying the compelling anti-corruption interests embodied in the Constitution, ethics codes, and federal laws. It implicates federal public corruption laws imposing criminal penalties, including the Securities Exchange Act; the federal prohibitions on illegal gratuities, conflicts of interest, and outside compensation for federal employment; and the Trade Secrets Act. Because the scheme is so far from legitimate that it is possibly criminal, it cannot serve any legitimate government interest worthy of infringing on Plaintiffs' rights under the First Amendment and Equal Protection Clause, and the public interest favors enjoining the scheme.

**ARGUMENT**

Defendants cannot demonstrate the legitimate government interest necessary to defeat Plaintiffs' Equal Protection claim, let alone the significant interest necessary to defeat Plaintiffs' First Amendment claims, because there is no government interest in providing preferential access to official communications. *See Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 618 (1985) (holding that unequal distributions of benefits must, at a minimum, "rationally further[] a legitimate [government] purpose"); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (holding that time, place, and manner restrictions must be "narrowly tailored to serve

a significant government interest”). Rather, providing such preferential access to government officials’ communications in exchange for a fee is not only detrimental to anti-corruption principles and public confidence in government, but also potentially criminal. Enjoining the Truth Social scheme is therefore strongly in the public’s interest. *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 79 (2d Cir. 2024).

**I. There is no government interest in permitting federal officeholders to exploit their public office for private profit.**

The Constitution, congressional ethics rules, and federal statutes confirm that public officeholders may not use their official positions for personal profit, including by exploiting nonpublic government information for private gain. Together, these sources reflect the anti-corruption principle that government officials owe their loyalty to the public and the Constitution, not to any person or entity that might seek leverage through financial benefits. Profiting off one’s status as a government official is anathema to this principle.

Since the founding, our constitutional structure has sought to protect against government corruption. Before the Constitution’s ratification, James Madison advocated for the Senate as a bulwark against corruption because of the “misfortune incident to republican government . . . that those who administer it may forget their obligations to their constituents, and prove unfaithful to their important trust.” The Federalist No. 62 (James Madison). Alexander Hamilton foresaw and warned against the “avaricious man, who might happen to fill the office [of the President]” and “would feel a propensity, not easy to be resisted by such a man, to make the best use of the opportunity he enjoyed, while it lasted.” The Federalist No. 72 (Alexander Hamilton).

The Constitution reflects this anti-corruption principle in the Foreign Emoluments and Domestic Emoluments Clauses. The Foreign Emoluments Clause prohibits federal officeholders from accepting gifts, payments, or benefits from foreign states without congressional consent. U.S.

Const. art. I, § 9, cl. 8. The Domestic Emoluments Clause ensures that the President receives a fixed salary that cannot increase or decrease during his term, "preventing the legislature from using its control over the President's salary to exert influence over him." Kevin J. Hickey & Michael A. Foster, *The Emoluments Clauses of the U.S. Constitution*, at 1 (Jan. 27, 2021); U.S. Const. art. II, § 1, cl. 7. The Clause also prohibits the President from receiving emoluments from federal or state governments to ensure that the President will "have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." The Federalist No. 73 (Alexander Hamilton).

Congress's own ethics rules also reflect this principle. Congressional ethics rules prohibit members and legislative staff from seeking to profit from their public office or employment. H. Rule 23, cl. 3; S. Rule 37.1. For example, legislators and senior staff may not receive honoraria for speeches and articles, or use "information received confidentially in the performance of governmental duties for making private profit." Code of Ethics for Government Service, U.S. H. Comm. on Ethics, https://ethics.house.gov/manual/code-of-ethics-for-government-service/ (last visited Sep. 16, 2026).

Congress enshrined this principle in statutes that penalize officials who trade early access to information for benefits. *See infra* Part II. As explained below, the Truth Social scheme potentially violates these criminal statutes. Because the Truth Social scheme is potentially criminal, it is far afield from the legitimate government interest required to overcome an Equal Protection claim, and even further from the significant government interest required to justify a First Amendment restriction. And permitting the potentially criminal scheme to operate contravenes the public interest. *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[S]ecuring First Amendment rights is in the public interest.").

## II. The Truth Social scheme may violate criminal laws.

The Truth Social scheme could create criminal liability for executive branch officials and for those paying for early access to Truth Social ("paid subscribers"). The scheme may violate the Securities Exchange Act, the prohibition on illegal gratuities, the prohibition on conflicts of interest for federal employees, the prohibition on illicit outside compensation for federal employment, and the Trade Secrets Act.[2] That the scheme may expose participants to *any* potential criminal consequences demonstrates that it cannot be predicated on a legitimate government interest and that the public interest favors enjoining officials and subscribers from engaging in the potentially illegal scheme.[3]

### A. The scheme could violate the Securities Exchange Act.

The Truth Social scheme presents a potential violation of the Securities Exchange Act for both executive branch officials and paid subscribers because the scheme is remarkably akin to an official giving someone outside of the government an unlawful insider tip. The Securities

---

[2] This brief does not address whether these statutes apply to the President, and, if so, whether the President could claim any immunity from criminal prosecution. The brief instead analyzes the criminal laws on the assumptions that those laws apply to all public officials—and everyday citizens—equally and that no one is "above the law." *Trump v. United States*, 603 U.S. 593, 642 (2024). But there is nothing to indicate that any public official, including the President, can claim immunity for receiving compensation from third parties for performing his official duties. *See id.* at 632 n.3 (acknowledging that in a prosecution for bribery, "the prosecutor may admit evidence of what the President allegedly demanded, received, accepted, or agreed to receive or accept in return for being influenced in the performance of the act" (citing 18 U.S.C. § 201(b)(2)); *id.* at 655 (Barrett, J., concurring) ("The Constitution, of course, does not authorize a President to seek or accept bribes, so the Government may prosecute him if he does so.") (citing Const. art. II, § 4)).

[3] *Amici curiae* recognize the enormous challenge of proving any criminal offense at trial. Successful prosecutions of these offenses would require overcoming the challenges faced every day by prosecutors, let alone those prosecuting the most powerful and well-resourced defendants. But Defendants are not on trial for criminal offenses, and Plaintiffs need not prove anything beyond a reasonable doubt. The fact that reasonable minds can even contemplate whether this scheme violates multiple federal criminal statutes speaks to how Plaintiffs satisfy the burden they carry here of showing that there is no legitimate government interest that can justify the Truth Social scheme and that the public interest favors enjoining it.

Exchange Act prohibits "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). This prohibition extends to members of the executive branch, including the President and Vice President, "with respect to material, nonpublic information derived from such person's position as an executive branch employee . . . or gained from the performance of such person's official responsibilities," under Section 4 of the Stop Trading on Congressional Knowledge ("STOCK") Act. 15 U.S.C. § 78u-1(h) & (h)(2)(A)(ii)(I). The law's prohibition on "any manipulative or deceptive device or contrivance" has long been interpreted by courts to encompass insider trading. *United States v. Chow*, 993 F.3d 125, 136 (2d Cir. 2021); *United States v. Shvartsman*, 722 F. Supp. 3d 276, 293 (S.D.N.Y. 2024).

Executive branch officials could be held criminally liable under the Securities Exchange Act because the scheme intentionally creates a paid premium-access window during which official government information remains material and nonpublic. The scheme therefore enables officials, who have access to material nonpublic information, to disclose that information to paid subscribers and trade on it in violation of the officials' duty of trust and confidence under the STOCK Act.

Paid subscribers could also be held criminally liable for trading on information received before the public through the Truth Social scheme. Courts have held that trading securities based on material nonpublic information that the trader received in violation of a duty of confidentiality constitutes a crime under the Securities Exchange Act. *See Salman v. United States*, 580 U.S. 39, 42 (2016) ("The tippee acquires a tipper's duty . . . if the tippee knows the information was disclosed in breach of the tipper's duty."); *Chow*, 993 F.3d at 138–39 (trading on material nonpublic information received from a tipper who breaches a duty of confidentiality can violate 15 U.S.C. § 78j(b) when the tippee knows or understands the information was disclosed in breach of that duty). Paid subscribers who trade on information they receive on Truth Social before the

public will have traded material nonpublic information received in breach of the duty of confidentiality imposed on executive officials under the STOCK Act.

An example illustrates the similarity between an official posting nonpublic information for paid subscribers and an official providing an inside tip. Suppose that the President decides that at 11:00 a.m., he is going to impose tariffs on a country that exports computer chips, and he announces the decision on Truth Social to paid subscribers at 9:00 a.m. Upon announcement, a paid subscriber sells computer chip stocks at 9:05 a.m. The President's post becomes available to the public at 10:00 a.m., and computer chip stocks plummet. The President has provided the paid subscriber with material nonpublic information in violation of his duty under the STOCK Act. And the paid subscriber has traded on material nonpublic information that originated from the President, who owes a fiduciary duty under the STOCK Act. The President and the paid subscriber would have therefore violated the Securities Exchange Act and could be criminally liable, just as they would be if the President had secretly emailed or texted the subscriber market-moving information, and the paid subscriber traded on that information. The materiality of this information can be inferred from the $60,000 to $100,000 a month that high-frequency trading firms have already reportedly been willing to pay for it.

**B. The scheme could constitute an illegal gratuity.**

It is illegal for a public official of the United States to accept a payment from a private party for an official act that he has performed or is going to perform. The scheme could constitute an illegal gratuity, and criminal liability could potentially extend to both the President and paid subscribers.

Section 201(c)(1)(B) prohibits public officials from "directly or indirectly demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person[.]" 18

U.S.C. § 201(c)(1)(B). The Supreme Court has described an illegal gratuity as "a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404–05 (1999).

Trump Media & Technology Group owns and operates Truth Social. President Trump is the beneficiary of Trump Media & Technology Group and therefore receives money through the $100,000 that paid subscribers pay. Dkt. 36-8. Those shelling out over $1 million a year for early access are not doing so for early access's sake; they are paying for early access to presidential announcements (*i.e.*, official acts).

Subscribing to paid Truth Social access could also be considered providing an illegal gratuity in violation of 18 U.S.C. § 201(c)(1)(A), which prohibits anyone from "directly or indirectly giv[ing], offer[ing], or promis[ing] anything of value to any public official," "for or because of any official act performed or to be performed by such public official[.]" Demonstrating a violation of this statute does not require that the official has taken or promised to take specific action for the money accepted. *United States v. McDade*, 827 F. Supp. 1153, 1171 (E.D. Pa. 1993), *aff'd in part, appeal dismissed in part,* 28 F.3d 283, *reh'g and reh'g en banc denied, cert. denied,* 514 U.S. 1003 ("The statute itself does not include a quid pro quo requirement."). Paid subscribers could be charged with paying an illegal gratuity because they are paying a fee to receive special access to learn about official acts. Their payment does not need to directly influence the President's actions to constitute an illegal gratuity because the statute has no quid pro quo requirement. *Id.* The payment alone is enough.[4]

[4] Given that subscribers are not simply paying for a single announcement, but rather a continuing stream, this scheme potentially amounts to bribery. See 18 U.S.C. § 201(b)(1)(A) & (b)(2)(A); *United States v. Rosen*, 716 F.3d 691, 700 (2d Cir. 2013) ("[T]he federal bribery and honest services

### C. The scheme could constitute an illegal conflict of interest.

This scheme also potentially constitutes a criminal conflict of interest, in violation of 18 U.S.C. § 208.

Section 208 prohibits federal employees from being on both sides of a financial relationship between the federal government and private business. It prohibits "an officer or employee of the executive branch" from "participat[ing] personally and substantially" in a "particular matter" in which he "has a financial interest." 18 U.S.C. § 208(a). Courts have affirmed convictions for those aiding and abetting violations of Section 208, including the owner of a company who concealed his business relationship with an Air Force project manager. *See United States v. Schaller*, 401 F. App'x 419, 421–23 (11th Cir. 2010) (unpublished); *see also United States v. Villanueva*, 410 F. App'x 638, 639 (4th Cir. 2011) (per curiam) (unpublished) (affirming conviction for aiding and abetting "participation as a government employee in a transaction in which he knew he had a financial interest").

Here, President Trump's posting of the Administration's policy on a platform in which he has at least a 41% holding, worth at least $1 billion, could well have violated Section 208 after he took office and continued to profit from Truth Social. In adding an expensive subscription, the Truth Social Scheme simply deepens the Office of the President in the corrupting influence of public service entangled with private profit. The President is participating "personally and substantially" in a matter in which he "has a financial interest," namely, owning the platform with which he speaks to the American people. As the White House Press Secretary stated, the President's Truth Social posts are "the policy of the Trump Administration," "coming straight from

---

fraud statutes . . . criminalize scheme[s] involving payments at regular intervals in exchange for specific official acts as the opportunities to commit those acts arise . . . .").

the horse's mouth." The White House, *Press Secretary Karoline Leavitt Briefs Members of the Media, Feb 18, 2026*, at 35:39–45 (YouTube, Feb. 18, 2026) https://www.youtube.com/watch?v=RkMpdNeG2sA. The scheme is therefore no different from a federal employee participating in a matter in which he has a financial stake. For example, it would be unlawful for the head of NASA and the CEO of an aerospace firm selling rockets to NASA to be the same person, presiding over both the rocket purchase and the rocket sale. Defendants' scheme appears worse by orders of magnitude: the President is on one side of a transaction, the social media company he owns is on the other, and the product for sale is his social media posts. To apply the NASA example, here, the President's own words are the rockets.

### D. The scheme could constitute illicit outside compensation for federal employment.

The scheme could constitute unlawful outside compensation for federal employment that extends to both executive branch officials and subscribers.

Executive branch officials could be criminally liable under the Truth Social scheme for accepting compensation outside of their federal employment. Under 18 U.S.C. § 209(a), a member of the executive branch cannot "receive[] any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government[.]" Through the Truth Social scheme, the President is receiving private funds for his official duties that unlawfully supplement the salary he receives from the federal government. Receiving these additional funds appears to facially violate Section 209(a)'s criminal prohibitions.

Criminal liability for providing unlawful compensation to federal employees could also extend to the paid subscribers on the other side of the ledger. Paying for early Truth Social access could be considered a contribution of illicit compensation under Section 209(a), which prohibits

anyone from "mak[ing] any contribution to, or in any way supplement[ing], the salary of" an executive branch member. Paid subscribers pay to receive early access to information concerning official government announcements, policy decisions, personnel appointments, and other executive actions. In paying for that information, paid subscribers pay private remuneration to Trump Media & Technology Group, which directly benefits President Trump, in connection to the President's performance of his governmental duties.

### E. The scheme could violate the Trade Secrets Act.

The Truth Social scheme could constitute a violation of the Trade Secrets Act. Under the Trade Secrets Act, any officer of the United States who "publishes, divulges, [or] discloses," information received in the course of official duties, which "concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association" commits a crime. 18 U.S.C. § 1905. By design, this scheme requires the President to announce until-then confidential information to paid subscribers before lawful public release in violation of the Trade Secrets Act. For example, the President could release information to paid subscribers identifying the contractor whom he plans to award with a particular contract for a project in Washington D.C. before that information becomes available to the public. The release of this information could criminally violate the Trade Secrets Act.

* * *

Because there are myriad ways that the Truth Social scheme could pose criminal liability for both the President and for subscribers, there is no legitimate or significant government interest that justifies the scheme, and the public interest favors enjoining the scheme.

## CONCLUSION

Public officers are trusted with serving the public and operating outside of corrosive special interests. But the Truth Social scheme flips this anti-corruption principle on its head, allowing the executive branch to privately benefit from people who can afford to pay for special access to official government announcements and profit from that early access. Such apparent corruption only elevates the need to protect the rights of the media organizations monitoring it. *Amici* respectfully request that the Court grant the motion for preliminary injunction.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Alice C.C. Huling*
Alice C.C. Huling
Renata O'Donnell*
Dana Paikowsky*
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200
ahuling@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
dpaikowsky@campaignlegalcenter.org

Ryan Crosswell*
SINGLETON SCHREIBER
591 Camino de la Reina
Suite 1025
San Diego, CA 92108
rcrosswell@singletonschreiber.com

**pro hac vice application forthcoming*

*Counsel for Proposed Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 7.1(c) of the Local Rules for the United States District Court for the Southern District of New York, the undersigned counsel for amici hereby certifies that this amicus brief complies with the type volume limitation of Rule 7.1(c). As measured by Microsoft Word, there are 3,640 words in this brief.

By: *<u>/s/ Alice C.C. Huling</u>*

Alice C.C. Huling
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
ahuling@campaignlegalcenter.org

*Counsel for Amici*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2026, I electronically filed a copy of the foregoing Brief *amici curiae* using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 21, 2026

By: *<u>/s/ Alice C.C.C Huling</u>*
Alice C. Huling
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Suite 400
Washington, DC 20005
(202) 736-2200
ahuling@campaignlegalcenter.org

*Counsel for Amici*

# APPENDIX A

*Alphabetical List of Amici Curiae*

**James S. Arisman**
U.S. Attorney's Office for the District of Columbia, Assistant U.S. Attorney (1988-1989, 1991-1995)

**Richard R. Barker**
U.S. Attorney's Office for the District of Columbia, Assistant U.S. Attorney (2014-2019)
U.S. Attorney's Office for the Eastern District of Washington, Assistant U.S. Attorney, Acting U.S. Attorney (2019-2025)

**Michael R. Bromwich**
U.S. Attorney's Office for the Southern District of New York, Assistant U.S. Attorney (1983-1987)
Office of Independent Counsel (Iran-Contra), Associate Counsel (1987-1989)
U.S. Department of Justice, Office of the Inspector General, Inspector General (1994-1999)

**Douglas Cannon**
U.S. Attorney's Office for the Middle District of North Carolina, Senior Litigation Counsel (1979-2007)

**Perry A. Carbone**
U.S. Attorney's Office for the District of New Jersey, Deputy Chief, Special Prosecutions Division (1994-2003)
U.S. Attorney's Office for the Southern District of New York, Criminal Division, Chief, White Plains Division, Chief (2003-2008, 2009-2025)

**Robert K. Cassibry**
U.S. Attorney's Office for the Southern District of Texas, Assistant U.S. Attorney, First Assistant U.S. Attorney (1992-1997)
U.S. Department of Justice, Office of Legal Education, Deputy Director (1997-1998)
U.S. Attorney's Office for the District of Columbia, Assistant U.S. Attorney (1998-2002)
U.S. Department of Justice, Criminal Division Training Center, Director (2002-2006)
U.S. Department of Justice, Office of Legal Education, Assistant Director, Criminal and National Security Programs (2006-2021)

**Ty Cobb**
U.S. Attorney's Office for the District of Maryland, Assistant U.S. Attorney, Chief, Criminal Division (1980-1986)

Organized Crime Drug Enforcement Task Forces, Mid-Atlantic Regional Coordinator (1983-1986)

**Ryan Crosswell**
U.S. Attorney's Office for the Middle District of Louisiana, Assistant U.S. Attorney (2014-2017)
U.S. Attorney's Office for the Southern District of California, Assistant U.S. Attorney (2017-2020)
U.S. Department of Justice, Public Integrity Section, Trial Attorney (2020-2025)

**Margaret Ellen Curran**
U.S. Attorney's Office for the District of Rhode Island, Assistant U.S. Attorney, U.S. Attorney (1986-2003)

**Cecilia L. Gardner**
U.S. Attorney's Office for the District of New Jersey, Assistant U.S. Attorney (1980-1983)
U.S. Attorney's Office for the Eastern District of New York, Assistant U.S. Attorney (1983-1989, 1992-1998)

**Alan Gershel**
U.S. Attorney's Office for the Eastern District of Michigan, Assistant U.S. Attorney, Interim U.S. Attorney (1980-2008)
U.S. Department of Justice, Criminal Division, Deputy Assistant Attorney General (1999)

**Mike Gordon**
U.S. Attorney's Office for the Middle District of Florida, Assistant U.S. Attorney (2023-2025)

**David E. Green**
U.S. Department of Justice, Public Integrity Section, Trial Attorney (1987-1996)
U.S. Department of Justice, Computer Crime and Intellectual Property Section, Deputy Chief (1996-2003)

**John Haried**
U.S. Department of Justice, Assistant U.S. Attorney (1990-2010)
Executive Office for U.S. Attorneys, Senior Counsel (2010-2020)
U.S. Department of Justice, Office of the Deputy Attorney General, Director (2020-2025)

**Lynn Helland**
U.S. Attorney's Office for the Eastern District of Michigan, Assistant U.S. Attorney, Supervisory Assistant U.S. Attorney (1982-2017)

**Frederick G. Herold**
U.S. Attorney's Office for the Eastern District of Pennsylvania, Assistant U.S. Attorney, Criminal Division (1987-1991)

**Judith Hetherton**
U.S. Attorney's Office for the District of Columbia, Deputy Chief, Appellate Division, Member, Fraud Division (1974-1979)

**Elliott B. Jacobson**
U.S. Attorney's Office for the Southern District of New York, Assistant U.S. Attorney, Deputy Chief, Criminal Division, Chief, White Plains Division, Senior Litigation Counsel (1985-2017)

**Wallace H. Kleindienst**
U.S. Attorney's Office for the District of Columbia, District of Arizona, and District of Colorado, Assistant U.S. Attorney, First Assistant U.S. Attorney, Senior Litigation Counsel (1981-2022)

**Brian M. Legghio**
U.S. Attorney's Office for the Eastern District of Michigan, Assistant U.S. Attorney (1982-1988)

**Andrew Levchuk**
U.S. Attorney's Office for the District of Massachusetts, Assistant U.S. Attorney (1992-2003)
U.S. Department of Justice, Public Integrity Section, Senior Trial Attorney (2007-2011)

**Joel R. Levin**
U.S. Attorney's Office for the Eastern District of Wisconsin, Assistant U.S. Attorney (1980-1984)
U.S. Attorney's Office for the Northern District of California, Assistant U.S. Attorney, Chief, Criminal Division (1984-1997)
U.S. Attorney's Office for the Northern District of Illinois, Assistant U.S. Attorney, First Assistant U.S. Attorney, Acting U.S. Attorney (1997-2008, 2014-2018)

**Jim Lewis**
U.S. Attorney's Office for the Central District of Illinois, U.S. Attorney (2010-2016)

**Sheldon N. Light**
U.S. Attorney's Office for the Eastern District of Michigan, Unit Chief, Senior Litigation Counsel (1983-2016)

**Karen Loeffler**
U.S. Attorney's Office for the District of Alaska, Assistant U.S. Attorney, Criminal Chief, U.S. Attorney (1988-2017)

**John R. Marti**
U.S. Department of Justice, Fraud Section, Trial Attorney (1997-2000)
U.S. Attorney's Office for the District of Minnesota, First Assistant U.S. Attorney, Acting U.S. Attorney (2000-2015)

**Ralph Drury Martin**
U.S. Department of Justice, Senior Trial Attorney (1982-1990)

**Kathleen Mehltretter**
U.S. Attorney's Office for the Western District of New York, Assistant U.S. Attorney, Chief, Criminal Division, First Assistant U.S. Attorney, Acting U.S. Attorney (1981-2010)

**John Meyer**
U.S. Attorney's Office for the Northern District of Illinois, Assistant U.S. Attorney (1972-1977)

**Barry Miller**
U.S. Department of Justice, Civil Rights Division, Trial Attorney (1979-1982)
U.S. Attorney's Office for the Northern District of Illinois, Public Corruption Section, Assistant U.S. Attorney (2004-2009)

**Jeff Modisett**
U.S. Attorney's Office for the Central District of California, Deputy Chief, Public Corruption and Government Fraud Section (1984-1988)

**Julius J. Nam**
U.S. Attorney's Office for the Central District of California, Assistant U.S. Attorney, Public Corruption and Civil Rights Section (2016-2018, 2019-2024)

**Gordon B. Nash**
U.S. Attorney's Office for the Northern District of Illinois, Assistant U.S. Attorney, Chief, Special Prosecutions (1971-1978)

**Sheila Markin Nielsen**
U.S. Attorney's Office for the Northern District of Illinois, Assistant U.S. Attorney (1981-1985)

**Larry D. Patton**
U.S. Attorney's Office for the Western District of Oklahoma, U.S. Attorney (1978-1981)

**James I. Pearce**
U.S. Department of Justice, Criminal Appellate, Attorney (2013-2025)
U.S. Department of Justice, Public Integrity Section, Trial Attorney (2018-2021)
U.S. Attorney's Office for the District of Columbia, Special Assistant United States Attorney, (2021-2022)
Office of Special Counsel, Assistant Special Counsel (2022-2025)

**Daniel Purdom**
U.S. Attorney's Office for the Northern District of Illinois, Assistant U.S. Attorney (1980-1986)

**Daniel E. Reidy**
U.S. Attorney's Office for the Northern District of Illinois, First Assistant U.S. Attorney, Chief, Special Prosecutions Division (1975-1987)

**Miriam Rocah**
U.S. Attorney's Office for the Southern District of New York, Assistant U.S. Attorney, Chief, White Plains Division (2012-2017)

**Karen Rochlin**
U.S. Attorney's Office for the Southern District of Florida, Assistant U.S. Attorney, Deputy Chief (2002-2009)

**Mark L. Rotert**
U.S. Attorney's Office for the Northern District of Illinois, Assistant U.S. Attorney (1987-1994)

**John Roth**
U.S. Attorney's Office for the Southern District of Florida, Chief, Narcotics Section (1994-1999)
U.S. Attorney's Office for the District of Columbia, Chief, Fraud and Public Corruption Section, Executive Assistant U.S. Attorney (2004-2007, 2009-2010)
U.S. Department of Justice, Criminal Division, Chief (2008-2009)

**Ann C. Rowland**
U.S. Attorney's Office for the Northern District of Ohio, Deputy Chief, Criminal Division (1995-2018)

**Frank G. Scafidi**
Federal Bureau of Investigation, Special Agent, Supervisory Special Agent, Unit Chief (1986-2002)

**Charles Scheeler**
U.S. Attorney's Office for the District of Maryland, Assistant U.S. Attorney (1984-1989)

**Peter F. Schenck**
U.S. Attorney's Office for the Eastern District of Pennsylvania, Special Prosecutions Unit, Fraud Chief, Criminal Chief, First Assistant U.S. Attorney (1979-1985, 1990-2018)

**William Richard Scruggs**
U.S. Attorney's Office for the Southern District of Florida, Chief, Public Corruption Section (1996-2000)

**Vivian Shevitz**
U.S. Attorney's Office for the Eastern District of New York, Chief, Appeals (1981-1982)

**Dayle E. Spencer**
U.S. Attorney's Office for the Northern District of Alabama, Assistant U.S. Attorney (1977-1984)

**Beth Sreenan**
U.S. Attorney's Office and U.S. Department of Justice, Criminal Division, Assistant U.S. Attorney, Resident Legal Advisor, Regional Director, Special Counsel (1991-2024)

**Wayne F. Stiles**
Federal Bureau of Investigation, Miami Field Office, Special Agent (1970-1992)

**Scott E. Williams**
U.S. Attorney's Office for the Western District of Oklahoma, Assistant U.S. Attorney, Deputy Criminal Chief, Criminal Chief, Executive Assistant U.S. Attorney (2002-2024)
Executive Office for U.S. Attorneys, Assistant Director (2020-2024)

**Leo Wise**
Office of Congressional Ethics, U.S. House of Representatives, Staff Director and Chief Counsel (2008-2010)
U.S. Attorney's Office for the District of Maryland, Chief, Fraud and Public Corruption Section (2020-2023)

U.S. Department of Justice, Public Integrity Section, Trial Attorney, Principal Senior Assistant Special Counsel (2023-2025)