**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE INTERCEPT MEDIA, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | No. 26-cv-06867-JPO |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**


TABLE OF CONTENTS ........................................................................................................ ii

TABLE OF AUTHORITIES ................................................................................................ iii

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD ......................................................................................................... 4

ARGUMENT ...................................................................................................................... 4

I. Plaintiffs are Not Likely to Succeed on the Merits of Any of their Claims. ...................... 4

A. Plaintiffs Cannot Satisfy Article III Standing's Redressability Requirement. ............... 4

B. The Truth API Is Not Government Action Subject to Constitutional Restrictions. ....... 8

C. Plaintiffs' Claims Rest on An Inaccurate Premise. ...................................................... 12

D. The First Amendment Claims Are Without Merit. ...................................................... 13

1. The President's Decision to Post on Truth Social Is Consistent with the First Amendment. ......................................................................................................... 13

2. Plaintiffs' Rely on Inapposite Equal-Access Cases. ......................................... 17

3. The Forum Analysis Is Inapplicable. ................................................................ 17

4. The Unconstitutional Conditions Doctrine Does Not Apply. ........................... 19

E. There Is No Fifth Amendment Violation. ................................................................... 21

II. Plaintiffs Have Not Established Irreparable Harm. .......................................................... 23

III. The Balance of Equities Weighs Overwhelmingly in Defendants' Favor. ......................... 25

CONCLUSION ................................................................................................................... 26

CERTIFICATE OF COMPLIANCE WITH LOCAL RULES ............................................... 27

# TABLE OF AUTHORITIES

*ABC v. Cuomo*,
570 F.2d 1080 (2d Cir. 1977) ..................... 17

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) ..................... 8, 12

*Associated Press v. Budowich*,
No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) ..................... 14, 16, 21

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014) ..................... 20

*Baltimore Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) ..................... 14

*Betts v. Shearman*,
751 F.3d 78 (2d Cir. 2014) ..................... 11

*Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
150 F.4th 76 (2d Cir. 2025) ..................... 19

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) ..................... 10, 11

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
331 F.3d 342 (2d Cir. 2003) ..................... 23

*Byrne v. Rutledge*,
623 F.3d 46 (2d Cir. 2010) ..................... 17

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) ..................... 15, 21

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ..................... 21

*Clinton v. Jones*,
520 U.S. 681 (1997) ..................... 7

*Comm. to Establish the Gold Standard v. United States*,
392 F. Supp. 504 (S.D.N.Y. 1975) ..................... 6

*Cox v. New Hampshire*,
312 U.S. 569 (1941) ..................... 20

*Cranley v. Nat'l Life Ins. Co.*,
318 F.3d 105 (2d Cir. 2003) .......... 10

*Crichlow v. Fischer*,
No. 12-CV-7774 NSR, 2015 WL 678725 (S.D.N.Y. Feb. 17, 2015) .......... 12

*F.C.C. v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) .......... 23

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .......... 5, 6

*Haaland v. Brackeen,*
599 U.S. 255 (2023) .......... 7

*Harris v. Quinn*,
573 U.S. 616 (2014) .......... 8

*Hooper v. Bernalillo Cnty. Assessor*,
472 U.S. 612 (1985) .......... 21

*Horvath v. Westport Library Ass'n*,
362 F.3d 147 (2d Cir. 2004) .......... 11

*Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*,
311 F.3d 534 (2d Cir. 2002) .......... 16

*Hudgens v. NLRB*,
424 U.S. 507 (1976) .......... 8

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) .......... 18

*Lamont v. Postmaster Gen. of U. S.*,
381 U.S. 301 (1965) .......... 20

*Lansing v. City of Memphis*,
202 F.3d 821 (6th Cir. 2000) .......... 10

*Lindke v. Freed*,
601 U.S. 187 (2024) .......... 10, 18, 19

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) .......... 8, 9

*M.S. v. Brown*,
902 F.3d 1076 (9th Cir. 2018) .......... 4

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) ........................................ 8, 18

*McCullen v. Coakley*,
573 U.S. 464 (2014) ........................................ 18

*Meyers v. Nixon*,
339 F. Supp. 1388 (S.D.N.Y. 1972) ........................................ 6

*Mississippi v. Johnson*,
71 U.S. 475 (1866) ........................................ 5, 7

*Murdock v. Pennsylvania*,
319 U.S. 105 (1943) ........................................ 20

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........................................ 4

*Nat'l Awareness Found. v. Abrams*,
50 F.3d 1159 (2d Cir. 1995) ........................................ 20

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the United States*,
No. 26A203, 2026 WL 2564318 (U.S. Aug. 31, 2026) ........................................ 26

*Neary v. Weichert*,
489 F. Supp. 3d 55 (E.D.N.Y. 2020) ........................................ 6

*New Colonial Ice Co. v. Helvering*,
292 U.S. 435 (1934) ........................................ 11

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ........................................ 6, 8

*Nicholas v. Bratton*,
376 F. Supp. 3d 232 (S.D.N.Y. 2019) ........................................ 17

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ........................................ 5

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................ 4

*Pen Am. Ctr., Inc. v. Trump*,
448 F. Supp. 3d 309 (S.D.N.Y. 2020) ........................................ 6

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) ........................................ 17

*Pleasant Grove City, Utah v. Summum*,
555 U.S. 460 (2009) ........................................ 18

*Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022) ........................................ 19

*Pub. Utilities Comm'n of D.C. v. Pollak*,
343 U.S. 451 (1952) ........................................ 8

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010) ........................................ 4

*Sampson v. Murray*,
415 U.S. 61 (1974) ........................................ 24

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) ........................................ 14

*Snyder v. Ringgold*,
133 F.3d 917, 1998 WL 13528 (4th Cir. 1998) ........................................ 14

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ........................................ 7

*Tancredi v. Metro. Life Ins. Co.*,
316 F.3d 308 (2d Cir. 2003) ........................................ 12

*Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995) ........................................ 23, 24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........................................ 4

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................ 26

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................ 6

*Trump v. United States*,
603 U.S. 593 (2024) ........................................ 1, 3, 6, 25

*U.S. Dept. of Agric. v. Moreno*,
413 U.S. 528 (1973) ........ 22

*United States v. Am. Libr. Ass'n, Inc.*,
539 U.S. 194 (2003) ........ 19

*United States v. Classic*,
313 U.S. 299 (1941) ........ 9

*United States v. Int'l Bhd. of Teamsters*,
941 F.2d 1292 (2d Cir. 1991) ........ 10, 22

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008) ........ 12

*West v. Atkins*,
487 U.S. 42 (1988) ........ 9

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ........ *passim*

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........ 7

*Zobel v. Williams*,
457 U.S. 55 (1982) ........ 22

# INTRODUCTION

The President of the United States has decided to communicate with the American people on Truth Social. Plaintiffs ask this Court to order the President to stop. That is, at least until Truth Social restructures its commercial products to satisfy Plaintiffs' preferences, or unless a "free version" of the content is otherwise available to all members of the public at the same time. This extraordinary request is justified, Plaintiffs say, by the First and Fifth Amendments. But neither of these Amendments authorizes, let alone requires, judicial micromanagement of the President's "bully pulpit." *Trump v. United States*, 603 U.S. 593, 629 (2024). Plaintiffs' view to the contrary would mean that an American without immediate access to the Gettysburg Address would have had a claim against President Lincoln. That is not the law. And regardless, Article III bars this suit because this Court lacks the power to grant relief that would redress Plaintiffs' purported injuries. This Court should deny Plaintiffs' motion for a preliminary injunction.

Plaintiffs challenge the operation of the Truth Application Programming Interface (Truth API), a subscription-based data feed on Truth Social that is created and operated entirely by Trump Media & Technology Group, a private company. Plaintiffs claim that the Truth API provides, for a fee, earlier access to posts from the President and other public officials. But the President's posts are accessible to the public in real-time, and, at most, a subscriber to Truth API receives a 50-millisecond advantage. Plaintiffs' representation that the API results in "significantly faster" access is therefore an overstatement at best.

On the law, Plaintiffs do not fare any better. They ask this Court to treat that private business decision as state action and to scrutinize that business decision under the First and Fifth Amendments. But the Constitution does not regulate private intermediaries' commercial products and does not prohibit the President or any other public official from speaking to the public using

commercial platforms that independently choose to provide preferential access to certain customers. Indeed, Plaintiffs' proposed interpretations would destabilize routine practices by which government officials communicate with the public through newspapers, television networks, subscription-based media, and other private platforms with paid or tiered services. In fact, Plaintiffs' theory, if taken to its illogical conclusion, would prohibit public officials from making any official announcements on social media at all, because accessing even free social-media posts requires a person to pay for internet access, which some people cannot afford to do. Precedent does not require or support these absurd results. In all events, because the Court lacks jurisdiction to enjoin the presidential actions at issue, and relief solely against the other defendants would not redress Plaintiffs' alleged injuries, Plaintiffs lack standing. Plaintiffs are thus unlikely to succeed on the merits.

The other factors independently require denial of Plaintiffs' motion. Plaintiffs' claimed irreparable harms rest on their erroneous constitutional arguments and on utter speculation about the API's effect on their finances and business activities. On the other side of the ledger, the requested injunction represents an extraordinary intrusion on the President's exercise of his power to speak to the American people and an unworkable one at that, for compliance depends on issues outside Defendants' control, such as a viewer's access to the internet or cable news. Therefore, this Court should deny Plaintiffs' motion.

**BACKGROUND**

Truth Social is a social media platform operated by non-party Trump Media & Technology Group (TMTG), a publicly traded company. *See* Trump Media & Technology Group, Securities and Exchange Commission Amended Annual Report (Form 10-K), at 24-25 (Apr. 30, 2026). Following his victory in the 2024 election, President Trump transferred his shares in TMTG to the Donald J. Trump Revocable Trust, of which President Trump is the sole beneficiary. *See* ECF No. 36-8. The trust is TMTG's largest shareholder, although it owns less than half the company's stock. *See id.*; TMTG 2026 Form 10-K at 22.

In July 2026, TMTG announced Truth API. Truth API is subscription-based data feed that provides access to posts from the ten top Truth Social accounts, which currently includes the President, White House officials, Cabinet members, and other senior government figures. *See id.* at 24-25; ECF No. 36-5 ¶¶ 15-16. Owing to machine readability, the Truth API functions to provide subscribers with, at most, a 50-millisecond advantage in receiving information. ECF No. 36-23 at 3. But all posts subject to the API go out to the public in "real time." *Id.*

Plaintiffs are two nonprofit organizations that track and report on President Trump's Truth Social posts. *See* Compl. ¶¶ 8-9, ECF No. 1. Defendants are President Trump in his official capacity, Natalie Harp in her official capacity as Executive Assistant, Daniel Scavino, in his official capacity as White House Deputy Chief of Staff and Director of the White House Personnel Office, the Executive Office of the President, and the White House Office. *Id.* ¶¶ 10-14. Plaintiffs claim that the Truth API impairs their ability to obtain and report on government information on equal terms in violation of the First and Fifth Amendment. *See id.* ¶¶ 80-122. Plaintiffs seek a preliminary injunction, enjoining Defendants from "posting, or allowing to be posted, announcements from President Trump on the website Truth Social so long as 'Truth API'

is in operation, applies to President Trump and the White House's announcements, and no free version of the content is available before or at the same time as the content is available through Truth API." Prop. Ord. at 1, ECF No. 36-25.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [petitioner] is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20. The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court must ensure that each factor is satisfied before an injunction may issue. *Salinger v. Colting*, 607 F.3d 68, 79-80, 84 (2d Cir. 2010).

## ARGUMENT

### I. Plaintiffs are Not Likely to Succeed on the Merits of Any of their Claims.

#### A. Plaintiffs Cannot Satisfy Article III Standing's Redressability Requirement.

To establish Article III standing, the plaintiffs must demonstrate that "they will suffer an injury that is traceable to a Government defendant and redressable by the injunction they seek." *Murthy v. Missouri*, 603 U.S. 43, 49-50 (2024). And because standing "is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), Plaintiffs must establish standing for each form of relief they seek, including a preliminary injunction. Here, Plaintiffs lack standing because the Court lacks the power to enter an injunction that would redress their alleged injuries. *See M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) ("[E]ven where a plaintiff

requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief.”).[1]

Plaintiffs seek an injunction “enjoining the President and his subordinates” from posting on Truth Social so long as the API is in place, it “applies to President Trump and the White House’s announcements, and no free version of the content is available before or at the same time as the content is available through Truth API.” Prop. Ord. at 1; *see also* Memo. in Supp. of Mot. for Prelim. Inj. (“Pls’ Mot.”) at 27, ECF No. 36-1. This requested injunction can redress Plaintiffs’ stated harms only if it reaches the President. But such relief is unavailable; this Court lacks jurisdiction to enjoin the President’s acts, including his decision to post on Truth Social.

It is axiomatic that courts have “no jurisdiction of a bill to enjoin the President in the performance of his official duties.” *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866). When presidential action requires “the exercise of judgment,” “general principles . . . forbid judicial interference with the exercise of Executive discretion.” *Id*. at 499. Just as courts cannot enjoin Congress in exercising its legislative function, they cannot enjoin the President in exercising the executive function. *Id*. at 500 (“Neither can be restrained in its action by the judicial department[.]”). To do so, the Court has observed, would be “without a precedent.” *Id*.

The Supreme Court reaffirmed these fundamental principles in *Franklin v. Massachusetts*, 505 U.S. 788 (1992). In that case, a district court issued an injunction requiring the President to take certain actions related to the census. Writing for a plurality, Justice O’Connor explained that “the District Court’s grant of injunctive relief against the President

[1] Even if the limitations on injunctive relief against the President discussed below are viewed as non-jurisdictional, they would still preclude Plaintiffs from obtaining any effective relief and thus preclude this Court from issuing an effectively advisory opinion on the merits. *Cf. Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (holding that a President “is entitled to absolute immunity from damages liability predicated on his official acts”).

himself [was] extraordinary, and should have raised judicial eyebrows." *Id*. at 802 (plurality) (citation omitted). Justice Scalia agreed that the President "may not be ordered to perform particular executive . . . acts at the behest of the Judiciary," a conclusion "implicit in the separation of powers." *Id*. at 827 (Scalia, J., concurring in the judgment). In line with *Mississippi* and *Franklin*, the D.C. Circuit has squarely held that "courts do not have jurisdiction to enjoin" the President regarding decisions committed to executive discretion. *Newdow v. Roberts*, 603 F.3d 1002, 1012-13 (D.C. Cir. 2010); *see also id.* at 1013 (recognizing that courts "have never submitted the President to declaratory relief"). Likewise, district courts in the Second Circuit have long rejected demands to enjoin the President's discretionary conduct, regardless of the claim. *See, e.g.*, *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 327-28 (S.D.N.Y. 2020); *Neary v. Weichert*, 489 F. Supp. 3d 55, 64 (E.D.N.Y. 2020); *Comm. to Establish the Gold Standard v. United States*, 392 F. Supp. 504, 506 (S.D.N.Y. 1975); *Meyers v. Nixon*, 339 F. Supp. 1388, 1391 (S.D.N.Y. 1972).

Plaintiffs' requested injunction runs contrary to this established remedial limit. "The President of the United States possesses an extraordinary power to speak to his fellow citizens." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018). "Indeed, a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Trump*, 603 U.S. at 629. For this reason, the Supreme Court concluded that "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Id.* And the President, of course, exercise his prerogative across various media channels, including social media. *See id.*

Plaintiffs ask this Court to control how the President exercises his authority, namely by forbidding the President from addressing the public through Truth Social unless certain conditions are met. Such an injunction would be "without a precedent." *Mississippi*, 71 U.S. at 500. Regardless of whether a narrow exception may permit injunctive relief for purely "ministerial" acts, any such exception would not apply here, because the President's decision regarding when and how to communicate is instead inherently an exercise of executive "discretion." *See Mississippi*, 71 U.S. at 489-90.

Neither case on which Plaintiffs rely, *see* Pls' Mot. at 27-28, justifies the extraordinary relief they request. *Clinton v. Jones* concerned a civil action for damages stemming from the President's personal conduct before he took office and thus in no way implicated executive functions. 520 U.S. 681, 684, 701 (1997). And *Youngstown Sheet & Tube Co. v. Sawyer* did not involve an injunction against the president himself, only his subordinates. 343 U.S. 579, 583 (1952).

Nor is this a case like *Youngstown* where relief against other Executive Branch officials can provide Plaintiffs "with an adequate remedy." *Swan v. Clinton*, 100 F.3d 973, 979-81 (D.C. Cir. 1996). The President can unilaterally operate his personal Truth Social account without relying on anyone else, including the other Defendants. Thus, an injunction that does not include the President would not, as a legal matter, redress Plaintiffs' alleged injuries, because the President could and would simply continue to post by himself. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) ("Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power."). Where, as here, "[t]he only apparent avenue of redress for plaintiffs' claimed injuries" would be an impermissible injunction against "the President

himself," the injuries are "not redressable" and the court lacks jurisdiction. *Newdow*, 603 F.3d at 1013 (holding plaintiffs challenging presidential action lacked standing because, other than the President, the defendants were members of the Executive Branch whom the President was not obligated to consult).

### B. The Truth API Is Not Government Action Subject to Constitutional Restrictions.

Even if Plaintiffs could establish standing, their claims would fail on the merits. "[T]he First Amendment does not restrict private conduct." *Harris v. Quinn*, 573 U.S. 616, 629 n.4 (2014). Rather, "the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976). The same is true of the guarantees contained in the Fifth Amendment. *See Pub. Utilities Comm'n of D.C. v. Pollak*, 343 U.S. 451, 461 (1952) (First and Fifth Amendments apply "to and restrict only the Federal Government and not private persons." (citations omitted)). Thus, to establish the deprivation of a "right secured by the Constitution or laws of the United States," a plaintiff must show "*both* [1] an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the [government] or by a rule of conduct imposed by the [government] or by a person for whom the [government] is responsible,' *and* [2] that 'the party charged with the deprivation must be a person who may fairly be said to be a [government] actor.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (emphasis supplied) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)); *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019) (applying the state action test to a First Amendment claim against a private corporation).

Even putting aside that TMTG is not a defendant in this case, Plaintiffs cannot show that the company engages in government action by creating and operating the Truth API.

*First*, the Truth API is not a "exercise of a right or privilege created by the [government]." *Lugar*, 457 U.S. at 937. It is neither a "power 'possessed by virtue of [federal] law,'" nor "made possible only because [it] is clothed with the authority of [federal] law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). Rather, Truth Social is a privately owned platform run by a private company, and it structures user interactions, including the Truth API, on terms of its own choosing. The President's use of his Truth Social account is governed by Truth Social's standard platform architecture and the features available to him have been created and controlled by TMTG. Decisions about whether to provide an API, how it functions, and what subscription model it uses are standard corporate choices made by TMTG as a private business.

Also, as Plaintiffs admit, *see* Pls' Mot. at 4, the Truth API applies not only to the President's posts, but also the posts of other government officials who obviously have no control or involvement with TMTG's decisions or the creation of Truth API. This underscores the error in treating the API service as the exercise of a state-created power. Further, from the perspective of government action, there is no difference between the President using Truth Social knowing that the company has an API service and his using of any other private platform that independently chooses to charge a fee for service or priority access. Indeed, many social media platforms use an API like the one at issue here. See ECF No. 36-23 at 3. And no one seriously contends that the President's use of any of those other platforms involves the use of any privilege created by the government.

*Second*, TMTG is not a government actor. For the conduct of a private entity to be 'fairly attributable' to the [government], there must be 'such a "close nexus between the State and the challenged action" that seemingly private behavior may be fairly treated as that of the State

itself." *Cranley v. Nat'l Life Ins. Co.*, 318 F.3d 105, 111 (2d Cir. 2003) (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)). Although Donald Trump "created" Trump Media, he did not do so in capacity as President, and, in any event, "[a] finding of state action may not be premised solely on the private entity's creation, funding, licensing, or regulation by the government." *Id.* at 112. That is especially so here, where Plaintiffs are not challenging the *creation* of Trump Media, but rather the Truth API service created by TMTG, not the President himself—let alone the President operating in his official capacity. *See Lindke v. Freed*, 601 U.S. 187, 196 (2024) (recognizing that, "[w]hile public officials can act on behalf of the State, they are also private citizens"); *see also id.* at 199 ("For state action to exist, the State must be responsible for the specific conduct of which the plaintiff complains." (quotation omitted)); *United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1296 (2d Cir. 1991) ("The question is not whether the decision to *establish* the [private entity] was state action, but rather whether the [private entity's] decision to *sanction* [the plaintiffs] may be fairly attributable to the Government." (internal quotation marks omitted)). And again, Truth API applies to speech by government officials other than President Trump, and possibly, in the future, private citizens, none of whom exercise any control, governmental or otherwise, over TMTG's adoption of API.

Plaintiffs are wrong that there is "pervasive entwinement" between President Trump and TMTG. *See* Pls' Mot. at 19-20. Other than their irrelevant contention that President Trump "created" TMTG," Plaintiffs claim that the President and TMTG share a financial motive. *Id*. But a public official's mere ownership of a private company's stock cannot possibly render all actions of that company into governmental action. That is especially true when the President does not even own a controlling stake in the company, *cf. Lansing v. City of Memphis*, 202 F.3d 821, 831 (6th Cir. 2000) ("The minority presence of public officials on the board of a private

entity does not render the entity a state actor.”). And, more importantly, given the fundamental principle of separateness between a corporation and its stockholders, *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 442 (1934), the President has no operational control over TMTG. As a result, this case is nothing like those in which a court has found state action based on pervasive entwinement. *See Horvath v. Westport Library Ass'n*, 362 F.3d 147, 154 (2d Cir. 2004) (“The combination of pervasive public funding of the Library and control of one-half of its governing board persuade us that such ‘pervasive entwinement’ is present here.”); *Brentwood Acad.*, 531 U.S. at 300 (finding state action where public school official did not “merely control but overwhelmingly perform[ed] all but the purely ministerial acts by which the Association exists and functions in practical terms”).

The “Social Media 6-Hour Exclusive”—an agreement in which the President commits, with some exceptions, to first post on Truth Social—does not move the needle. *See* Pls' Mot. at 3; ECF No. 36-9 at 3. The fact that a public official has made a commitment to provide exclusive content to a private company does not turn the private company's actions into governmental action. For example, if the President had instead made the exact same commitment to X, no one would think that X had somehow become a governmental platform (whether or not the President happened to own some shares in X).

Plaintiffs' remaining theories for why TMTG is a state actor also fail. Contrary to Plaintiffs' assertion that TMTG is a “willful participant in joint activity with President Trump,” Mot. 20, there is no evidence that two “share some common goal to violate the plaintiff's rights.” *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014). TMTG's is a company whose goal is to maximize profit. On Plaintiffs' reasoning, any social media company, or news organization for

that matter, would be a state actor if it sought to obtain and publish exclusive news from government officials and charged a fee related to publication.

Moreover, the fact that the President, sometimes in his governmental capacity, posts on Truth Social does not mean that the State "encouraged," or was "involved with," the API. *Contra* Pls' Mot. at 20. Indeed, the President's mere acquiescence does not transform private conduct into state action. *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 313 (2d Cir. 2003) (citing *Sullivan*, 526 U.S. at 52). Rather, the sort of encouragement that implicates the state action doctrine is illustrated by *United States v. Stein*, where the "government brought home to KPMG that its survival depended on its role in a joint project with the government to advance government prosecutions." 541 F.3d 130, 147 (2d Cir. 2008). Plaintiffs allege nothing like that here. TMTG is not a state actor.

### C. Plaintiffs' Claims Rest on An Inaccurate Premise.

Plaintiffs' arguments largely rest on the notion that Truth API provides "significantly faster" access to posts on Truth Social. *See, e.g.*, Pls' Mot. at 5. But Plaintiffs do not substantiate this assertion, instead quoting from a news article. *See* ECF No. 36-19 at 3. This does not justify the extraordinary relief Plaintiffs seek. *Cf. Crichlow v. Fischer*, No. 12-CV-7774 NSR, 2015 WL 678725, at *8 (S.D.N.Y. Feb. 17, 2015) ("Conclusory allegations lacking supporting evidence will not support a preliminary injunction."). And, indeed, Plaintiffs' own evidence undermines this contention. At most, due to machine readability, the API delivers a "a 50-millisecond" headstart. ECF No. 36-23 at 3. This overcomes any delay caused by the manual tracking of a social media feed. But the API does not, contrary to Plaintiffs' suggestion, withhold information from the public. Instead, "all posts go out in real time," meaning that, as soon as the President posts, the content of that message is "public information." *See id.* Accordingly, assuming a

sufficient internet connection, even if the API's delivery of information causes a difference between when a subscriber receives information and when a non-subscriber does, that difference is a fraction of a second, and thus entirely negligible.

When viewed from this vantage, Plaintiffs have two possible complaints. First, if their internet connection is not as fast as other non-subscribers, Plaintiffs may have a complaint against their internet provider. But that would not justify an injunction against the President and others. Second, Plaintiffs may have a complaint against TMTG for delivering posts to paid subscribers. But that would be like objecting if a private company scanned the Federal Register every day and pushed out notices to paid subscribers. There is no viable claim in that hypothetical, and there is nothing here either. This Court should accordingly deny Plaintiffs' motion. And, for the reasons below, even on their own understanding, Plaintiffs' claims fail as a matter of law.

### D. The First Amendment Claims Are Without Merit.

#### 1. The President's Decision to Post on Truth Social Is Consistent with the First Amendment.

Perhaps recognizing that they cannot bring this suit based on the actions of a private non-defendant, Plaintiffs predicate each of their First Amendment claims on the theory that President Trump himself violates the First Amendment when he speaks in a private forum that charges a fee, because that deprives Plaintiffs of equal access to his speech. *See, e.g.*, Pls' Mot. at 9 ("[O]nce the President chooses to speak to the public on Truth Social, Plaintiffs—like everyone else—have the right to equally access that speech."); *id*. at 13 ("Defendants' Truth API scheme unlawfully burdens Plaintiffs' right to access the designated public fora of President Trump's official government announcement posts on Truth Social."). The claims thus all fail because they rest on the fundamentally erroneous premise that the First Amendment requires the President to

make public announcements on a platform that Plaintiffs can access on equal terms. Just as there is no First Amendment restriction on the President's discretion to "grant interviews or briefings with selected" individuals or media outlets, *see Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *6 (D.C. Cir. June 6, 2025) (citing *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977)), the First Amendment does not prohibit the President from posting to a social media site that requires a fee for preferential treatment.

Courts have long recognized the "common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter," as well as the "equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments." *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 418 (4th Cir. 2006) (quoting *Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528, at *4 (4th Cir. 1998)). Indeed, the newspaper in *Ehrlich* conceded that government officials routinely "evaluate reporters and reward them with advantages of access," meaning that "government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression." *Id*. Allowing such routine conduct to become the basis for a constitutional claim, the court explained, would "plant the seed of a constitutional case" in "virtually every" interaction between a public official and the press. *Id*.

The same logic applies here. The First Amendment is not implicated by the President's choice of platform or medium for his own speech. *See Sherrill*, 569 F.2d at 129 ("Nor is the discretion of the President to grant interviews or briefings with selected journalists challenged. It would certainly be unreasonable to suggest that because the President allows interviews with some bona fide journalists, he must give this opportunity to all."). And this does not change even

if the platform—itself not bound by the First Amendment, *see supra* Section (I)(B)—provides preferential treatment to certain users. If it were otherwise, *any* government official (not just President Trump) would violate the First Amendment by posting on Truth Social if his posts were subject to Truth API—or indeed, simply by giving an interview to any news outlet that requires a paid subscription, or by appearing on any television network that is not freely accessible. *See* Pls' Mot. at 9 ("[O]nce the President chooses to speak to the public on Truth Social, Plaintiffs—like everyone else—have the right to equally access that speech."). In other words, Plaintiffs "would hold that tens of thousands of [governmental officials] have presumptively violated the First Amendment" merely by making official announcements on private platforms that provide preferential treatment to paying customers, a practice that, to Defendants' knowledge, has "never been previously questioned." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). Such an absurd consequence demonstrates the unfounded nature of Plaintiffs' view of the First Amendment.

Indeed, the absurdity of Plaintiffs' position is far more fundamental. It is simply impossible for government officials to speak in a way that ensures that all members of the public can receive "equal" access at the same exact time without incurring any costs. For example, even if the Truth API service did not exist, members of the public could not immediately access the President's statements on Truth Social unless *they pay for internet access*, which some cannot afford to do (and which others do only at slower speeds). And for the same reason, such individuals also cannot access government websites that make official announcements. And even if the government could somehow (implausibly) make all such announcements at the same time through broadcast television or physical publications, such individuals may well also lack televisions and certainly could not all obtain physical publications at the same time as those with

internet access. Of course, the number of people who lack sufficient resources to obtain "immediate" access to information available on the internet or television is undoubtedly much smaller than the number of people who lack sufficient resources to pay for Truth API. But that factual distinction is legally immaterial under the First Amendment, because a purported "equal access" right would be violated for the former no less than the latter. *See Budowich*, 2025 WL 1649265, at *9 (concluding the concession that the President could "discriminate on the basis of viewpoint in granting exclusive interviews, answering journalists' questions, or selecting journalists to attend an event about a particular subject matter" was fatal to the AP's claim that the President could not subject a few reporters to disfavored treatment).

Moreover, Plaintiffs' theory fails even on the erroneous assumption that TMTG's operation of the API is government action. Even when the government operates a public forum, the First Amendment permits it to adopt content-neutral access restrictions, including those involving tiered or paid access. *See Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002). For example, if the government hosts a speaker's symposium exclusively on a stage constructed on the National Mall, the First Amendment obviously allows the government to charge for tickets and charge higher prices for better seats, even though that means most members of the public will not be able to receive this information at the same time and some attendees may hear less well than others because of the price they were able to pay. In fact, government-operated arts institutions similarly use tiered pricing. The First Amendment allows such content-neutral access restrictions, and Plaintiffs fail to reconcile their proposed rule with this unchallenged practice.

**2. Plaintiffs' Rely on Inapposite Equal-Access Cases.**

In the light of the preceding discussion, Plaintiffs err in invoking cases like *Nicholas v. Bratton*, 376 F. Supp. 3d 232 (S.D.N.Y. 2019), and *ABC v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977). *See* Pls' Mot. at 9-11. *Nicholas* concerned a claim regarding a reporter's access to the site of rescue operations. 376 F. Supp. 3d at 259. In the quoted portion, the Court was setting out the governing First Amendment law before ultimately denying the reporter's motion for summary judgment. *See id.* at 259, 272. And *Cuomo* concerned ABC's equal access to campaign facilities. 570 F.2d at 1082. The Second Circuit held that "once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media." *Id.* at 1083. As should be obvious, neither of these cases, or any other on which Plaintiffs rely, is anything like this one. They do not concern a government official's choice of communication platform, and certainly not a private company's independent design of its own subscription API. And thus, none of them support Plaintiffs' argument that the President violates the First Amendment when he uses a privately operated platform to disseminate announcements and the private platform structures its own technical features, including paid API access, as part of its business model.

**3. The Forum Analysis Is Inapplicable.**

Plaintiffs likewise err in appealing to forum doctrine. *See* Pls' Mot. at 12. The forum-based approach on which Plaintiffs rely "divides government property into three [main] categories—the traditional public forum, the designated public forum, and the nonpublic forum." *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010). A traditional public forum is a place that "by long tradition or by government fiat ha[s] been devoted to assembly and debate," like public streets and parks. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

The government may impose "[r]easonable time, place, and manner restrictions" on speech in a traditional public forum, but "any restriction based on the content of the speech must satisfy strict scrutiny," and "restrictions based on viewpoint are prohibited." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009). A designated public forum is "property that the State has opened for expressive activity by part or all of the public." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). Speech restrictions in a designated public forum are "subject to the same limitations as [those] governing a traditional public forum." *Id.*

Relying on *Lindke v. Freed*, Plaintiffs contend that the challenged API qualifies as a speech restriction in a designated public forum. Mot. 12. *Lindke* involved claims that a government official blocked social-media users from commenting on the official's posts on the official's personal social-media account, and the Supreme Court addressed the question whether that action qualified as state action. 601 U.S. at 193-97. *Lindke* is thus inapposite for two reasons.

*First*, the alleged access restriction Plaintiff challenges is imposed by TMTG, which (as explained above) is not a state actor. *See supra* Section (I)(B); *Halleck*, 587 U.S. at 812 ("[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor."). Thus, Plaintiffs are wrong to reach for the test that applies to government-imposed time, place, and manner restrictions. *See McCullen v. Coakley*, 573 U.S. 464, 477 (2014). There was no suggestion whatsoever in *Lindke* that the First Amendment would have been implicated if Facebook or X had unilaterally imposed a fee to access their platforms, either generally or specifically for accounts of individual who were public officials. And such an imposition would certainly not qualify as state action under

*Lindke*'s test. Instead, because such restrictions are not "traceable to the State's power or authority," 601 U.S. at 198, any such claim would fail at the threshold.

*Second*, Plaintiffs allege only that the Truth API "interferes with their ability to collect, store, and access an archive of the information conveyed" on the President's Truth Social account. Pls' Mot. at 13. Unlike the commenting at issue in *Lindke*, these activities are "noncommunicative step[s] in the production of speech," and thus the same restrictions do not apply. *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022).

Even if the Court were to reject these distinctions, the API constitutes a content-neutral access limitation that does not contravene the First Amendment. As previously discussed, content-neutral tiered access is permissible in many contexts: for example, charging more for better seats at a government-sponsored symposium or implementing tiered pricing at government-run arts institutions. The same principle applies here. A content-neutral, payment-based distinction in access to the delivery of information is constitutionally permissible and does not violate the First Amendment. *See supra* Section (I)(D)(1).

**4. The Unconstitutional Conditions Doctrine Does Not Apply.**

Plaintiffs' unconstitutional-conditions claim likewise fails. *See* Pls' Mot. at 13-14. That doctrine prevents the government from requiring an individual to surrender a constitutional right as the price of receiving a governmental benefit. *Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 150 F.4th 76, 96-97 (2d Cir. 2025). It also prohibits the government from denying a benefit on a basis that infringes protected speech, even when the individual has no entitlement to that benefit. *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 210 (2003) (plurality). Plaintiffs invoke this doctrine in arguing that Defendants have forced them into an impermissible choice: either subsidize Truth Social or receive slower access to the

President's official communications. *See* Pls' Mot. at 14. But Defendants have not imposed any conditions on Plaintiffs, let alone coercive ones. The only "condition" that Plaintiffs identify is Truth API. But that condition is one imposed by a private company against whom Plaintiffs seek no relief—not a condition imposed by any named defendant. That is no more an unconstitutional condition than the President giving an exclusive interview to a cable-news channel.

Contrary to Plaintiffs, *see id*. at 14, the fee owed under the API is not a constitutionally problematic subsidy. Otherwise, the newsstand would become the font of First Amendment claims, for each time a customer purchased a newspaper to read an official interview, that customer could claim the official's choice in interlocutor compelled a subsidy. Moreover, Plaintiffs' attempt to analogize the Truth API to compelled subsidization is especially strained because the President's announcements remain fully accessible to them for free. *See id*. at 14. No constitutional right protects a journalist's or researcher's preferred technical method of accessing publicly available information. The Constitution protects expression; it does not entitle Plaintiffs to an optimized delivery format. *See Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014) (unconstitutional conditions doctrine applies only where the government burdens a constitutional right through coercive conditions, even on benefits lacking economic value).

The cases that speak to the imposition of fees, Pls' Mot. at 15, are similarly far afield for the simple reason that this case does not involve the government's imposition of a fee. Also, the cases on which Plaintiffs rely are nothing like this one. *See Lamont v. Postmaster Gen. of U. S.*, 381 U.S. 301, 302 (1965) (federal statute requiring an addressee to request the delivery of "communist political propaganda"); *Murdock v. Pennsylvania*, 319 U.S. 105, 106 (1943) (ordinance requiring a license fee for most solicitors); *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941) (requiring a fee for local parades and processions); *Nat'l Awareness Found. v. Abrams*, 50

F.3d 1159, 1160 (2d Cir. 1995) (state law requiring "professional solicitors in the employ of professional fundraisers to register with the State and pay an $80 annual fee before conducting fundraising activities in New York"). None of these cases come close to holding that government officials cannot choose to make official announcements on private platforms that choose to provide content in a machine-readable format for a fee.

**E. There Is No Fifth Amendment Violation.**

Plaintiffs' Fifth Amendment claim fails for the same reasons their First Amendment claims do. At bottom, their argument would convert the Equal Protection Clause into a constitutional restraint on "the discretion of the President" to choose how and through which mediums to communicate with particular audiences. *Budowich*, 2025 WL 1649265, at *6. The "teachings of history, experience, and precedent," weigh strongly against this reading of the Fifth Amendment. *City of Austin*, 596 U.S. at 76. These sources do not suggest that the President (or any government official) must satisfy any level of scrutiny when deciding, for example, whether to grant an interview to one publication instead of another, or whether to make an announcement through a platform that some users can access more quickly than others. The Equal Protection Clause has never been understood to regulate such speech-related choices and Plaintiffs identify no such authority.

The flaw in Plaintiffs' theory is the assumption that any difference in technical access speed amounts to government distribution of unequal benefits requiring constitutional justification. But the cases they cite merely address classic equal-protection problems, that is the government's allocation of public benefits, *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 622-23 (1985)); government classifications among citizens, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985); and discriminatory restrictions on participation in

government programs, *U.S. Dept. of Agric. v. Moreno*, 413 U.S. 528, 537-38 (1973) and *Zobel v. Williams*, 457 U.S. 55, 59 (1982). *See* Pls' Mot. at 15-16. None of those principles apply to a situation where the President uses a private, third-party communications platform and that platform independently offers an optional paid service.

Plaintiffs propose that any time a government actor communicates through a private outlet with a paywall, subscription model, or tiered access structure, the government distributes "benefits unequally," triggering equal-protection scrutiny. *Id*. at 15. Like with Plaintiffs' First Amendment theory, this proposal would mean that a President might violate the Fifth Amendment when he gives an interview a subscription-based newspaper, appears on a cable news network, or participates in a pay-walled livestream. This Court should reject a novel constitutional theory that threatens such disruptive consequences.

In any event, even if the Fifth Amendment was implicated, Plaintiffs' claim still fails. Plaintiffs identify no authority suggesting that rational basis review prohibits a government official from using a platform that offers paid enhancements to its service. Nor do they cite any case even suggesting that the government must police, regulate, or restructure private pricing features before communicating through that platform. As explained, the Constitution does not require government speakers to ensure that every private intermediary they use provides identical access to all users, nor does it bar government officials from choosing communications mediums with features Plaintiffs might prefer to avoid.

Plaintiffs also argue that the President has created "two tiers of access" to government information by posting on a platform with an optional, paid API. Pls' Mot. at 16. But the President has not created any tiers at all, rather TMTG has. And the Fifth Amendment does not bind private companies. *Int'l Bhd. of Teamsters*, 941 F.2d at 1296. A private entity's commercial

decision cannot be reclassified as a governmental classification simply because Plaintiffs wish to characterize it that way. *See supra* Section (I)(B).

Finally, Plaintiffs' argument presumes a governmental interest must justify TMTG's pricing structure. But that presumption is downstream from Plaintiffs' error in concluding that this pricing structure qualifies as state action. In any case, a content-neutral, commercially rational pricing distinction easily meets rational-basis review. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (providing that, under rational-basis review, a classification must "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification").

In short, Plaintiffs are unlikely to succeed on their Fifth Amendment claim.

## II. Plaintiffs Have Not Established Irreparable Harm.

Apart from the lack of any likelihood of success, Plaintiffs also have failed to demonstrate that they will suffer irreparable harm if the Court does not enter the requested preliminary injunction.

Plaintiffs first claim irreparable harm by way of constitutional injury. Pls' Mot. at 24. But Plaintiffs have failed to demonstrate any First Amendment injury and especially not any governmental action that "directly limits speech." *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003) (irreparable injury may be presumed only where a government action "directly limits speech").

Plaintiffs' remaining claimed injuries are speculative and thus insufficient. *See Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("Irreparable harm is an injury that is not remote or speculative but actual and imminent[.]"). The Intercept claims that it might lose "news stories, and with them, readers and donors." Pls' Mot. at 25. And FPF

claims that it might lose its investments into its "Trump Anti-Press Social Media Tracker." *Id.* But these assertions are entirely conjectural. As previously explained, the President's announcements remain fully accessible to Plaintiffs and to the public free of charge. *See supra* Section (I)(D)(4). Also, the dissemination of the President's posts across numerous news and social media channels undermines Plaintiffs' suggestion that their access is impaired in any meaningful way.

Plaintiffs' asserted archival injuries fail for the same reasons. *See* Pls' Mot. at 25. Their claim assumes that Truth Social's API design creates a risk that presidential records will not be preserved. But presidential communications are immediately and widely captured, reposted, and archived across innumerable public and private channels.

Irreparable harm is an essential prerequisite for equitable relief, *see Sampson v. Murray*, 415 U.S. 61, 88 (1974) ("[T]he basis of injunctive relief in the federal courts has always been irreparable harm."), and Plaintiffs do not face it. This is yet another reason to deny the motion.

Finally, the requested injunction would have minimal, if any, effect. As requested, the preliminary injunction applies only if "no free version of the content is available before or at the same time as the content is available through Truth API." Prop. Ord. at 1. But, even with the API, all posts "go out in real time." ECF No. 36-23 at 3. Accordingly, it is not apparent that the injunction would not save Plaintiffs from any of their claimed harms. If, despite the text of their proposed order, Plaintiffs are instead asking for an injunction that prevents the President from speaking on private platforms that give special notifications to paid subscribers, that only underscores how flawed their claims are on the merits and how improper it would be to issue such an injunction. Regardless, this Court should deny Plaintiffs' motion.

### III. The Balance of Equities Weighs Overwhelmingly in Defendants' Favor.

Merits aside, the Court should independently deny a preliminary injunction because the balance of equities weighs heavily against relief. Even at final judgment, there is no entitlement to injunctive relief for a prevailing party. Rather, courts must always weigh the equities to evaluate whether an injunctive remedy is an appropriate exercise of remedial discretion. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (explaining that a court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief" before issuing a preliminary injunction, which is "an extraordinary remedy never awarded as of right"). Here, that balance manifestly cuts again relief.

On one side exist Plaintiffs' conjectural harms. *See supra* Section (II). Additionally, amici claim that the public interest merits an injunction. *See* Amicus Br., ECF No. 50-1. This attempt to tilt the balance is based on factual inaccuracy and legal error. API access arrangements are industry practice. Contrary to amici's arguments, Truth Social sends each post into the public feed at "real time," ECF No. 36-23 at 3, and the API merely provides subscribers with the ability to overcome technological delays that are otherwise inherent to the system. With the correct facts in mind, amici's frivolous legal theories collapse.

Plaintiffs' hypothetical harms, inapplicable statutes, and empty allegations of criminal misconduct are plainly outweighed by the serious harms that would result from judicial interference with Defendants' choices about where to speak, either by restricting the speech on Truth Social or compelling parallel speech elsewhere. The proposed injunction would dictate the medium, manner, and technological conditions under which the President "speak[s] to" the American people. *Trump*, 603 U.S. at 618. That is the very heart of presidential discretion, yet

Plaintiffs' injunction would effectively compel the President to modify how he communicates official information—a result unprecedented in scope and wholly incompatible with the limits of equitable relief against the Executive. Such an extraordinary judicial intrusion into core executive functions can itself cause immediate and irreparable harm. *See Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the United States*, No. 26A203, 2026 WL 2564318, at *3 (U.S. Aug. 31, 2026); *Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025). And, under the guise of "equal access," it threatens to deprive that very access to millions of Americans that interact with the President on Truth Social. The balance of the equities and consideration of public interest provide an independent reason to deny the pending motion. *See Winter*, 555 U.S. at 32.

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: September 24, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General

NOAH T. KATZEN
Assistant Branch Director
Federal Programs Branch

*/s/ Heidy L. Gonzalez*
HEIDY L. GONZALEZ
*Trial Attorney*
U.S. Department of Justice,
Civil Division, Federal Programs
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov

FL Bar No. 1025003

*Attorney for Defendants*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULES**

I certify that this memorandum contains 8,037 words, in compliance with the Local Rule 7.1(c) regarding the word-count limitation.