**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**THE INTERCEPT MEDIA, INC. and FREEDOM OF THE PRESS FOUNDATION,**

***Plaintiffs,***

**- against -**

**DONALD J. TRUMP, in his official capacity as President of the United States; NATALIE J. HARP; DANIEL SCAVINO; EXECUTIVE OFFICE OF THE PRESIDENT; and WHITE HOUSE OFFICE,**

***Defendants*.**

No. 26-cv-6867 (JPO)

**BRIEF OF TRUMP MEDIA & TECHNOLOGY GROUP CORP.**
**AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS**

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ....................................................................................1

INTRODUCTION ..........................................................................................................2

ARGUMENT ...............................................................................................................4

I. Truth API Distributes Presidential Speech That Is Already Public. ..................................4

II. TMTG's Independent Operation of Truth API Is Private Commercial Conduct, Not Government Action. ....................................................................................7

III. Truth API Reflects Ordinary Practices Across Information Markets. ................................8

IV. Plaintiffs' Theory Would Convert Ordinary Information Delivery Into a Constitutional Restriction on Public Speech ......................................................11

V. The Securities Laws Provide No Basis for Plaintiffs' Theories. ......................................13

CONCLUSION ...........................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994)....................16

*Chiarella v. United States*,
445 U.S. 222 (1980)....................13, 14, 15

*Clinton v. Jones*,
520 U.S. 681 (1997)....................12

*Dirks v. SEC*,
463 U.S. 646 (1983)....................14, 16

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003)....................8

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)....................14, 16

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008)....................12

*Hafer v. Melo*,
502 U.S. 21 (1991)....................12

*Knight First Amendment Institute at Columbia University v. Trump*,
928 F.3d 226 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021)....................6, 7

*Lewis v. Clarke*,
581 U.S. 155 (2017)....................12

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019)....................8, 12

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)....................2, 8

*SEC v. Dorozhko*,
574 F.3d 42 (2d Cir. 2009)....................15

*SEC v. Zandford*,
535 U.S. 813 (2002)....................14

*In re Social Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*,
702 F. Supp. 3d 809 (N.D. Cal. 2023) ....................12

*United States v. Cassese*,
428 F.3d 92 (2d Cir. 2005)....................17

*United States v. Chestman*,
947 F.2d 551 (2d Cir. 1991) (Winter, J., concurring)....................14

*United States v. O'Hagan*,
521 U.S. 642 (1997)....................15, 16

*Zemel v. Rusk*,
381 U.S. 1 (1965)....................11

*Zeran v. America Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ....................12

**Statutes**

15 U.S.C. § 78ff(a)....................17

15 U.S.C. § 78j(b) ....................13

15 U.S.C. § 78u-1(h)....................15

47 U.S.C. § 230(b)(1)–(2)....................13

47 U.S.C. § 230(c)(1)....................12

**Other Authorities**

Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,310, 59,311 (Sept. 21, 2010) ....................14

Exchange Act Release No. 34-88837, 85 Fed. Reg. 28,671, 28,672-75 (May 7, 2020) ....................14

Securities Exchange Act of 1934 Release No. 34-51808, 70 Fed. Reg. 37,496, 37,567 (June 29, 2005)....................10, 13

**INTEREST OF AMICUS CURIAE**

Nonparty amicus curiae Trump Media & Technology Group Corp. ("TMTG") is a publicly traded media and technology company that owns and operates Truth Social and Truth API. Truth Social was founded in 2021, after major social-media platforms wrongly de-platformed President Trump, in order to create an alternative forum dedicated to open discourse and free expression. Truth Social is now a principal platform for President Trump's direct communication with the American public, while Truth API provides a standard, commercial, machine-readable channel for distributing publicly available Truth Social content.

TMTG brings to this case facts uniquely within its knowledge. TMTG created and operates both Truth Social and Truth API and is able to explain how a Truth becomes public, how the website delivers content to human users, how the API delivers the same content to automated systems, why differences in receipt time (milliseconds) arise, and why TMTG created Truth API, with API standing for application programming interface. The underlying technology of Truth API is a market standard and is longstanding; Truth API belongs to a class of "tried-and-true technology that's been in the social media system for quite some time, more than a decade." *See* Exhibit 3 at 1.

TMTG also has a direct interest in Plaintiffs' effort to constitutionalize its independent commercial decisions. Plaintiffs' suit directly implicates TMTG's constitutional right to its editorial discretion and how it chooses to promote or display content. Truth API reflects TMTG's response to unauthorized scraping, demonstrated customer demand, and its obligations to hundreds of thousands of shareholders. TMTG is a publicly traded company, operated by its management and board; TMTG created the product and determines its architecture, pricing, and commercial terms; and TMTG decides how content is distributed and licensed across its platform. Those choices also implicate the editorial autonomy that the Supreme Court has recognized in social-

media platforms' decisions about how to present and disseminate third-party speech. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024).[1]

## INTRODUCTION

President Trump utilizes Truth Social to speak directly to the American public, and TMTG uses ordinary communications technology to distribute that speech broadly and efficiently. Truth API is a commercial, machine-readable service that delivers already-public posts to automated systems, just as APIs and similar services do throughout modern information markets. Plaintiffs nevertheless wrongly claim that ordinary differences of milliseconds in computer processing of that public speech somehow violate the First Amendment. That theory is wrong and frivolous.

Plaintiffs' theory rests on a basic category error: they confuse publication with receipt. Dkt. No. 1 ("Complaint") ¶¶ 53, 57, 65, 85, 91. Truth API distributes speech that is already public. When President Trump posts a Truth, he publishes his words to the public. TMTG then distributes that same public content through different technological channels—some designed for human readers, others for machines. Truth API does not provide subscribers with unpublished presidential speech, an embargoed preview, or any other form of nonpublic information. An API allows software applications to communicate and exchange data directly. *See* Exhibit 2. Truth API uses this familiar, widespread technology to deliver the same underlying content available through the public website. Truth Social sends each new Truth into the public feed *before* it sends the same content through Truth API. The milliseconds Plaintiffs emphasize arise afterward, because machines process structured data faster than humans load and read webpages. The difference is one of downstream receipt, not of public versus nonpublic information.

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than amicus curiae, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

This distinction resolves the case in Defendants' favor. President Trump supplies the speech; TMTG supplies the private-sector technology through which that speech is distributed. TMTG's management and board—not the President—operate the company. TMTG created Truth API, set its architecture and commercial terms, and did so in response to unauthorized scraping, demonstrated customer demand, and TMTG's obligations to shareholders. President Trump neither created nor controls those functions. Plaintiffs seek to improperly constitutionalize TMTG's independent product design because the President uses Truth Social to communicate. The First Amendment does not turn a private sector platform's engineering and commercial decisions into state action.

Selling faster, machine-readable access to public information is not extraordinary. The Intercept itself uses an RSS feed; social-media companies, including X (formerly Twitter) and soon Reddit, Inc., sell API access; network providers charge for lower latency; and securities exchanges sell infrastructure that allows customers to receive and act on public market information faster than others. Even the SEC's market-data rules distinguish between when information is released and how quickly different users receive it thereafter. Truth API follows that familiar model: customers pay for structure, automation, reliability, integration, and speed—not for secret information, which does not exist.

Plaintiffs ask the Court to wrongly turn those ordinary differences in delivery into a constitutional injury. The dire consequences would extend well beyond Truth Social. Courts would be forced to police APIs, RSS feeds, server location, network routing, subscription services, and other routine communications architecture whenever a public official at any level of government speaks through a private-sector platform. And the practical result would be less speech: platforms would face pressure either to abandon ordinary commercial products or to stop hosting government

speakers, while public officials would have fewer channels through which to communicate directly with the public. Properly understood, the First Amendment safeguards the opposite result—more speakers, more platforms, and more avenues for public access.

Amici's securities-law accusations do not rescue Plaintiffs' theory. They repeat the same underlying mistake by treating faster receipt of public information as access to material nonpublic information, which is not at play here. But securities law prohibits deception, not latency; the SEC expressly permits differential speed in the receipt of public market data; and nothing alleged here identifies deception, misuse of confidential information, scienter, or a securities transaction by either President Trump or TMTG. Everything relevant occurred openly: the President published to the public, TMTG operated and disclosed a commercial product, and there is no allegation or evidence that anyone secretly conveyed or traded on confidential information. The invocation of criminal securities law cannot justify an injunction that would suppress TMTG and restrict the lawful public speech Truth Social exists to disseminate.

Plaintiffs attempt to invoke the right to receive speech to justify restricting the means by which that speech is distributed. The Constitution requires no such inversion. The Court should deny the preliminary injunction.

## <u>ARGUMENT</u>

### I. Truth API Distributes Presidential Speech That Is Already Public.

Truth Social makes President Trump's posts publicly available and distributes them through several channels. Plaintiffs' flawed theory—that TMTG releases his speech to paying API customers before the public—misstates that process. Truth Social sends each new Truth to the public feed *before* sending it to Truth API. Glabe Decl. ¶ 14. Slight differences in when recipients receive and process that content arise from the logistics of transmission, not a period of exclusive access to unpublished presidential speech, which does not exist.

The President's Truth Social account reaches approximately 13 million registered followers, as well as additional readers—including The Intercept—who view his posts without following his account. *See* Glabe Decl. ¶ 15. Anyone with an internet connection can read his public Truths. No account, subscription, or contractual relationship with TMTG is required.

Every Truth undergoes the same initial processing before it can be distributed to any user, including those using Truth API. When the President, or any other user, posts a Truth, Truth Social processes its text and any images, videos, outside links, or references to other users. These elements require data to be synchronized on Truth Social's servers. The average Truth requires up to 50 milliseconds of processing before distribution through any channel, including Truth API. Glabe Decl. ¶ 14. That processing precedes delivery to all users; it is not a delay imposed on the public for API subscribers' benefit.

Once processing is complete, Truth Social distributes the post through three channels: the website homepage, users' personalized alerts pages, and Truth API. It sends the post into the public feed first. *Only after that process begins does it send the same post to Truth API*. Glabe Decl. ¶ 14. The homepage and alerts page present the content for human readers, while the API transmits it in structured form to automated systems. How quickly a particular recipient then receives and processes the post depends on the delivery method, internet connection, and network path. Glabe Decl. ¶¶ 23–26.

Truth API is an industry standard, commercial feed providing licensed, real-time access to public posts from the highest-ranking Truth Social accounts. Glabe Decl. ¶ 10. Any customer willing to pay the subscription fee can access Truth API; TMTG does not restrict access to this product. *See* Glabe Decl. ¶ 22. As TMTG Interim CEO Kevin McGurn explained, such technology has been used in social media for more than a decade. Exhibit 3 at 1.

The API's direct connection to Truth Social's servers explains any difference in receipt time. After processing is complete and the post is released to the public feed, the API pushes the data directly to clients' computers, avoiding much of the delay involved in loading a webpage, processing a notification, and displaying content for a human reader. Glabe Decl. ¶ 22–25. McGurn estimated up to an approximately 50-millisecond advantage in receipt, while explaining that "all posts go out in real time. As soon as the president posts or any of our other creators post, it is public information, and it goes out in the internet." Exhibit 3 at 2. As he put it, "if it's machine readable, machines are faster than people. That's why a little latency occurs." *Id.* The API changes how published information is delivered and processed, not whether it is public.

Differences in receipt time are an ordinary feature of public internet access, even among users viewing the same post on the same website. A reader in New York may receive a post before a reader in rural Alaska because the data travel different distances and network routes. Connection speed, congestion, server load, hardware, and browser performance create further variation. Glabe Decl. ¶¶ 24–25. Even two users requesting the same post at the same moment through the same interface can receive it milliseconds apart. Those differences do not mean that one received nonpublic information and the other received public information.

Truth API operates within that same network environment. Subscribers purchase a structured feed suited to automated use, just as other users may benefit from faster connections, shorter network routes, or more powerful devices. The relevant distinction is between publication and subsequent receipt and processing. Plaintiffs try to erase that key distinction by improperly treating ordinary differences after publication as preferential access to government information.

*Knight First Amendment Institute at Columbia University v. Trump*, does not save Plaintiffs' theory. 928 F.3d 226 (2d Cir. 2019), *vacated as moot*, 141 S. Ct. 1220 (2021). In *Knight*,

the Second Circuit held that the President could not use Twitter's blocking function to exclude certain critics, finding that the account was used for official purposes. *Id.* at 232-36. Here, by contrast, TMTG does not exclude anyone from accessing the President's speech because every Truth is published to the public, and Truth API is available to any customer willing to pay the subscription fee. TMTG's independent decision to offer a commercial product that delivers already-public content in a machine-readable format is not the viewpoint-based denial of access that *Knight*, now vacated, addressed.

## II. TMTG's Independent Operation of Truth API Is Private-Sector Commercial Conduct, Not Government Action.

President Trump's use of Truth Social does not convert TMTG's independent commercial decisions into government action subject to First Amendment constraints. Truth API is a private-sector commercial product developed and operated by TMTG. TMTG decided to launch the product, which is standard in the social media industry, and TMTG controls its architecture, pricing, licensing, operations, and customer relationships. President Trump neither created nor controls those functions, nor does he serve as an officer or director of TMTG. Glabe Decl. ¶¶ 16–18. His use of Truth Social to communicate does not convert TMTG's independent business decisions into state action governed by the First Amendment.

TMTG developed Truth API in response to existing commercial demand and unauthorized scraping. Third parties were already using automated software to collect public posts for purposes including resale and artificial-intelligence training, contrary to TMTG's terms of service. That activity consumed server capacity and required resources to block it; overloaded servers could also disrupt public access and reduce advertising revenue. Glabe Decl. ¶¶ 18–21. Truth API offered a licensed alternative through which TMTG could meet customer demand, enforce its terms, and earn revenue for its shareholders. Customers purchase structured data, automated access, reliable

integration, and efficient delivery. The product changed the commercial terms and technology for accessing published posts, not when those posts became public.

TMTG's corporate structure reinforces the distinction between the company and the President. President Trump is neither an officer nor a director of TMTG. On December 17, 2024, he transferred all his TMTG shares to the Donald J. Trump Revocable Trust. Donald J. Trump, Jr., the sole trustee, holds sole voting and investment authority over those shares. President Trump remains the sole beneficiary of the trust but exercises no voting or investment authority. Glabe Decl. ¶¶ 16–17. Nor does ownership of shares confer ownership of corporate assets: "An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). Truth Social and Truth API belong to TMTG.

TMTG also exercises its own editorial judgment in selecting, ordering, displaying, and distributing content. *See Moody*, 603 U.S. at 731. Those editorial decisions implicate TMTG's First Amendment interests, and hosting the President's speech does not by itself transform the company into a government actor. *See Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 812 (2019).

Plaintiffs' theory disregards these separate roles. It misattributes TMTG's product design and commercial decisions to the government because the President uses the Truth Social platform. The record instead shows a company responding to unauthorized use, customer demand, and its responsibilities to shareholders. Those are non-governmental decisions protected by the First Amendment, not presidential directives constrained by it.

## III. Truth API Reflects Ordinary Practices Across Information Markets.

Truth API offers capabilities routinely sold across news, social media, and financial markets: structured data, automated access, reliable delivery, and reduced transmission delays. Publishers offer machine-readable feeds, network providers sell better performance, and securities

exchanges charge for infrastructure that reduces delivery time. Truth API follows that familiar commercial model. Plaintiffs would wrongly treat these ordinary practices as constitutionally suspect because the public content being distributed includes the President's speech.

Machine-readable distribution is so commonplace that The Intercept itself uses it. Its RSS feed at theintercept.com/feed/ allows automated systems to identify newly published articles, read their headlines, and process their contents without navigating the website. Such systems can identify market-moving news and act on it while a human reader is still reading the headline. The same reporting is available through both channels; the feed makes it easier for computers to process.

Other social-media companies, including platforms that directly and indirectly disseminate posts from President Trump, sell the same kinds of capabilities that Truth API provides. X describes Powerstream as its "lowest-latency streaming API for accessing public X data in real-time," designed to deliver data with minimal delay. Exhibit 4. In fact, President Trump's posts on X are sold through an API product, just like his posts on Truth Social. X's Enterprise API starts at $50,000 per month, with Powerstream offered as a premium add-on. Reddit is developing a similar product. *See* Exhibit 5 at 8. Threads, Bluesky, and Mastodon also offer machine-readable access to public content, although they do not monetize their APIs in the same manner. *See* Exhibits 9, 10, 11. Bloomberg and other news and financial-information businesses likewise sell specialized delivery and tiered access. *See* Exhibit 12. Charging for structured, automated delivery is an established business practice.

Paid improvements in transmission speed are also standard features of internet infrastructure. Google Cloud offers differently priced network tiers, including a Premium Tier that routes traffic through its private fiber network to improve performance. Exhibit 6. Cloudflare's

paid Argo Smart Routing service selects faster paths around congestion. Exhibits 7, 8. Cloudflare reports approximately 30% faster web-application performance, and Discord's chief technology officer reported a reduction of approximately 33 milliseconds in load times. Exhibit 7. Businesses routinely purchase these services because even small reductions in delivery time have commercial value.

Even regulated securities markets accommodate commercial services that reduce delivery time. Exchanges such as Nasdaq and the London Stock Exchange Group sell colocation services that place customers' servers closer to exchange infrastructure. That proximity reduces the time needed to receive market data and transmit orders. The SEC's market-data rules distinguish between priority in transmission and differences in subsequent receipt: an exchange may not transmit covered data to a customer before transmitting them to the Network processor, but it need not synchronize delivery to end users. Securities Exchange Act of 1934 ("Exchange Act") Release No. 34-51808, 70 Fed. Reg. 37,496, 37,567 (June 29, 2005). Thus, even where milliseconds can affect trading outcomes, the regulatory framework does not treat unequal receipt times as inherently improper. Although those rules do not govern Truth API, they illustrate how established markets accommodate the same distinction between release and receipt at issue here, and that distinction is fatal to this case.

Truth API belongs within this ordinary commercial landscape. TMTG packages public posts for automated use, just as other companies package reporting, social-media content, and market data for customers with specialized needs. The President's use of Truth Social does not convert those familiar delivery practices into a constitutional violation.

## IV. Plaintiffs' Theory Would Convert Ordinary Information Delivery Into a Constitutional Restriction on Public Speech.

Plaintiffs nonetheless attempt to wrongly turn differences in the delivery of public information into constitutional grounds for restricting it. Their theory would require courts to supervise private-sector communications systems and limit the platforms through which officials may speak. The First Amendment protects public communication; it does not restrict communication on the impracticable assumption that every recipient must receive the same information at precisely the same instant. *See Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965).

If accepted by the Court, Plaintiffs' theory would have no workable stopping point because public speech has always reached different audiences at different times. A person attending a speech hears it before a newspaper reader; White House pool reporters receive information before journalists outside the pool; and paying television subscribers watch a presidential interview before others encounter it through reporting or rebroadcast. Indeed, paying subscribers of certain outlets (e.g., the Wall Street Journal and CNBC) may receive access to exclusive content conveying the pronouncements of government officials that is entirely or practically unavailable to non-subscribers.

Digital networks produce comparable differences through connection speed, routing, and processing. Treating those differences as constitutional injuries would require courts to decide whether a data feed is too efficient, a server too close to a customer, or a broadcast available too soon to subscribers. That inquiry would extend to all official statements, including posts, interviews, and press conferences, of not just the President but every other government official, turning the right to receive public speech into judicial supervision of the order and speed at which every audience receives it—a perverse result that would itself offend the First Amendment.

That approach also disregards the separate roles of the President and the platform. Truth Social carries official communications alongside political advocacy, commentary, and personal expression. The Supreme Court recognizes the distinction between governmental office and "the individual who happens to be the President." *Clinton v. Jones*, 520 U.S. 681, 701 (1997); *see also Lewis v. Clarke*, 581 U.S. 155, 162–63 (2017); *Hafer v. Melo*, 502 U.S. 21, 25 (1991). TMTG, in turn, independently operates the infrastructure through which those communications travel. Hosting a public official's speech does not alone transform a private platform into a government actor. *See Halleck*, 587 U.S. at 811–12. Plaintiffs cannot erase those distinctions by wrongly attributing the platform's product design, pricing, and delivery choices to the government.

Section 230 independently bars Plaintiffs' claims. It provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). TMTG is an interactive computer service; President Trump and other users are the information content providers; and Plaintiffs seek to impose liability for how TMTG distributes and monetizes user-created content—exactly the publisher function § 230 protects. *See In re Social Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 702 F. Supp. 3d 809, 826–27 (N.D. Cal. 2023). Decisions about how Truths appear, how the API structures and delivers data, and how access to platform content is licensed are "traditional editorial functions," including "deciding whether to publish, withdraw, postpone or alter content." *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997); *see also Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–72 (9th Cir. 2008) (protecting "neutral tools" for disseminating content). Plaintiffs cannot evade § 230 by attempting to improperly repackage those protected publishing decisions as constitutional violations. Congress enacted the statute to "promote the continued development of the Internet"

and "preserve the vibrant and competitive free market" for interactive services, 47 U.S.C. § 230(b)(1)–(2), and it provides an independent basis to deny the preliminary injunction.

The practical consequence of Plaintiffs' contrary view, if adopted by the Court, would be less public access to government speech. Officials would be barred from platforms offering ordinary commercial data products, while platforms would face pressure to abandon those products or stop hosting official communications. That consequence would extend beyond Truth Social to innumerable other services through which the public receives official speech from federal, state, and local government officials. The public interest would be injured by reducing the channels of communication in order to eliminate differences in how recipients obtain and process public information.

## V. The Securities Laws Provide No Basis for Plaintiffs' Theories.

### A. The Securities Laws Expressly Permit Differential Speed in Receiving Public Information.

Amici's securities-law theory rests on a faulty premise the law expressly rejects: that receiving public information faster than others is equivalent to trading on material nonpublic information. Section 10(b) prohibits deception, not latency. 15 U.S.C. § 78j(b). "[N]either the Congress nor the Commission ever has adopted a parity-of-information rule," and § 10(b) imposes no "general duty between all participants in market transactions to forgo actions based on material, nonpublic information." *Chiarella v. United States*, 445 U.S. 222, 233, 235 (1980). The securities laws affirmatively accommodate differential speed. Regulation NMS expressly provides that market centers need not "synchronize the delivery of [their] data to end-users" with delivery through the Network processor. Regulation NMS, Exchange Act Release No. 34-51808, 70 Fed. Reg. 37,496, 37,567 (June 29, 2005). Importantly, the SEC has repeatedly approved paid colocation and data services that give subscribers reduced latency in receiving market information,

Exchange Act Release No. 34-62960, 75 Fed. Reg. 59,310, 59,311 (Sept. 21, 2010), including an NMS service designed to reduce latency by more than 140 microseconds. Exchange Act Release No. 34-88837, 85 Fed. Reg. 28,671, 28,672–75 (May 7, 2020).

Truth API operates on the same basic principle: the President publishes a Truth to the public, and paying subscribers receive that public information through a faster, machine-readable channel. The API provides no access to unpublished posts, no embargoed information, and no period during which TMTG withholds the Truth from the public feed. On the contrary, Truth posts are sent to the public *before* they are sent to Truth API subscribers. The alleged advantage is therefore speed in receiving public information—not privileged access to confidential information. The securities laws do not categorize faster infrastructure, superior technology, or more efficient processing of public information into fraud. *See Chiarella*, 445 U.S. at 233, 235; *Dirks v. SEC*, 463 U.S. 646, 657–59 (1983). Amici's objection may be about fairness, but "[a] rule commanding equal access would result in a securities market governed by relative degrees of ignorance." *United States v. Chestman*, 947 F.2d 551, 577–78 (2d Cir. 1991) (Winter, J., concurring). If the SEC wished to require simultaneous receipt of presidential social-media posts by every market participant, it could adopt such a rule. Section 10(b) does not supply one.

**B. None of the Elements of a Securities-Law Violation Are Met.**

The same result holds under ordinary securities-fraud doctrine. Section 10(b) and Rule 10b-5 require deception, scienter, and conduct 'in connection with' the purchase or sale of securities. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *SEC v. Zandford*, 535 U.S. 813, 819–20 (2002). Insider-trading liability is narrower still: possession of valuable information is not enough. Under the classical theory, liability depends upon trading in breach of a fiduciary duty; under the misappropriation theory, the defendant must deceptively appropriate confidential information in breach of a duty to its source for use in securities trading. *Chiarella*, 445 U.S. at

228–35; *United States v. O'Hagan*, 521 U.S. 642, 652–56 (1997); *see SEC v. Dorozhko*, 574 F.3d 42, 44 (2d Cir. 2009). Those requirements are squarely not satisfied here.

All of the information at issue here was public, transparent, and undertaken through TMTG's ordinary corporate processes in furtherance of its obligations to shareholders. President Trump published Truths openly to the public; TMTG distributed those published posts to the public first, and then through a publicly disclosed commercial API; and no one secretly conveyed, misappropriated, or traded on confidential information. That conduct does not implicate the deception, misuse of material nonpublic information, or securities trading that § 10(b) prohibits.

The API, its speed advantage, its customers, and its commercial purpose were publicly disclosed via a press release and accompanying filing with the SEC. There was no secret tip, concealed conduit, embargoed disclosure, or period in which a Truth was withheld from the public while favored traders received it first. The absence of any deception defeats § 10(b)'s textual requirement. *O'Hagan*, 521 U.S. at 659 n.9. The STOCK Act does not change that result. Although it provides that covered federal officials owe a duty of trust and confidence with respect to material nonpublic information obtained through their public positions (which is not at issue here), 15 U.S.C. § 78u-1(h), it does not dispense with § 10(b)'s requirements of deception, scienter, material nonpublic information, and a connection to securities trading. Nor does TMTG owe the investing public a fiduciary or similar duty to ensure equal-speed *receipt* of users' posts. "[W]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak," and no such duty arises from the "mere possession of nonpublic market information." *Chiarella*, 445 U.S. at 235.

Nor was there any securities transaction involving misuse of confidential information. There is absolutely no evidence or allegation President Trump traded securities on a Truth before

publication, secretly disclose a Truth to a favored trader, or otherwise use confidential information in connection with a securities transaction. Neither is there evidence that TMTG traded on the President's information or used it in any securities transaction. Amici identify no such TMTG trade in which material nonpublic information was exploited. In the misappropriation context, the deceptive breach and securities transaction must "coincide." *O'Hagan*, 521 U.S. at 656. They do not here.

Scienter is independently absent. There is no evidence that President Trump was involved in the creation of Truth API, much less that he posted on Truth Social with an intent to deceive or defraud. And TMTG's public disclosure of the API, its function, and its commercial purpose is irreconcilable with a theory of concealed fraudulent conduct. *See Ernst & Ernst*, 425 U.S. at 193 & n.12.

Amici cannot cure those defects by invoking Truth API's subscribers, and their unfounded suggestion otherwise represents a misguided attempt to harm TMTG and its subscribers. Briefly, tippee liability requires an upstream breach of duty and the recipient's knowledge of that breach. *Dirks*, 463 U.S. at 659–64; *O'Hagan*, 521 U.S. at 675. Here, the President publishes information to the public, TMTG delivers that published information through a disclosed product, and subscribers receive it through that product. There is no underlying breach for a subscriber to inherit and no deceptive scheme for TMTG to facilitate. Nor may private parties recast that conduct as aiding and abetting; § 10(b) does not impose private civil liability for merely assisting another's violation. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177, 191 (1994).

Amici wrongly invoke accusations of criminality to justify suppressing and restricting the lawful public speech that Truth Social exists to disseminate. They ask the Court to wrongly treat a

transparent, publicly disclosed means of distributing already-published speech as potential criminal conduct—and then use that supposed, nonexistent, criminality as a reason to enjoin the President's use of the platform that carries it. But criminal securities liability requires proof beyond a reasonable doubt of a "willful[]" violation of the securities laws. 15 U.S.C. § 78ff(a); *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005). That proof is absent here. Amici identify no deception, breach of duty, scienter, misuse of material nonpublic information, or qualifying securities transaction sufficient even to establish civil liability, much less a willful crime. Their invocation of criminal law supplies no public-interest basis for an injunction. It instead illustrates the profoundly detrimental speech consequences of Plaintiffs' theory: President Trump would face pressure to alter how and where he communicates with the public, while TMTG, and other outlets, would be forced to restrict a lawful channel for distributing that speech. The securities laws do not warrant that result, nor do they empower courts to wrongly transform lawful differences in the speed of receiving public information into criminal conduct—or to use that transformation as a basis for impairing a platform devoted to the broad dissemination of users' free speech.

## CONCLUSION

The Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: September 28, 2026

Respectfully submitted,

*<u>/s/ Caryn G. Schechtman</u>*
Caryn G. Schechtman (NY-2910420)
**DLA PIPER LLP (US)**
1251 Avenue of the Americas, 27th Floor
New York, NY 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
caryn.schechtman@us.dlapiper.com

Eric Forni (*pro hac vice* forthcoming)
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110
Telephone: (617) 406-6000
eric.forni@dlapiper.com

Rachel A.H. Horton (*pro hac vice* forthcoming)
**DLA PIPER LLP (US)**
1650 Market St., Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
rachel.horton@dlapiper.com

Seth Billingsley (*pro hac vice* forthcoming)
**DLA PIPER LLP (US)**
1900 N. Pearl Street, Suite 2200
Dallas, TX 75201
Telephone: (214) 743-4536
seth.billingsley@us.dlapiper.com

Josh Halpern (*pro hac vice* forthcoming)
**JH Legal PLLC**
1100 H Street NW, Suite 840
Washington, DC 20005
Telephone: (610) 405-5531
jhalpern@jhlegalpllc.com

*Counsel for Amicus Curiae Trump Media & Technology Group Corp.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2026, a true and correct copy of the foregoing Brief of Trump Media & Technology Group Corp. as Amicus Curiae in Support of Defendants was electronically filed using the Court's CM/ECF System, which will send notification of such filing to all counsel of record.

*/s/ Caryn G. Schechtman*
Caryn G. Schechtman