**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE INTERCEPT MEDIA, INC., *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:26-cv-6867 |

# REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION


Scott A. Kronland
Barbara J. Chisholm
Matthew J. Murray
Marisa C. Lowe
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Tel. 415-421-7151
Fax. 415-362-8064
skronland@altber.com
bchisholm@altber.com
mmurray@altber.com
mlowe@altber.com

John Langford
Stacy Livingston
David A. Schulz
MEDIA FREEDOM & INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
Tel. (203) 432-2366
Fax (203) 432-3034
john.langford@ylsclinics.org

Nikhel S. Sus
Jonathan E. Maier*
Stuart C. McPhail
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jmaier@citizensforethics.org
smcphail@citizensforethics.org

Brendan Ballou
Andrea Dobson-Forsee
PUBLIC INTEGRITY PROJECT
1763 Columbia Rd. NW Ste. 175
Washington, DC 20009
(917) 684-3900
ballou@publicintegrityproject.org

*Counsel for Plaintiffs*
**Pro hac vice* motion pending

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. Defendants' Scheme Irreparably Harms Plaintiffs ..... 2

II. The Challenged Conduct Is State Action ..... 3

III. Plaintiffs Are Likely to Succeed on the Merits ..... 6

A. The Truth API Scheme Violates Plaintiffs' First Amendment Rights ..... 6

1. Equal Access ..... 6

2. Public Forum ..... 7

3. Unconstitutional Conditions ..... 8

B. The Truth API Scheme Violates Plaintiffs' Fifth Amendment Rights ..... 9

IV. Plaintiffs' Harms Are Redressable ..... 10

V. The Remaining Preliminary Injunction Factors Are Satisfied ..... 11

CONCLUSION ..... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Broad. Companies, Inc. v. Cuomo*,
570 F.2d 1080 (2d Cir. 1977)....6

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999)....10

*Associated Press v. Budowich*,
2025 WL 1649265 (D.C. Cir. June 6, 2025)....7, 10

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014)....9

*Betts v. Shearman*,
751 F.3d 78 (2d Cir. 2014)....5

*Biden v. KFAI*,
141 S.Ct. 1220 (2021)....7, 10

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001)....4, 5

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961)....5

*Cable News Network, Inc. v. Trump*,
2026 WL 2868560 (D.D.C. Sept. 24, 2026)....10

*Clinton v. City of New York*,
524 U.S. 417 (1998)....11

*Cook v. Trump*,
804 F.Supp.3d 14 (D.D.C. 2025)....11

*Cornelio v. Connecticut*,
32 F.4th 160 (2d Cir. 2022)....3

*Cornelius v. Benevolent Prot. Order of Elks*,
382 F.Supp. 1182 (D. Conn. 1974)....3

*District of Columbia v. Trump*,
291 F.Supp.3d 725 (D. Md. 2018)....12

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)....................10

*Gilmore v. City of Montgomery*,
417 U.S. 566 (1974)....................3

*Haaland v. Brackeen*,
599 U.S. 255 (2023)....................11

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981)....................7

*Hooper v. Bernalillo Cnty. Assessor*,
472 U.S. 612 (1985)....................9

*Hotel Emps. & Rest. Emps. Union, Loc. 100 of N.Y., N.Y. & Vicinity, AFL-CIO v. City of N.Y. Dep't of Parks & Recreation*,
311 F.3d 534 (2d Cir. 2002)....................8

*Illinois v. Trump*,
2025 WL 2886645 (N.D. Ill. Oct. 10, 2025)....................12

*KFAI v. Trump*,
302 F.Supp.3d 541 (S.D.N.Y. 2018)....................10, 11, 12

*KFAI v. Trump*,
928 F.3d 226 (2d Cir. 2019)....................7, 8

*Legi-Tech, Inc. v. Keiper*,
766 F.2d 728 (2d Cir. 1985)....................5

*Lehman v. City of Shaker Heights*,
418 U.S. 298 (1974)....................8

*Lindke v. Freed*,
601 U.S. 187 (2024)....................3, 7

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)....................9

*McKenna v. Nassau Cnty.*,
2023 WL 8455670 (E.D.N.Y. Dec. 6, 2023)....................8

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866)....................10

*Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*,
__ U.S. __, 2026 WL 2564318 (Aug. 31, 2026)....................11

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010)....................10

*Nicholas v. Bratton*,
376 F.Supp.3d 232 (S.D.N.Y. 2019)....................6, 8

*Norwood v. Harrison*,
413 U.S. 455 (1973)....................3

*N.Y. Progress & Prot. PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013)....................3

*Paulsen v. Cnty. of Nassau*,
925 F.2d 65 (2d Cir. 1991)....................8

*Pen Am. Ctr., Inc. v. Trump*,
448 F.Supp.3d 309 (S.D.N.Y. 2020)....................10

*Reitman v. Mulkey*,
387 U.S. 369 (1967)....................3, 4

*Saget v. Trump*,
375 F.Supp.3d 280 (E.D.N.Y. 2019)....................12

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977)....................10

*Soule v. Conn. Ass'n of Schs., Inc.*,
90 F.4th 34 (2d Cir. 2023) (en banc)....................11

*Stevens v. N.Y. Racing Ass'n*,
665 F.Supp. 164 (E.D.N.Y. 1987)....................6

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996)....................10

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................11

*Utah v. Evans*,
536 U.S. 452 (2002)....................10, 11

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....................11

**Constitutional Provisions**

First Amendment ........................................................................................................6, 9

Fifth Amendment .......................................................................................................9, 10

**Other Authorities**

Daniel Thomas, "The Executive Trying to Monetise Trump's Posts," *Fin. Times,* Aug. 5, 2026, https://perma.cc/UC49-6Q6D .................................................................5

## INTRODUCTION

Defendants try to avoid this basic fact: the President is selling early access to official government information for his own profit. Such a scheme is unconstitutional.

Defendants' arguments fall into three categories. None succeed.

*First*, Defendants argue that the harms Plaintiffs experience are too small to warrant relief. But Trump Media simultaneously trumpets the advantages of Truth API, with its faster access to, and archive of, the President's official posts. And more than a dozen subscribers are already paying up to $100,000 per month for this supposedly negligible benefit.

*Second*, Defendants argue that Plaintiffs' harms do not flow from state action. But Defendants' scheme to enrich the President is state action violating the Constitution, whether or not Trump Media also qualifies as a state actor. And because the President is deeply entwined with the company he created, named after himself, holds the most shares in, and is contractually committed to support, Trump Media's implementation of this pay-to-play early-access scheme likewise constitutes state action.

*Third*, Defendants offer a jumble of slippery-slope hypotheticals suggesting that if their scheme were unconstitutional, any restriction on access to government speech would be, too. This ignores the unique problem at the heart of their scheme—Defendants are motivated not to inform the public, but to enrich the President. Defendants' hypotheticals involve nothing similar, and even assuming they involve state action, could be justified by legitimate government interests. Here, there is *no* government interest in helping the President profit from selling official information, so no restriction on Plaintiffs' rights is justified to allow it.

It is Defendants' scheme to sell government information for personal profit, not their hypotheticals, that has frightening implications. Plaintiffs' motion for a preliminary injunction should be granted.

## ARGUMENT

### I. Defendants' Scheme Irreparably Harms Plaintiffs

Counter to the facts and controlling precedent, Defendants argue that any harms to Plaintiffs from the Truth API scheme are "negligible." ECF 54 ("Opp.") 12-13.

*First*, Trump Media has consistently marketed the Truth API as delivering meaningfully faster access to Trump's posts. ECF 36-19 at 3; *see also* ECF 36-18. Even now, Trump Media's general counsel admits that API subscribers "receive the same public content faster than scrapers," even though scrapers can pull from Truth Social's servers "thousands of [times] a second." ECF 62-1 ¶¶19, 21. And over a dozen companies already pay up to $100,000 per month for the time advantage of the service, ECF 36-22 at 5, undercutting Defendants' claim that the advantage is "negligible."

*Second*, Plaintiffs are harmed not just by slower access to information, but because it is less accurate. ECF 36-1 ("Mot.") 21-25. Truth API provides subscribers a "historical archive" of posts from top accounts since 2022. ECF 36-18. Those who visit Truth Social's website get only posts the President has not edited or deleted, ECF 36-4 ¶6, and are prohibited from archiving those posts before he does so, ECF 36-19 at 4. If Defendants continue their scheme, *The Intercept* and Freedom of the Press Foundation ("FPF") will be forced to rely on the President's version of the past for their reporting and archiving.

Defendants claim that "presidential communications are immediately and widely . . . archived" elsewhere. Opp. 24. But Truth Social's terms of service prohibit such archiving, ECF

36-4 ¶10, and Trump Media announced a crackdown on anyone archiving posts without paying for the API, ECF 36-19 at 4. In fact, right after this case was filed, Trump Media accused FPF of violating these terms of service. ECF 36-24 at 5. Defendants and Trump Media have made clear: paying the President is the only way to get an accurate history of his official statements.

*Third*, it is settled that any unjustified deprivation of a constitutional right, however small, is impermissible. *Cornelio v. Connecticut*, 32 F.4th 160, 176 (2d Cir. 2022); *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 487 (2d Cir. 2013). There is no government interest in selling early access to government information to profit the President, so no restriction on Plaintiffs' rights can be justified.

## II. The Challenged Conduct Is State Action

Defendants are government actors. They do not dispute that, under *Lindke v. Freed*, 601 U.S. 187 (2024), they engage in state action when they post the President's official government announcements on Truth Social subject to the Truth API. Nor do they dispute that the Truth API imposes discriminatory access to those government announcements, giving a "headstart" to paying users. Opp. 12; ECF 62-1 ¶¶23-24.

When the government encourages or "place[s] its power, property and prestige" behind private discrimination, that discrimination is attributable to the state. *Reitman v. Mulkey*, 387 U.S. 369, 380 (1967) (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)). Defendants enable, encourage, and become accountable for Trump Media's discriminatory two-tier scheme by essentially granting Trump Media a monopoly on distributing President Trump's government announcements, regardless of whether Trump Media is a state actor. *See Gilmore v. City of Montgomery*, 417 U.S. 566, 569 (1974); *Norwood v. Harrison*, 413 U.S. 455, 466-67 (1973); *Cornelius v. Benevolent Prot. Order of Elks*, 382 F.Supp. 1182, 1188-89 (D. Conn. 1974)

(state action "clearly" satisfied where government defendants aided discriminatory private club). Defendants' assertion that Trump "mere[ly] acquiesce[s]" in Trump Media's decision to discriminate is willful blindness. Opp. 12.

Defendants' own state action is enough to find them liable for violating the Constitution. But separately and additionally, Trump Media's entwinement and joint action with President Trump render it a state actor, too. Mot. 19-21.

Defendants do not contest the facts underpinning the interrelationship between Trump and Trump Media, instead attempting to disaggregate them. Opp. 10-11. But Supreme Court precedent holds that state action analysis must consider circumstances as a whole. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 289 & n.4 (2001) (whether conduct is fairly attributable to state is "necessarily fact-bound inquiry" focused on "underlying reality," not "formalism"); *Reitman*, 387 U.S. at 378.

The full picture here is that President Trump founded Trump Media and named it after himself. ECF 36-6 at 4. Trump is the company's largest shareholder. ECF 36-8; *cf.* Opp. 3. Trump maintains an exclusive-access agreement with Trump Media's social media product, Truth Social. ECF 36-5 ¶¶5-6; ECF 36-9 at 3-5; ECF 36-10 at 42-43, 60; Opp. 11. Trump and his aides regularly post official government announcements exclusively on Truth Social. ECF 36-5 ¶¶8-10, 13; ECF 36-4 ¶7; Opp. 12. Trump Media's "success depend[s]" on exclusive access to Trump's official statements. ECF 36-10 at 18, 25, 36. Truth API's purpose is to monetize Trump's regular use of Truth Social to make official government announcements. *See* ECF 36-5 ¶¶14, 17; ECF 36-18; ECF 36-21. The Truth API and Truth Social could not function as they do without Trump's ongoing participation and approval. Trump Media's CEO says Trump is "the

one at the end of the phone," and that Trump Media will be a core part of Trump's portfolio after Trump leaves office.[1]

Defendants argue that Trump and Trump Media do not "share [a] common goal to violate the plaintiff's rights," *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014), because Trump Media's goal is to maximize profit. Opp. 11-12. But President Trump *shares the same goal*: maximizing Trump Media's profits and therefore his personal wealth. *See Burton*, 365 U.S. at 723-26 (discrimination by private restaurant within public garage constituted state action based on "peculiar relationship," which conferred on each a "variety of mutual benefits").

Defendants contend that Plaintiffs' constitutional deprivations are not "'caused by the exercise of some right or privilege created by the State or … by a person for whom the State is responsible.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation omitted); Opp. 8. But "the facts justify a conclusion of state action under the criterion of entwinement" or willful participation in joint activity, even if other methods of establishing state action "may not be satisfied by the same facts." *Brentwood Acad.*, 531 U.S. at 302. Regardless, Trump Media exercises a "privilege" provided by government officials (Trump and his aides) by hosting an exclusive channel for Trump's official announcements, *see Legi-Tech, Inc. v. Keiper*, 766 F.2d 728, 733 (2d Cir. 1985) (discussing state-created monopoly on access to certain government information), and for the reasons stated above, Trump is "responsible" for Trump Media's maintenance of the Truth API for his posts.

---

[1] Daniel Thomas, "The Executive Trying to Monetise Trump's Posts," *Fin. Times*, Aug. 5, 2026, https://perma.cc/UC49-6Q6D. Trump Media's assertions of independence in its late-filed amicus are inconsistent with its own CEO's statements before Plaintiffs filed this motion.

## III. Plaintiffs Are Likely to Succeed on the Merits

Defendants raise several hypotheticals, each misunderstanding Plaintiffs' claims. This case arises from exclusive disclosure of official information to a site providing discriminatory access to profit the President. Restrictions on constitutional rights must be justified by legitimate government interests, even under the most lenient standard. Defendants identify no such interest, but their motivation is plain: to cause the President to profit personally from disclosing government information. There is *no* restriction on Plaintiffs' rights justified by this inappropriate interest. It fails under any relevant standard. For this reason, this case is *sui generis* and unlike Defendants' hypotheticals.

### A. The Truth API Scheme Violates Plaintiffs' First Amendment Rights

#### 1. Equal Access

When, as here, the government makes information available to "the general public or to some members of the press," *Nicholas v. Bratton*, 376 F.Supp.3d 232, 259 (S.D.N.Y. 2019), the First Amendment "requires equal access to all of the media," *Am. Broad. Companies, Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977). Any differential treatment must be content-neutral, serve a legitimate government interest, and have benefits outweighing the benefits of removing the restriction. *Nicholas*, 376 F.Supp.3d at 260 (citing *Stevens v. N.Y. Racing Ass'n*, 665 F.Supp. 164, 175 (E.D.N.Y. 1987)). The doctrine applies when nominally private parties impose access restrictions, provided there is state action. *See, e.g., Cuomo*, 570 F.2d at 1083 (political candidates restricted access to private campaign facilities); *Stevens*, 665 F.Supp. at 172-75 (private association was state actor). As explained above, the only interest here is in helping the President personally profit by selling official information. This is not a legitimate government interest, and its benefits do not outweigh the benefits of removing the restriction.

Defendants respond by stressing that the President may constitutionally grant interviews to favored outlets. Opp. 13-16. This is irrelevant. President Trump no more gives Truth Social a "scoop" than he gives the microphone a scoop when he speaks at a press conference. In both situations, he uses a tool to broadcast information to a general audience and cannot impose unreasonable restrictions on who can join that audience. *See Associated Press v. Budowich*, 2025 WL 1649265, at *6 (D.C. Cir. June 6, 2025) (distinguishing limited-access spaces from Brady Briefing Room). If, as Defendants maintain, "as soon as the President posts, the content of that message is 'public information,'" Opp. 12; *see also* ECF 61-1 at 2, 14-17, then he cannot be granting a scoop to API subscribers. And if he is, the information was not public when they received it and he may well be violating securities laws. ECF 50-1 at 5-6.

**2. Public Forum**

Defendants do not—and could not—contest that Defendants engage in state action when they post government information on Truth Social, *Lindke*, 601 U.S. at 198, and each such post constitutes a designated public forum, *KFAI v. Trump ("KFAI II")*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated as moot sub nom. Biden v. KFAI*, 141 S.Ct. 1220 (2021).

Defendants rehash their state action arguments, asserting that Trump Media imposes the access restrictions in its private capacity. Opp. 18-19. This argument fails for the same reasons explained above: Trump Media is engaged in state action here, but even if it were not, Trump Media's "private" discrimination is attributable to Defendants because they significantly encourage it. *Supra* sec. II.

Defendants therefore must show that Truth API's access restrictions on President Trump's posts are content-neutral, are effectively tailored to a significant government interest, and leave open ample alternative avenues. *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*,

452 U.S. 640, 643-44, 647-48 (1981) (evaluating content-neutral restrictions at open-to-all state fair). Defendants fail this test. Mot. 9-10.

Defendants argue futilely for relaxed scrutiny because Plaintiffs seek to listen in the forum, not speak. Opp. 19 (citing *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022)). While Defendants' scheme fails at any level of scrutiny, Mot. 15-16, forum analysis depends on the nature of a space and the government's intent in creating it—*not* whether those who seek access want to speak or listen. *See Paulsen v. Cnty. of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991); *McKenna v. Nassau Cnty.*, 2023 WL 8455670, at *8 (E.D.N.Y. Dec. 6, 2023) (evaluating exclusion of listener from forum); *Nicholas*, 376 F.Supp.3d at 270 (same). President Trump's posts constitute designated public fora because, when making them, he intends to open public spaces to speak in the comments. Opp. 12; *see KFAI II,* 928 F.3d at 237. Restrictions on listeners in these fora are analyzed just like restrictions on speakers.

Defendants are equally misguided in citing *Hotel Employees* for the proposition that the government could validly charge for access to President Trump's Truth Social posts as a proprietor. Opp. 16 (citing *Hotel Emps. & Rest. Emps. Union, Loc. 100 of N.Y., N.Y. & Vicinity, AFL-CIO v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002)). *Hotel Employees* dealt with neither paid access to speech nor a designated public forum, 311 F.3d at 553-56, and the President has no proprietary interest in government announcements, Mot. 9-10. Even in its proprietary capacity, the government cannot impose "arbitrary, capricious, or invidious" restrictions, as here. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974).

### 3. Unconstitutional Conditions

Defendants also impose an unconstitutional condition, forcing Plaintiffs to choose between access to faster, more accurate government information or the constitutional right not to subsidize Truth Social's expressive activity. Mot. 13-14.

Defendants' first argument—that Trump Media, not Defendants, burdens the Plaintiffs, Opp. 19-20—fails for the reasons explained repeatedly above. *Supra* sec. II.

Alternatively, Defendants say Plaintiffs are not "compelled" to subsidize Truth Social because they can forego the benefit and access President Trump's posts more slowly. Opp. 20. The same is true in every unconstitutional conditions case, and it gives Defendants no cover. *See Mahmoud v. Taylor*, 606 U.S. 522, 561 (2025) ("the availability of [homeschooling] is no answer" to First Amendment burdens on religious exercise at public schools). Besides, Plaintiffs seek both timely and accurate historical information, the latter of which—because the President edits and deletes posts—Truth Social's website will never provide. *Supra* sec. I.

To the extent Defendants suggest faster access to government information is not a sufficient "benefit," they are wrong. Opp. 19-20. A benefit only needs to be objectively desirable. *Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014). Both Plaintiffs attest that they seek access to the API because it would improve the speed and accuracy of their work. ECF 36-3 ¶¶18-20; ECF 36-4 ¶13. And others clearly share Plaintiffs' attested interest; more than a dozen subscribers have agreed to pay $100,000 monthly fees for the API. ECF 62-3 at 3.

**B. The Truth API Scheme Violates Plaintiffs' Fifth Amendment Rights**

Irrational classifications violate the Fifth Amendment. *See Hooper v. Bernalillo Cnty. Assessor,* 472 U.S. 612, 618 (1985). Here, Defendants privilege those who are willing to enrich the President over those who are not. Mot. 15-16.

Defendants maintain that the Fifth Amendment cannot restrain the "'discretion of the President' to choose how and through which mediums to communicate with particular audiences." Opp. 21 (quoting *Budowich*, 2025 WL 1649265, at *6). But that quote comes from *Sherrill*, a case that *did* restrict the "discretion of the president" by clarifying that the White

House could not violate the Fifth Amendment by revoking press passes without due process. *Sherrill v. Knight*, 569 F.2d 124, 130-31 (D.C. Cir. 1977); *see Cable News Network, Inc. v. Trump,* 2026 WL 2868560, at *2-4 (D.D.C. Sept. 24, 2026). Neither *Sherrill* nor *Budowich* stand for the proposition that the President has unlimited discretion to restrict access to government information.

## IV. Plaintiffs' Harms Are Redressable

This Court can restrain the President from violating Plaintiffs' constitutional rights. Injunctive relief here would not dictate whether or what the President delivers through his "bully pulpit." Opp. 1, 6; *Newdow v. Roberts*, 603 F.3d 1002, 1011-12 (D.C. Cir. 2010) (court could not enjoin content of President's inaugural address). Rather, it would restrain the "ministerial" act of choosing an illegal medium for that speech. *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) ("abid[ing] by the requirements of duly enacted and otherwise constitutional statutes" is ministerial) (applying *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality)) (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498-99 (1866) (though Court could not enjoin President's actions in reconstruction, "the President of the United States may be required, by the process of this court, to perform a purely ministerial act")); *cf. Pen Am. Ctr., Inc. v. Trump*, 448 F.Supp.3d 309, 328 (S.D.N.Y. 2020) (finding injunctive relief improper because President's affected actions were non-ministerial). Courts have made this distinction to enjoin the President from posting on a social media platform while blocking Americans from access, and can do so here. *See KFAI v. Trump ("KFAI I")*, 302 F.Supp.3d 541, 578 (S.D.N.Y. 2018), *vacated as moot sub nom. Biden v. KFAI*, 141 S.Ct. 1220 (2021).

Further, relief against the subordinate defendants, which Defendants do not suggest is improper, independently establishes redressability. *See Utah v. Evans*, 536 U.S. 452, 464 (2002)

(relief against subordinate satisfied redressability) (citing *Franklin*, 505 U.S. at 803); *see, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952); *Cook v. Trump*, 804 F.Supp.3d 14, 44 (D.D.C. 2025) (finding injunction against subordinates to reinstate Federal Reserve Board Member unlawfully terminated by President would provide requested relief). Even a "partial remedy" satisfies redressability, *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 50 (2d Cir. 2023) (en banc), *see also id.* at 69 (Pérez, J., concurring in part) (redressability is a "low bar"), and preventing the subordinates from posting government announcements subject to Trump Media's restrictions increases the "likelihood" that official pronouncements would appear in other mediums, *Utah*, 536 U.S. at 464; *see also KFAI I*, 302 F.Supp.3d at 562 (redressability satisfied even if President could "if he so chose . . . undercut this relief" against subordinates) (quoting *Swan*, 100 F.3d at 980-81).[2]

**V. The Remaining Preliminary Injunction Factors Are Satisfied**

Defendants' remaining arguments on the balance of equities and public interest are meritless.

Defendants argue that granting relief would be an "extraordinary judicial intrusion into core executive functions" that would "cause immediate and irreparable harm." Opp. 26. But the cases Defendants cite are inapt. In each, the court declined to intervene, not because doing so was an "extraordinary judicial intrusion," but because the government would likely succeed on the merits. *See Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the U.S.*, __ U.S. __, 2026 WL 2564318, at *3 (Aug. 31, 2026); *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). In fact, courts

[2] The possibility of declaratory relief against the President on final judgment further establishes redressability. *See Clinton v. City of New York*, 524 U.S. 417, 425 n.9, 435 (1998); *KFAI I*, 302 F.Supp.3d at 562; *cf. Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (declaration must be against causal party to provide redress).

may and do intervene when the President violates constitutional rights. *Illinois v. Trump*, 2025 WL 2886645, at *11 (N.D. Ill. Oct. 10, 2025) (issuing injunctive relief against President); *Saget v. Trump*, 375 F.Supp.3d 280, 333-35 (E.D.N.Y. 2019) (same); *KFAI I*, 302 F.Supp.3d at 578-79 (concluding court had authority to enjoin President's social media blocking); *District of Columbia v. Trump*, 291 F.Supp.3d 725, 750 (D. Md. 2018).

Finally, Defendants argue that a ruling for Plaintiffs "threatens to deprive . . . access to millions of Americans that interact with the President on Truth Social." Opp. 26. This reaches the heart of this case. A ruling for Plaintiffs will actually expand Americans' access to the President's speech. Right now, the President speaks first and most accurately to those willing to pay him; then he speaks to the rest of America. If Defendants are compelled to stop this illegal scheme, the President won't stop speaking. Rather, he will start speaking to Americans equally, as the Constitution demands.

## **CONCLUSION**

For the reasons above, Plaintiffs' motion for preliminary injunction should be granted.

Dated: October 1, 2026

Respectfully Submitted,

*/s/ Barbara J. Chisholm*

Scott A. Kronland
Barbara J. Chisholm
Matthew J. Murray
Marisa C. Lowe
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Tel. 415-421-7151
Fax. 415-362-8064
skronland@altber.com
bchisholm@altber.com
mmurray@altber.com
mlowe@altber.com

Nikhel S. Sus
Jonathan E. Maier*
Stuart C. McPhail
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jmaier@citizensforethics.org
smcphail@citizensforethics.org

John Langford
Stacy Livingston
David A. Schulz
MEDIA FREEDOM & INFORMATION ACCESS CLINIC
YALE LAW SCHOOL[3]
127 Wall Street
New Haven, CT 06511
Tel. (203) 432-2366
Fax (203) 432-3034
john.langford@ylsclinics.org

Brendan Ballou
Andrea Dobson-Forsee
PUBLIC INTEGRITY PROJECT FUND
1763 Columbia Rd. NW Ste. 175
Washington, DC 20009
(917) 684-3900
ballou@publicintegrityproject.org

**Pro hac vice* motion forthcoming
*Counsel for Plaintiffs*

[3] The views expressed herein do not purport to represent the institutional views of Yale Law School, if it has any.

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

I certify that this memorandum complies with the 3,500 word limit of Local Rule 7.1(c). Including footnotes, but excluding the caption, tables, signature blocks, and required certificate, this memorandum contains 3,444 words according to Microsoft Word's word count.

*/s/ Barbara J. Chisholm*