**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

THE INTERCEPT MEDIA, INC., *et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

Defendants.

No. 26-cv-06867-JPO

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... ii
TABLE OF AUTHORITIES ..... iii
INTRODUCTION ..... 1
BACKGROUND ..... 2
LEGAL STANDARD ..... 3
ARGUMENT ..... 4
I. The Court Lacks Subject-Matter Jurisdiction Over All Claims. ..... 4
II. All Claims Fail Under Rule 12(b)(6). ..... 8
A. Because TMTG Is Not A State Actor, Truth API Does Not Inflict any Constitutional Injury. ..... 8
B. The Complaint Alleges No Violation of Plaintiffs' First Amendment Rights. ..... 17
C. Plaintiffs Rely on Inapposite Equal Access and Fail to State an Equal-Access Claim (Count I) ..... 20
D. The Complaint Fails to State a Claim Based on an Allegedly Unlawful Time, Place, or Manner Restriction on Access to a Public Fora (Count II). ..... 21
E. The Complaint Does Not Plausibly Allege that the Government Conditioned Access to a Benefit on the Surrender of Protected Right Or Charged an Unconstitutional Fee (Count III). ..... 23
F. The Complaint Does Not Identify Any Equal Protection Violation (Count IV). ..... 26
CONCLUSION ..... 28
CERTIFICATE OF COMPLIANCE WITH LOCAL RULES ..... 28

# TABLE OF AUTHORITIES

**Cases**

*ABC v. Cuomo*,
570 F.2d 1080 (2d Cir. 1977) .......... 20

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999) .......... 9, 10

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) .......... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 3

*Associated Press v. Budowich*,
No. 25-5109, 2025 WL 1649265 (D.C. Cir. June 6, 2025) .......... 18, 19

*Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*,
322 F.3d 1298 (11th Cir. 2003) .......... 25

*Baltimore Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) .......... 17, 18

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*,
529 U.S. 217 (2000) .......... 24

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 3

*Betts v. Shearman*,
751 F.3d 78 (2d Cir. 2014) .......... 16

*Boehringer Ingelheim Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*,
150 F.4th 76 (2d Cir. 2025) .......... 23

*Bowles v. Willingham*,
321 U.S. 503 (1944) .......... 19

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001) .......... 11, 15

*Burton v. Wilmington Parking Authority*,
365 U.S. 715 (1961) .......... 12, 13

*Cantor Fitzgerald Inc. v. Lutnick*,
313 F.3d 704 (2d Cir. 2002) .......... 26

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) ..... 19

*Cook v. Trump*,
804 F. Supp. 3d 14 (D.D.C. 2025) ..... 7

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.d.r.l*,
790 F.3d 411 (2d Cir. 2015) ..... 3

*Courthouse News Serv. v. Schaefer*,
2 F.4th 318 (4th Cir. 2021) ..... 19, 21

*Cranley v. Nat'l Life Ins. Co. of Vermont*,
318 F.3d 105 (2d Cir. 2003) ..... 10, 11

*Crowley v. Courville*,
76 F.3d 47 (2d Cir. 1996) ..... 26

*F.C.C. v. Beach Commc'ns, Inc.*,
508 U.S. 307 (1993) ..... 27

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ..... 5, 6, 7, 8

*Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*,
745 F.2d 767 (2d Cir. 1984) ..... 25

*Grogan v. Blooming Grove Volunteer Ambulance Corps*,
768 F.3d 259 (2d Cir. 2014) ..... 9, 15

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ..... 8

*Hadges v. Yonkers Racing Corp.*,
918 F.2d 1079 (2d Cir. 1990) ..... 12

*Harris v. Quinn*,
573 U.S. 616 (2014) ..... 8

*Horvath v. Westport Library Association*
362 F.3d 147 (2d Cir. 2004) ..... 15

*Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*,
311 F.3d 534 (2d Cir. 2002) ..... 20, 22

*Hudgens v. NLRB*,
424 U.S. 507 (1976) ..... 9

*In re Application of The Herald Co.*,
734 F.2d 93 (2d Cir.1984) .......... 23

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) .......... 21, 25

*Khulumani v. Barclay Nat. Bank Ltd.*,
504 F.3d 254 (2d Cir. 2007) .......... 13

*Knight First Amend. Inst. at Columbia Univ. v. Trump*,
302 F. Supp. 3d 541 (S.D.N.Y. 2018) .......... 7, 8

*Lansing v. City of Memphis*,
202 F.3d 821 (6th Cir. 2000) .......... 13

*LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester*,
40 F.3d 587 (2d Cir. 1994) .......... 26

*Lindke v. Freed*,
601 U.S. 187 (2024) .......... *passim*

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982) .......... 9, 10

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 7

*M.S. v. Brown*,
902 F.3d 1076 (9th Cir. 2018) .......... 4

*Manhattan Cmty. Access Corp. v. Halleck*,
587 U.S. 802 (2019) .......... 9, 22

*Marbury v. Madison*,
5 U.S. 137 (1803) .......... 7

*McCullen v. Coakley*,
573 U.S. 464 (2014) .......... 22

*Mississippi v. Johnson*,
71 U.S. 475 (1866) .......... 5, 6

*Moose Lodge No. 107 v. Irvis*,
407 U.S. 163 (1972) .......... 9

*Murdock v. Pennsylvania*,
319 U.S. 105 (1943) .......... 25

*Murthy v. Missouri*,
603 U.S. 43 (2024) ........ 4

*N.A.A.C.P. v. Hunt*,
891 F.2d 1555 (11th Cir. 1990) ........ 24

*Neary v. Weichert*,
489 F. Supp. 3d 55 (E.D.N.Y. 2020) ........ 5

*New Colonial Ice Co. v. Helvering*,
292 U.S. 435 (1934) ........ 13

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ........ 5, 6, 8

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ........ 4

*Nordlinger v. Hahn*,
505 U.S. 1 (1992) ........ 26

*Pen Am. Ctr., Inc. v. Trump*,
448 F. Supp. 3d 309 (S.D.N.Y. 2020) ........ 5

*Powe v. Miles*,
407 F.2d 73 (2d Cir. 1968) ........ 10

*Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022) ........ 22, 23, 25

*Pub. Utilities Comm'n of D.C. v. Pollak*,
343 U.S. 451 (1952) ........ 9

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) ........ 24

*Snyder v. Ringgold*,
133 F.3d 917, 1998 WL 13528 (4th Cir. 1998) ........ 18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........ 3

*Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*,
985 F.2d 102 (2d Cir. 1993) ........ 12

*Stefanoni v. Darien Little League, Inc.*,
101 F. Supp. 3d 160 (D. Conn. 2015) ........ 14

*Stevens v. New York Racing Association*,
665 F. Supp. 164 (E.D.N.Y. 1987) .......... 21

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) .......... 6, 7

*Sybalski v. Indep. Grp. Home Living Program, Inc.*,
546 F.3d 255 (2d Cir. 2008) .......... 10, 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 4

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......... 6

*Trump v. United States*,
603 U.S. 593, 629 (2024) .......... 6

*United States v. Int'l Bhd. of Teamsters*,
941 F.2d 1292 (2d Cir. 1991) .......... 26

*United States v. Lee*,
455 U.S. 252 (1982) .......... 24

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008) .......... 17

*West v. Atkins*,
487 U.S. 42 (1988) .......... 9, 11

*White v. Moylan*,
554 F. Supp. 2d 263 (D. Conn. 2008) .......... 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 7

*Zemel v. Rusk*,
381 U.S.  (1965) .......... 17

*Zucco v. AutoZone, Inc.*,
800 F. Supp. 2d 473 (W.D.N.Y. 2011) .......... 3

**Rules**

Fed. R. Civ. P. 8 .......... 3

Fed. R. Civ. P. 12 .......... 3, 8

# INTRODUCTION

Plaintiffs claim that the President of the United States violates the Constitution when he exclusively uses Truth Social to communicate with the American people. Plaintiffs ask this Court to enjoin the President's exclusive use of Truth Social while the private company that operates the platform maintains a subscription-based data feed that delivers posts from certain high-ranking accounts to paying users marginally faster than those same posts are delivered to the rest of the public. Plaintiffs also ask the Court to declare that exclusive use unlawful. This Court should dismiss the Complaint.

First, this Court lacks subject matter jurisdiction because Plaintiffs do not have Article III standing to bring this suit. Plaintiffs' claims are not redressable by the relief requested because federal courts cannot enter injunctive or declaratory relief against the President, and injunctive or declaratory relief against the other Defendants would not redress Plaintiffs' alleged injuries.

Second, Plaintiffs fail to plausibly allege any constitutional violation. A private company created Truth Social and continues to operate it; that company's commercial decisions cannot be attributed to the government or subjected to constitutional scrutiny. And the President does not violate the Constitution when he speaks through Truth Social. The Constitution guarantees no real-time access to presidential statements and the President does not have to justify his choices about where and how he communicates with the American people. Plaintiffs' untenable theories to the contrary would call into constitutional question most, if not all, methods of public communication. But nothing in text, history, tradition, or precedent demands such absurd consequences.

For these reasons, this Court should dismiss the Complaint.

**BACKGROUND**

Truth Social is a social media platform operated by non-party Trump Media & Technology Group (TMTG), a publicly traded company. *See* Compl. ¶¶ 18-24, ECF No. 1. Following his victory in the 2024 election, President Trump transferred his shares in TMTG to the Donald J. Trump Revocable Trust, of which President Trump is the sole beneficiary. *Id.* ¶ 37. The Trust is TMTG's largest shareholder, although it owns less than half the company's stock. *Id.* ¶¶ 38-39.

In July 2026, TMTG announced Truth API. *Id.* ¶ 52. Truth API is subscription-based data feed that provides access to posts from the ten top Truth Social accounts, which currently includes the President, White House officials, Cabinet members, and other senior government figures. *Id*. ¶ 54. The Truth API functions to deliver posts to subscribers faster than non-subscribers can access them. *Id*. ¶¶ 53, 55-57. Plaintiffs fail to specifically allege how much faster the Truth API delivers these posts. Along with Truth API, which would provide "a historical archive of posts dating back to 2022," TMTG's CEO stated an intent to disrupt "web-scraping tools that offer instant and archived access to Truth Social posts." *Id.* ¶ 58.

Plaintiffs are two nonprofit organizations that track and report on President Trump's Truth Social posts. *See id*. ¶¶ 8-9. Defendants are President Trump in his official capacity, Natalie Harp in her official capacity as Executive Assistant, Daniel Scavino, in his official capacity as White House Deputy Chief of Staff and Director of the White House Personnel Office, the Executive Office of the President, and the White House Office. *Id.* ¶¶ 10-14. Plaintiffs claim that the Truth API impairs their ability to obtain and report on government information on equal terms in violation of the First and Fifth Amendment. *See id*. ¶¶ 80-122. Plaintiffs seek a declaration that "Defendants' practice of posting official government information exclusively on

Truth Social, which maintains a paid API for such official government information, is unconstitutional and unlawful" and an injunction preventing "Defendants, their agents, and anyone acting in concert or participation with Defendants from posting, or allowing to be posted, official government information exclusively on Truth Social, which maintains a paid API for such official government information." *Id.* at 29.

## LEGAL STANDARD

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.d.r.l*, 790 F.3d 411, 416-17 (2d Cir. 2015) (quotation and citation omitted). When "a case is at the pleading stage, the plaintiff must clearly allege facts demonstrating each element" of standing, a constitutional prerequisite to Article III adjudication. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation omitted and omission adopted).

Moreover, "[a] motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the party's claim for relief." *Zucco v. AutoZone, Inc.*, 800 F. Supp. 2d 473, 475 (W.D.N.Y. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) Thus, the Court imposes two requirements on a plaintiff: (1) that she plead facts, not legal conclusions, and (2) that the pleading state a plausible claim on its face. *Id.*; *see* Fed. R. Civ. P. 8(a)(2).

## ARGUMENT

### I. The Court Lacks Subject-Matter Jurisdiction Over All Claims.

Under Article III, Plaintiffs must demonstrate that "they will suffer an injury that is traceable to a Government defendant and redressable by the injunction they seek." *Murthy v. Missouri*, 603 U.S. 43, 49-50 (2024). And because standing "is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), Plaintiffs must establish standing for each form of relief they seek. Here, Plaintiffs lack standing because the Court lacks the power to enter a remedy that would redress their alleged injuries. *See M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) ("[E]ven where a plaintiff requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief.").[1]

Plaintiffs seek a declaration "that Defendants' practice of posting official government information exclusively on Truth Social, which maintains a paid API for such official government information, is unconstitutional and unlawful" and an injunction that would prevent "Defendants from posting, or allowing to be posted, official government information exclusively on Truth Social, which maintains a paid API for such official government information." Compl. at 29. These remedies can redress Plaintiffs' stated harms only if they reach the President. But such relief is unavailable; this Court cannot enjoin the President from posting exclusively on Truth Social or enter declaratory relief stating that the President violates the Constitution when he does so.

[1] Even if the limitations on injunctive relief against the President discussed below are viewed as non-jurisdictional, they would still preclude Plaintiffs from obtaining any effective relief and thus preclude this Court from effectively issuing an advisory opinion on the merits. *Cf. Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (holding that a President "is entitled to absolute immunity from damages liability predicated on his official acts").

It is axiomatic that courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866). When presidential action requires "the exercise of judgment," "general principles . . . forbid judicial interference with the exercise of Executive discretion." *Id.* at 499. Just as courts cannot enjoin Congress in exercising its legislative function, they cannot enjoin the President in exercising the executive function. *Id.* at 500 ("Neither can be restrained in its action by the judicial department[.]"). To do so, the Supreme Court has observed, would be "without a precedent." *Id.*

The Supreme Court reaffirmed these fundamental principles in *Franklin v. Massachusetts*, 505 U.S. 788 (1992). In that case, a district court issued an injunction requiring the President to take certain actions related to the census. Writing for a plurality, Justice O'Connor explained that "the District Court's grant of injunctive relief against the President himself [was] extraordinary, and should have raised judicial eyebrows." *Id.* at 802 (plurality) (citation omitted). Justice Scalia agreed that the President "may not be ordered to perform particular executive . . . acts at the behest of the Judiciary," a conclusion "implicit in the separation of powers." *Id.* at 827 (Scalia, J., concurring in the judgment).

Lower courts have ruled accordingly. The D.C. Circuit has squarely held that "courts do not have jurisdiction to enjoin" the President regarding decisions committed to executive discretion. *Newdow v. Roberts*, 603 F.3d 1002, 1012-13 (D.C. Cir. 2010). Likewise, district courts in the Second Circuit have long rejected demands to enjoin the President's discretionary conduct, regardless of the claim. *See, e.g.*, *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 327-28 (S.D.N.Y. 2020); *Neary v. Weichert*, 489 F. Supp. 3d 55, 64 (E.D.N.Y. 2020).

For similar reasons, federal courts lack the authority to issue a declaratory judgment against the President concerning the performance of his official duties. That was the conclusion

of Justice Scalia in *Franklin*. *See* 505 U.S. at 827 (Scalia, J., concurring in the judgment) ("I think we cannot issue a declaratory judgment against the President."). And lower courts have concluded the same. *See*, *e.g.*, *Newdow*, 603 F.3d at 1013 ("[Courts] have never submitted the President to declaratory relief."); *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("[S]imilar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [the] request for a declaratory judgment.").

Plaintiffs' requested relief runs contrary to these established remedial limits. "The President of the United States possesses an extraordinary power to speak to his fellow citizens." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018). "Indeed, a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." Trump v. United States, 603 U.S. 593, 629 (2024). For this reason, the Supreme Court concluded that "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Id.* And the President, of course, exercises his prerogative across various media channels, including social media. *See id.*

Plaintiffs ask this Court to control how the President exercises his authority, namely by forbidding the President from exclusively addressing the public through Truth Social, and to declare that the President's actions are unconstitutional. *See* Compl. at 29. These remedies are "without a precedent." *Mississippi*, 71 U.S. at 500. Even if a narrow exception may permit relief regarding purely "ministerial" acts, *but see, e.g.*, *Swan*, 100 F.3d at 978 ("We have, however, never attempted to exercise power to order the President to perform a ministerial duty."), any such exception would not apply here, because the President's decision regarding when and how to communicate is instead inherently an exercise of executive "discretion," *see Mississippi*, 71

U.S. at 489-90. The actions at issue are in no sense analogous to the quintessential ministerial duty—the delivery of the commission in *Marbury v. Madison*, 5 U.S. 137, 158 (1803).

Nor is this a case like *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) where relief against other Executive Branch officials can provide Plaintiffs "with an adequate remedy." *Swan*, 100 F.3d at 979-81. The President can unilaterally operate his personal Truth Social account without relying on anyone else, including the other Defendants. Thus, an injunction or a declaration that does not include the President would not, as a legal matter, redress Plaintiffs' alleged injuries, because the President could and would simply continue to post by himself.

This case is unlike those which involve de facto reinstatements, *see, e.g.*, *Swan*, 100 F.3d at 980; *Cook v. Trump*, 804 F. Supp. 3d 14, 45 (D.D.C. 2025), and different from the case that involved the blocking of plaintiffs on social media, *see Knight First Amend. Inst. at Columbia Univ. v. Trump* (*KFAI*), 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018). In those cases, the courts issued remedies meant to cause Executive Branch officials to take certain actions, and these actions, such as those necessary to effectuate de facto reinstatement, would provide the plaintiff with a modicum of relief. In this case, on the other hand, the requested remedies are intended to prevent the non-presidential Defendants from assisting the President with his social media positing. The effect of these remedies is entirely "speculative." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). As noted, the President himself could decide to post on his own.

Many of those cases are also unpersuasive for a second reason. In *Franklin*, Justice O'Connor and Justice Scalia disagreed about redressability. Justice O'Connor's redressability analysis assumed that "it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and

constitutional provision by the District Court, even though they would not be directly bound by such a determination." 505 U.S. at 803 (plurality op.). Justice Scalia rejected that position, explaining that redressability "requires that the court be able to afford relief *through the exercise of its power,* not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." 505 U.S. at 825 (Scalia, J., concurring in the judgment).

Some of cases in this area have relied on Justice O'Connor's position on redressability. *See, e.g.*, *KFAI*, 302 F. Supp. 3d at 562. But the Supreme Court has since taken Justice Scalia's side in the debate. *See Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) ("It is a federal court's judgment, not its opinion, that remedies an injury."). Therefore, the cases that rely on Justice O'Connor's position no longer serve as a helpful guide in assessing redressability.

Where, as here, "[t]he only apparent avenue of redress for plaintiffs' claimed injuries" would be an impermissible injunction and declaration against "the President himself," the injuries are "not redressable" and the court lacks jurisdiction. *Newdow*, 603 F.3d at 1013. Accordingly, Plaintiffs lack standing and the Complaint should be dismissed.

## II. All Claims Fail Under Rule 12(b)(6).

Even if the Court had jurisdiction, each of Plaintiffs' claims should be dismissed under Rule 12(b)(6) because Plaintiffs fail to plausibly allege any constitutional violation.

### A. Because TMTG Is Not A State Actor, Truth API Does Not Inflict any Constitutional Injury.

Plaintiffs' claims stem from an alleged "burden" Truth API imposes on their ability to cover the President. *See, e.g.*, Compl. ¶ 75. But Truth API is the product of a private company, and thus the alleged injuries it causes do not violate the Constitution. This is because "the First Amendment does not restrict private conduct." *Harris v. Quinn*, 573 U.S. 616, 629 n.4 (2014). Rather, "the constitutional guarantee of free speech is a guarantee only against abridgment by

government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976). The same is true of the guarantees contained in the Fifth Amendment. *See Pub. Utilities Comm'n of D.C. v. Pollak*, 343 U.S. 451, 461 (1952).

To have a constitutional claim arising from private action, a plaintiff must demonstrate that "the State is indeed responsible for the conduct of which the plaintiff complains." *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 263 (2d Cir. 2014). This requires two showings. *See Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999).

First, a plaintiff must show that the conduct is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). In other words, the power at issue must be a "power possessed by virtue of [federal] law," such that the private party's actions were "made possible only because the private party was clothed with the authority of federal law." *West v. Atkins*, 487 U.S. 42, 49 (1988) (quotation omitted). This element is met, for example, when a private party acts "pursuant to [a] statute." *Lugar*, 457 U.S. at 939. But it is not met when, for example, the "governmental decisions" that affect the private party are "unconnected" with the challenged conduct. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 177 (1972). The difference is that, in the second example, the action at issue was not "traceable to the State's power or authority." *Lindke v. Freed*, 601 U.S. 187, 198 (2024).

Second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar*, 457 U.S. at 937. The Supreme Court has "articulated a number of different factors or tests in different contexts" that inform the answer to this question. *Id.* at 939. All are aimed to determine whether the state "was involved with the *activity that caused the*

*injury* giving rise to the action." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257-58 (2d Cir. 2008) (quotation omitted); *see, e.g.*, *Powe v. Miles*, 407 F.2d 73, 81 (2d Cir. 1968) ("[T]he state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury."). In other words, "a plaintiff must show that the allegedly unconstitutional conduct is fairly attributable to the state." *Cranley v. Nat'l Life Ins. Co. of Vermont*, 318 F.3d 105, 111 (2d Cir. 2003) (quoting *Sullivan*, 526 U.S. at 50).

Plaintiffs allege that the President's use of Truth Social, combined with TMTG's creation of a paid API, constitutes "state action" because the President posts official announcements on the platform and owns corporate shares in its parent company. Compl. ¶¶ 36-46, 75-79. Plaintiffs also point to various agreements between President Trump and TMTG, including one in which the President promises to "first channel any and all social media communications and posts coming from a DJT Personal Profile to Truth Social and not to re-post them elsewhere for six hours," with exceptions for "posts about government, politics, political messaging, political fundraising, get-out-the-vote efforts, or other related topics." *Id.* ¶¶ 44-45 (emphasis and quotation marks omitted). Based on these allegations, Plaintiffs assert that the existence of the optional, paid API reflects "joint action" *id.* ¶ 77, or a "symbiotic relationship," *id.* ¶ 51, between the President and TMTG. But these allegations are insufficient; they fail to show that TMTG engaged in state action when it created the Truth API and fail to show that the company engages in state action as it operates Truth API.

To start, the Truth API does not reflect the "exercise of a right or privilege created by the [government]." *Lugar*, 457 U.S. at 937. Its creation and implementation are not traceable to a "power possessed by virtue of [federal] law," nor was the Truth API "made possible only because

[TMTG] is clothed with the authority of [federal] law." *West*, 487 U.S. at 49 (quotation omitted). Rather, Truth Social is a privately owned platform run by a private company, and that company structures user interactions, including the Truth API, on terms of its own choosing. These decisions are in "no way dependent on state authority." *Lindke*, 601 U.S. at 199. TMTG did not create the API pursuant to a statute, nor was its ability to provide this service reliant on any blessing of federal law. Instead, the creation of the API was an exercise of private power. Further, from the perspective of government action, there is no difference between the President using Truth Social knowing that the company has an API service and his using of any other private platform that independently chooses to charge a fee for service or priority access. Indeed, many social media platforms use an API like the one at issue here. And no one seriously contends that the President's use of any of those other platforms involves the use of any privilege created by the government.

For those reasons, Plaintiffs' allegations fail to make the first showing required by the Supreme Court's state-action precedents. This Court can accordingly stop here. But even if this Court decides to continue, Plaintiffs' outlook does not get any better, as TMTG is not a government actor. "For the conduct of a private entity to be 'fairly attributable' to the [government], there must be 'such a "close nexus between the State and the challenged action" that seemingly private behavior may be fairly treated as that of the State itself." *Cranley*, 318 F.3d at 111 (quoting *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001)).

There is no such nexus here. Although Donald Trump "created" Trump Media, he did not do so in capacity as President, and, in any event, "[a] finding of state action may not be premised solely on the private entity's creation, funding, licensing, or regulation by the government." *Id.* at

112. That is especially so here, where Plaintiffs are not challenging the *creation* of Trump Media, but rather the Truth API service created by TMTG, not the President himself—let alone the President operating in his official capacity. *See Lindke*, 601 U.S. at 196 (recognizing that, "[w]hile public officials can act on behalf of the State, they are also private citizens"); *see also id.* at 199 ("For state action to exist, the State must be responsible for the specific conduct of which the plaintiff complains." (quotation omitted)). And again, Truth API applies to speech by government officials other than President Trump, and possibly, in the future, private citizens, none of whom exercise any control, governmental or otherwise, over TMTG's adoption of API.

Plaintiffs allege a few different theories as to this second prong of the Supreme Court's test, but all of them fail to convince. Plaintiffs allege that there is "joint and symbiotic action" between President Trump and TMTG. Compl. ¶ 77. Plaintiffs also allege that President, TMTG, and Truth Social are "enmeshed." *Id.* ¶ 47. These allegations could refer to at least three different tests for state action, but none apply here.

To start, the Second Circuit has said that a "symbiotic relationship between the state and the defendant" can cause "private conduct to qualify as state action." *Standardbred Owners Ass'n v. Roosevelt Raceway Assocs., L.P.*, 985 F.2d 102, 105 (2d Cir. 1993). The main Supreme Court precedent cited for this proposition is *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), where the "Supreme Court found that the restauranteur's action qualified as state action because the state owned the building, paid the building's maintenance, owned an adjacent parking lot and therefore had a direct financial interest in the restaurant's success, and dedicated the building for public purposes, thereby conferring tax exempt status on the building," *Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1082 (2d Cir. 1990). Based on these findings, the Supreme Court concluded that the "State so far insinuated itself into a position of

interdependence with Eagle that it must be recognized as a joint participant in the challenged activity." *Burton*, 365 U.S. at 725.

Since then, the Supreme Court has "severely narrowed" *Burton*. *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 314 n.8 (2d Cir. 2007) (Korman, J., concurring in part and dissenting in part). And Plaintiffs' allegations come nowhere near the facts in *Burton*. Plaintiffs claim that the President and TMTG share a financial motive. Compl. ¶ 77. But a public official's mere ownership of a private company's stock cannot possibly render all actions of that company into governmental action. That is especially true when the President does not even own a controlling stake in the company, *cf. Lansing v. City of Memphis*, 202 F.3d 821, 831 (6th Cir. 2000) ("The minority presence of public officials on the board of a private entity does not render the entity a state actor."), and in the light of the fundamental principle of separateness between a corporation and its stockholders, *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 442 (1934).

The "Social Media 6-Hour Exclusive"—an agreement in which the President commits, with some exceptions, to first post on Truth Social—does not move the needle. Compl. ¶¶ 40-45. The fact that a public official has made a commitment to provide exclusive content to a private company does not turn the private company's actions into governmental action. For example, if the President had instead made the exact same commitment to X, no one would think that X had somehow become a governmental platform (regardless of whether the President happened to own some shares in X). TMTG is a company whose goal is to maximize profit. On Plaintiffs' reasoning, any social media company, or news organization for that matter, would be a state actor if it sought to obtain and publish exclusive news from government officials and charged a fee related to publication.

Plaintiffs also rely on a handful of other provisions of the 2024 agreement that includes the six-hour exclusive, such as the President's grant to TMTG of a license to use his likeness to promote Truth Social, the President's promise not to found or develop, or acquire a controlling interest in, another social media platform, and TMTG's promises to submit any uses of the President's likeness to him for approval, not use his likeness in a manner that would injure the President, and to not dissociate from him. *Id.* ¶¶ 47-49. But these provisions pre-dated the President's return to office, and do not demonstrate that the federal government is in a state of interdependence with TMTG. *See Lindke*, 601 U.S. at 196 (recognizing that, "[w]hile public officials can act on behalf of the State, they are also private citizens"). The same is true of Plaintiffs' other allegations, which concern the value of President Trump's posts to TMTG, and President Trump's favorable posts about Truth Social. Compl. ¶¶ 50-51. Many media businesses would be adversely affected if public officials no longer appeared on their platforms, and public officials often speak favorably about some of these businesses.[2] Those two facts do not render those businesses state actors subject to the Constitution.

For these reasons, there is no symbiotic relationship between the federal government and TMTG.

A close relative of the symbiotic relationship test is the pervasive entwinement test. *See Stefanoni v. Darien Little League, Inc.*, 101 F. Supp. 3d 160, 173 (D. Conn. 2015); Compl. ¶ 47 (claiming that "Trump Media and President Trump are enmeshed"). The line of cases applying to that test speak "to situations in which the private entity is "entwined with governmental

[2] *See, e.g.*, Liam O'Dell, *Alexandria Ocasio-Cortez takes swipe at X, praises 'humanity' of Bluesky amid return to rival app*, indy100, https://perma.cc/ZUT6-AAK5 (regarding Bluesky, Representative Alexandria Ocasio-Cortez stating "I don't even know why I stopped using this in the first place? Good GOD it's nice to be in a digital space with other real human beings.").

policies," or when government is "entwined in [the private entity's] management or control." *Brentwood Acad.*, 531 U.S. at 296. When "the relevant facts show pervasive entwinement to the point of largely overlapping identity," *id.* at 303, then the private entity is subject to the Constitution. Thus, Plaintiffs here must show "that the State is so entwined with [TMTG's] management that" TMTG's "decisions are fairly attributable to the State." *Grogan*, 768 F.3d at 268.

As alleged, this case is nothing like those in which a court has found state action based on pervasive entwinement. In *Brentwood Academy*, for example, 84% of the high schools in the athletic association at issue were public. 531 U.S. at 299. Also, State Board of Education members served as ex officio members of the association's rulemaking and administrative bodies, and the association's "ministerial employees [were] treated as state employees to the extent of being eligible for membership in the state retirement system." *Id.* at 291, 300. And in *Horvath v. Westport Library Association*, almost all the funding for the library at issue came from the public coffers, and the local government appointed half of the Library's trustees. 362 F.3d 147, 153 (2d Cir. 2004); *see id.* at 154 ("The combination of pervasive public funding of the Library and control of one-half of its governing board persuade us that such 'pervasive entwinement' is present here.").

Here, Plaintiffs do not allege that the federal government manages or controls TMTG, and missing is any allegation that TMTG is "entwined with governmental policies." *Brentwood Acad.*, 531 U.S. at 296. Quite simply, Plaintiffs' allegations concerning the President's involvement with Truth Social do not "show pervasive entwinement to the point of largely overlapping identity between the [federal government] and [TMTG]." *Horvath*, 362 F.3d at 154.

TMTG is a private actor that made a commercial decision. That decision is not subject to constitutional scrutiny.

Next, to the extent Plaintiffs invoke the "joint action" test, *see* Compl. ¶ 77, their allegations are again insufficient. "A private actor can only be a willful participant in joint activity with the State or its agents if the two share some common goal to violate the plaintiff's rights." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (quotation omitted). Thus, to give an example used in *Betts*, a plaintiff properly pleaded state action when two private security guards and the "arresting officer reviewed surveillance footage, discovered that the plaintiff's merchandise was not, in fact, stolen, and worked in tandem to 'fabricate a reason to arrest plaintiff for shoplifting.'" *Id.* at 85-86 (alteration adopted) (quoting *White v. Moylan*, 554 F. Supp. 2d 263, 267 (D. Conn. 2008)). In that example, "[b]y jointly working to fabricate evidence of a crime, the private actors and the police officer shared the common goal of violating the plaintiff's constitutional rights." *Id.* at 86.

In this case, on the other hand, Plaintiffs do not allege that the creation of the API was the product of "some agreement between" the President and TMTG to violate their rights, nor do they allege facts demonstrating that implementation of the API constitutes a joint effort between the two. Plaintiffs therefore flunk the joint-action test.

Finally, to the extent Plaintiffs argue that state action exists because the President provided "significant encouragement" to the Truth API scheme, *see Sybalski*, 546 F.3d at 257, they fail to allege facts demonstrating such encouragement. The sort of encouragement that implicates the state action doctrine is illustrated by *United States v. Stein*, where the "government brought home to KPMG that its survival depended on its role in a joint project with the

government to advance government prosecutions." 541 F.3d 130, 147 (2d Cir. 2008). Plaintiffs allege nothing like that here.

* * *

In sum, Plaintiffs fail to plausibly allege that TMTG is a state actor. Indeed, Plaintiffs' allegations fail to meet either of the two requirements the Supreme Court has enumerated. The Truth API is the product of an exercise of private power by a private actor. Accordingly, in evaluating the plausibility of Plaintiffs' claims—the Court must answer only one question: whether a public official violates either the First or Fifth Amendments when he speaks through a platform that results in some listeners receiving the communication marginally faster than everyone else. For the reasons below, the answer is no.

### B. The Complaint Alleges No Violation of Plaintiffs' First Amendment Rights.

At bottom, Plaintiffs' First Amendment claims rest on the proposition that the President violates the First Amendment when he speaks through a platform that is not equally and freely accessible by all who wish to access it. *See* Compl. ¶¶ 5, 86, 99, 109. But there is no precedent recognizing a constitutional right to receive government announcements in real time, or at any particular speed, let alone through the medium a plaintiff prefers. Indeed, the Supreme Court has recognized that "the right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 17 (1965).

Plaintiffs' proposed rule would conflict with the "common and widely accepted practice among politicians of granting an exclusive interview to a particular reporter," as well as the "equally widespread practice of public officials declining to speak to reporters whom they view as untrustworthy because the reporters have previously violated a promise of confidentiality or otherwise distorted their comments." *Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 418 (4th Cir.

2006) (quoting *Snyder v. Ringgold*, 133 F.3d 917, 1998 WL 13528, at *4 (4th Cir. 1998)); *see Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *6 (D.C. Cir. June 6, 2025) (explaining that there is no First Amendment restriction on the public official's discretion to "grant interviews or briefings with selected" individuals or media outlets). The newspaper in *Ehrlich* conceded that government officials routinely "evaluate reporters and reward them with advantages of access," meaning that "government officials regularly subject all reporters to some form of differential treatment based on whether they approve of the reporters' expression." 437 F.3d at 418. Allowing such routine conduct to become the basis for a constitutional claim, the court explained, would "plant the seed of a constitutional case" in "virtually every" interaction between a public official and the press. *Id*.

That logic requires dismissal of Plaintiffs' claims. Because the First Amendment is not implicated by the President's choice of platform or medium for his own speech, the First Amendment certainly does not prohibit a public official from posting to a social media site—itself not bound by the First Amendment, *see supra* Section (II)(A)—that charges a fee for preferential treatment.

If it were otherwise, *any* government official (not just President Trump) would violate the First Amendment by posting on Truth Social if his posts were subject to Truth API—or indeed, simply by giving an interview to any news outlet that requires a paid subscription, or by appearing on any television network that is not freely accessible. *See* Compl. ¶ 85 (alleging that Plaintiffs have a First Amendment "right to access President Trump's public comments on equal terms with other members of the press and public"). In other words, Plaintiffs "would hold that tens of thousands of [governmental officials] have presumptively violated the First Amendment" merely by making official announcements on private platforms that provide preferential

treatment to paying customers, a practice that, to Defendants' knowledge, has "never been previously questioned." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). Such an absurd consequence demonstrates the unfounded nature of Plaintiffs' view of the First Amendment.

Indeed, the absurdity of Plaintiffs' position is far more fundamental. The Constitution does not require the "impossible," *Bowles v. Willingham*, 321 U.S. 503, 515 (1944); *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021), and it is simply impossible for government officials to speak in a way that ensures that all members of the public can receive "equal" access at the same exact time without incurring any costs. For example, even if the Truth API service did not exist, members of the public could not immediately access the President's statements on Truth Social unless *they pay for internet access*, which some cannot afford to do (and which others do only at slower speeds). And for the same reason, such individuals also cannot access government websites that make official announcements. Even if the government could somehow make all such announcements at the same time through broadcast television or physical publications, such individuals may well also lack televisions and certainly could not all obtain physical publications at the same time as those with internet access. Of course, the number of people who lack sufficient resources to obtain "immediate" access to information available on the internet or television is undoubtedly much smaller than the number of people who lack sufficient resources to pay for Truth API. But that factual distinction is legally immaterial under the First Amendment, because a purported "equal access" right would be violated for the former no less than the latter. *See Budowich*, 2025 WL 1649265, at *9 (concluding the concession that the President could "discriminate on the basis of viewpoint in granting exclusive interviews, answering journalists' questions, or selecting journalists to attend

an event about a particular subject matter" was fatal to the AP's claim that the President could not subject a few reporters to disfavored treatment).

Moreover, Plaintiffs' theory fails even on the erroneous assumption that TMTG's operation of the API is government action. Even when the government operates a public forum, the First Amendment permits it to adopt content-neutral access restrictions, including those involving tiered or paid access. *See Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002). For example, if the government hosts a speaker's symposium exclusively on a stage constructed on the National Mall, the First Amendment obviously allows the government to charge for tickets and charge higher prices for better seats, even though that means most members of the public will not be able to receive this information at the same time and some attendees may hear less well than others because of the price they were able to pay. In fact, government-operated arts institutions similarly use tiered pricing. The First Amendment allows such content-neutral access restrictions, and Plaintiffs fail to reconcile their proposed rule with this unchallenged practice.

### C. Plaintiffs Rely on Inapposite Equal Access and Fail to State an Equal-Access Claim (Count I)

In the light of the above discussion, Plaintiffs fail to state a plausible equal-access claim. Indeed, the cases on which Plaintiffs rely are entirely inapposite. *See* Compl. ¶¶ 83-84. *ABC v. Cuomo* concerned unequal access to campaign facilities during the primary runoff for Mayor of New York. 570 F.2d 1080, 1081-82 (2d Cir. 1977). CBS and NBC were allowed in, but ABC was not. *Id.* at 1083. The Second Circuit concluded that "the First Amendment rights of ABC and of its viewing public would be impaired by their exclusion from the campaign activities." *Id.* And *Stevens v. New York Racing Association* concerned the racing association's denial of working

credentials to the plaintiff, which prohibited the plaintiff "from bringing a camera into and taking and being in pictures in the paddock areas of defendant's racing track." 665 F. Supp. 164, 175 (E.D.N.Y. 1987).

Neither case is remotely analogous to this one, which concerns a government official's choice of communication platform and an access restriction that a private party imposes. And thus, they do not support Plaintiffs' claim that the President violates the First Amendment when he uses a privately operated platform to disseminate announcements and the private platform structures its own technical features, including paid API access, as part of its business model. Plaintiffs' claim therefore fails as a legal matter.

Plaintiffs' claim would remain meritless even if this Court concluded that implementation of the Truth API constituted state action. The Truth API results in, at most, an inconsequential delay for non-subscribers. And "inconsequential delays" do not violate the First Amendment. *Courthouse News Serv.*, 2 F.4th at 328. If, for example, ABC had to wait outside the campaign facility for a fraction of a second before entering, there would have been no viable claim in *Cuomo*. And the same is true here. In response, Plaintiffs will likely attempt to frame this argument as a plea for a "*de minimis* exception," Compl. ¶ 91, but Defendants need no exception because there is no "speech restriction" that conflicts with the First Amendment's guarantee. This Court should accordingly dismiss Count I.

### D. The Complaint Fails to State a Claim Based on an Allegedly Unlawful Time, Place, or Manner Restriction on Access to a Public Fora (Count II).

Plaintiffs also seek recourse in forum doctrine. *See* Compl. ¶¶ 96-103. Relying on *Lindke v. Freed*, Plaintiffs contend that President Trump's Truth Social posts are a designated public fora—or "property that the State has opened for expressive activity by part or all of the public," *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)—and that Truth API

constitutes an unreasonable, time, place, or manner restriction, *see Hotel Emps.*, 311 F.3d at 545 ("[R]estrictions on speech in designated public fora are constitutional only if they are content-neutral time, place, and manner restrictions that are (1) necessary to serve a compelling state interest and (2) narrowly drawn to achieve that interest" (quotation omitted)).

Plaintiffs fail to state a claim. *Lindke* involved claims that a government official blocked social-media users from commenting on the official's posts on the official's personal social-media account, and the Supreme Court addressed the question of whether that action qualified as state action. 601 U.S. at 193-97. *Lindke* is inapposite for two reasons.

*First*, the alleged access restriction Plaintiff challenges is imposed by TMTG, which (as explained above) is not a state actor. *See supra* Section (II)(A); *Halleck*, 587 U.S. at 812 ("[W]hen a private entity provides a forum for speech, the private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor."). Thus, Plaintiffs are wrong to reach for the test that applies to government-imposed time, place, and manner restrictions. *See McCullen v. Coakley*, 573 U.S. 464, 477 (2014). There was no suggestion whatsoever in *Lindke* that the First Amendment would have been implicated if Facebook or X had unilaterally imposed a fee to access their platforms, either generally or specifically for accounts of individual who were public officials. And such an imposition would certainly not qualify as state action under *Lindke*'s test. Instead, because such restrictions are not "traceable to the State's power or authority," 601 U.S. at 198, Plaintiffs' claim fails.

*Second*, Plaintiffs allege only that the Truth API's actions interfere with their ability to collect and access complete and archived versions of the President's Truth Social posts. *See* Compl. ¶ 72. Unlike the commenting at issue in *Lindke*, these activities are "noncommunicative step[s] in the production of speech." *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022). And

thus, the same restrictions do not apply. *See id.* The Supreme Court has warned against extending the public forum doctrine "in a mechanical way" to contexts that meaningfully differ from those in which the doctrine has traditionally been applied. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-73 (1998). And it has traditionally been applied in cases "concerned with assembly, the exchange of ideas to and among citizens, the discussion of public issues, the dissemination of information and opinion, and debate," not the mere access to information. *Price*, 45 F.4th at 1069; *see In re Application of The Herald Co.*, 734 F.2d 93, 100 (2d Cir.1984) ("To claim a value in access to information comparable to the value of freedom of expression is to ignore 200 years of First Amendment jurisprudence.").

Thus, even assuming the Truth API's restriction qualifies as state action, Defendants need only meet a standard of "reasonableness," which asks whether the restriction is "reasonable in light of the purpose served by the forum." *Price*, 45 F.4th at 1072 (quotation omitted). It is. As previously discussed, content-neutral tiered access is permissible in many contexts: for example, charging more for better seats at a government-sponsored symposium or implementing tiered pricing at government-run arts institutions. The same principle applies here. A content-neutral, payment-based distinction in access to the delivery of information is constitutionally permissible and does not violate the First Amendment. This Court should dismiss Count II.

### E. The Complaint Does Not Plausibly Allege that the Government Conditioned Access to a Benefit on the Surrender of Protected Right Or Charged an Unconstitutional Fee (Count III).

Plaintiffs next invoke the unconstitutional conditions doctrine. That doctrine forbids the government from "requiring a regulated party to give up its constitutional rights in exchange for a government benefit." *Boehringer Ingelheim Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*, 150 F.4th 76, 96–97 (2d Cir. 2025). Here, Plaintiffs claim that Defendants have

forced them into an impermissible choice: either subsidize Truth Social or receive slower access to the President's official communications. *See* Compl. ¶ 109. But Defendants have not imposed any conditions on Plaintiffs, let alone coercive ones. The only "condition" that Plaintiffs identify is the cost of the Truth API. *See id.* ¶ 112. But that condition is one imposed by TMTG, a private company against whom Plaintiffs seek no relief—not a condition imposed by any named defendant. That is no more an unconstitutional condition than the President giving an exclusive interview to a cable-news channel. If Plaintiffs were right, the newsstand would become the font of First Amendment claims, for each time a customer purchased the New York Times to read an exclusive interview involving a public official, that customer could claim the official's choice in platform compelled a subsidy. That cannot be right, and Plaintiffs' claim fails as a matter of law.

That result holds even if this Court disagrees with Defendants on state action. "There is nothing in this case approaching a Government-mandated pledge or motto that [Plaintiffs] must endorse." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006). Also, payment to the government does not violate the First Amendment, even if the funds paid will be spent for speech and expression with which Plaintiffs disagree. *See Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 229 (2000) ("Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies."); *cf. United States v. Lee*, 455 U.S. 252, 260 (1982) ("The tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief"); *N.A.A.C.P. v. Hunt*, 891 F.2d 1555, 1566 (11th Cir. 1990) ("The Supreme Court has held that union members cannot be compelled to pay dues which support causes disagreeable to them," but that holding "has never been applied to the government, however; if it were, taxation would become impossible.").

Separate from their unconstitutional-conditions theory, but under the same claim, Plaintiffs allege that the Truth API "burdens Plaintiffs' Fifth Amendment right not to be charged unreasonable sums to access official government information." Compl. ¶ 113. Like their other theories, this one fails out the gate because a private company, not the federal government, is charging the sum.

And even if Plaintiffs were right on state action, dismissal remains warranted. The cases on which Plaintiffs have previously relied on for this claim, *see* ECF No. 36-1 at 15—such as *Murdock v. Pennsylvania*, where the Supreme Court held that the government "may not impose a charge for the enjoyment of a right granted by the federal constitution," 319 U.S. 105, 113 (1943)—are inapplicable. Assuming state action, the government, in operating a social media company, "is not acting in a traditional governmental capacity." *Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*, 745 F.2d 767, 774 (2d Cir. 1984). Instead, the government would be acting in a "proprietary" capacity. *Id.* And "[w]here the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). The government, in that situation, would have a "significant interest" in the "raising of revenue," *Gannett*, 745 F.2d at 775, and would have to demonstrate only that the charged fee is "reasonable," *See Price*, 45 F.4th at 1073.

Reasonableness in this context includes "a commercial component." *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1309 (11th Cir. 2003). Plaintiffs do not allege that the fee is commercially unreasonable, and the access burden is minimal. Indeed, Plaintiffs do not allege any facts demonstrating a cognizable harm; instead, they rest on conclusory

statements. *See, e.g.*, Compl. ¶ 57 ("[T]hose who subscribe to Truth API will get the President's posts faster—potentially significantly faster—than those who do not."). Such allegations are woefully insufficient. *See Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 709 (2d Cir. 2002) ("[W]e give no credence to plaintiff's conclusory allegations.").

For these reasons, this Court should dismiss Count III.

**F. The Complaint Does Not Identify Any Equal Protection Violation (Count IV).**

Plaintiffs' final claim rests on the Equal Protection Clause. *See* Compl. ¶¶ 116-22. The Equal Protection Clause prevents "governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). To state an equal-protection claim, a plaintiff must allege that it "compared with others similarly situated, was selectively treated" and that "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Crowley v. Courville*, 76 F.3d 47, 52-53 (2d Cir. 1996) (quoting *LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)).

Here, Plaintiffs claim that Defendants "are granting Truth API subscribers preferential and valuable access to President Trump's official government statements." Compl. ¶ 119. But, of course, any difference in delivery time is owed to private action—TMTG's creation of the API—not state action. *See id.* ¶¶ 3, 52. Plaintiffs' claim would therefore run against TMTG—not Defendants. But the Fifth Amendment does not bind private companies. *United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1296 (2d Cir. 1991).

And there is no legal basis to subject the President's choice in platform to scrutiny under the Fifth Amendment.[3] Like with Plaintiffs' First Amendment theory, this proposal would mean that a President might violate the Fifth Amendment when he gives an interview to a subscription-based newspaper, appears on a cable news network, or participates in a pay-walled livestream. But there is no reason to think that cases like *Ehrlich* or *Budowich* would come out differently if the disgruntled reporter pressed a claim under the Fifth Amendment rather than the First. Indeed, no authority suggests that a government official is prohibited from using a platform that offers paid enhancements to its service. The Constitution does not require government speakers to ensure that every private intermediary they use provides identical access to all users, nor does it bar government officials from choosing communications mediums with features Plaintiffs might prefer to avoid. This Court should reject Plaintiffs' novel Fifth Amendment theory, which threatens incredibly disruptive consequences.

Finally, even this Court concluded that TMTG is a state actor for purposes of the Truth API, a content-neutral, commercially rational pricing distinction easily meets rational-basis review. A subscription-based program is common among similar platforms, as is charging money for faster access. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (providing that, under rational-basis review, a classification must "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification").

In sum, because Plaintiffs fail to state an equal-protection claim, this Court should dismiss Count IV.

---

[3] Even if there was, the President's choice of Truth Social is entirely rational given that other prominent platforms temporarily blocked him from posting.

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court dismiss the Complaint in its entirety.

Dated: October 30, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BRANTLEY T. MAYERS
Counsel to the Assistant Attorney General

NOAH T. KATZEN
Assistant Branch Director
Federal Programs Branch

*/s/ Heidy L. Gonzalez*
HEIDY L. GONZALEZ
*Trial Attorney*
U.S. Department of Justice,
Civil Division, Federal Programs
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 598-7409
Email: heidy.gonzalez@usdoj.gov
FL Bar No. 1025003

*Attorney for Defendants*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES

I certify that this memorandum contains 8,697 words, in compliance with the Local Rule 7.1(c) regarding the word-count limitation.