**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

THE INTERCEPT MEDIA, INC., *et al.*

*Plaintiffs*,

v.

DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,

*Defendants*.

Civil Action No. 1:26-cv-6867

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Scott A. Kronland
Barbara J. Chisholm
Matthew J. Murray
Marisa C. Lowe
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Tel. 415-421-7151
Fax. 415-362-8064
skronland@altber.com
bchisholm@altber.com
mmurray@altber.com
mlowe@altber.com

John Langford
Stacy Livingston
David A. Schulz
MEDIA FREEDOM & INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
Tel. (203) 432-2366
Fax (203) 432-3034
john.langford@ylsclinics.org

Nikhel S. Sus
Jonathan E. Maier
Stuart C. McPhail
CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jmaier@citizensforethics.org
smcphail@citizensforethics.org

Brendan Ballou
Andrea Dobson-Forsee
PUBLIC INTEGRITY PROJECT
1763 Columbia Rd. NW Ste. 175
Washington, DC 20009
(917) 684-3900
ballou@publicintegrityproject.org

*Counsel for Plaintiffs*

## TABLE OF CONTENTS


INTRODUCTION ........ 1

LEGAL STANDARD ........ 1

ARGUMENT ........ 2

I. Plaintiffs have standing because the Court can redress their injuries. ........ 2

A. The Court may enter declaratory and injunctive relief against the President. ........ 2

B. Even if the Court cannot bind the President, relief against his subordinates would redress at least some of Plaintiffs' injuries. . ........ 5

II. The Complaint challenges state action that is subject to constitutional scrutiny ........ 7

A. Defendants' own conduct is state action. ........ 8

B. The Complaint separately alleges that Trump Media is a state actor. . ........ 10

1. The API functions because of a privilege granted by the government. ........ 11

2. Trump Media acts as a state actor when it sells early access to President Trump's official announcements. ........ 12

III. The Complaint plausibly alleges that the Truth API scheme violates the First and Fifth Amendments. ........ 17

A. No legitimate interest justifies providing a head start on official announcements to those who pay the President's company (Count I). ........ 17

B. The head start restricts access to designated public fora without narrow tailoring (Count II) ........ 20

C. The scheme makes faster access conditional on forfeiting First Amendment rights (Count III). ........ 24

D. Selling early access to official speech for the President's private profit serves no legitimate government interest (Count IV). ........ 26

CONCLUSION ........ 27

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Broad. Cos., Inc. v. Cuomo*,
570 F.2d 1080 (2d Cir. 1977)....17, 18

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
880 F. Supp. 2d 456 (S.D.N.Y. 2012)....20

*Am. Atheists, Inc. v. Port Authority of N.Y. & N.J.*,
936 F. Supp. 2d 321 (S.D.N.Y. 2013), *aff'd*, 760 F.3d 227 (2d Cir. 2014)....13, 14

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)....2

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....2

*Associated Press v. Budowich*,
780 F. Supp. 3d 32 (D.D.C. 2025)....19

*Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*,
322 F.3d 1298 (11th Cir. 2003)....23

*Autor v. Pritzker*,
740 F.3d 176 (D.C. Cir. 2014)....25

*Banks v. Manchester*,
128 U.S. 244 (1888)....18, 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....2

*Betts v. Shearman*,
751 F.3d 78 (2d Cir. 2014)....16

*Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
150 F.4th 76 (2d Cir. 2025)....24

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001)....11, 12, 13, 14

*Burton v. Wilmington Parking Auth.*,
365 U.S. 715 (1961)....8, 12, 14, 15, 27

*Carter v. HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016)....1, 6

*Clinton v. City of New York*,
524 U.S. 417 (1998)....3, 5

*Clinton v. Jones*,
520 U.S. 681 (1997)....2

*Connecticut v. Am. Elec. Power Co.*,
582 F.3d 309 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011)....5

*Cook v. Trump*,
804 F. Supp. 3d 14 (D.D.C. 2025)....7

*Cooper v. U.S. Postal Serv.*,
577 F.3d 479 (2d Cir. 2009)....11

*Cornelio v. Connecticut*,
32 F.4th 160 (2d Cir. 2022)....19

*Cornelius v. Benevolent Protective Order of Elks*,
382 F. Supp. 1182 (D. Conn. 1974)....9

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985)....23

*County of Rockland v. Triborough Bridge & Tunnel Auth.*,
181 F.4th 249 (2d Cir. 2026)....27

*Courthouse News Serv. v. Schaefer*,
2 F.4th 318 (4th Cir. 2021)....20

*Cummings v. Missouri*,
71 U.S. 277 (1866)....9

*Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*,
118 F.4th 505 (2d Cir. 2024)....5

*Fabrikant v. French*,
691 F.3d 193 (2d Cir. 2012)....11, 12

*Forbes v. City of New York*,
2008 WL 3539936 (S.D.N.Y. Aug. 12, 2008)....14, 15

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)....4, 5

*Frey v. City of New York*,
157 F.4th 118 (2d Cir. 2025)....5, 6

*Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*,
745 F.2d 767 (2d Cir. 1984)....................23

*Georgia v. PublicResource.Org, Inc.*,
590 U.S. 255 (2020)....................18, 23

*Gilmore v. City of Montgomery*,
417 U.S. 556 (1974)....................9, 10, 11

*Haaland v. Brackeen*,
599 U.S. 255 (2023)....................5

*Harrison v. New York*,
95 F. Supp. 3d 293 (E.D.N.Y. 2015)....................15

*Holodnak v. Avco Corp., Avco-Lycoming Div., Stratford, Conn.*,
514 F.2d 285 (2d Cir. 1975)....................13

*Hooper v. Bernalillo Cnty. Assessor*,
472 U.S. 612 (1985)....................26

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee ("ISKCON")*,
505 U.S. 672 (1992)....................23, 24

*Jackson v. Statler Found.*,
496 F.2d 623 (2d Cir. 1973)....................9

*Janus v. AFSCME, Council 31*,
585 U.S. 878 (2018)....................25

*Janusaitis v. Middlebury Volunteer Fire Dep't*,
607 F.2d 17 (2d Cir. 1979)....................14

*Khalil v. Trustees of Colum. Univ. in City of N.Y.*,
833 F. Supp. 3d 404 (S.D.N.Y. 2026)....................8

*Knight First Amend. Inst. at Colum. Univ. v. Trump ("KFAI I")*,
302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019),
*vacated as moot sub. nom Biden v. KFAI*, 593 U.S. 901 (2021).................... *passim*

*Knight First Amend. Inst. at Colum. Univ. v. Trump ("KFAI II")*,
928 F.3d 226 (2d Cir. 2019), *vacated as moot sub nom. Biden v. KFAI*,
593 U.S. 901 (2021)....................21, 23

*Knight First Amend. Inst. at Colum. Univ. v. Trump*,
953 F.3d 216 (2d Cir. 2020), *vacated as moot sub nom. Biden v. KFAI*,
593 U.S. 901 (2021)....................9

*Knight v. City of New York*,
164 F.4th 173 (2d Cir. 2026) ....................................................................................5

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965).............................................................................................22

*Lehman v. City of Shaker Heights*,
418 U.S. 298 (1974).............................................................................................24

*Lindke v. Freed*,
601 U.S. 187 (2024).........................................................................................8, 21

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001).............................................................................................19

*Lugar v. Edmondson Oil Co.*,
457 U.S. 922 (1982)...............................................................................8, 10, 11, 12

*McKenna v. Nassau County*,
2023 WL 8455670 (E.D.N.Y. Dec. 6, 2023) .......................................................22

*Mississippi v. Johnson*,
71 U.S. 475 (1866)..............................................................................................3, 4

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024).............................................................................................25

*Murdock v. Pennsylvania*,
319 U.S. 105 (1943).........................................................................................25, 26

*Murphy v. N.Y. Racing Ass'n, Inc.*,
76 F. Supp. 2d 489 (S.D.N.Y. 1999)....................................................................15

*N.Y. Mag. v. Metro. Transp. Auth.*,
136 F.3d 123 (2d Cir. 1998).................................................................................23

*Nat'l Awareness Found. v. Abrams*,
50 F.3d 1159 (2d Cir. 1995).................................................................................25

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974) ............................................................................2, 4

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) ..............................................................................3

*Nicholas v. Bratton*,
376 F. Supp. 3d 232 (S.D.N.Y. 2019)..................................................17, 20, 22

*Norwood v. Harrison*,
413 U.S. 455 (1973) .......... 9, 10

*Packingham v. North Carolina*,
582 U.S. 98 (2017) .......... 21

*Paulsen v. County of Nassau*,
925 F.2d 65 (2d Cir. 1991) .......... 22

*Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022) .......... 22

*Reitman v. Mulkey*,
387 U.S. 369 (1967) .......... 9

*Rumsfeld v. FAIR, Inc.*,
547 U.S. 47 (2006) .......... 25

*Saget v. Trump*,
375 F. Supp. 3d 280 (E.D.N.Y. 2019) .......... 2

*Stevens v. N.Y. Racing Ass'n, Inc.*,
665 F. Supp. 164 (E.D.N.Y. 1987) .......... 17, 18, 20

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) .......... 5, 7

*Travis v. Owego-Apalachin Sch. Dist.*,
927 F.2d 688 (2d Cir. 1991) .......... 20, 21

*Trump v. United States*,
603 U.S. 593 (2024) .......... 4, 12

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008) .......... 11, 16

*Utah v. Evans*,
536 U.S. 452 (2002) .......... 5

*White v. Moylan*,
554 F. Supp. 2d 263 (D. Conn. 2008) .......... 16

**Federal Rules**

Federal Rule of Civil Procedure 12(b)(6) .......... 2

**U.S. Constitution**

U.S. Const. amend. I .......... *passim*

U.S. Const. amend. IV ....................................................................................................16

U.S. Const. amend. V.......................................................................................17, 26, 27

## INTRODUCTION

The President may choose where he speaks, but he may not sell a head start on what he says when he makes government announcements. Since August 1, 2026, Trump Media & Technology Group ("Trump Media"), the company that owns Truth Social, has charged up to $100,000 a month for early access to the "market-moving" posts on Truth Social from the President's and other government officials' accounts. ECF 1 ("Compl.") ¶¶52–56. Trump Media's largest shareholder is a trust of which the President is the sole beneficiary. *Id.* ¶¶10, 37–39. Because Defendants publish official announcements on Truth Social first, paying subscribers get the government's news before the public and non-subscribed media outlets.

Defendants' motion to dismiss fails for three reasons. *First*, Plaintiffs have standing. The Court may enter relief reaching the President's ministerial choice of where to post government statements first, and, moreover, an order against his staff alone would shrink the stream of announcements sold in advance. *Second*, the Complaint challenges state action: Defendants' own decision to route official announcements through a pay-for-priority platform. The Complaint also plausibly alleges that Trump Media is a state actor under multiple theories. *Third*, accepting the alleged facts as true and drawing all inferences in Plaintiffs' favor, the Complaint plausibly states four claims upon which relief can be granted.

The Court should therefore deny Defendants' motion.

## LEGAL STANDARD

Because Defendants challenge standing on the face of the Complaint, the Court asks only whether the Complaint "allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue," accepting its allegations as true and drawing all reasonable inferences in Plaintiffs' favor. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016) (citation omitted). A court evaluating a motion to dismiss likewise considers whether the Complaint

pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court does not consider whether the plaintiff can prove its allegations, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and "[t]he choice between two plausible inferences … is not a choice to be made by the court on a Rule 12(b)(6) motion," *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

## ARGUMENT

### I. Plaintiffs have standing because the Court can redress their injuries.

Defendants say no order from this Court could redress Plaintiffs' injuries. ECF 85-1 ("Mot.") at 4–8. They are wrong twice over. The Court may enter relief against the President himself, and even if it could not, an order against Defendants Harp, Scavino, and other White House staff would reduce the number of official posts sold first to paying subscribers.

#### A. The Court may enter declaratory and injunctive relief against the President.

This Court may remedy Plaintiffs' constitutional injuries by awarding relief, either injunctive or declaratory, against the President. "[I]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Clinton v. Jones*, 520 U.S. 681, 705 (1997) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 753–54 (1982)). "[N]o immunity established under any case known … bars every suit against the President for injunctive, declaratory or mandamus relief." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974).

Although courts are understandably cautious about issuing relief directly against the President, they have done so to remedy plaintiffs' injuries if it would "not invade the province of executive discretion." *Saget v. Trump*, 375 F. Supp. 3d 280, 333–35, 379 (E.D.N.Y. 2019) (rejecting argument court lacked subject matter jurisdiction for lack of remedy in claim against

the President, concluding that "enjoining the President to ensure executive officials operate in accordance with the law is appropriate in this case and well within the Court's power"). That includes issuing declaratory relief against the President, which the Supreme Court has upheld. *See Clinton v. City of New York*, 524 U.S. 417, 425 & n.9, 436, 448 (1998) (finding standing and upholding declaratory relief against the President declaring line-item veto unconstitutional); *id.* at 463 (Scalia, J., concurring in part) (agreeing court had jurisdiction); *see also Knight First Amend. Inst. at Colum. Univ. v. Trump ("KFAI I")*, 302 F. Supp. 3d 541, 576–80 (S.D.N.Y. 2018) (entering declaratory relief against President and subordinate declaring that their blocking users on social media violated the users' First Amendment rights), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *vacated as moot sub. nom Biden v. KFAI*, 593 U.S. 901 (2021) (vacating due to President Trump's departure from office).

Defendants say the relief Plaintiffs seek is improper because it touches on the President's executive "discretion." Mot. 6 (citing *Mississippi v. Johnson*, 71 U.S. 475, 489–90 (1866)). But *Johnson* declined to take judicial control of Reconstruction, and Plaintiffs' requested relief is nothing like supervising the "assign[ment of] generals to command" and the "detail[ing of] sufficient military force to enable such officers to discharge their duties." 71 U.S. at 499. Plaintiffs' requested relief instead resembles the relief sought in *KFAI I*, where the court considered relief preventing the President from posting on social media while blocking users but did not otherwise direct the substance of his statements. 302 F. Supp. 3d at 578 ("Any such injunction would not direct the President to execute the laws in a certain way, nor would it mandate that he pursue any substantive policy ends."); *contrast Newdow v. Roberts*, 603 F.3d 1002, 1011–12 (D.C. Cir. 2010) (concluding court could not direct substance of President's inaugural address). Precluding the President from exclusively posting official materials on Truth

Social as long as the entity discriminates in access imposes only the most "minimal" burden: he would remain free to choose the substance of his posts and could comply by making government announcements available first on a free platform, like the White House website.

Defendants' position that courts lack power to affect the President's choice of "bully pulpit" is "without a precedent." *Johnson*, 71 U.S. at 500. Defendants cite no authority holding that relief comparable to what Plaintiffs seek is beyond a court's power. That gap is no accident. Defendants theorize that the President has limitless authority to use any forum as his "bully pulpit." Mot. 6 (quoting *Trump v. United States*, 603 U.S. 593, 629 (2024)). On that theory, this Court would be powerless to stop the President from commandeering its own proceedings to make them his bully pulpit. The law requires no such thing.

Although courts sometimes confine injunctive relief to subordinates where "Congress has delegated the performance of duties to federal officials subordinate to the President and one or more of them can be named as a defendant" to provide complete relief, it would be "exalting form over substance if the President's acts were held to be beyond the reach of judicial scrutiny when he himself is [a] defendant." *Nat'l Treasury Emps. Union*, 492 F.2d at 346. Defendants claim that President Trump "could and would simply continue to post by himself" in the absence of relief directed against him. Mot. 8. In such cases, and where the injunction touches only a ministerial act like the choice of forum for exclusively posting official pronouncements, the law permits injunctive relief against the President.

The law also permits declaratory relief against the President. Defendants adopt Justice Scalia's view that declaratory relief against the President is improper, a view that attracted no other votes on the Court. *See* Mot. 5–7 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring) ("I think we cannot issue a declaratory judgment against the

President”)). That solitary view is not the law, particularly because a majority of the Court has since adopted the contrary view. *See Utah v. Evans*, 536 U.S. 452, 463–64 (2002) (adopting plurality opinion in *Franklin*, 505 U.S. at 803, establishing redressability for declaratory relief because of “substantial[] likel[ihood] that the President … would abide by an authoritative interpretation”); *see also Clinton*, 524 U.S. at 425 n.9. Indeed, Justice Scalia himself appears to have later abandoned his view. *See Clinton*, 524 U.S. at 463 (Scalia, J., concurring in part) (agreeing court had jurisdiction to award relief, including declaratory judgment against the President).

Nor does *Haaland v. Brackeen*, 599 U.S. 255, 293–94 (2023), help Defendants. It recognized only that redressability is not satisfied “whenever a decision might persuade actors *who are not before the court*,” *id.* at 293 (emphasis added), and the President is before this Court.

**B. Even if the Court cannot bind the President, relief against his subordinates would redress at least some of Plaintiffs’ injuries.**

Even if the Court cannot order the President to stop violating the Constitution, Defendants are wrong that an order enjoining the other Defendants would not provide “an adequate remedy” for purposes of standing. Mot. 7 (quoting *Swan v. Clinton*, 100 F.3d 973, 979–81 (D.C. Cir. 1996)). Redressability requires only that Plaintiffs’ requested relief redress “at least some” of their injuries. *Frey v. City of New York*, 157 F.4th 118, 138 (2d Cir. 2025) (citation omitted). And the Second Circuit has repeatedly rejected Defendants’ all-or-nothing approach by holding that requested relief need not “completely” redress an asserted injury, *Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 521 (2d Cir. 2024), redress “*every*” asserted injury, *Knight v. City of New York*, 164 F.4th 173, 179 (2d Cir. 2026), or “address or prevent all harm,” *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 348–49 (2d Cir. 2009), *rev’d on other grounds*, 564 U.S. 410 (2011).

Defendants ignore Plaintiffs' well-pleaded allegations that President Trump has posted to his Truth Social account 9,000 to 11,000 times since retaking office and that each of Defendants Harp and Scavino "regularly publishes President Trump's Truth Social posts on his behalf," Compl. ¶¶11–12, 33, which the Court must accept as true, drawing all reasonable inferences in Plaintiffs' favor. *See Carter*, 822 F.3d at 57. Defendants instead assert that "the President *could* and *would* simply continue to post by himself." Mot. 7 (emphases added). But to credit that assertion over Plaintiffs' well-pleaded allegations, the Court would have to draw inferences—and make factual presumptions—against Plaintiffs. It would have to presume that the President, without the White House staff who help him post, would set aside enough of his time to personally make every official announcement on Truth Social that he now makes with their help. The governing standard forbids that inference.

The only permissible inference is also the only logical one: Harp and Scavino increase the number of official announcements that President Trump can make on Truth Social, and barring them from facilitating those official announcements while President Trump's account is subject to the Truth API will reduce the frequency and extent of Plaintiffs' injuries by reducing the volume of official announcements to which paying Truth API subscribers have preferential access. For *The Intercept*, that reduction will limit the number of times that other news outlets are unlawfully provided a head start on reporting and reacting to the President's official announcements. *See* Compl. ¶66. For Freedom of the Press Foundation, that reduction will limit the volume of official announcements to which only API subscribers have sure and unrestricted access. *See* Compl. ¶¶68-72. Under settled Second Circuit law, that reduction satisfies the redressability requirement. *See, e.g.*, *Frey*, 157 F.4th at 138.

Nor does the calculus change because redressing Plaintiffs' injuries requires injunctive relief that compels Defendants to refrain from ongoing unconstitutional conduct rather than requiring some specific affirmative action to cure it. *See* Mot. 7–8. Defendants cite nothing for the proposition that injunctions against defendants, whether government officials or private citizens, are *ipso facto* "speculative" unless they require specific affirmative conduct. And courts in this district have recognized the opposite in a First Amendment case involving federal employees, including one of the Defendants here. *See KFAI I*, 302 F. Supp. 3d at 562 ("*Any* declaratory or injunctive relief as to Scavino that results in the unblocking of the individual plaintiffs will redress at least some of their future injury, regardless of whether the President could, theoretically, reblock them subsequently.").

Defendants' cited cases differ from this one in a way that matters. The remedies in *Swan* and *Cook* required those defendants to take specific affirmative actions to reverse specific unlawful actions that gave rise to the claims. *See Swan*, 100 F.3d at 980 (reinstating a federal appointment); *Cook v. Trump*, 804 F. Supp. 3d 14, 45 (D.D.C. 2025) (same). Redressability here, as in any case where defendants are engaged in a course of repeated unlawful acts, cannot be reduced to an order to perform a single task.

## II. The Complaint challenges state action that is subject to constitutional scrutiny.

Defendants contend that "because [Trump Media] is not a state actor, Truth API does not inflict any constitutional injury." Mot. 8 (capitalization omitted); *id.* at 10 (arguing that the Complaint's "allegations are insufficient" because "they fail to show that [Trump Media] engages in state action as it operates Truth API"). But Defendants ask the wrong question by focusing on the wrong actor. President Trump and the other Defendants are government actors whose ongoing, regular use of the Trump Media platform for the exclusive release of

government information qualifies as state action. The Complaint alleges that Defendants are violating the Constitution irrespective of whether Trump Media is a state actor.

And even as to the wrong question, Defendants provide the wrong answer. The facts alleged in the Complaint permit the reasonable inference that Trump Media's conduct qualifies as state action subject to constitutional scrutiny when Trump Media provides preferred access to President Trump's exclusive posts of government information to those who pay for the Truth API.

Whether a private party's conduct is state action turns on "sifting facts and weighing circumstances," *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961), so the motion must be denied where, as here, the allegations permit a reasonable inference of state action and "plaintiffs haven't even gotten discovery yet," *Khalil v. Trustees of Colum. Univ. in City of N.Y.*, 833 F. Supp. 3d 404, 428 (S.D.N.Y. 2026) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).

**A. Defendants' own conduct is state action.**

The Complaint challenges government action by government actors: Defendants "exclusively publish[ing] … official government announcements on Truth Social after the launch of Truth API." Compl. ¶78; *see* Mot. 1, 4, 6. The alleged effect of that government action is two-tier access to official information with preferred access granted to news organizations and others willing to pay money to Trump Media. Compl. ¶¶52–59. Defendants do not dispute that they are engaged in state action when they post official announcements on the Trump Media platform. *See Lindke v. Freed*, 601 U.S. 187, 201 (2024) ("'[G]enerally, a public employee' purports to speak on behalf of the State while speaking 'in his official capacity or' when he uses his speech to fulfill 'his responsibilities pursuant to state law.'") (quoting *West v. Atkins*, 487 U.S. 42, 50

(1988)); *Knight First Amend. Inst. at Colum. Univ. v. Trump*, 953 F.3d 216, 219 (2d Cir. 2020) (mem.), *vacated as moot sub nom. Biden v. KFAI*, 593 U.S. 901 (2021).

That being so, Plaintiffs' constitutional claims do not depend on whether Trump Media is a state actor. Case law recognizes a fundamental distinction between claims against government defendants challenging their unconstitutional involvement in or support of private discrimination (like Plaintiffs' claims here) and claims against a private defendant alleging that it is a state actor. *See Cornelius v. Benevolent Protective Order of Elks*, 382 F. Supp. 1182, 1189 (D. Conn. 1974); *Jackson v. Statler Found.*, 496 F.2d 623, 637 (2d Cir. 1973) (Friendly, J., dissenting from denial of rehearing en banc). The Supreme Court has repeatedly barred government support for private discrimination without holding that the private party was a state actor. In *Norwood v. Harrison*, 413 U.S. 455, 463–65 (1973), the Court held that a state agency could not provide textbooks to private schools "said to be racially discriminatory," not that the private schools were state actors. In *Gilmore v. City of Montgomery*, 417 U.S. 556, 569 (1974), the Court affirmed an injunction prohibiting a city from "permitting exclusive access to public recreational facilities by segregated private schools." And in *Reitman v. Mulkey*, 387 U.S. 369, 373 (1967), the Court upheld a judgment invalidating a constitutional amendment that facilitated discrimination by private landlords; it did not hold that the private landlords were state actors.

These cases reflect the principle that "what cannot be done directly cannot be done indirectly." *Cummings v. Missouri*, 71 U.S. 277, 288 (1866). Defendants could not hold White House press briefings at a private resort that admits only those who pay President Trump's media company. Nor can they route official announcements exclusively to a private platform that sells a head start to those who pay it.

The Complaint does not merely allege that Defendants happen to post information on Truth Social, which happens to have a paid API. The Complaint alleges that President Trump has an ongoing contractual relationship with Trump Media committing him to use the platform, that he is the largest shareholder and profits from the paid API, that Defendants regularly provide exclusive access to official government information through the Trump Media platform, and critically that the financial success of the API depends on Defendants' participation because their "continued exclusive use of Truth Social to post market-moving government information is *necessary* to attract and retain subscribers." Compl. ¶¶24, 39–46, 77–78 (emphasis added). The API is set up specifically to exploit Trump Media's relationship with the President and those who post for him. *See id.* ¶¶52, 54–56, 76–78. Thus, the Complaint plausibly alleges that Defendants' actions "facilitate, reinforce, and support private discrimination" between subscribers and nonsubscribers, *Norwood*, 413 U.S. at 466, and that the government is providing Trump Media with "exclusive access" to government information to further its paid API scheme, *Gilmore*, 417 U.S. at 569. Because the question of whether the government is impermissibly facilitating private discrimination hinges on the "peculiar facts or circumstances present," the Complaint cannot be dismissed on the pleadings. *Id.* at 573 (citation omitted). The Court need go no further to reject Defendants' state action arguments.

**B. The Complaint separately alleges that Trump Media is a state actor.**

Even though Plaintiffs' claims do not hinge on whether Trump Media is engaged in state action when it imposes the Truth API on President Trump's posts, the Complaint sufficiently alleges that it is.

Defendants rely exclusively on the two-part test from *Lugar*, 457 U.S. at 937, but that test is not the only route to state action, *see id.* at 939 (Court expressly did not displace "different tests" for state action). "There is no single test to identify state actions and state actors."

*Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009) (quoting *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004)); *see, e.g.*, *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–305 (2001) (finding state action without first applying part one of the *Lugar* test); *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) (same).

In any event, even under *Lugar*'s two-part test, the Complaint's allegations support the reasonable inference that Trump Media's operation of the paid API for Trump's account is state action. The *Lugar* test asks (1) whether plaintiffs' deprivation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and (2) whether "the party charged with the deprivation [is] a person who may fairly be said to be a state actor." 457 U.S. at 936. Drawing all inferences in Plaintiffs' favor, the Complaint's allegations satisfy both prongs.

**1. The API functions because of a privilege granted by the government.**

Determining whether a private party's conduct qualifies as state action requires "identifying the specific conduct of which the plaintiff complains." *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999)). Here, Plaintiffs challenge the imposition of preferential access to official government information to those who pay to enhance Trump's profits through Trump Media's Truth API scheme. That scheme involves the "exercise of a right or privilege having its source in state authority," *Lugar*, 457 U.S. at 939, because it depends entirely on government actors' (Defendants') use of the platform as an *exclusive* outlet for official government announcements. Compl. ¶¶40–46, 77–78; *see Gilmore*, 417 U.S. at 567–68 (equating city's decision to give discriminatory private schools "exclusive" use of facilities with intentional joint effort to segregate facilities). The Complaint's allegations also reasonably suggest that there is at least a tacit agreement between President Trump and Trump Media about the President's continued use

of the platform for official government statements, so Trump Media can sell preferred access to government information for the financial benefit of Trump Media and personal financial benefit of President Trump. *See* Compl. ¶¶3–4, 40–46, 55, 77–78.

The Truth API and the exclusivity arrangement are thus rooted in the President's official authority to make official pronouncements. *See Trump*, 603 U.S. at 618 ("[S]ome Presidential conduct—for example, speaking to … the American people, certainly can qualify as official even when not obviously connected to a particular constitutional or statutory provision.") (citation omitted). Truth API has nothing to sell but the exercise of presidential authority. It thus relies on a "privilege having its source in state authority." *Lugar*, 457 U.S. at 939. Strip away the President's agreement to continue to use Truth Social as the exclusive outlet for the release of certain official announcements, and Trump Media would have no product to sell for $100,000 per month.

**2. Trump Media acts as a state actor when it sells early access to President Trump's official announcements.**

The Complaint's allegations also support the reasonable inference that Trump Media is a state actor under the entwinement, symbiotic relationship, joint action, and significant encouragement tests, any one of which suffices. *See Fabrikant*, 691 F.3d at 207 (state action exists "when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity functions are entwined with state policies"); *Burton*, 365 U.S. at 723 (articulating the symbiotic relationship test).

***Entwinement.*** The Complaint plausibly alleges entwinement. The test asks whether a private entity is "'entwined with governmental policies' or … government is 'entwined in [its] management or control.'" *Brentwood Academy*, 531 U.S. at 296 (citation omitted). In *Brentwood Academy*, the athletic association was a state actor in part because it was "enjoy[ing] the schools'

moneymaking capacity as its own." *Id.* at 299–301. And in *American Atheists, Inc. v. Port Authority of New York and New Jersey*, 936 F. Supp. 2d 321, 332–33 (S.D.N.Y. 2013), *aff'd*, 760 F.3d 227 (2d Cir. 2014), the court found state action where "but for" the Port Authority's donation of the cross, "the Foundation would not be able to include the artifact in the Museum."

Although "no one fact" may be sufficient, the Complaint identifies a "host of facts" supporting an entwinement theory of state action, *Brentwood Acad.*, 531 U.S. at 295–96, including:

1. President Trump created Trump Media and Truth Social. Compl. ¶¶10, 18–19, 21;
2. A trust of which President Trump is the sole beneficiary is Trump Media's largest shareholder. Compl. ¶¶10, 39; *cf. Horvath*, 362 F.3d at 153 (not controlling a majority of Library's trustees does not "preclude[] a finding" of state action); *contra* Mot. 13, 15;
3. President Trump maintains a "Social Media 6-Hour Exclusive" agreement with Trump Media. Compl. ¶¶40–46; *see Am. Atheists*, 936 F. Supp. 2d at 333 (noting a "Memorandum of Understanding between the Port Authority and the Foundation" as evidence of entwinement);
4. Trump Media has acknowledged in SEC filings that its "success depends" on President Trump and his "politically-related" posts. Compl. ¶¶24, 47; and
5. The paid Truth API scheme could not exist as it does without President Trump's ongoing exclusive posting of official government announcements on the platform. *Id.* ¶77 ("continued exclusive use of Truth Social to post

market-moving government information is *necessary* to attract and retain subscribers") (emphasis added).

As in *Brentwood Academy*, Trump Media is "enjoy[ing] [President Trump's] moneymaking capacity as its own" by profiting off his official announcements. 531 U.S. at 299–301. And Trump Media's own profits circle back to President Trump as the company's largest shareholder. *See* Compl. ¶¶10, 39. As in *American Atheists*, "but for" the President's actions, the Truth API scheme would not exist. 936 F. Supp. 2d at 333; *see* Compl. ¶77.

***Symbiotic relationship.*** The Complaint also alleges state action under the similar symbiotic relationship test. The symbiotic relationship test considers whether "under all the circumstances, the interests of the governmental and private entities are so intertwined that the state must be recognized as 'a joint participant in the challenged activity.'" *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 23 (2d Cir. 1979) (quoting *Burton*, 365 U.S. at 725).

One theme recurs across the cases finding a symbiotic relationship: "whether the [state actor] shares in any profits the private entity has generated from the challenged conduct." *Forbes v. City of New York*, 2008 WL 3539936, at *7 (S.D.N.Y. Aug. 12, 2008). In *Holodnak v. Avco Corp., Avco-Lycoming Div., Stratford, Conn.*, 514 F.2d 285, 289–90 (2d Cir. 1975), for example, "the Government contributed land, buildings, and equipment, and … Avco supplied the labor force, [which] operated for their mutual benefit."

The Complaint alleges that President Trump and Trump Media are financially intertwined in the Truth API scheme for their mutual benefit. As in *Holodnak*, each supplies an essential ingredient—President Trump provides exclusive first access to his official government announcements and Trump Media provides the Truth API technology and product. *See* Compl.

¶¶40–46, 52–56. Neither ingredient is worth anything without the other, and the ongoing arrangement profits both—demonstrating a symbiotic relationship.

Defendants cite a footnote in a concurring and dissenting opinion to suggest that the symbiotic relationship test has been "severely narrowed," Mot. 13, but they cite no binding authority for that proposition. Courts continue to find a symbiotic relationship where a government actor profits from the conduct at issue. *See Murphy v. N.Y. Racing Ass'n, Inc.*, 76 F. Supp. 2d 489, 495 (S.D.N.Y. 1999) (noting that lower courts treat "the public authority's profiting" as "the most significant fact" in *Burton*) (citation omitted). And the Complaint alleges that both the government Defendants and Trump Media are "indispensable elements in the financial success of [the joint venture]" and will profit from it. *Burton*, 365 U.S. at 724; *see* Compl. ¶¶10, 39, 77.

***Joint action.*** The Complaint's allegations also permit the reasonable inference that Trump Media is a state actor on a joint action theory. Such joint action can take the form of a "prearrangement," "custom, or policy," *Forbes*, 2008 WL 3539936, at *5 (quoting *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)), involving "agreement and concerted action," *Harrison v. New York*, 95 F. Supp. 3d 293, 322 (E.D.N.Y. 2015) (citation omitted).

President Trump has an ongoing, contractual exclusivity arrangement with Trump Media and is the company's largest shareholder, and Trump Media operates the Truth API to monetize President Trump's Truth Social posts, which redounds to President Trump's personal financial benefit. Compl. ¶¶39–46, 54. The facts permit the inference of an agreement between President Trump and Trump Media that President Trump will continue to use the platform as the exclusive

outlet for significant official government announcements; otherwise, outsiders would not pay $100,000 per month for an API subscription.

Because the differential access to government information here violates the Constitution, the Complaint's allegations also support the inference that President Trump and Trump Media "share some common goal to violate the plaintiff's rights." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (citation omitted). The joint actors need not intend to violate the law; they need only share the goal of achieving the result the plaintiff challenges. *See, e.g.*, *White v. Moylan*, 554 F. Supp. 2d 263, 267 (D. Conn. 2008) (common goal was to fabricate a basis for an arrest, not to violate the Fourth Amendment); *Betts*, 751 F.3d at 85–86. The Complaint supports the reasonable inference that President Trump and Trump Media agreed to monetize President Trump's power to disclose official government information, to benefit both. Compl. ¶¶2–3, 77–78.

***Significant encouragement.*** The Complaint further alleges that Defendants' exclusivity arrangement provides "significant encouragement" to the pay-for-access scheme sufficient to establish state action. *See Stein*, 541 F.3d at 147–48 & n.9 (finding significant encouragement where prosecutors "so schooled [KPMG] … in the necessity of enforcing [the] … policy that KPMG understood what was expected of it"). The same facts that support a reasonable inference of entwinement, symbiotic relationship, and joint action, including that Trump Media's success remains dependent on the President, also support a plausible claim based on a significant encouragement theory. Compl. ¶¶3–4, 40–46, 55, 77–78.

Thus, even if Plaintiffs' claims depended on attributing Trump Media's operation of the API to the State, the Complaint alleges far more than is needed to survive a motion to dismiss.

## III. The Complaint plausibly alleges that the Truth API scheme violates the First and Fifth Amendments.

The Complaint pleads facts sufficient to plausibly allege claims for violation of the First Amendment under the equal access doctrine (Count I), forum doctrine (Count II), unconstitutional conditions doctrine (Count III), and violation of the Fifth Amendment's equal protection component (Count IV). At the crux of all four claims is the absence of any legitimate government interest in selling early access to official announcements for the President's private profit.

### A. No legitimate interest justifies providing a head start on official announcements to those who pay the President's company (Count I).

Although a President need not talk to press pools or the public, "[o]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media." *Am. Broad. Cos., Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977); *Nicholas v. Bratton*, 376 F. Supp. 3d 232, 259–60 (S.D.N.Y. 2019). Unequal access violates the First Amendment unless it (1) is content-neutral, (2) serves a legitimate government interest, and (3) the benefits of providing unequal access outweigh the benefits of not doing so. *Nicholas*, 376 F. Supp. 3d at 260 (citing *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987)).

Defendants trigger the rule. When they feed President Trump's posts into the Truth API, they make those "public comment[s]" available first to more than ten subscriber organizations, including "some of the media." *Cuomo*, 570 F.2d at 1083; *see* Compl. ¶¶25–35, 52–56, 56–59; *see also* ECF 54 ("PI Opp.") at 12; ECF 61-1 at 2, 4–6, 14 (admitting that the posts are "public" "as soon as the President posts"). So Defendants bear the burden of justifying the unequal terms. *See Nicholas*, 376 F. Supp. 3d at 259–60. They cannot carry it.

The only interest the Truth API serves is the President's private profit, and that is not a government interest at all. Compl. ¶¶5, 88. Trump Media sells the Truth API as a "high margin" product premised on preferential access to "market-moving" government information. Compl. ¶¶55–56. The government receives none of the proceeds, and the price bears no relation to the cost of the service. *See id.* The profits flow to a company whose largest shareholder is the President's trust. *Id.* ¶¶2, 10, 37–39. Public officials have no proprietary interest in their official statements. *See Banks v. Manchester*, 128 U.S. 244, 253 (1888); *Georgia v. PublicResource.Org, Inc.*, 590 U.S. 255, 275 (2020). So they have nothing to sell and no legitimate reason to let their company sell faster access for them.

Defendants barely try to identify another interest. They cite only one case letting the government charge fees as a proprietor. Mot. 20. But those fees funded the government's own operations; the fee here funds the President's private company. *See* Compl. ¶¶36-39, 56. And even a proprietor's fees must be reasonable, which Plaintiffs plausibly allege this one is not. Compl. ¶¶56, 88, 105, 111–13.

Defendants also contend that equal-access precedents do not apply where private actors and public officials impose a restriction together. Mot. 20–21. But multiple leading equal-access precedents involved exactly that: nominally private entities helping impose the restriction. *See Am. Broad. Cos., Inc.*, 570 F.2d at 1081–82 (private candidates for office excluded news organization from election-night party on private property); *Stevens*, 665 F. Supp. at 166 (nominally private racing association prohibited reporter from bringing camera onto racetrack property).

Nor would applying the doctrine here "plant the seed" of a constitutional case in every exchange between officials and the press. Mot. 18 (quoting *Baltimore Sun Co. v. Ehrlich*, 437

F.3d 410, 418 (4th Cir. 2006)). Where unequal access results from inevitable realities of physics or the happenstance decisions of independent third parties, constitutional questions will not arise because there will be no state action. *Contra* Mot. 19. And applying the equal access doctrine here will have no effect on the practice of granting "exclusives" to favored press.[1] When a public official gives an exclusive interview, that official selects a specific intermediary to receive *nonpublic* statements, which the intermediary makes public through the exercise of their own discretion. *See Associated Press v. Budowich*, 780 F. Supp. 3d 32, 53 (D.D.C. 2025). But here, President Trump's posts are public the moment they're transmitted. *See* Compl. ¶57; PI Opp. 12 ("[A]s soon as the President posts, the content of that message is 'public information.'"). Indeed, if the posts were not public, President Trump could be violating securities laws by enabling paying subscribers to trade on material, nonpublic information. *See* ECF 50-1 at 5–6.

Defendants close by arguing that the delay nonsubscribers face from the Truth API—a delay others pay $1.2 million a year to avoid—is too small to matter. Mot. 21. But First Amendment rights do not start and stop based on the magnitude of the burden or the importance of the speech at issue. Both the Supreme Court and the Second Circuit have held that "there is no *de minimis* exception for a speech restriction that lacks sufficient tailoring or justification." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001); *Cornelio v. Connecticut*, 32 F.4th 160, 176 (2d Cir. 2022). To conclude otherwise would create untenable line-drawing questions: is a one-second delay acceptable? What about one minute? An hour?

Slight burdens on First Amendment rights are more likely to *survive* scrutiny, but they still must face it. Otherwise, brief restrictions could be as arbitrary as officials liked. If the

[1] It is far from settled that public officials may discriminate by viewpoint in granting exclusive interviews; Defendants cite only two out-of-circuit cases, one a nonprecedential stay order. *See* Mot. 17–18. Because this case does not involve an "exclusive," however, Plaintiffs assume for the sake of argument that the practice is permissible.

candidates in *Cuomo* had admitted ABC a fraction of a second after NBC and CBS to manage traffic flow, that slight government interest might have justified the delay. *See Nicholas*, 376 F. Supp. 3d at 260. But a delay imposed for a viewpoint-discriminatory reason, or for no legitimate reason, would fail, just as this one does. *See Stevens*, 665 F. Supp. at 175 ("When some members of the press are given access … the state cannot arbitrarily impose limits on other press representatives' access to the news.").

Nor do Plaintiffs ask Defendants to do the "impossible." Mot. 19. Plaintiffs claim no freestanding right to information or to their preferred method of gathering it. *Contra* Mot. 17 (citing *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)). If the Truth API did not exist, Plaintiffs could not insist that anyone create it. But by choosing to use the Truth API, Defendants have raised the floor on how "expeditiously" access can be provided. *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021) (quoting *Doe v. Pub. Citizen*, 749 F.3d 246, 273 (4th Cir. 2014)). As long as that preferred access is available to some, they must provide it to Plaintiffs or give a legitimate reason for refusing.

### B. The head start restricts access to designated public fora without narrow tailoring (Count II).

As the Complaint alleges, Defendants' early-access scheme unlawfully restricts access to designated public fora: President Trump's posts. Compl. ¶¶97–99, 101, 103. In designated public fora, even content-neutral restrictions must be "narrowly tailored to serve a significant government interest" and "leave[] open ample alternative channels of communications." *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir. 1991) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)); *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 880 F. Supp. 2d 456, 469 (S.D.N.Y. 2012). Plaintiffs have plausibly

alleged that Truth API's restrictions fail these criteria because they are not narrowly tailored to any legitimate government interest.

President Trump's posts constitute designated public fora because, when making them, he intends to open public spaces to speak in the comments. Compl. ¶¶96–97; *see KFAI v. Trump ("KFAI II")*, 928 F.3d 226, 237 (2d Cir. 2019), *vacated as moot sub nom. Biden v. KFAI*, 593 U.S. 901 (2021). Defendants apparently concede that if public forum analysis applies, President Trump's posts constitute designated public fora. They argue, instead, that public forum analysis should not apply at all or should be modified to apply some more generous standard. Mot. 21–23. Both arguments fail.

*First*, Defendants warn that forum doctrine should not extend "in a mechanical way" to contexts where it may not be appropriate. *See* Mot. 23 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672–73 (1998)). But courts have already applied forum doctrine to public officials' social media accounts. *See Lindke*, 601 U.S. at 198; *KFAI II*, 928 F.3d at 237 (concluding that President Trump's tweets are designated public fora). Like streets and parks, these spaces exist to facilitate public discourse and the exchange of views, and they are treated no differently from physical spaces for the same. *See Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Defendants' attempts to distinguish *Lindke* rehash the state action arguments already refuted above. *See* Part II.

*Second*, Defendants assert that if public forum analysis does apply, the Court should require only a showing that the Truth API's restriction on access to that forum is "reasonable." Mot. 22–25. But because President Trump's posts are (concededly) designated public fora, restrictions must be content-neutral, narrowly tailored to achieve a significant government

interest, and leave open ample alternative avenues for speech. *See Travis*, 927 F.2d at 692. Nothing justifies applying a lower standard.

Defendants offer two reasons for a "reasonableness" standard. First, Plaintiffs purportedly seek to use the forum as listeners rather than speakers. Mot. 22–23 (citing *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022)). But forum analysis depends on the nature of a space and the government's intent in creating it, not on whether those who seek access want to speak or listen. *See Paulsen v. County of Nassau*, 925 F.2d 65, 69 (2d Cir. 1991). Courts apply the same First Amendment test when the government seeks to exclude listeners from a forum as they apply to exclusions of speakers. *McKenna v. Nassau County*, 2023 WL 8455670, at *8 (E.D.N.Y. Dec. 6, 2023) (evaluating exclusion of listener from forum); *Nicholas*, 376 F. Supp. 3d at 270 (same). Such a distinction would undermine First Amendment principles. "[T]he dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them. It would be a barren marketplace of ideas that had only sellers and no buyers." *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

In support, Defendants rely on the D.C. Circuit's decision in *Price*. *See* Mot. 22–25. But *Price* is inapposite, and it was wrongly decided. *See Price,* 45 F.4th at 1082 (Tatel, J., dissenting) (criticizing majority for degrading First Amendment protections by "disaggregat[ing] speech creation and dissemination" "for the very first time"). The plaintiff in *Price* was not engaged in newsgathering, 45 F.4th at 1067, and the permit-and-fee regime at issue completely exempted newsgathering, *id.* at 1064. Even under *Price*'s more relaxed test, a restriction that reached newsgathering would likely have been considered "unreasonable." *See id.* at 1071, 1075. More generally, inasmuch as *Price* suggested that the proper level of scrutiny applies to the *type* of First-Amendment-protected activity a person seeks to undertake in a public forum, it is wrong.

Second, Defendants analogize to cases in which a public entity has a statutory mandate to operate like a business, giving the government greater latitude to charge commercial fees in its role as a proprietor. Mot. 25 (citing *Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*, 745 F.2d 767, 774 (2d Cir. 1984)). But those cases have no bearing on the actions of the Defendant public officials, who are not and cannot be acting as "proprietors" when they post government announcements on social media for the purpose of sharing information with a broad audience. *Banks*, 128 U.S. at 253; *PublicResource.Org*, 590 U.S. at 275. The Court need not consider the "proprietor" cases unless the Court's analysis rests on Trump Media's functions as a state actor. And even so, the proprietor cases give Trump Media no shelter.

The "proprietor" cases fit within the ordinary law of public fora; they do not sit outside it. Courts sometimes treat the government's proprietary role as evidence that it did not intend to open a space for public discourse, *see N.Y. Mag. v. Metro. Transp. Auth.*, 136 F.3d 123, 129–30 (2d Cir. 1998), or weigh that role in asking whether a restriction is reasonable "in light of the purpose of the [nonpublic] forum and all the surrounding circumstances," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985). Either way, what matters is that the forum has a purpose other than the exchange of views, like getting commuters where they need to go, *see Gannett*, 745 F.2d at 774, or facilitating air travel, *see Int'l Soc'y for Krishna Consciousness, Inc. v. Lee ("ISKCON")*, 505 U.S. 672, 678, 682 (1992). In *Gannett,* 745 F.2d at 772, for example, courts upheld fees that funded an "efficient, self-sufficient operation" in transit hubs where expression was incidental to the forum's purpose. *See also Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1308 (11th Cir. 2003) (en banc).

The facts here distinguish the proprietor cases in almost every respect. *First*, President Trump intends to open each of his posts to public comment at the moment he posts. *See KFAI II*,

928 F.3d at 232. *Second*, President Trump has no non-speech-related business purpose with which unrestricted access to Truth Social posts might interfere—nor, to the extent it matters, does Trump Media. Unlike cases that deal with airports, train stations, post offices, public buses, and the like, Truth Social is designed entirely to facilitate speech between users and the public, and it faces no space limitations or other constraints that require it to distinguish among groups of users—something it had never done, or needed to do, in the years leading up to August 2026. *See* Compl. ¶¶10, 19, 22–23, 52. By imposing arbitrary distinctions between different classes of these public listeners, the Truth API is inconsistent with the purpose of the forum, and therefore it fails even the "reasonableness" test. *See ISKCON*, 505 U.S. at 683 (articulating "reasonableness" test); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974) (plurality opinion) (explaining that restrictions imposed by proprietors may not be "arbitrary, capricious, or invidious").

Plaintiffs have alleged restrictions imposed by Truth API that fail under any forum analysis: they cannot survive scrutiny as restrictions in a designated public forum, nor are they reasonable restrictions in a nonpublic one.

### C. The scheme makes faster access conditional on forfeiting First Amendment rights (Count III).

Plaintiffs have alleged that the Truth API scheme imposes an unconstitutional condition, forcing Plaintiffs to choose between access to faster, more accurate government information and their constitutional rights. The unconstitutional conditions doctrine prohibits the government from "burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 150 F.4th 76, 96 (2d Cir. 2025) (quoting *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013)).

Defendants' posting of government announcements subject to the Truth API presents a valuable benefit, both because the scheme offers faster, machine-readable access to government information—a key competitive advantage in the news industry—and because it offers a historical archive of President Trump's posts in a searchable format. Compl. ¶¶53, 56, 58. These features surpass the low bar that a benefit be objectively desirable, *Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014), and Defendants do not argue otherwise.

But to access that benefit, Plaintiffs must forfeit their constitutional rights. *First*, while Trump Media is engaged in state action (*see* Part II.B), it is a private actor, so to access the benefit Plaintiffs must relinquish their constitutional right not to subsidize private speakers[2] with whom they disagree: namely Trump Media, which "speaks" when it exercises its editorial discretion to moderate content on Truth Social. *See* Compl. ¶¶49, 66, 68; *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024); *Janus v. AFSCME, Council 31*, 585 U.S. 878, 894 (2018) (requiring subsidization of private entity engaged in state action violated First Amendment).[3] *Janus* triggers (at least) exacting scrutiny, 585 U.S. at 894, which Defendants do not argue they satisfy.

*Second*, even if Trump Media were considered a government agency, the challenged scheme forces Plaintiffs to relinquish their constitutional right not to be charged excessive government fees for the privilege of exercising their First Amendment rights. *See* Compl. ¶¶56, 66; *Murdock v. Pennsylvania*, 319 U.S. 105, 113–15 (1943); *Nat'l Awareness Found. v. Abrams*,

[2] Defendants point out that the compelled subsidy doctrine does not apply to fees paid to the government. Mot. 24 (citing *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 229 (2000)). This is true, but irrelevant. Trump Media is not the government, even if it engages in state action when operating the API as to President Trump's posts.

[3] Defendants' reliance on *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006), *see* Mot. 24, is misplaced because Plaintiffs raise a compelled-subsidy claim, not a compelled-speech claim. Compelled subsidies are evaluated under *Janus*; the unions there, like Truth Social here, expressed many messages. *See Janus*, 585 U.S. at 893.

50 F.3d 1159, 1165 (2d Cir. 1995) (collecting cases). These precedents prohibit state actors from generating profits[4] by imposing fees for the exercise of First Amendment rights, allowing only fees that "defray the expenses" the speech imposes on governments. *See Murdock*, 319 U.S. at 113–14. The $100,000 per-month fee for accessing Truth API is avowedly "high margin" and violates this principle. Compl. ¶56. Either way, the Truth API scheme imposes an unconstitutional condition.

**D. Selling early access to official speech for the President's private profit serves no legitimate government interest (Count IV).**

Plaintiffs have plausibly alleged that Defendants are violating the Fifth Amendment's equal protection provision by granting differential access to President Trump's official government statements to those who pay the President's media company, with no legitimate government interest. Compl. ¶¶115–22. Defendants claim that the Fifth Amendment's equal protection component does not restrict "the President's choice in [social media] platform." Mot. 27. This assertion is wrong; there is no social media exception to the Fifth Amendment. When the government "distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause," and such distinctions must, at a minimum, "rationally further[] a legitimate [government] purpose." *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 618 (1985) (statute failed rational-basis scrutiny where it distributed an "economic benefit" on "the basis of residence" without any "identifiable state interest" in doing so). Defendants' own hypothetical—an exclusive interview with a paywalled outlet—shows the difference. Mot. 27. Such an interview might serve a legitimate interest in keeping the public informed through multiple channels. But selling advance access to public statements for the President's personal profit does not. *See* Part III.A.

[4] As explained above, the cases treating government actors as "proprietors" who may impose profit-driven fees for speech do not apply in this case. *See* Part III.B.

Defendants are wrong that no government actor here has made a classification subject to the Fifth Amendment. Mot. 26. Each Defendant is a government actor, and Plaintiffs challenge *their* posting of government announcements subject to the two-tier Truth API scheme. That a private company is involved in the scheme does not free Defendants from the Constitution's strictures. *See Burton*, 365 U.S. at 724–25. Even if Trump Media's choice to operate the API is not state action (it is when applied to the President's posts, *see* Part II.B), the President himself made the unconstitutional decisions to sign the exclusivity contract with Trump Media and to consistently post first and exclusively on Truth Social, thereby granting unequal access to government information on the basis of a recipient's willingness to pay the President's company $100,000 per month. Compl. ¶¶33, 36–46. Defendants' choice to post there exclusively while knowing the President's posts will be subject to the API creates an irrational governmental classification in violation of the Fifth Amendment.

Defendants' only rationale—that a "commercially rational pricing distinction easily meets rational-basis review," Mot. 27—might work if the government set the fee to raise its own revenue. *See County of Rockland v. Triborough Bridge & Tunnel Auth.*, 181 F.4th 249, 259–60 (2d Cir. 2026). That is not what is happening here. The fee enriches the President's company, not the public fisc, and enriching the President (and his company) is no legitimate government purpose. *See* Part III.A.

Because Plaintiffs plausibly allege that no legitimate government interest justifies Defendants' actions and their means are irrational, the Truth API scheme fails equal protection scrutiny.

## CONCLUSION

This Court should therefore deny Defendants' motion.

Dated: November 13, 2026

Respectfully Submitted,

*/s/ Barbara J. Chisholm*

Scott A. Kronland
Barbara J. Chisholm
Matthew J. Murray
Marisa C. Lowe
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, California 94108
Tel. 415-421-7151
Fax. 415-362-8064
skronland@altber.com
bchisholm@altber.com
mmurray@altber.com
mlowe@altber.com

Nikhel S. Sus
Jonathan E. Maier
Stuart C. McPhail
CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
nsus@citizensforethics.org
jmaier@citizensforethics.org
smcphail@citizensforethics.org

John Langford
Stacy Livingston
David A. Schulz
MEDIA FREEDOM & INFORMATION ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
Tel. (203) 432-2366
Fax (203) 432-3034
john.langford@ylsclinics.org

Brendan Ballou
Andrea Dobson-Forsee
PUBLIC INTEGRITY PROJECT FUND
1763 Columbia Rd. NW Ste. 175
Washington, DC 20009
(917) 684-3900
ballou@publicintegrityproject.org

*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

I certify that this memorandum complies with the 8,750 word limit of Local Rule 7.1(c). Including footnotes, but excluding the caption, tables, signature blocks, and required certificate, this memorandum contains 8,451 words according to Microsoft Word's word count.

*/s/ Barbara J. Chisholm*